IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02048-REB-KLM

(Consolidated with Civil Action No. 08-cv-02055-CMA-CBS, 08-cv-02078-MSK-BNB, 08-cv-02267-MSK-CBS, 08-cv-02420-PAB, 08-cv-02603-MSK-BNB)

In re SPECTRANETICS CORPORATION SECURITIES LITIGATION

---

**DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT AND MEMORANDUM IN SUPPORT THEREOF**

---

Defendants The Spectranetics Corporation ("Spectranetics" or the "Company"), Guy A. Childs, Emile Geisenheimer, Jonathan W. McGuire, John G. Schulte and Craig M. Walker, M.D. (the "Individual Defendants" and collectively with Spectranetics the "Defendants") respectfully move to dismiss Lead Plaintiff ("Plaintiff")'s Consolidated Class Action Complaint (the "CAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "Reform Act"). Pursuant to REB Civ. Practice Standard V.I.1., Defendants have read this Court's Practice Standards and certify that they have complied with such standards in this motion.[1]

---

[1]    While D. Colo. L.R. 7.1A does not require a party to confer concerning a motion under Fed. R. Civ. P. 12, Defendants informed Plaintiff of the bases for this motion in a filing on 9/1/2009 and in an email dated 9/10/1009.  Plaintiff did not respond to the Defendants' email but based on discussions concerning the 9/1/2009 filing, Defendants believe that Plaintiff does **not** consent to the relief requested and intends to oppose the motion.

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................2

SUMMARY OF THE CONSOLIDATED AMENDED COMPLAINT ...................................4

I.      Spectranetics' Products Help Clear Blocked Arteries In the Heart And Legs
        Without Dangerous Surgery...................................................................................4

II.     Spectranetics Never Sold Any Wires Or Balloons Manufactured Outside the
        United States. ......................................................................................................6

III.    The Government Executes A Search Warrant Based On Incorrect Information
        From A Terminated Company Employee................................................................7

IV.     Stockholders Sue Spectranetics Claiming It Should Have Accused Itself Of
        Wrongdoing In Its Public Filings...........................................................................8

BACKGROUND ON FDA REGULATION OF OFF-LABEL USES OF MEDICAL
        DEVICES ..............................................................................................................9

LEGAL STANDARD ...................................................................................................12

ARGUMENT ...............................................................................................................13

I.      Defendants Had No Duty To Disclose Uncharged Bad Acts Related To Alleged
        Violations Of The Food, Drug & Cosmetic Act. ...................................................13

        A.      Spectranetics Made No Statements Rendered Misleading By Alleged Off-
                Label Promotion For ISR..........................................................................19

                1.      Spectranetics Did Not Become Obligated to Accuse Itself of
                        Wrongdoing Based On A Risk Disclosure Concerning Potential
                        Product Liability Claims. ................................................................19

                2.      Spectranetics Had No Duty to Disclose Off-Label Promotion For
                        ISR Simply Because It Mentioned ISR in its Public Statements....23

                3.      Spectranetics Had No Duty to Accuse Itself of Wrongdoing by
                        Reporting Accurate Financials.......................................................26

        B.      Spectranetics Had No To Duty To Disclose Purported Unapproved Uses
                of Third-Party Devices Based On Accurate Statements Of The Law. ......27

II.     Plaintiff's Conclusory And Unsupported Allegations Fail To Meet the Exacting
        Standards of the Reform Act And Tenth Circuit Law...........................................29

        A.      Plaintiff's Primary Sources Do Not Provide Sufficient Factual Support For
                Plaintiff's Allegations. .................................................................................30

        B.      Plaintiff Cannot Adopt An Unreliable Complaint From A Former Company
                Employee. ....................................................................................................30

        C.      Plaintiff Cannot Rely On Unsupported Claims From A Former Company
                Employee. ....................................................................................................31

        D.      The Generalized "Facts" Attributed To Plaintiff's Sources Do Not
                Demonstrate Fraud .....................................................................................32

        E.      Plaintiff Engages In Pleading Games To Hide The Lack Of Support For Its
                Claims. .........................................................................................................34

III.    Plaintiff Has Not Pled Any Material Misstatements Or Omissions. .....................35

IV.     Plaintiff Has Failed To Allege Scienter Given That It Can Offer No Motive Or
        Particularized Facts Demonstrating Intent To Defraud. ......................................37

        A.      The Defendants Acquired Stock During The Class Period Thereby
                Undermining Any Inference Of Scienter......................................................38

        B.      Plaintiff Has Not Alleged Recklessness That Reflects A Danger Of
                Misleading Investors. ..................................................................................39

        C.      Plaintiff's Allegations Taken As A Whole In Fact Demonstrate That
                Defendants Did NOT Act With Scienter. ....................................................42

V.      Plaintiff Has Failed To Allege Loss Causation Because The CAC Does Not
        Identify Any Corrective Disclosures. ...................................................................43

VI.     Plaintiff Relies Upon Discredited Doctrines........................................................44

        A.      Plaintiff's Attempt To Reinvigorate The Abrogated Group Pleading
                Doctrine Fails. .............................................................................................45

        B.      Plaintiff's Scheme Liability Claim Fails Because It Is Based Solely On
                Misstatements and Plaintiff Has Not Adequately Pled Reliance...............47

        C.      Plaintiff Has Failed to Plead Control Person Liability. ...............................49

CONCLUSION...............................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

Abrams v. Baker Hughes, Inc.,
  292 F.3d 424 (5th Cir. 2002) ...................................................................................34

Adams v. Kinder Morgan, Inc.,
  340 F.3d 1083 (10th Cir. 2003).......................................................................... passim

Anderson v. Abbott Labs.,
  140 F. Supp. 2d 894 (N.D. Ill. 2001) ...................................................................24, 28

Andropolis v. Red Robin Gourmet Burgers, Inc.,
  505 F. Supp. 2d 662 (D. Colo. 2007) ..................................................................35, 38

Avon Pension Fund v. GlaxoSmithKline PLC,
  No. 08-4363-CV, 2009 WL 2591173 (2d Cir. Aug. 24, 2009).....................................39

Backman v. Polaroid Corp.,
  910 F.2d 10 (1st Cir. 1990) ....................................................................................24

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007)...............................................................................................33

Braintree Labs., Inc. v. Nephro-Tech, Inc.,
  No. 96-2459-JWL, 1997 WL 94237 (D. Kan. Feb. 26, 1997) .....................................16

Brody v. Transitional Hosp. Corp.,
  280 F.3d 997 (9th Cir. 2002)...................................................................................24

Buckman Co. v. Plaintiffs' Legal Comm.,
  531 U.S. 341 (2001).............................................................................................5, 9

Calif. Pub. Employees' Ret. Sys. v. Chubb Corp.,
  394 F.3d 126 (3d Cir. 2004)....................................................................................32

Citron v. Daniell,
  796 F. Supp. 649 (D. Conn. 1992)...........................................................................15

City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc.,
  388 F. Supp. 2d 932  (S.D. Ind. 2005) .....................................................................44

City of Phila. v. Fleming Cos., Inc.,
  264 F.3d 1245 (10th Cir. 2001) ........................................................................... passim

Cottrell, Ltd. v. Biotrol Int'l, Inc.,
  191 F.3d 1248 (10th Cir. 1999) ........................................................................... 16, 17

Cozzarelli v. Inspire Pharm., Inc.,
  549 F.3d 618 (4th Cir. 2008) ..................................................................................... 41

D.E. & J Ltd. P'ship v. Conaway,
  284 F. Supp. 2d 719 (E.D. Mich. 2003) ...................................................................... 46

Del Giudice v. S.A.C. Capital Mgmt., LLC,
  No. 06-1413(SRC), 2009 WL 424368 (D.N.J. Feb. 19, 2009) .................................... 31

Desai v. Deutsche Bank Sec. Ltd,
  573 F.3d 931 (9th Cir. 2009) ...................................................................................... 49

Dura Pharm., Inc. v. Broudo,
  544 U.S. 336 (2005) ..................................................................................... 3, 12, 43

Funke v. Life Fin. Corp.,
  237 F. Supp. 2d 458 (S.D.N.Y. 2002) ......................................................................... 42

Gallagher v. Abbott Labs.,
  269 F.3d 806 (7th Cir. 2001) ............................................................................... 14, 24

Galvin v. McCarthy,
  545 F. Supp. 2d 1176 (D. Colo. 2008) ........................................................................ 37

Garfield v. NDC Health Corp.,
  466 F.3d 1255 (11th Cir. 2006) .................................................................................. 38

GFF Corp. v. Assoc. Wholesale Grocers, Inc.,
  130 F.3d 1381 (10th Cir. 1997) .................................................................................. 40

Glassman v. Computervision Corp.,
  90 F.3d 617 (1st Cir. 1996) ........................................................................................ 35

Greene v. Horizon/CMS Healthcare Corp.,
  No. CIV. 97-114JP/DJS, 1998 WL 2030956 (D.N.M. July 13, 1998) .......................... 46

Greenstone v. Cambex Corp.,
  777 F. Supp. 88 (D. Mass. 1991) ............................................................................... 26

Grossman v. Novell, Inc.,
   120 F.3d 1112 (10th Cir. 1997).............................................................................. passim

Higginbotham v. Baxter Int'l, Inc.,
   495 F.3d 753 (7th Cir. 2007)................................................................................. 31, 32

Horizon Asset Mgmt., Inc. v. H&R Block, Inc.,
   No. 08-1593, __ F.3d __,
   2009 WL 2870505 (8th Cir. Sept. 9, 2009)................................................................. 12

In re Am. Bus. Fin. Servs., Inc. Sec. Litig.,
   413 F. Supp. 2d 378 (E.D. Pa. 2005)........................................................................ 46

In re Carter-Wallace, Inc. Sec. Litig.,
   150 F.3d 153 (2d Cir. 1998)..................................................................................... 25

In re Ceridian Corp. Sec. Litig.,
   542 F.3d 240 (8th Cir. 2008) ................................................................................... 41

In re Citigroup, Inc., Sec. Litig.,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ....................................................................... 27

In re Connetics Corp. Sec. Litig.,
   542 F. Supp. 2d 996 (N.D. Cal. 2008)........................................................................ 31

In re Epogen & Aranesp Off-Label Marketing & Sales Practices Litig.,
   590 F. Supp. 2d 1282 (C.D. Cal. 2008)...................................................................... 16

In re FBR Inc. Sec. Litig.,
   544 F. Supp. 2d 346 (S.D.N.Y. 2008) ........................................................... 15, 20, 28

In re First Union Corp. Sec. Litig.,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) ....................................................................... 39

In re FX Energy, Inc. Sec. Litig.,
   No. 2:07-CV-874 CW, 2009 WL 1812828 (D. Utah. June 25, 2009).............. 13, 31, 32

In re Gilead Sciences Sec. Litig.,
   No. C03-4999 MJJ, 2005 WL 181885 (N.D. Cal. Jan. 26, 2005) ............................... 36

In re GlaxoSmithKline PLC Sec. Litig.,
   No. 05 Civ. 3751(LAP), 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) .......................... 36

In re GlenFed, Inc. Sec. Litig.,
   60 F.3d 591 (9th Cir. 1995)...................................................................................... 46

In re Gupta Corp. Sec. Litig.,
   900 F. Supp. 1217 (N.D. Cal. 1994)...........................................................................46

In re Hansen Natural Corp. Sec. Litig.,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007)......................................................................44

In re Humphrey Hospitality Trust, Inc. Sec. Litig.,
   219 F. Supp. 2d 675 (D. Md. 2002).............................................................................39

In re Impac Mortgage Holdings, Inc. Sec. Litig.,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008)......................................................................46

In re K-tel Int'l, Inc. Sec. Litig.,
   300 F.3d 881 (8th Cir. 2002) ...............................................................................38, 40

In re Leapfrog Enters., Inc. Sec. Litig.,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007)......................................................................20

In re Maxim Integrated Prod., Inc. Sec. Litig.,
   __ F. Supp. 2d __, 2009 WL 2136939 (N.D. Cal. July 16, 2009) .........................43, 44

In re Nat'l Century Fin. Enter., Inc.,
   504 F. Supp. 2d 287 (S.D. Ohio 2007)..................................................................46, 47

In re PEC Solutions, Inc. Sec. Litig.,
   418 F.3d 379 (4th Cir. 2005) ......................................................................................38

In re Qwest Comm. Int'l Sec. Litig.,
   387 F. Supp. 2d 1130 (D. Colo. 2005) ........................................................................45

In re Silicon Graphics Inc. Sec. Litig.,
   183 F.3d 970 (9th Cir. 1999) ......................................................................................34

In re Sofamor Danek Group, Inc.,
   123 F.3d 394 (6th Cir. 1997) ........................................................................14, 18, 26

In re Take-Two Interactive Sec. Litig.,
   551 F. Supp. 2d 247  (S.D.N.Y. 2008) ........................................................................42

In re Teledyne Def. Contracting Deriv. Litig.,
   849 F. Supp. 1369 (C.D. Cal. 1993)............................................................................15

In re The Baan Co. Sec. Litig.,
   103 F. Supp. 2d 1 (D.D.C. 2000) ...............................................................................46

In re The Vantive Corp. Sec. Litig.,
   283 F.3d 1079 (9th Cir. 2002)....................................................................................39

In re Wet Seal, Inc. Sec. Litig.,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007).....................................................................22

In re Williams Sec. Litig.—WCG Subclass,
   558 F.3d 1130 (10th Cir. 2009)............................................................................43, 44

Ind. Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,
   537 F.3d 527 (5th Cir. 2008).....................................................................................38

Ind. St. Dist. Council v. Omnicare, Inc.,
   527 F. Supp. 2d 698 (E.D. Kent. 2007)....................................................................28

Joseph v. Wiles,
   223 F.3d 1155 (10th Cir. 2000) ................................................................................49

Karacand v. Edwards,
   53 F. Supp. 2d 1236 (D. Utah 1999)...................................................................14, 26

Kemp v. Medtronic, Inc.,
   231 F.3d 216 (6th Cir. 2000).....................................................................................16

Lautenberg Found. v. Madoff,
   No. 09-816 (SRC), 2009 WL 2928913 (D.N.J. Sept. 9, 2009)...................................47

Lentell v. Merrill Lynch & Co., Inc.,
   396 F.3d 161 (2d Cir. 2005).......................................................................................47

Lewis v. Chrysler Corp.,
   949 F.2d 644 (3d Cir. 1991).......................................................................................15

Ley v. Visteon Corp.,
   543 F.3d 801 (6th Cir. 2008)......................................................................................22

Maher v. Durango Metals, Inc.,
   144 F.3d 1302 (10th Cir. 1998)..................................................................................49

Makor Issues & Rights, Ltd. v. Tellabs, Inc.,
   437 F.3d 588, 602-03 (7th Cir. 2006)........................................................................45

McDonald v. Kinder-Morgan, Inc.,
   287 F.3d 992 (10th Cir. 2002)..............................................................................24, 27

Med Safe Nw., Inc. v. Medvial, Inc.,
  1 Fed. Appx. 795 (10th Cir. 2001)..............................................................................14

Medtronic, Inc. v. Lohr,
  518 U.S. 470 (1996)..................................................................................................22

Merrell Dow Pharms. Inc. v. Thompson,
  478 U.S. 804 (1986)..................................................................................................16

Mizzaro v. Home Depot, Inc.,
  544 F.3d 1230 (11th Cir. 2008).............................................................................12, 40

Oran v. Stafford,
  226 F.3d 275 (3d Cir. 2000)......................................................................................25

Paracor Fin., Inc. v. General Electric Cap. Corp.,
  96 F.3d 1151 (9th Cir. 1996) .....................................................................................49

PDK Labs, Inc. v. Friedlander,
  103 F.3d 1105 (2d Cir. 1997).....................................................................................16

Polar Int'l Brokerage Corp. v. Reeve,
  108 F. Supp. 2d 225 (S.D.N.Y. 2000) ........................................................................46

PR Diamonds, Inc. v. Chandler,
  364 F.3d 671 (6th Cir. 2004).....................................................................................38

Resnik v. Swartz,
  303 F.3d 147 (2d Cir. 2002)......................................................................................14

Riegel v. Medtronic, Inc.,
  128 S. Ct. 999 (2008)................................................................................................22

Roeder v. Alpha Indust., Inc.,
  814 F.2d 22 (1st Cir. 1987) ...................................................................................14, 15

Searls v. Glasser,
  64 F.3d 1061 (7th Cir. 1995) .....................................................................................38

Shriners Hosp. for Children v. Qwest Comm. Int'l, Inc.,
  No. 04-CV-0781-REB-CBS, 2005 WL 2350569 (D. Colo. Sept. 23, 2005) ................38

Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,
  365 F.3d 353 (5th Cir. 2004)......................................................................................45

Stoneridge Investment Partners v. Scientific-Atlanta, Inc.,
  128 S. Ct. 761 (2008)...........................................................................................44, 48

TCS Cap. Mgmt., LLC v. APAX Partners, LP,
  No. 06-CV-13447(CM), 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008)...........................47

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
  551 U.S. 308 (2007)...............................................................................13, 37, 40, 42

The Sorkin, LLC v. Fischer Imaging Corp.,
  No. Civ.A. 03-CV-00631-R, 2005 WL 1459735 (D. Colo. June 21, 2005)............32, 49

The Winer Family Trust v. Queen,
  503 F.3d 319 (3d Cir. 2007)..............................................................................24, 45

United States v. Crop Growers Corp.,
  954 F. Supp. 335 (D.D.C. 1997) .............................................................................15

United States v. Matthews,
  787 F.2d 38 (2d Cir. 1986).....................................................................................15

Washington Legal Found. v. Friedman,
  13 F. Supp. 2d 51, 74 (D.D.C. 1998) ......................................................................11

Washington Legal Found. v. Henney,
  202 F.3d 331 (D.C. Cir. 2000).........................................................................6, 9, 11

Washington Legal Found. v. Henney,
  56 F. Supp. 2d 81 (D.D.C. 1999) ...........................................................................11

Wojtunik v. Kealy,
  394 F. Supp. 2d 1149 (D. Ariz. 2005) .....................................................................46

Zeid v. Kimberley,
  930 F. Supp. 431 (N.D. Cal. 1996)..........................................................................20

Zucco Partners, LLC v. Digimarc Corp.,
  552 F.3d 981 (9th Cir. 2009) .................................................................................38

**Statutes, Regulations & Rules**

15 U.S.C § 78j ...................................................................................... passim

15 U.S.C. § 78t..............................................................................................49

15 U.S.C. § 78u ........................................................................12, 13, 26, 29

17 C.F.R. § 229.103 ...................................................................................................... 14

17 C.F.R. § 230.405 ...................................................................................................... 49

17 C.F.R. § 240.10b-5 ............................................................................................ passim

17 C.F.R. 240.10b-5 ...................................................................................................... 12

21 U.S.C. § 360 ............................................................................................................. 10

Federal Rule of Civil Procedure 11 ............................................................................... 30

Federal Rule of Civil Procedure 9 ................................................................................. 12

## Other Authorities

Krista Hessler Carver, "A Global View of the First Amendment Constraints on FDA," 63
   Food D. L.J. 151 (2008) ............................................................................................ 11

Ralph F. Hall & Elizabeth S. Sobotka, "Inconsistent Government Policies:  Why FDA
   Off-Label Regulation Cannot Survive First Amendment Review Under Greater New
   Orleans," 62 Food D. L.J. 1 (2007) ........................................................................... 11

## INTRODUCTION

Plaintiff's CAC wrongly struggles to morph Spectranetics' potential regulatory problems with the Food & Drug Administration ("FDA") into a claim of securities fraud. This effort fails because courts have uniformly held that companies owe no duty to their stockholders to accuse themselves of wrongdoing or to disclose the type of information allegedly omitted in the CAC. The securities laws do not require companies to commit the equivalent of legal harakiri whereby they admit that they may have broken the law. Instead, companies need only disclose pending legal proceedings or proceedings known to be contemplated by the government. Plaintiff does not and cannot allege that Spectranetics did not fully comply with that obligation.

These general principles have even more force where the alleged wrongdoing involves purported violations of FDA rules. Congress prohibited private plaintiffs from attempting to enforce violations of FDA rules and regulations. Any claim that attempts to make an end-run around this ban by asserting violations of FDA rules and regulations under the guise of other statutes must be dismissed. Plaintiff here is trying to do exactly that as the CAC contains more citations to various FDA regulations than it does to the securities laws. Because Defendants fully complied with their disclosure duties and because Plaintiff cannot circumvent the bar against private actions under FDA rules, the lawsuit must be dismissed.

Plaintiff's attempt to fit the square peg of alleged FDA violations into the round hole of Section 10(b) of the Securities Exchange Act affects its ability – or lack thereof – to satisfy the exacting pleading standards applicable to each element of its securities

fraud claim.  Defendants never made any false or misleading statements during the class period.  Plaintiff also cannot allege that the statements it challenges were materially misleading because Spectranetics' alleged violations of FDA regulations had no affect on Spectranetics' bottom line.  Plaintiff offers speculation and conjecture on materiality but does not allege any concrete facts that establish that Spectranetics made significant money from off-label uses of its products, let alone off-label uses that resulted from promotion.

Plaintiff has also failed to allege that Spectranetics or any of the defendants acted with scienter.  Nobody had a motive to artificially inflate Spectranetics' stock price, and, indeed, nearly all of the Individual Defendants purchased – and none sold – stock during the class period.  Plaintiff's otherwise conclusory allegations that the defendants "must have known" that they were violating the law has been roundly rejected by the United States Court of Appeals for the Tenth Circuit.  City of Phila. v. Fleming Cos., Inc., 264 F.3d 1245, 1264 (10th Cir. 2001).

Finally, Plaintiff has failed to allege loss causation as well.  The CAC alleges only that Spectranetics' stock price fell when the Company announced the execution of the FDA search warrant.  The press release regarding the search warrant, however, is not a corrective disclosure under Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005) because it merely revealed a potential risk that Spectranetics may have violated certain FDA rules and regulations and not that Spectranetics had actually done so.

For each of these reasons, the Court should dismiss the CAC.

3

## SUMMARY OF THE CONSOLIDATED AMENDED COMPLAINT

I.    **Spectranetics' Products Help Clear Blocked Arteries In the Heart And Legs Without Dangerous Surgery.**

Spectranetics develops, manufactures, markets, and distributes single-use fiber-optic laser catheters for use in minimally invasive surgical procedures to clear blocked arteries within the body. (CAC ¶¶ 2, 48.) It has a range of laser catheters that are used to treat peripheral arterial disease ("PAD") by removing calcium and plaque in the legs both above and below the knee. (Id. ¶ 49.) Spectranetics also has a range of laser catheters used to clear blockages in and around the heart. (Id. ¶ 51.) The CAC refers to these two product lines as Spectranetics' Vascular Intervention products. (Id.)

Spectranetics laser catheters for the leg have broad general approval for "use in the treatment of infrainguinal stenoses and occlusions" or essentially blocked arteries below the groin. (CAC ¶ 4; Ex. 2 at 7; Ex. 4 at 4, 42; Ex. 27 at 1.)[2] It also had no contraindications. (Id.) The primary alternative to the use of Spectranetics laser catheters for PAD is surgical bypass which is both more invasive (as it involves cutting tissue to expose the arteries) and also entails greater risks than atherectomy.[3] (Ex. 2 at 4.) Spectranetics cardiac laser catheters are approved for use in 7 different treatments including specific approval for the treatment of in-stent restenosis ("ISR") in the coronary. (CAC ¶¶ 4, 62; Ex. 4 at 3; Ex. 20 at 3; Ex. 28 at 2.) ISR refers to a specific

---

[2]    All cites to "Ex. __" are to the exhibits attached to the Declaration Of Richard H. Zelichov In Support Of Defendants' Motion To Dismiss Lead Plaintiff's Consolidated Class Action Complaint.

[3]    Atherectomy involves inserting a catheter into an artery and advancing it to the place of blockage and then feeding a device that can clear the blockage through the catheter. Spectranetics' products use relatively cool ultraviolet energy to ablate or remove the blockage. (Ex. 2 at 4.) Other atherectomy products use mechanical means such as a rapidly rotating blade, a scraping blade, or similar technology.

type of arterial blockage whereby a stent that was inserted in a previous procedure has become blocked again and needs to be cleared to restore blood flow. No product has a specific indication for treatment of ISR in the legs including the commonly used standard angioplasty balloon. (Ex. 23 at 21.)

During the class period, Spectranetics was also in the process of obtaining specific approval for the treatment of ISR in the legs. (CAC ¶¶ 65-67; Ex. 2 at 9-10; Ex. 4 at 8-9; Ex. 17 at 1.) Spectranetics had discussed a testing protocol with the FDA by which to test the safety of the laser on the kind of stents doctors tend to use in the leg, began testing in accordance with that protocol in December 2007, and submitted the results of its testing to the FDA on September 11, 2008. (Ex. 2 at 10; Ex. 4 at 9; Ex. 17 at 1.) These results demonstrated that stents subjected to extensive fatigue testing following laser interaction had no fatigue-related failures. (Ex. 4 at 9; Ex. 17 at 1.)

Spectranetics had also sponsored two ISR clinical trials – SALVAGE and PATENT. (Ex. 2 at 9-10; Ex. 4 at 8-9; Ex. 17 at 1.) The PATENT trial was initiated in Germany, in September 2007, to test Spectranetics laser catheters for the treatment of ISR in the leg. (CAC ¶ 65; Ex. 2 at 9; Ex. 4 at 8.) The SALVAGE trial, initiated in February 2008, was a physician-sponsored trial in the United States intended to test the use of Spectranetics laser catheters followed by placement of a stent manufactured by Gore for treatment of ISR in the leg. (CAC ¶ 66; Ex. 2 at 10; Ex. 4 at 9; Ex. 17 at 1.)

Even without a specific indication for ISR in the legs, doctors remained free to use the laser for such treatment. See Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 350-51 (2001); see also Washington Legal Found. v. Henney, 202 F.3d 331, 333

(D.C. Cir. 2000). In fact, there was no product – including angioplasty balloons – that had a specific indication for ISR. (Ex. 23 at 21.) Doctors preferred to use the laser if they wanted to use an atherectomy device because the other atherectomy products – which use rotating mechanical blades or similar technologies – were expressly contraindicated for use in treating ISR in the legs. Mechanical blades and similar technologies cause damage to the stents thereby making them unsafe. (Ex. 20 at 3; Ex. 21 at 3; Ex. 23 at 17.) In contrast, Spectranetics was not contraindicated for use in ISR. (CAC ¶¶ 111, 155; Ex. 22 at 15; Ex. 23 at 17; Ex. 27 at 1.) Indeed, the FDA-approved Instructions for Use ("IFU") for Spectranetics laser catheters for the leg specifically state that there are "[n]o known contraindications" meaning that there are no uses – including ISR – for which evidence shows that the device is unsafe. (Ex. 23 at 17; Ex. 27 at 1.)

## II.    **Spectranetics Never Sold Any Wires Or Balloons Manufactured Outside the United States.**

Between 2006 and 2008, Spectranetics considered engaging in two transactions with foreign manufacturers of vascular intervention products in order to expand its product offerings. (CAC ¶¶ 78-86.) In 2006, Spectranetics contracted with a Japanese company named FMD, Inc. ("FMD") to import catheter guidewires that could be used in conjunction with its laser catheters. (Id. ¶ 80.) FMD manufactured such guidewires for the market in Japan. (Id. ¶¶ 80-81.) Its products were very highly regarded because the founders of FMD had designed the market-leading guidewires sold by Asahi. (Ex. 26.) Similarly, in 2007, Spectranetics had preliminary discussions with a German manufacturer of intravascular devices named Bavaria Medizin Technologie ("BMT")

6

concerning potentially importing angioplasty balloons that could be used in the leg. (CAC ¶¶ 83-86; Ex. 25.)

Spectranetics ultimately never went forward with either transaction. It cancelled its contract with FMD before selling any FMD guidewires because Spectranetics determined that the transaction was not cost-effective. (CAC ¶ 99.) Spectranetics also never sold any BMT balloons. Plaintiff alleges that Spectranetics did arrange for two physicians to use a few of these imported devices on some patients but does not and cannot allege that Spectranetics received any payment for these uses. (Id. ¶¶ 85-86, 170-171.)

## III.    The Government Executes A Search Warrant Based On Incorrect Information From A Terminated Company Employee.

On September 4, 2008, the FDA and the U.S. Immigration and Customs Enforcement ("ICE") – but not the Securities and Exchange Commission ("SEC") or any agency charged with enforcing the securities laws – executed a search warrant on Spectranetics. (CAC ¶¶ 9, 201.) The search warrant requested information in four areas related to potential violations of FDA and immigration rules and regulations. (Id. ¶ 201.) Following the FDA/ICE search warrant, Spectranetics received an inquiry from the Financial Industry Regulatory Authority ("FINRA"). (Id. ¶ 90.) It also received a request from the Denver office of the SEC for the voluntary production of certain documents. (Id.)

The FDA/ICE investigations along with the investigations by FINRA and the SEC were seemingly based upon an earlier claim filed by a former Spectranetics employee with the U.S. Department of Labor, Occupational Safety and Health Administration

("DOL"). (CAC ¶ 10.) The former employee claimed that he was terminated by the Company because he challenged, among other things, its promotion of its products for the treatment of ISR when the products were, according to the employee, not safe for that use. (Id. ¶ 89.) The Company filed its response to this claim in June 2008 and the DOL dismissed the complaint on December 5, 2008. (Ex. 4 at 38; see also Ex. 11.)

The former employee's claim that the company's products were not safe for the treatment of ISR was demonstrably false. As discussed above, at the time of the search warrant, Spectranetics had completed testing – in accordance with a protocol reviewed and agreed to by the FDA – and was about to submit a report demonstrating that the laser caused no fatigue-related failures to a broad range of stents. (Ex. 4 at 9; see also Ex. 17 at 1.) Spectranetics did not stop its testing for ISR upon execution of the search warrant, and in May 2009, Spectranetics made a further submission to the FDA. This submission provided additional data – backed up by clinical trials – demonstrating the safety and effectiveness of the laser products for the treatment of ISR. (Ex. 18 at 1.)

## IV. Stockholders Sue Spectranetics Claiming It Should Have Accused Itself Of Wrongdoing In Its Public Filings.

Stockholders filed numerous lawsuits shortly after September 4, 2008. These lawsuits claimed that Spectranetics' potential problems with FDA and ICE concerning possible violations of the Food, Drug, and Cosmetic Act ("FDCA"), accompanying FDA regulations, and customs laws somehow established securities fraud. (CAC ¶ 88.) These complaints were consolidated and a lead plaintiff was appointed by the Court. Plaintiff eventually filed the CAC on August 4, 2009. The CAC alleges that Defendants

made statements that were misleading because Spectranetics did not accuse itself publicly of wrongdoing in connection with the (1) alleged illegal importation and use of medical devices from Japan and Germany and (2) alleged promotion and marketing of its laser to treat ISR in peripheral arteries. (CAC ¶¶ 101, 176, 199, 238.) Notably, the CAC does not allege that any person associated with Spectranetics sold stock during the period of alleged wrongdoing. Indeed, as discussed in more detail below, the Individual Defendants actually acquired stock during the class period.

## BACKGROUND ON FDA REGULATION OF
## OFF-LABEL USES OF MEDICAL DEVICES

The FDA's policies concerning "off-label" use of drugs and medical devices are vague and ambiguous. On the one hand, the FDA considers certain marketing activities concerning "off-label" uses of a product (use of a device for some other purpose than that for which it has been approved by the FDA) to constitute "misbranding." On the other hand, the "FDA itself recogniz[es] the value and propriety of off-label use" and "'off-label' usage of medical devices . . . is an accepted and necessary corollary of the FDA's mission to regulate . . . without directly interfering with the practice of medicine." Buckman, 531 U.S. at 350. Therefore, "[o]nce a drug or medical device has been approved or cleared by FDA, generally, healthcare professionals may lawfully use or prescribe that product for uses or treatment regimens that are not included in the product's approved labeling." Henney, 202 F.3d at 333; (Ex. 31 at 3.) In short, doctors can prescribe any product for any use as they see fit so long as the product has been approved by the FDA in some capacity.

Given this inherent contradiction, the FDA's rules about "off-label" uses of products do not provide clear guidance to companies. For example, while companies may not "promote" off-label uses to physicians, companies "may respond to unsolicited requests for information from health care professionals, even if responding to [the] requests requires the companies to provide information regarding off-label uses." (Ex. 30 at 1, 9; <u>see also</u> 21 U.S.C. § 360aaa-6(a) ("[n]othing . . . shall be construed as prohibiting a manufacturer from disseminating information in response to an unsolicited request from a health care practitioner")). In addition, off-label uses of products may be presented at "industry-supported scientific and educational activities that are otherwise independent and non-promotional," but not at activities that are "are not independent and nonpromotional." (<u>See</u> Ex. 29 at 1.) Also, reprints of scientific articles concerning off-label uses can be distributed to physicians in certain circumstances but not in others. (<u>See</u> 21 U.S.C. § 360aaa, <u>et seq</u>. (no longer effective); Ex. 31 at 3-6.) Indeed, companies in this area constantly face complicated choices concerning what they can and cannot do with regard to promoting off-label, and frequently, these ambiguities lead to reasoned disagreement among regulators, professional advisors, and industry participants.[4]

The First Amendment also curtails the extent to which the FDA may regulate "promotional" speech and further muddies the waters. Thus, for example, after a district court struck down the FDA's regulations limiting the conditions under which a company could distribute reprints of scientific articles to physicians, <u>see Washington Legal Found.</u>

---

[4]    These complicated choices explain Plaintiff's allegation that "off-label compliance issues . . . were already recognized by numerous Spectranetics employees." (CAC ¶¶ 16, 211.)

v. Henney, 56 F. Supp. 2d 81, 87 (D.D.C. 1999), the FDA was only able to save its regulations on appeal by construing them as a safe-harbor, rather than a mandatory requirement, and indicating that it would review each situation on a case-by-case basis. See Henney, 202 F.3d at 335, dismissing appeal from and vacating in part 56 F. Supp. 2d 81.    Similarly, a court struck down portions of the FDA's guidance concerning whether "industry-supported scientific and educational activities" were otherwise "independent and non-promotional." Washington Legal Found. v. Friedman, 13 F. Supp. 2d 51, 74 (D.D.C. 1998), appeal dismissed and vacated by Henney, 202 F.3d 331. Thus, even if FDA rules indicate that some particular practice is prohibited as "off-label" promotion, it is not unlawful for a company to continue that practice if the First Amendment's protections for truthful speech (commercial or otherwise) apply. See Krista Hessler Carver, "A Global View of the First Amendment Constraints on FDA," 63 Food D. L.J. 151 (2008); Ralph F. Hall & Elizabeth S. Sobotka, "Inconsistent Government Policies: Why FDA Off-Label Regulation Cannot Survive First Amendment Review Under Greater New Orleans," 62 Food D. L.J. 1 (2007).

The application of this already complex set of rules and legal principles to the conduct Plaintiff challenges in the CAC is incredibly difficult. The heart of Plaintiff's securities fraud claim rests upon Spectranetics' alleged violation of these ambiguous rules concerning off-label promotion. Plaintiff, however, does not even allege that ISR is an off-label use of Spectranetics' products.[5]    In addition, the IFU required that

---

[5]    Indeed, as discussed above, the IFU for Spectranetics' laser in the legs included a general indication that the laser was safe and effective "[f]or use in the treatment of infrainguinal [below the groin] stenoses and occlusions." (Ex. 27 at 1.)

Spectranetics ensure that physicians were trained in the use of the laser thereby necessitating the training summits that Plaintiff attempts to challenge in the CAC. (Ex. 27 at 2.)

## LEGAL STANDARD

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, require a plaintiff to allege that the defendant (1) made a misrepresentation or omission (2) of material fact (3) with scienter (4) upon which the plaintiff justifiably relied, and (5) which caused injury to the plaintiff.  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); Adams v. Kinder Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003).  Claims under Section 10(b) and Rule 10b-5 are also governed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "Reform Act").  The Reform Act significantly raised the pleading standards applicable to private claims under the Securities Exchange Act of 1934 in order to curb abuse in private securities lawsuits. See City of Phila. v. Fleming Cos., 264 F.3d 1245, 1258 (10th Cir. 2001).

Under the Reform Act, the plaintiff must plead both falsity and scienter with particularity as to each defendant and each allegedly false statement. Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008); Horizon Asset Mgmt., Inc. v. H&R Block, Inc., No. 08-1593, __ F.3d __, 2009 WL 2870505, at *2-3 (8th Cir. Sept. 9, 2009). To plead falsity, the plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Moreover, if an allegation regarding the statement or omission is made on

information and belief, "the complaint shall state with particularity all facts on which that belief is formed." Id.

To plead scienter, the Reform Act requires a plaintiff "with respect to each act or omission, . . . [to] state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. In re FX Energy, Inc. Sec. Litig., No. 2:07-CV-874 CW, 2009 WL 1812828, at *5 (D. Utah. June 25, 2009); see also 15 U.S.C. § 78u-4(b)(2). This is a "stringent" requirement. Adams, 340 F.3d at 1096. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud" or "knowing or intentional conduct." Fleming Cos., 264 F.3d at 1258-59. Recklessness can satisfy this standard, but "[c]ourts have been cautious about imposing liabilities for securities fraud based on reckless conduct." Id. at 1260. In determining whether a complaint meets these exceptionally high standards, "the court must take into account plausible opposing inferences" and a "complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007).

Complaints that fail to meet these standards "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

## ARGUMENT

### I.    Defendants Had No Duty To Disclose Uncharged Bad Acts Related To Alleged Violations Of The Food, Drug & Cosmetic Act.

Plaintiff has a fundamental problem attempting to assert a claim of securities fraud because it bases the entire CAC on the mistaken premise that Defendants had a

duty to accuse themselves of uncharged, unlawful acts because Spectranetics'
stockholders might be interested in that information. The securities laws, however, do
not require companies to disclose all material information in their possession to their
stockholders. In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997)
("[m]ateriality alone is not sufficient to place a company under a duty of disclosure");
Gallagher v. Abbott Labs., 269 F.3d 806, 808 (7th Cir. 2001); Med Safe Nw., Inc. v.
Medvial, Inc., 1 Fed. Appx. 795, 804 (10th Cir. 2001) ("There is no liability under
[Section] 10(b) . . . or Rule 10b-5 for failure to disclose information absent a duty to do
so."). Rather, Defendants are obligated to disclose only what the SEC specifically
requires that they disclose and what is needed to ensure that statements they make are
not false or misleading. See Karacand v. Edwards, 53 F. Supp. 2d 1236, 1244 (D. Utah
1999); Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002); Roeder v. Alpha Indust.,
Inc., 814 F.2d 22, 26-28 (1st Cir. 1987).

    The SEC has made it quite clear in detailed rules known as Regulation S-K when
companies must disclose potential wrongdoing. Item 103 of Regulation S-K requires
only that companies disclose "any material pending legal proceedings" and "any such
proceedings known to be contemplated by governmental authorities." 17 C.F.R.
§ 229.103 (emphasis added). Thus, with respect to claims by civil plaintiffs, companies
only have to disclose legal proceedings **after** they are commenced, and with respect to
the government, companies only have to disclose potential legal proceedings **after** the
government has informed the company that it is contemplating such action. The SEC
does not require companies to accuse themselves of wrongdoing before they are

charged with such conduct by civil plaintiffs or notified of such conduct by the government. Spectranetics fully complied with the obligations described above as it put out a press release on September 4, 2008 disclosing the FDA/ICE search warrant on the very day that it was executed. (See CAC ¶ 201.)

Similarly, the case law makes clear that companies do not have to disclose uncharged, unlawful conduct. In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) (collecting multiple cases from courts throughout the U.S. holding companies have no duty to accuse themselves of wrongdoing or disclose uncharged unlawful conduct); Lewis v. Chrysler Corp., 949 F.2d 644, 652 (3d Cir. 1991) ("the general rule [is] that the federal securities laws do not impose a duty upon parties to publicly admit the culpability of their actions").[6] Courts will not place companies "in the untenable position of either publicly confessing their potential misconduct before their guilt is properly determined by a court, or incurring liability for damages resulting from their failure to disclose the misconduct." Chrysler, 949 F.2d at 652. Courts also do not want every violation of some underlying rule of state or federal law prosecuted as a claim for securities law based on the theory that the company failed to disclose such violation. Id.

These rules that companies need not accuse themselves of wrongdoing take on further significance in cases where there are alleged violations of the FDCA. Congress chose not to allow for a private right of action under the FDCA and to leave exclusive

---

[6]    See also Roeder, 814 F.2d at 26-27; United States v. Matthews, 787 F.2d 38, 49 (2d Cir. 1986); United States v. Crop Growers Corp., 954 F. Supp. 335, 345 (D.D.C. 1997); In re Teledyne Def. Contracting Deriv. Litig., 849 F. Supp. 1369, 1381-82 (C.D. Cal. 1993); Citron v. Daniell, 796 F. Supp. 649, 654 (D. Conn. 1992).

jurisdiction over enforcement to the FDA.    See, e.g., Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 811 (1986) ("Congress did not intend a private federal remedy for violations of the" FDCA); Kemp v. Medtronic, Inc., 231 F.3d 216, 236 (6th Cir. 2000) (citing "well-established precedent that no implied private right of action exists under the FDCA").    Courts therefore dismiss private claims for violation of the FDCA masquerading as other federal or state law claims.    See, e.g., PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1113 (2d Cir. 1997) (dismissing case where plaintiff attempted to use Lanham Act and Georgia statutes "to privately enforce alleged violations of the FDCA"); In re Epogen & Aranesp Off-Label Marketing & Sales Practices Litig., 590 F. Supp. 2d 1282, 1287-90 (C.D. Cal. 2008) (RICO).    In addition, "claims that require direct interpretation and application of the FDCA are not properly recognized" because they "are more appropriately addressed by the FDA, especially in light of Congress's intention to repose in that body the task of enforcing the FDCA." Cottrell, Ltd. v. Biotrol Int'l, Inc., 191 F.3d 1248, 1254-55 (10th Cir. 1999) (quoting Braintree Labs., Inc. v. Nephro-Tech, Inc., No. 96-2459-JWL, 1997 WL 94237, at *6-7 (D. Kan. Feb. 26, 1997)).

Plaintiff here is violating these principles.    The CAC contains more citations to various FDA regulations than it does to the securities laws.    (See, e.g., CAC ¶¶ 3, 10, 13, 15, 16, 33, 34, 36, 40, 54-87.)    It is hard even to see how Plaintiff can even characterize Defendants' conduct as securities fraud.    Assuming Plaintiff's allegations are accurate, the CAC merely alleges that Defendants acted to try and maximize the profitability of the company for the benefit of Spectranetics' stockholders and did not act

to harm them as required for a claim of securities fraud. Plaintiff does not and cannot allege that the Defendants received any benefit from their actions. Spectranetics did not use its stock to acquire other companies, the Individual Defendants did not sell their stock at inflated prices, and Messrs. Childs, Geisenheimer and Schulte and Dr. Walker actually acquired stock during the class period. See Part IV(A) below.

More importantly, any adjudication of Plaintiff's claims will require direct interpretation and application of the FDCA. Biotrol Int'l, 191 F.3d at 1255. This Court cannot decide whether the Defendants committed securities fraud without first deciding whether they violated the FDCA. This is a question that Congress has expressly left to the FDA and not private litigants attempting to assert claims for securities fraud. Indeed, we are aware of no case that has decided whether certain conduct constituted off-label promotion where the FDA (or at least the government of the United States) was not a party. Furthermore, the FDA has not abrogated its responsibility in this area thereby necessitating private party or court intervention. The FDA OCI specifically identifies "[o]ff label promotion of FDA approved drugs and medical devices" as a priority generally and in this case the FDA (along with the ICE) has already acted pursuant to its statutory authority with respect to Spectranetics. (Ex. 32; see, e.g., CAC ¶¶ 9, 10, 201.) Whether Spectranetics' alleged conduct – with respect to alleged off-label promotion and the importation of the balloons and wires – may ultimately have crossed over the FDA's vague and fuzzy lines concerning what is appropriate should be left to the FDA. This is especially important here because the apparent impetus for the FDA's investigation – alleged information from a former employee that Spectranetics'

17

products were not safe for the treatment of ISR – was false. Spectranetics had already discussed a testing protocol for such treatment with the FDA, the results of this testing demonstrated that Spectranetics' laser was safe to treat ISR in the legs, and Plaintiff does not and cannot allege facts to establish that the laser was not safe for ISR.

Sofamor Danek is nearly on all fours with this case. In Sofamor Danek, a company reported record revenues and earnings that it publicly attributed to "increased sales volume" and other factors which created the impression that the company's "tremendous growth . . . was due to an increase in legitimate unit sales." 123 F.3d at 400-01. The company also furthered this impression by noting that it does not "encourage the use of products for unapproved applications." Id. at 397-98. At the same time, the company was allegedly engaged in the illicit promotion of its products in violation of FDA rules and regulations. Id. at 401. The plaintiffs claimed that the company's statements were false and misleading because the company failed to disclose that it had engaged in unlawful sales tactics. Id. at 400. The Sixth Circuit, however, held that the company's statements were not false and misleading despite the fact that the plaintiffs had alleged that its revenues and earnings were inflated by the defendant's alleged unlawful practices because the company had no duty to opine publicly that its sales conduct was illegal. Id. at 402. The court reasoned that "a company is under no duty to disclose the details of its merchandising practices" and that the legality of Sofamor Danek's conduct was a matter of opinion that did not need to be disclosed. Id. at 400-02.

For these reasons alone, this case must be dismissed.

**A.    Spectranetics Made No Statements Rendered Misleading By Alleged Off-Label Promotion For ISR.**

Plaintiff tries to overcome the longstanding principles discussed above by claiming that Spectranetics became obligated to accuse itself of alleged unlawful promotion of its product for ISR by making various statements during the class period. The CAC points to three types of statements to attempt to establish this duty:  (1) a statement made in its Form 10-K concerning product liability exposure that indicated that "[w]e do not promote our products for off-label or otherwise unapproved usage" (CAC ¶ 159);   (2) every positive statement in Spectranetics' press releases or conference calls (id. ¶¶ 105, 111, 128, 130, 136, 139, 141, 147, 153, 155, 180, 182, 189, 197); and (3) Spectranetics' accurate statements of its past earnings results (id. ¶¶ 104, 113, 114, 127, 132, 133, 138, 141, 143, 144, 152, 157, 158, 179, 184, 185, 188, 193, 194).  As discussed in more detail below, none of these three statements are actionable because they did not put Spectranetics' alleged wrongdoing at issue.

**1.    Spectranetics Did Not Become Obligated to Accuse Itself of Wrongdoing Based On A Risk Disclosure Concerning Potential Product Liability Claims.**

Plaintiff's argument that Spectranetics became obligated to accuse itself of supposed unlawful promotion of its products for treatment of ISR based on single statement made in Spectranetics' 2007 Form 10-K is implausible.  In contrast to its prominent placement in the CAC on its own in bold, the statement – that "[w]e do not promote our products for off-label or otherwise unapproved usage" – comes at the very end of a lengthy Risk Disclosure designed to provide warnings to Spectranetics' stockholders concerning risks to which the Company was subject.  See, e.g., In re

Leapfrog Enters., Inc. Sec. Litig., 527 F. Supp. 2d 1033, 1047-49 (N.D. Cal. 2007) (rejecting plaintiffs' assertion that defendant's risk disclosures created an actionable basis for securities fraud); Zeid v. Kimberley, 930 F. Supp. 431, 437 (N.D. Cal. 1996) ("Defendants' warnings regarding potential adverse factors are not actionable as a matter of law"); see also FBR, 544 F. Supp. 2d at 362 (risk factors excuse liability rather than create it); Grossman v. Novell, Inc., 120 F.3d 1112, 1120-21 (10th Cir. 1997). This risk disclosure was about product liability claims and was not about FDA compliance. This section, in its entirety, states:

> **Product liability and other claims against us may reduce demand for our products or result in substantial damages.**
>
> Our business exposes us to potential liability for risks that may arise from the clinical testing of our product candidates, the use of our products by physicians and the manufacture and sale of any approved products. An individual may bring a product liability claim against us, including frivolous lawsuits, if one of our products causes, or merely appears to have caused, an injury. We maintain product liability insurance in the amount of $7 million per occurrence with an annual aggregate maximum of $7 million. The coverage limits of our insurance policies may be inadequate, and insurance coverage with acceptable terms could be unavailable in the future. A product liability claim, recall or other claim with respect to uninsured liabilities or for amounts in excess of insured liabilities could have a material adverse effect on our business. We do not maintain clinical trial insurance. Any product liability claim or series of claims or class actions brought against us, with or without merit, could result in:
>
> • liabilities that substantially exceed our insurance levels, which we would then be required to pay from other sources, if available;
>
> • an increase of our product liability insurance rates or the inability to renew or obtain product liability insurance coverage in the future on acceptable terms, or at all;
>
> • withdrawal of clinical trial volunteers or patients;
>
> • damage to our reputation and the reputation of our products;

- regulatory investigations that could require costly recalls or product modifications;

- litigation costs; and

- the diversion of management's attention from managing our business.

Claims may be made by consumers, healthcare providers or others selling our products. We may be subject to claims against us even if an alleged injury is due to the actions of others. For example, we rely on the expertise of physicians, nurses and other associated medical personnel to perform the medical procedures and related processes relating to our products. If these medical personnel are not properly trained or are negligent in using our products, the therapeutic effect of our products may be diminished or the patient may suffer injury, which may subject us to liability. In addition, an injury resulting from the activities of our suppliers may serve as a basis for a claim against us. We do not promote our products for off-label or otherwise unapproved uses. However, we cannot prevent a physician from using our products for any off-label applications. If injury to a patient results from such an inappropriate use, we may become involved in a product liability suit, which will likely be expensive to defend.

(Ex. 1 at 28-29; Ex. 2 at 30-31.)

Plaintiff rips the statement out of the context in which the sentence was included in the Form 10-K.[7] The context makes clear, however, that Spectranetics did not become obligated to accuse itself of alleged unlawful promotion of its products for the treatment of ISR based on this statement. Grossman, 120 F.3d at 1120 (statements must be analyzed in context).

First, Spectranetics' public filings include risk factors to identify risks (not to provide assurances) and the risk factor quoted above was solely about a single type of risk (product liability claims) that is not at issue in this litigation. In this risk disclosure,

---

[7]    Plaintiff also relies on another similar alleged statement from Schulte that it misquotes and takes out of context. (CAC ¶ 191; Ex. 23 at 21-22.) Plaintiff's claim based on this statement fails for the same reasons as the statement in paragraph 159 concerning alleged off-label promotion.

Spectranetics states that one of the possible facts relevant to this risk is that doctors may use Spectranetics' products off-label, and if they do, Spectranetics is less likely to have a preemption defense to potential product liability claims. See Medtronic, Inc. v. Lohr, 518 U.S. 470, 477-79, 498-99, 502-03 (1996); Riegel v. Medtronic, Inc., 128 S. Ct. 999, 1007-08 (2008) (product liability claims preempted where product used in manner approved by FDA). At worst, Spectranetics alleged promotion for off-label uses merely makes it possible that a patient might have an argument to defeat a preemption defense to a product liability claim against Spectranetics if the patient could establish that its injury resulted from such promotion.    Irrespective of Spectranetics promotional practices, doctors remained free to use the products off-label, Spectranetics had product liability risk, and it was hardly worth mentioning its lack of promotion.  Most significantly, this case is not about product liability claims against Spectranetics let alone product liability claims related to any off label promotion or use of Spectranetics products and so the risk factor is entirely irrelevant here. Ley v. Visteon Corp., 543 F.3d 801, 811 (6th Cir. 2008) (statement made in context of discussion of earnings cannot be interpreted as comment on liquidity); In re Wet Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1178 n.11 (C.D. Cal. 2007) (plaintiff cannot create Section 10(b) liability by taking statement out of context).

Second, the statement does **not** say that Spectranetics was not promoting its products for the treatment of ISR and in fact **never** mentions ISR at all.  It thus cannot give rise to a duty to disclose any such conduct.  Indeed, Spectranetics would never have raised ISR in the context of a product liability discussion because it never

expected and has not been subject to any product liability claims related to the use of its products for ISR.    In contrast to the false and misleading information from the company's former employee upon which the FDA based its decision to execute a search warrant, the data demonstrates that Spectranetics laser is safe and effective for the treatment of ISR.

Third, Plaintiff cannot turn this isolated statement within a section on product liability claims into a statement concerning FDA compliance because Spectranetics' Form 10-K had entirely separate risk disclosures concerning FDA regulation.    These sections indicated that Spectranetics "cannot assure you that we . . . [are] in compliance or that we will be able to maintain compliance with all regulatory requirements," (Ex. 1 at 25; Ex. 2 at 27), and that "[i]f we fail to comply with applicable FDA and foreign regulatory requirements, we may not receive regulatory approvals or may be subject" to various penalties, (Ex. 1 at 22; Ex. 2 at 25).    Indeed, courts only find Section 10(b) violations based on non-SEC regulatory violations where the company expressly denies any such violations and Spectranetics clearly did not do so.    See Part I.B. below.

### 2.    Spectranetics Had No Duty to Disclose Off-Label Promotion For ISR Simply Because It Mentioned ISR in its Public Statements.

Plaintiff also cannot claim that Spectranetics had a duty to disclose its allegedly unlawful conduct promoting its product for ISR just because Spectranetics discussed its business in press releases and conference calls.[8]  Rule 10b-5 prohibits "only misleading

---

[8]    Many of the statements that Plaintiff claims were false or misleading are "vague statements of corporate optimism," or puffery, which are not actionable under securities laws.  See Grossman, 120 F.3d at 1118-20.    Plaintiff cites numerous statements of mere puffery related to ISR and Spectranetics' sales of its laser in general.  For example, Plaintiff alleges that the former president

and untrue statements, not statements that are incomplete." Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). This does not mean that "by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990); see also Anderson v. Abbott Labs., 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001), aff'd sub nom. Gallagher, 269 F.3d 806. For an omission to be misleading, a company "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Brody, 280 F.3d at 1006; see also The Winer Family Trust v. Queen, 503 F.3d 319, 330 (3d Cir. 2007). The Tenth Circuit has summed up these principles succinctly holding that "[a] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 998 (10th Cir. 2002) (emphasis added). Statements that are no "less true" with or without the alleged undisclosed information are not actionable under Rule 10b-5. Id. at 998-99.

The vast majority of the statements that Plaintiff challenges do not even mention ISR and thus cannot be misleading for failing to disclose that Spectranetics was allegedly promoting its product for that use. (See, e.g., CAC ¶¶ 105, 128, 141, 180, 189, 197.) These statements do not state or imply anything about whether Spectranetics was promoting its product for the treatment of ISR, are no less true

---

expressed "excitement" about the prospect of using its products to treat ISR (CAC ¶ 111) and stated that: "We are also pleased with the progress in our clinical trials" (id. ¶ 139). Regardless of the question of duty, these statements are not actionable under the federal securities laws.

whether Spectranetics disclosed that it was promoting for ISR or not, and the meaning

of the statements is not altered in any way by the alleged fact that Spectranetics was

promoting for ISR.    Even the Defendants' statements that mention ISR were not

misleading for failing to disclose Spectranetics' alleged unlawful promotion for this use.

The information about ISR promotion would not "alter the meaning" of statements

(1) that Spectranetics saw an opportunity for its products in the treatment of ISR (id.

¶¶ 105, 111, 136, 147, 153, 155, 182); (2) that Spectranetics was conducting clinical

trials to obtain a specific indication for ISR (id. ¶¶ 105, 130, 139, 147, 153); or (3) any of

the other myriad statements that just mention ISR cited in the CAC (id. ¶¶ 64, 111, 130,

136, 139).    Indeed, none of these statements stated or implied anything about whether

Spectranetics was promoting its products for ISR, and the statements were no less true

than they would have been had Spectranetics indicated that it was promoting its

products for ISR.[9]

---

[9] Plaintiff's suggestion that Spectranetics misled its stockholders because Spectranetics did not
disclose to the FDA the results of a preliminary test that allegedly showed that the laser damaged
nitinol stents is nonsensical. First, Plaintiff has only alleged that Spectranetics had a duty to disclose
this study to the FDA and not to its stockholders.  This is purportedly a case alleging securities fraud
not fraud on the FDA.  Second, Spectranetics had detailed discussions with the FDA concerning the
proper protocol for testing the laser on nitinol stents and the results showed that "stents subject to
extensive fatigue testing following laser interaction had no fatigue-related failures." (Zelichov Decl.,
Ex. 4 at 9; Ex. 17 at 1.)  Third, while Plaintiff repeats multiple times that Spectranetics had a duty to
disclose to the FDA "every possible way the device can harm humans" (CAC ¶¶ 75, 150), the CAC
cites nothing to support this assertion.  Fourth, it is very clear under the securities laws that in cases
involving pharmaceutical products like this one, a plaintiff must allege that there is "statistically
significant evidence" that a product causes a particular problem that threatens the continued viability
of the product in order to establish that the manufacturer has a duty to disclose the problem.  See In
re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 157 (2d Cir. 1998); see also Oran v. Stafford, 226
F.3d 275, 283-84 (3d Cir. 2000).  Here, Plaintiff, at most, has alleged a single preliminary study and
does not (and cannot) allege that this study provided statistically significant evidence of a problem
with Spectranetics' laser let alone a problem that threatens the continued viability of the product.

Furthermore, the Reform Act requires not just that a plaintiff identify each and every misleading statement but must also provide "the reason or reasons why [each] statement is misleading." 15 U.S.C. § 78u-4(b)(1). The CAC has failed this standard concerning the vast majority of the statements in Spectranetics' press releases and conference calls (not to mention its 10-Qs and 10-Ks) because it merely repeats the same boilerplate "explanations" over and over. (CAC ¶¶ 94, 106, 112, 116, 129, 131, 135, 137, 140, 142, 146, 148, 154, 156, 160, 168, 176, 178, 181, 183, 187, 190, 192, 196, 198, 199.) These explanations, however, do not suffice as they leave Defendants and this Court to guess why Plaintiff believes that Spectranetics wholly accurate statements were misleading. Grossman, 120 F.3d at 1124; Karacand, 53 F. Supp. 2d at 1242, 1248 ("conclusory allegations [as to why statement is misleading] cannot be credited").

### 3. Spectranetics Had No Duty to Accuse Itself of Wrongdoing by Reporting Accurate Financials.

Plaintiff's final argument is that Spectranetics had a duty to accuse itself of wrongdoing by accurately reporting revenue figures that might have included revenue from alleged unlawful activity. (CAC ¶¶ 104, 113, 114, 127, 132, 133, 143, 144, 152, 157, 158, 179, 184, 185, 188, 193, 194.) This argument has been regularly considered and rejected by courts throughout the country including the court in Sofamor Danek discussed above. Indeed, courts have held that accurate financial disclosures alone do not create any duty to disclose wrongful activity. See Greenstone v. Cambex Corp., 777 F. Supp. 88, 91 (D. Mass. 1991), aff'd, 975 F.2d 22 (1st Cir. 1992) (dismissing securities claim where plaintiff did not allege that company inaccurately reported its

revenue but argued "instead that the reports would have been more accurate and complete" if the company had revealed its improper activities which influenced its financial success); In re Citigroup, Inc., Sec. Litig., 330 F. Supp. 2d 367, 377-78 (S.D.N.Y. 2004). Plaintiff cannot morph accurate statements concerning a company's financial results into a claim of securities fraud merely by alleging that some of the company's revenue came from alleged unlawful activity.

B.     **Spectranetics Had No To Duty To Disclose Purported Unapproved Uses of Third-Party Devices Based On Accurate Statements Of The Law.**

The CAC also attempts to allege that Spectranetics had a duty to accuse itself of purportedly arranging for doctors to use imported medical devices from FMD and BMT during the class period. Plaintiff, however, does not and cannot allege that Spectranetics ever made any public statements about the potential transactions with FMD or BMT. Plaintiff does not even allege that Spectranetics ever mentioned FMD or BMT in its press releases or conference calls. Plaintiff also does not and cannot allege that Spectranetics made any statements about whether it was or was not importing products from outside the U.S. Thus, the allegedly omitted facts do not alter the meaning of any statements made by Spectranetics. See McDonald, 287 F.3d at 998.

Recognizing that it has no actual statements about FMD or BMT upon which to base its claim, Plaintiff instead only references statements in Spectranetics' Form 10-Ks that indicate (1) that Spectranetics does "not promote [its] products for off-label or otherwise unapproved usage" (CAC ¶¶ 92, 159) and (2) wholly accurate general statements of the law such as "[a]ll clinical studies of investigational devices must be

27

conducted in compliance with FDA's requirements" (id. ¶¶ 93, 166, 167). These statements do not save Plaintiff's claim. As Plaintiff admits, Spectranetics never tried to sell either of these products and therefore could not have promoted their use. Plaintiff at most has alleged that Spectranetics provided a few of these devices to doctors for clinical testing, but does not allege that this constitutes "promotion" or that Spectranetics was paid by anybody for this testing. In addition, as discussed above, this entire statement is about product liability claims and Plaintiff cannot allege that there have been any product liability claims arising out of any use of the FMD wires or BMT balloons.

Spectranetics also had no duty to disclose its alleged uncharged unlawful conduct with respect to the FMD wires and BMT balloons merely by making accurate statements describing FDA rules and regulations. There can be no liability for merely describing the FDA rules. Anderson, 140 F. Supp. 2d at 905 (general statements of the law do not state or imply that the company was complying with those rules); see also FBR, 544 F. Supp. 2d at 353. Indeed, even when a company indicates generally that it complies with all the rules and regulations to which it is subject, it is still not obligated to disclose alleged violations of the law. Ind. St. Dist. Council v. Omnicare, Inc., 527 F. Supp. 2d 698, 709-10 (E.D. Kent. 2007) (rejecting plaintiffs' efforts to premise their fraud claim on a generalized statement that the company is in compliance with applicable laws and regulations). Here, Plaintiff has merely alleged that Spectranetics accurately described the law applicable to medical device companies; it did not indicate that it was in compliance with the law; and Spectranetics in fact specifically warned that we "cannot

assure you that we . . . [are] in compliance or that we will be able to maintain compliance with all regulatory requirements." (Ex. 2 at 27.)

In short, Defendants never had any duty to accuse themselves of wrongdoing either with respect to alleged off-label promotion of its products or the use of the products from FMD or BMT. For this reason alone, the CAC should be dismissed.

## II.    Plaintiff's Conclusory And Unsupported Allegations Fail To Meet the Exacting Standards of the Reform Act And Tenth Circuit Law.

Plaintiff's factual allegations lack the particularity and specificity required by the Reform Act and Tenth Circuit law especially because Plaintiff based all of its allegations on information and belief. See, e.g., Adams, 340 F.3d at 1095, 1097-1100. The Tenth Circuit has held that allegations based on "investigation of counsel" – such as all the allegations here – are considered allegations on "information and belief" whereby the complaint "must 'state with particularity all facts upon which [their] belief is formed.'" Id. at 1097-98 (quoting 15 U.S.C. § 78u-4(b)(1)). (See also CAC ¶¶ Preamble, 52, 53, 62, 69-72, 74-87.)

Applying the Reform Act's heightened pleading standard, the Tenth Circuit ruled that a plaintiff making allegations based on information and belief must "state with particularity facts that support a reasonable belief in the misleading nature of a defendant's statements." Adams, 340 F.3d at 1099-1100. To determine whether a plaintiff has done so, the Tenth Circuit instructs district courts to conduct:

> an evaluation of (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any

other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

See id. at 1099. And while the Reform Act requires specific facts in every case, such specifics are especially important in this case because, as discussed above, the FDA rules concerning off-label use of medical devices are vague and ambiguous.

### A. Plaintiff's Primary Sources Do Not Provide Sufficient Factual Support For Plaintiff's Allegations.

Plaintiff bases its information and belief on two primary sources: (i) a so-called "whistleblower" complaint filed by Scott Schlesinger, a former Spectranetics employee who was fired by the Company on April 3, 2008 (CAC ¶¶ 10, 12, 16, 89, 107, 108, 149, 161-163, 172, 174, 175); and (ii) an unnamed "confidential witness," referred to as "CW 1," who Plaintiff claims was an executive officer at Spectranetics headquarters from May 2007 through October 2008 (id. ¶¶ 96-100, 117, 120, 123-126, 150, 164, 165, 169-171, 212).[10] Neither of these sources provides sufficient support for Plaintiff's allegations and neither actually provides specific facts – as opposed to vague generalizations – that establish that Spectranetics violated any FDA rules or regulations.

### B. Plaintiff Cannot Adopt An Unreliable Complaint From A Former Company Employee.

Plaintiff's reliance on Schlesinger's "whistleblower" complaint is improper because parties are prohibited under Rule 11 of the Federal Rules of Civil Procedure

---

[10]  The CAC also relies on information from two other CWs but neither provides any relevant information. CW 2 was only employed at Spectranetics for only the first six months of the class period and the information that he or she provides is both too general to support any claim and not incriminating in any event. (CAC ¶¶ 109, 121.) CW 3 similarly provides no relevant information. He or she provides information concerning events only after the end of the class period and there is nothing inconsistent between CW 3's description of the events of September 4, 2008 and the Company's press release that day. (CAC ¶¶ 202-203.)

("Rule 11") from relying on allegations from pleadings filed in another lawsuit.  See, e.g., Del Giudice v. S.A.C. Capital Mgmt., LLC, No. 06-1413(SRC), 2009 WL 424368, at *6, 8-10 (D.N.J. Feb. 19, 2009); see also In re Connetics Corp. Sec. Litig., 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008).   Thus, Plaintiff's attempt to adopt and incorporate allegations from Schlesinger's complaint wholesale into the CAC is improper.  Id.  In addition, Schlesinger was fired by Spectranetics and demonstrated animosity towards Spectranetics thereafter.  (See CAC ¶¶ 10, 89, 90.)  What Plaintiff describes as a "whistleblower" complaint was actually a complaint that Schlesinger brought against Spectranetics for wrongful termination and related claims.  (Id. ¶ 89.)

Federal courts have been reluctant to credit information from sources, like Schlesinger, who may "have axes to grind."  See, e.g., Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007); FX Energy, 2009 WL 1812828, at *10.  Finally, this Court should discount anything based on the "whistleblower" complaint because Schlesinger served as the apparent source for the incorrect information that Spectranetics products are not safe for ISR and Plaintiff does not and cannot allege any facts to support this assertion.

### C.   Plaintiff Cannot Rely On Unsupported Claims From A Former Company Employee.

While using an unnamed source is not prohibited per se, Plaintiff's reliance on an unnamed source like CW 1 does require Plaintiff to provide additional facts in support of its allegations.  See, e.g., Adams, 340 F.3d at 1102-03.  In particular, Plaintiff must provide facts demonstrating that CW 1 had direct personal knowledge of the information

attributed to him.[11]  Id. at 1102; see also The Sorkin, LLC v. Fischer Imaging Corp., No. Civ.A. 03-CV-00631-R, 2005 WL 1459735, at *6-7 (D. Colo. June 21, 2005) (citing Calif. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)).  Plaintiff does not do so.  For example, Plaintiff describes CW 1 as a former officer of Spectranetics from May 2007 through October 2008 but cites him as a source concerning the use of the FMD guidewires in 2006 including specifics concerning the labeling on the packaging.  (CAC ¶¶ 96, 97.)  Similarly, Plaintiff also cites CW 1 as the source that "[Defendant] Dr. Walker . . . provided Spectranetics with approximately 50% to 60% of its revenue" even though there is nothing in CW 1's purported job description to indicate that CW1 would have had access to data on Spectranetics' revenues and the sources of those revenues. (Id. ¶¶ 96, 120.)  In addition, like Schlesinger, CW 1 is a former Spectranetics employee and therefore possibly has an "ax[] to grind" against his former employer.  See, e.g., Higginbotham, 495 F.3d at 757; FX Energy, 2009 WL 1812828, at *10.

### D.    The Generalized "Facts" Attributed To Plaintiff's Sources Do Not Demonstrate Fraud

Even if the Court were to credit the information attributed to the "whistleblower" complaint and CW 1, these "witnesses" have not provided specific facts – as opposed to generalizations – that Spectranetics actually violated the FDA's rules and regulations. See Adams, 340 F.3d at 1098 ("[g]eneralized or conclusory allegations of fraud will not be sufficient" to support a claim for securities fraud).  For example, Plaintiff alleges that

---

[11]    As Plaintiff uses the pronoun "he" while referring to CW 1 (see, e.g., CAC ¶ 99), Defendants will do the same.

"according to CW 1, the Company spent considerable time, effort, and money on the marketing and promotion of its laser and disposables for off-label use." (CAC ¶ 117.) What does this mean? Does it mean that Spectranetics responded to doctor requests for off-label information? Does it mean that Spectranetics sent an article reprint to a doctor? These acts might be promotion within the general meaning of the term but are perfectly appropriate. Without more specifics, this information is nothing more than a conclusory claim that would not suffice under Rule 8 let alone the heightened particularity requirements of the Reform Act. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Similarly, Plaintiff's allegation that the "whistleblower" complaint claims that the company "illegally and 'extensively' market[ed] its laser and catheters for uses that had not been approved by the FDA" – absent more specifics and references to the particular bases for this statement – cannot be credited, and is therefore, devoid of meaning. (CAC ¶ 89.)

Indeed, the only specifics – and the use of the word specific is generous in this context – alleged in the CAC do not demonstrate that Spectranetics violated any FDA rules or regulations. There was nothing wrong with Spectranetics training some unnamed physicians at unidentified training sessions on unexplained dates on off-label uses of its products. As discussed above, its IFU required physician training, and in any event, Spectranetics told its stockholders that it was conducting such training including for ISR. (Ex. 19 at 2, 4, 11-14, 17; CAC ¶¶ 70, 77, 120, 128.) Plaintiff's allegations regarding comments concerning conferences is innocuous because physicians are

permitted to discuss the possible uses of products at "industry-supported scientific and educational activities that are otherwise independent and non-promotional." (CAC ¶ 107.) In addition, the CAC's allegations that Spectranetics put together unidentified sales materials that discussed off-label uses in unexplained ways are irrelevant. (Id. ¶ 69(b).) Spectranetics was allowed to answer unsolicited questions about off-label uses and required materials in order to do that. The lack of any specifics concerning these documents also severely undermines any reliance on them. See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 985 (9th Cir. 1999) ("a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports"); Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432 (5th Cir. 2002).

### E.    Plaintiff Engages In Pleading Games To Hide The Lack Of Support For Its Claims.

Plaintiff's allegations on information and belief are further weakened by the CAC's pleading games. These games involve (1) burying paragraphs for which it has no support whatsoever between paragraphs that purport to be based on the "whistleblower" complaint and/or CW1 and (2) hiding sentences without attribution between sentences with attribution. Thus, and merely by way of example, in Paragraph 98, the CAC attributes the wholly innocent information that Schulte updated the Board on the acquisition and testing of the FMD guidewire to CW 1 but offers no support for the next sentence claiming that the Board purportedly "discussed human product evaluations." Similarly, the first sentence of Paragraph 100 indicating that Mr. Childs knew that there were illegal tests of the FMD wires has no attribution while the second

non-culpable sentence does. In addition, the CAC provides no support for Paragraphs 118, 119, and 122 but hides them within Paragraphs 117, 120, 121, 123, 124, 125 and 126 for which it claims a source.

## III. Plaintiff Has Not Pled Any Material Misstatements Or Omissions.

Plaintiff failed to adequately plead that the alleged misstatements or omissions were material either as to alleged off-label promotion or use of imported products. See Fleming Cos., 264 F.3d at 1257-58, 1260-61, 1265 (requiring materiality); Grossman, 120 F.3d at 1118 (same). The Tenth Circuit has clearly held that an alleged misstatement or omission cannot be material as a matter of law if the alleged fraud has only a negligible relationship to a company's financials. See Grossman, 120 F.3d at 1119; see also Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996). Moreover, "forward-looking" statements are not material misstatements, unless they were actually known by the speaker to be false or made without a reasonable basis in fact. Grossman, 120 F.3d at 1120 n.6; Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662, 676-77 (D. Colo. 2007).

Plaintiff does not allege facts to establish the materiality of any alleged statement or omission regarding purported promotion for treatment of ISR by Defendants. Rather, it tries to make much of the unremarkable – and indisputably true – forward-looking statements by Spectranetics executives about the potential market for ISR but cannot allege that Spectranetics had obtained any significant portion of its revenue through off-label promotion. (CAC ¶¶ 63, 64, 105, 118, 136, 153, 166.) It alleges that Dr. Walker accounted for 50% to 60% of Spectranetics revenue but does not differentiate between

"proper" revenue and revenue generated by alleged off-label promotion. This failing is fatal given that Plaintiff acknowledges that Spectranetics products had many lawful uses and similarly admits that physicians were free to use the products voluntarily for off-label uses. (Id. ¶¶ 40, 49, 53, 62 120); see, e.g., In re Gilead Sciences Sec. Litig., No. C03-4999 MJJ, 2005 WL 181885, at *9 (N.D. Cal. Jan. 26, 2005) (dismissing 10(b) claim where allegations insufficient to show that off-label marketing materially increased sales of drug and refusing to "simply assume" materiality); In re GlaxoSmithKline PLC Sec. Litig., No. 05 Civ. 3751(LAP), 2006 WL 2871968, at *10 (S.D.N.Y. Oct. 6, 2006).

Plaintiff also claims that Spectranetics' revenue fell after the FDA executed its search warrant because Spectranetics could no longer promote its products for off-label uses. Plaintiff, however, does not tie any specific revenue to any claimed misconduct. In addition, Spectranetics' stock price and revenue growth in its vascular intervention business had fallen long before September 4, 2008. (Ex. 33; compare Ex. 13 at 1, 6 with Ex. 14 at 1, 7).

Last, Plaintiff's allegations relating to the alleged illegal use of the FMD guidewires and BMT balloons also fail for lack of materiality. According to Plaintiff's own allegations Spectranetics never earned one penny from any sales of FMD guidewires or BMT balloons. (CAC ¶ 99 (admitting no revenue came from FMD products); id. ¶¶ 83-86, 169-175 (discussing BMT, but not mentioning any revenue generated from BMT products).) In sum, Plaintiff has failed to allege any material misrepresentation or omission as a matter of law and its action must be dismissed.

**IV.    Plaintiff Has Failed To Allege Scienter Given That It Can Offer No Motive Or Particularized Facts Demonstrating Intent To Defraud.**

Plaintiff's CAC must also be dismissed because its scienter allegations completely fail to meet the stringent requirements of the Reform Act. A plaintiff must plead specific facts that "give rise to a strong inference" that "(1) the defendant knew of the potentially material fact, **and** (2) [that] the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Fleming Cos., 264 F.3d at 1261 (emphasis added); Adams, 340 F.3d at 1105 (strong inference must be "logically based upon particular facts"). "[K]nowledge in this context may be satisfied [by] recklessness" but "[c]ourts have been cautious about imposing liability for . . . reckless conduct" and require at least "severe recklessness." Fleming Cos. , 264 F.3d at 1260-61, 1262 n.19. Moreover, any purported inference of scienter must be evaluated in light of other competing inferences and a court must weigh "inferences urged by the plaintiff [against] competing inferences rationally drawn from the facts alleged." Tellabs, 551 U.S. at 314. An inference of scienter is considered "strong" only if it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Galvin v. McCarthy, 545 F. Supp. 2d 1176, 1186 (D. Colo. 2008) (quoting Tellabs, 551 U.S. at 314).

Plaintiff tries to meet these standards with haphazard innuendo but fails to acknowledge the fundamental problem that the Individual Defendants acquired – and did not sell – stock during the class period, thereby refuting any inference of scienter. While Plaintiff's reliance on innocuous generic corporate motives, unreliable and irrelevant information from confidential witnesses, wholly generic "must have known" conclusions, and non-securities based investigations are insufficient in the ordinary

case, they are especially inadequate here given the Individual Defendants stock purchases.[12]

## A. The Defendants Acquired Stock During The Class Period Thereby Undermining Any Inference Of Scienter.

Unlike almost every other case alleging securities fraud, Plaintiff has not alleged that any of the Individual Defendants sold stock during the class period. This alone undermines any effort to allege scienter. See, e.g., Red Robin, 505 F. Supp. 2d at 678 ("absence of inside sales dulls allegations of fraudulent motive") (citing PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 691 (6th Cir. 2004) and In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 894 (8th Cir. 2002)); Shriners Hosp. for Children v. Qwest Comm. Int'l, Inc., No. 04-CV-0781-REB-CBS, 2005 WL 2350569, at *10 (D. Colo. Sept. 23, 2005) (same).

More critically, the insider trading forms filed with the SEC over the class period show that nearly every one of the Individual Defendants **acquired** shares during the class period. (Ex. 5 (Childs) (2000 shares); Ex. 6 (Childs) (8000 shares); Ex. 7 (Geisenheimer) (75000 shares); Ex. 8 (Schulte) (5000 shares); Ex. 9 (Schulte) (5000 shares); Ex. 10 (Walker) (60000 shares).) These acquisitions of stock by each of the Individual Defendants affirmatively rebuts any inference of scienter. In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 390 (4th Cir. 2005); Searls v. Glasser, 64 F.3d 1061, 1068 (7th Cir. 1995); Avon Pension Fund v. GlaxoSmithKline PLC, No. 08-4363-

---

[12] Plaintiff also seems to attempt to allege scienter based on SOX certifications signed by Messrs. Schulte and Childs, but every Court of Appeals to address the issue has held that such certifications "add nothing" to the "scienter calculus." See, e.g., Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1004 (9th Cir. 2009); Ind. Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 544-45 (5th Cir. 2008); Garfield v. NDC Health Corp., 466 F.3d 1255, 1265-66 (11th Cir. 2006).

CV, 2009 WL 2591173, at *2 (2d Cir. Aug. 24, 2009).[13]  Indeed, the fact that the defendants most often referenced in the CAC – Mr. Schulte and Dr. Walker – together spent over $600,000 of their own cash on open market purchases of stock during the class period should be dispositive.  In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1094 (9th Cir. 2002) (small sales by "person most quoted in the complaint" "negate such an inference" of fraud).

These facts strongly weigh in favor of dismissal regardless of Plaintiff's other allegations.[14]

**B.    Plaintiff Has Not Alleged Recklessness That Reflects A Danger Of Misleading Investors.**

Plaintiff alleges that Defendants "must have known" that failure to disclose the alleged wrongdoing would mislead stockholders based on their positions with Spectranetics, information from the CWs, and because the FDA and ICE executed a search warrant on Spectranetics.  These allegations do not suffice.

The Tenth Circuit has clearly rejected "allegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading" and found that such "must have known" inferences "are precisely the types of inferences which [courts] on numerous occasions, have

---

[13]  See also In re Humphrey Hospitality Trust, Inc. Sec. Litig., 219 F. Supp. 2d 675, 686 (D. Md. 2002); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001).

[14]  The CAC's assertion that Spectranetics made misleading statements in order to try to sell the company at an allegedly inflated price does not demonstrate motive.  (CAC ¶ 165.)  The CAC does not and cannot allege that any such sale actually took place, and, even if it had, this would not constitute a "concrete" motive that differs in any way from a motive possessed by all companies. Fleming Cos., 264 F.3d at 1261, 1268-70 (alleged motives to facilitate corporate transaction and other generic corporate motives insufficient to allege scienter).

determined to be inadequate." Fleming Cos., 264 F.3d at 1264.  Thus, the allegations

of the CAC based on Defendants' positions and the conclusory claims that they must

have known of the wrongdoing cannot give rise to the requisite strong inference of

scienter. (CAC ¶¶ 26-30, 32-37, 72, 82, 100, 125, 126, 161, 176, 199, 244.)[15]  Indeed, it

is difficult to understand how Defendants must have known that Spectranetics' products

were not safe for use in the treatment of ISR when Plaintiff has not alleged facts so

indicating and the judicially noticeable information demonstrates just the opposite.  See

GFF Corp. v. Assoc. Wholesale Grocers, Inc., 130 F.3d 1381, 1385 (10th Cir. 1997)

("[m]ere legal conclusions and factual allegations that contradict . . . a properly

considered document are not well-pleaded facts that the court must accept as true").

Plaintiff's allegations based on the CWs fare no better.  As discussed above, the

information Plaintiff attributes to the CWs is not reliable.  In addition, the CWs do not

claim with sufficient specificity to satisfy the Reform Act that each of the Defendants

knew of the alleged wrongdoing. Adams, 340 F.3d at 1105-07 (analyzing scienter as to

each defendant individually); Mizzaro, 544 F.3d at 1238 (holding that "complaint must

allege facts supporting a strong inference of scienter 'for each defendant with respect to

each violation'").  The CWs do not allege – except in conclusory terms – that any of the

Defendants knew (1) that the FMD wires and BMT balloons were not approved for

---

[15]  The allegations of the CAC that are not supported by reference to any source as well as the
unsupported allegations hidden between and within paragraphs for which certain sentences or
clauses have sources but others do not are similarly insufficient to give rise to a strong inference of
scienter.  Tellabs, 551 U.S. at 326 (affirming that "omissions and ambiguities count against inferring
scienter"); Fleming Cos., 264 F.3d at 1264 (plaintiffs' conclusory allegations that defendants were
"actually aware or recklessly indifferent" to the wrongdoing fail to raise a strong inference of scienter
because they were "completely unsupported by any particularized facts"); In re K-Tel, 300 F.3d at 894
(unsupported allegations of scienter are not sufficient to satisfy the heightened pleading
requirements).

clinical testing, (2) that Spectranetics' alleged conduct concerning ISR allegedly violated the FDA's vague rules and regulations concerning off-label promotion, or (3) that the laser was not safe for the treatment of ISR. (CAC ¶¶ 97-98, 100, 120-123 125, 126, 165, 170-74.)

In addition, Plaintiff's claim that the FDA and ICE search warrant supports an inference of scienter as to a claim of securities fraud fails. The FDA and ICE are not charged with enforcing the securities laws and Plaintiff purports to be asserting a claim for securities fraud – not a violation of FDA rules or regulations. Indeed, the SEC – which does investigate securities fraud – was not even part of the team that executed the search warrant and merely made an informal request for documents nearly three weeks afterwards on September 24, 2008. (Ex. 3 at 15; CAC ¶ 90.) Even if the SEC were part of the team that executed the search warrant – and it was not – that would not demonstrate scienter. Cozzarelli v. Inspire Pharm., Inc., 549 F.3d 618, 628 n.2 (4th Cir. 2008) (pending SEC investigation is "too speculative to add much, if anything, to an inference of scienter"); In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 248-49 (8th Cir. 2008) (same). Last, given that Defendants were acquiring stock in the weeks and months leading up to the search warrant, it is much more reasonable to conclude that Defendants were just as surprised as the market by the developments on September 4, 2008.

Finally, even if the CAC alleged that Defendants knew of the alleged wrongdoing – which it has not – Plaintiff must still allege that "the defendant[s] knew that failure to reveal the potentially material fact would likely mislead investors." See Fleming Cos.,

41

264 F.3d at 1261.[16]  Plaintiff cannot do that because federal courts are reluctant to find scienter where the rules at issue are ambiguous, and as discussed above, the FDA rules at issue here are particularly vague as to the question of what actually constitutes off-label promotion.  See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 280  (S.D.N.Y. 2008) ("ambiguity counsels against a culpable reading of [CFO] Winters's – or any other defendant's – actions"); Funke v. Life Fin. Corp., 237 F. Supp. 2d 458, 468-71 (S.D.N.Y. 2002) (ambiguities in accounting principle defeated plaintiffs' attempt to predicate scienter of defendant company, officers and directors upon simple violation of rule).  Plaintiff must thus allege specific facts indicating, not just that Spectranetics' conduct violated the FDA's ambiguous rules but also that the Defendants knew that their conduct crossed those lines; acted to conceal those violations; and intended to defraud Spectranetics' stockholders by such concealment.  Plaintiff has not even attempted to meet these standards and therefore has not alleged scienter.

### C. Plaintiff's Allegations Taken As A Whole In Fact Demonstrate That Defendants Did NOT Act With Scienter.

Considered in its entirety, the CAC does not allege a strong inference of scienter. Tellabs, 551 U.S. at 326.  Plaintiff's hodge-podge of allegations attempting to establish intent to defraud cannot overcome the judicially noticeable facts that the Individual Defendants purchased Spectranetics' stock during the class period and the FDA's rules in this area are vague and ambiguous.

---

[16]   In addition, in Fleming Cos., the Tenth Circuit held that there was no scienter where a company failed to disclose a litigation to its stockholders because it was not clear that the defendants needed to disclose the litigation under Item 103 of Regulation S-K, and, as discussed above, Plaintiff cannot allege that Defendants were obligated to disclose the alleged uncharged wrongful conduct under Item 103 of Regulation S-K. Id. at 1265-68.

**V.     Plaintiff Has Failed To Allege Loss Causation Because The CAC Does Not Identify Any Corrective Disclosures.**

Plaintiff's CAC must also be dismissed for failure to allege loss causation.  The Supreme Court made clear in <u>Dura</u> that a plaintiff cannot simply plead that it purchased stock at an inflated price.  544 U.S. at 342, 346-48.  Instead, a plaintiff must plead that the purported fraud "proximately cause[d] [the] economic loss" and held that "[t]he complaint's failure to claim that Dura's share price fell significantly after the truth became known" rendered "plaintiff's complaint legally insufficient."  <u>Id</u>.

In the years since the Supreme Court decided <u>Dura</u>, courts have considered and rejected the theory that a plaintiff can allege loss causation merely by alleging that the company's stock price fell when a company announces a SEC or USAO investigation.  Thus, for example, in <u>In re Maxim Integrated Prod., Inc. Sec. Litig.</u>, __ F. Supp. 2d __, 2009 WL 2136939 (N.D. Cal. July 16, 2009), the court held that a plaintiff had not alleged loss causation by alleging that the company's stock price fell either after the company announced that the SEC was conducting an informal inquiry into the company's option practices or after the company announced that it received a subpoena from the U.S. Attorney for the Northern District of California "asking for documents relating to its stock option grants and practices."  <u>Id</u>. at *5-6.  The court reasoned that these disclosures merely provided notice that the company "may have illicitly backdated stock options" and not that it did and therefore were not corrective disclosures.  <u>Id</u>. at *6.  <u>See</u> <u>also</u> <u>In re Williams Sec. Litig.—WCG Subclass</u>, 558 F.3d 1130, 1141-42 (10th Cir. 2009) (stock price drop after filing of lawsuit not the result of facts disclosed in the suit but "'more logically occurred because the market feared that a

lawsuit' would independently harm the corporation"). Similarly, in In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007), the court dismissed a case for failure to allege loss causation where the stock price fell after the company announced an SEC investigation because "the mere existence of [an] investigation cannot support any inferences of wrongdoing." And in City of Austin Police Ret. Sys. v. ITT Educ. Serv., Inc., 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005), the court recognized that a "company's share price can drop suddenly [when it announces that the government came and executed search warrants] without any evidence or finding of wrongdoing by the company or its senior management."

Plaintiff has merely alleged that Spectranetics' stock price fell after it announced the FDA/ICE search warrant, and thus for the reasons explained in Maxim, Williams, Hansen, and ITT, Plaintiff has failed to allege loss causation. (CAC ¶¶ 217-222.)

## VI.    **Plaintiff Relies Upon Discredited Doctrines.**

Apparently recognizing that it cannot state a claim under Section 10(b) with the particularity required by the Reform Act, Plaintiff has attempted to rely on discredited doctrines that once applied under certain circumstances. Thus, Plaintiff invokes the group pleading doctrine even though every Court of Appeals to have addressed the issue has ruled that it did not survive the Reform Act. Plaintiff also invokes "scheme" liability under Rules 10b-5(a) and (c) even though the Supreme Court made clear in Stoneridge Investment Partners v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 770 (2008) that there is no such thing as scheme liability.

**A.    Plaintiff's Attempt To Reinvigorate The Abrogated Group Pleading Doctrine Fails.**

Plaintiff cannot rely on the group pleading doctrine to try and charge the Individual Defendants with liability for statements in Spectranetics' press releases and SEC filings.  Before Congress enacted the Reform Act in 1995, "the group pleading doctrine allow[ed] a plaintiff to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud." Winer, 503 F.3d at 335.    Practically, this meant that individual defendants who ran the day-to-day affairs of the company could be held responsible for all company press releases and SEC filings.  However, every Court of Appeals that has addressed the issue has held that the doctrine is inconsistent with the Reform Act and did not survive its passage. See, e.g., id. at 335-37; Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006), rev'd on other grounds, 551 U.S. 308 (2007); Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 363-65 (5th Cir. 2004).  Defendants recognize that this Court has held otherwise, see In re Qwest Comm. Int'l Sec. Litig., 387 F. Supp. 2d 1130, 1145 (D. Colo. 2005), but note that the Court did not have the benefit of the Court of Appeals decisions discussed above. Based on the reasoning of those decisions, the Court should dismiss this case against every defendant not specifically alleged to have made a statement – Childs[17], Geisenheimer, McGuire and Walker – and clarify that the other Individual Defendants cannot be liable under Rule 10b-5 for all statements in press releases or SEC filings.

---

[17]    Plaintiff only alleges that Mr. Childs made one statement (CAC ¶ 141) and this statement is not actionable for the reasons discussed above.

Any potential liability can only be based on those statements each Defendant specifically made during the class period.[18]

Moreover, even if the group pleading doctrine were still viable, Plaintiff has not alleged facts to apply it to defendants Geisenheimer and Walker who were outside directors during the class period.[19]  Before it was abrogated by the Reform Act, courts held that the doctrine applied only to persons involved in the day-to-day management of the company and the preparation of the allegedly misleading statements at issue.  In re GlenFed, Inc. Sec. Litig., 60 F.3d 591, 593 (9th Cir. 1995); Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237-38 (S.D.N.Y. 2000).  Hence, it did not apply to outside directors.  In re The Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 18 (D.D.C. 2000); In re Am. Bus. Fin. Servs., Inc. Sec. Litig., 413 F. Supp. 2d 378, 395-96 (E.D. Pa. 2005)).[20]  And conclusory claims, like Plaintiff's here, that Geisenheimer and Dr. Walker were not typical outside directors because they received payments from the company does not show participation with regard to the statements at issue.  See GlenFed, 60 F.3d at 593

---

[18]  Plaintiff also cannot hold Mr. Schulte responsible for any of the statements attributed to him in various newspaper articles because Plaintiff does not allege that Mr. Schulte "sufficiently entangle[d]" himself with those articles by reviewing the articles before they were published to ensure that the quotes were accurate and providing the times and dates of his apparent interactions with the reporters.  Greene v. Horizon/CMS Healthcare Corp., No. CIV. 97-114JP/DJS, 1998 WL 2030956, at *4 (D.N.M. July 13, 1998).

[19]  The group pleading doctrine also does not apply to oral statements made by others.  See In re Impac Mortgage Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1092 (C.D. Cal. 2008); D.E. & J Ltd. P'ship v. Conaway, 284 F. Supp. 2d 719, 732 (E.D. Mich. 2003).

[20]  In addition, the mere signature of an outside director on a document is not enough to make the outside director liable for the contents of the document.  In re Nat'l Century Fin. Enter., Inc., 504 F. Supp. 2d 287, 298 (S.D. Ohio 2007); Wojtunik v. Kealy, 394 F. Supp. 2d 1149, 1165 (D. Ariz. 2005) (concurring "with the arguments of the outside directors that the Amended Complaint is insufficient to the extent that it alleges that their mere signatures on the 1999 10-K sufficiently links them to any misrepresentations and omissions contained in that form"); In re Gupta Corp. Sec. Litig., 900 F. Supp. 1217, 1241 (N.D. Cal. 1994) ("[T]he mere fact that an outside director signed a group published document does not make the outside director liable for the contents of the document.").

("Plaintiffs fall short of alleging operational involvement on the part of the outside directors, a prerequisite for group pleading."); In re Nat'l Century, 504 F. Supp. 2d at 298-99 (refusing to apply group pleading doctrine where complaint merely asserted that the Outside Directors were "far more involved" than "typical outside directors").

### B.    Plaintiff's Scheme Liability Claim Fails Because It Is Based Solely On Misstatements and Plaintiff Has Not Adequately Pled Reliance.

Plaintiff also attempts to assert a claim based upon Rules 10b-5(a) and (c) or so called "scheme" liability. In cases alleging securities fraud, plaintiffs usually resort to "scheme" liability only against third-party defendants with no affiliation to the company at issue such as outside accountants or other outside professional advisors. Thus, Plaintiff's addition of a scheme claim against the Defendants here – who constitute the company at issue and certain of its directors and officers – reflects its inability to state a claim under Rule 10b-5(b) and is yet another baseless and desperate attempt to avoid a proper dismissal of this action. Plaintiff's scheme claim fails because (1) it is based on misrepresentations and omissions; (2) it suffers from the same defects as the claim under Rule 10b-5(b); and (3) Plaintiff has not alleged reliance.

Courts have agreed "that where the sole basis for [a scheme] claim[] is alleged misrepresentations or omissions, plaintiffs have not [stated a] claim under Rule 10b-5(a) and (c)." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177 (2d Cir. 2005); Lautenberg Found. v. Madoff, No. 09-816 (SRC), 2009 WL 2928913, at *11-12 (D.N.J. Sept. 9, 2009); TCS Cap. Mgmt., LLC v. APAX Partners, LP, No. 06-CV-13447(CM), 2008 WL 650385, at *22 (S.D.N.Y. Mar. 7, 2008) (holding that re-labeling misstatements and omissions as "manipulative and deceptive conduct" is a "sleight of hand [that] does

not magically transform its disclosure claim into a market manipulation claim").    This

principle applies here to bar Plaintiff's "scheme" claim because Plaintiff bases this claim

on the same omissions and misrepresentations that it relies upon to support its Rule

10b-5(b) assertions.  (CAC ¶ 238.)

Plaintiff's scheme claim also fails for the same reasons that its claim under Rule

10b-5(b) fails.  No matter whether classified as a claim under Rule 10b-5(b) or a claim

under Rules 10b-5(a) and (c), Plaintiff cannot assert a claim that is an end-run around

the bar on any private rights of action under the FDCA.  See Part I above.  Similarly, the

securities laws do not exist to prohibit all potentially improper conduct either by turning

such activity into a claim under Rule 10b-5(b) by alleging that companies must disclose

uncharged unlawful conduct or by claiming that all such conduct by a public company or

its directors and officers constitutes deceptive conduct within the meaning of the Rules

10b-5(a) and (c).  This would clearly be contrary to Congressional intent concerning the

scope of the securities laws.  See Stoneridge, 128 S. Ct. at 772 ( "[t]he jurisdiction of the

federal courts is carefully guarded against expansion by judicial interpretation").

Finally, conclusory allegations that a defendant committed a deceptive act, even

one in furtherance of a scheme to defraud investors, are insufficient to plead a claim

under (a) and (c).  Stoneridge, 128 S. Ct. at 769-71.  Instead, this Court must focus on

the elements of reliance and causation in order to determine whether Defendants'

deceptive acts, if any, were the proximate cause of Plaintiff's injuries.  Id.  Plaintiff here

does not allege facts that satisfy these elements.  Indeed, there is no presumption of

reliance in "scheme" cases, Desai v. Deutsche Bank Sec. Ltd, 573 F.3d 931, 938-42

(9th Cir. 2009); Joseph v. Wiles, 223 F.3d 1155, 1163-65 (10th Cir. 2000), and far from

indicating that it relied on the conduct at issue in buying Spectranetics stock, Plaintiff

claims that Spectranetics hid its illegal conduct from its stockholders.  (CAC ¶ 240.)

### C.    Plaintiff Has Failed to Plead Control Person Liability.

"[T]o state a prima facie case of control person liability [under Section 20(a)], the

plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over

the primary violator by the alleged controlling person."  Fleming Cos., 264 F.3d at 1270-

71.  Plaintiff fails this test for three reasons.  First, Plaintiff cannot establish a primary

violation of Section 10(b) and therefore cannot state a claim under Section 20(a).  Id.

Second, Plaintiff has not plead facts indicating that each defendant possessed "the

power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R.

§ 230.405; see Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998)

(dismissing claim under Section 20 where plaintiff failed to plead any facts "from which it

can reasonably be inferred the defendant was a control person").  Rather, the Plaintiff

merely makes generalized allegations based on Defendants' positions with

Spectranetics.    Third, the claim fails as to defendants Geisenheimer and Walker

because they were merely outside members of the board of directors, not company

executives.  See Adams, 340 F.3d at 1108 (dismissing 20(a) claim against Kinder, who

"was not an executive of the company, but simply a member of the board of directors");

Sorkin, 2005 WL 1459735, at *12; Paracor Fin., Inc. v. General Electric Cap. Corp., 96

F.3d 1151, 1163-64 (9th Cir. 1996).

## **CONCLUSION**

For all the foregoing reasons, the CAC should be dismissed.

Dated: September 18, 2009

/s/ Bruce G. Vanyo
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: 310-788-4400
Facsimile:  310-788-4471
Email:  bruce@kattenlaw.com

Counsel    for    Defendants    The
Spectranetics    Corporation,    Guy    A.
Childs, Emile Geisenheimer, Jonathan
W. McGuire, and Craig M. Walker, M.D.

/s/ Stephen C. Schulte
WINSTON AND STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5890
Facsimile:  312-558-5700
Email:  sschulte@winston.com

Counsel for Defendant John G. Schulte