**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 08-cv-02048-REB-KLM

(Consolidated with Civil Action Nos. 08-cv-02055-REB-KLM, 08-cv-02078-REB-KLM, 08-cv-02267-REB-KLM, 08-cv-02420-REB-KLM, and 08-cv-02603-REB-KLM)

In re SPECTRANETICS CORPORATION SECURITIES LITIGATION

--------

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

--------

Certification under REB Practice Standards V.I. and D. Colo. LCivR 7.1(a):  Counsel for Plaintiffs have read and complied with the Practice Standards of this Court governing the formatting and marshalling of this response to Defendants' Rule 12(b)(6) motion.

Plaintiffs,[1] who brought this action under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all persons or entities that purchased or acquired securities of Spectranetics Corporation ("Spectranetics" or the "Company") between March 16, 2007 and September 4, 2008, inclusive (the "Class Period"), respectfully submit this memorandum of law in opposition to the motion to dismiss Lead Plaintiff's Consolidated Class Action Complaint (the "Complaint")[2] filed by Spectranetics; the Company's Vice President, Chief Financial Officer ("CFO"), and Secretary, Guy A. Childs ("Childs"); the Company's President, Chief Executive Officer ("CEO") and director, John G. Schulte ("Schulte"); the Company's Chief Operating Officer ("COO"), Jonathan W. McGuire; the Chairman of Spectranetics' Board of Directors, Emile Geisenheimer ("Geisenheimer"); and a director of Spectranetics, Craig M. Walker ("Dr. Walker") (collectively, the "Individual Defendants"; and with the Company, "Defendants").

--------

[1]  Genesee County Employees' Retirement System, the Wayne County Employees' Retirement System and Peter J. Tortora (collectively, "Plaintiffs").

[2]  Paragraph references (¶ ) shall be to those in the Complaint (Dkt. No. 75).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION AND STATEMENT OF FACTS ........................................................... 2

ARGUMENT ................................................................................................................... 8

I.    THE LEGAL STANDARD ON A MOTION TO DISMISS ........................................ 8

II.   PLEADING REQUIREMENTS FOR A SECTION 10(B) CLAIM ............................. 8

III.  PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS ........................... 10

IV.   PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS AND OMISSIONS ...... 12

    A.    LEGAL STANDARD FOR THE DUTY TO DISCLOSE ................................................. 12

    B.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS .............. 14

    C.    THE MATERIALITY OF THE STATEMENTS HAS BEEN SUFFICIENTLY ALLEGED ......... 22

V.    THE INDIVIDUAL DEFENDANTS ARE ALL LIABLE ........................................... 26

VI.   THE ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF
    *SCIENTER* ................................................................................................................... 28

    A.    THE LEGAL STANDARD FOR ALLEGING *SCIENTER* ................................................ 28

    B.    THE COMPLAINT'S *SCIENTER* ALLEGATIONS ARE POWERFUL AND DETAILED ......... 30

        1.    Defendants Were Aware of Facts or Had Access to Information
            Contrary to Their Public Statements ................................................... 30

        2.    The Individual Defendants Were Certain to Know About the
            Company's Effort to Promote Off-Label Uses ..................................... 35

        3.    The Resignations and Investigations Provide Evidence of
            *Scienter* ............................................................................................. 37

        4.    Motive Has Been Adequately Pleaded ............................................... 38

        5.    The Proximity of the Misleading Statements and the Disclosure ........ 40

        6.    False SOX Certifications Provide Additional Evidence of
            *Scienter* ............................................................................................. 41

VII.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ...................... 41

VIII.  PLAINTIFFS STATE ACTIONABLE 10B-5(A) AND (C) CLAIMS.......................... 45

       A.   PLAINTIFFS' SCHEME ALLEGATIONS FALL UNDER RULE 10B-5(A) AND (C) ............ 45

       B.   THE MISREPRESENTATIONS AND OMISSIONS DO NOT FORECLOSE LIABILITY ......... 46

       C.   PLAINTIFFS' ALLEGATIONS ARE SUFFICIENT TO ESTABLISH RELIANCE .................. 47

IX.    THE COMPLAINT STATES A CLAIM FOR CONTROL PERSON LIABILITY....... 48

CONCLUSION .......................................................................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ............................................................................. 9, 28

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...................................................................... 33

*In re Alliance Pharm. Corp. Sec. Litig.*,
   279 F. Supp. 2d 171 (S.D.N.Y. 2003) ...................................................................... 17

*American Casualty Co. v. Glaskin*,
   805 F. Supp. 866 (D. Colo. 1992) .............................................................................. 8

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................... 10, 21

*Anderson v. Abbott Labs.*,
   140 F. Supp. 2d 894 (N.D. Ill. 2001) ........................................................................ 16

*In re Anicom Inc. Sec. Litig.*,
   No. 00-4391, 2001 U.S. Dist. LEXIS 6607 (N.D. Ill. May 15, 2001) ......................... 32

*In re Apollo Group Inc. Sec. Litig.*,
   395 F. Supp. 2d 906 (D. Ariz. 2005) ........................................................................ 38

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ............................................................................................... 8

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................... 35

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990) ...................................................................................... 21

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................................... 12, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 8

*Berson v. Applied Signal Tech., Inc.*,
　　527 F.3d 982 (9th Cir. 2008).................................................................. 34

*In re Bradley Pharms., Inc. Sec. Litig.*,
　　421 F. Supp. 2d 822 (D.N.J. 2006) ........................................................ 43

*In re Bristol Myers Squibb Co. Sec. Litig.*,
　　586 F. Supp. 2d 148 (S.D.N.Y. 2008) .................................... 37, 42, 44, 48

*Brody v. Transitional Hosp. Corp.*,
　　280 F.3d 997 (9th Cir. 2002)................................................................. 21

*In re CV Therapeutics Sec. Litig.*,
　　No. 03-03709, 2004 U.S. Dist. LEXIS 17419 (N.D. Cal. Aug. 5, 2004).................... 21

*Carlson v. Xerox Corp.*,
　　392 F. Supp. 2d 267 (D. Conn. 2005)...................................................... 33

*Carol Gamble Trust 86 v. E-Rex, Inc.*,
　　No. 03-15032, 2004 U.S. App. LEXIS 88 (9th Cir. Jan. 5, 2004) ............................ 50

*Chalverus v. Pegasys., Inc.*,
　　59 F. Supp. 2d 226 (D. Mass. 1999) ....................................................... 14

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
　　388 F. Supp. 2d 932 (S.D. Ind. 2005) ..................................................... 45

*City of Philadelphia v. Fleming Cos.*,
　　264 F.3d 1245 (10th Cir. 2001)...................................................... 12, 28

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
　　423 F. Supp. 2d 348 (S.D.N.Y. 2006) ...................................................... 43

*In re Complete Mgmt. Inc. Sec. Litig.*,
　　153 F. Supp. 2d 314 (S.D.N.Y. 2001) .................................................. 36, 39

*In re Connetics Corp. Sec. Litig.*,
　　542 F. Supp. 2d 996 (N.D. Cal. 2008)...................................................... 33

*In re Connetics Corp. Sec. Litig.*,
　　No. 07-02940, 2008 U.S. Dist. LEXIS 62515 (N.D. Cal. Aug. 14, 2008).................... 22

*In re CornerStone Propane Partners., L.P. Sec. Litig.*,
　　416 F. Supp. 2d 779 (N.D. Cal. 2005)...................................................... 30

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989)................................................................................. 36

*In re Countrywide Fin. Corp. Deriv. Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)........................................................... 35

*In re Credit Suisse First Boston Sec. Litig.*,
No. 97-4760, 1998 U.S. Dist. LEXIS 16560 (S.D.N.Y. Oct. 19, 1998) ................... 13

*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001)........................................................... 33

*Danis v. USN Commc'ns, Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999) ................................................................ 24

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005).......................................................................... 35

*David v. City & County of Denver*,
101 F.3d 1344 (10th Cir. 1996)......................................................................... 8

*Decker v. Massey-Ferguson*,
681 F.2d 111 (2d Cir. 1982).............................................................................. 17

*Desai v. Dautsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009)........................................................................... 47

*In re Digi Int'l Inc. Sec. Litig.*,
6 F. Supp. 2d 1089 (D. Minn. 1998)................................................................ 37

*Dudnikov v. Chalk & Vermilion Fine Arts*,
514 F.3d 1063 (10th Cir. 2008)......................................................................... 8

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................... 41, 42, 43

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003)............................................................................ 42

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................ 27

*In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*,
590 F. Supp. 2d 1282 (C.D. Cal. 2008)...................................................... 12

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) ....................................................... 36

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
466 F.3d 1 (1st Cir. 2006) ......................................................................... 41

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008) ....................................................... 19

*In re FX Energy, Inc.*,
No. 2:07-874, 2009 U.S. Dist. LEXIS 54551 (D. Utah June 25, 2009).................... 34

*In re Forest Labs. Sec. Litig.*,
No. 05-2827, 2006 U.S. Dist. LEXIS 97475 (S.D.N.Y. July 19, 2006)..................... 12

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2nd Cir. 2000) .................................................................... 22

*Garber v. Legg Mason, Inc.*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008) ....................................................... 25

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008)..................................................................... 11

*In re Gilead Scis. Sec. Litig*,
No. 03-4999, 2009 U.S. Dist. LEXIS 46751 (N.D. Cal. Jan. 26, 2005)................... 24

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997)................................................................. 26

*Grubka v. WebAccess Int'l, Inc.*,
445 F. Supp. 2d 1259 (D. Colo. 2006) ....................................................... 28

*Hall v. Children's Place Retail Stores, Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008) ....................................................... 37

*Hanon v. Dataprods. Corp.*,
976 F.2d 497 (9th Cir. 1992)..................................................................... 40

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)............................................... 44, 45

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 622 (S.D.N.Y. 2008) .............................................................. 30, 42

*Higginbotham v. Baxter*,
    495 F.3d 753 (7th Cir. 2007) .................................................................... 34

*Holmes v. Baker*,
    166 F. Supp. 2d 1362 (S.D. Fla. 2001) .................................................. 40

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ................................................................ 27

*In re ICG Commc'ns, Inc. Sec. Litig.*,
    No. 00-1864, 2006 U.S. Dist. LEXIS 6695 (D. Colo. Feb. 7, 2006)........................... 9

*In re Immucor Inc. Sec. Litig.*,
    No. 1:05-2276, 2006 U.S. Dist. LEXIS 72335 (N.D. Ga. Oct. 4, 2006) ................... 15

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
    527 F. Supp. 2d 698 ............................................................................... 16

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) .................................................... 18

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ............................................................. 47

*Kapur v. USANA Health Scis., Inc.*,
    No. 2:07-00177, 2008 U.S. Dist. LEXIS 58955 (D. Utah July 23, 2008) ................. 13

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008) .................................................... 32

*Kemp v. Medtronic, Inc.*,
    231 F.3d 216 (6th Cir 2000) .................................................................. 11

*Klein v. PDG Remediation*,
    937 F. Supp. 323 (S.D.N.Y. 1996) ....................................................... 23

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ................................................................ 39

*Lapin v. Goldman Sachs Group, Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................. 15

*Lautenberg Found. v. Madoff*,
   No. 09-816, 2009 U.S. Dist. LEXIS 82084 (D.N.J. Sept. 9, 2009) ........................... 45

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005).............................................................. 42, 44

*In re Lernout & Hauspie Sec. Litig.*,
   230 F. Supp. 2d 152 (D. Mass. 2002) ...................................................... 27

*Lewis v. Chrysler Corp.*,
   949 F.2d 644 (3d Cir. 1991)............................................................. 19

*Maher v. Durango Metals*,
   144 F.3d 1302 (10th Cir. 1998) ........................................................ 48, 49

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................... 34, 35, 36

*McMahan & Co. v. Wherehouse Entm't*,
   900 F.2d 576 (2d Cir. 1990) ............................................................. 17

*Merrell Dow Pharm. Inc. v. Thompson*,
   478 U.S. 804 (1986)................................................................. 11

*In re MicroStrategy Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................... 39

*In re Micron Tech. Sec. Litig.*,
   No. 06-85-S, 2009 U.S. Dist. LEXIS 13793 (D. Idaho Feb. 23, 2009)................ 46, 48

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   No. 06-6863, 2008 U.S. Dist. LEXIS 68419 (C.D. Cal. July 10, 2008) ..................... 27

*In re Moody's Corp. Sec. Litig.*,
   599 F. Supp. 2d 493 (S.D.N.Y. 2009) ..................................................... 33

*In re Motorola Sec. Litig.*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) ..................................................... 42

*In re NPS Pharms., Inc.*,
   No. 2:06-00570, 2007 U.S. Dist. LEXIS 48713 (D. Utah July 3, 2007) ........ 28, 35, 49

*New Jersey v. Sprint Corp.*,
    531 F. Supp. 2d 1273 (D. Kan. 2008) ....................................................... 9

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
    *America W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................ 40

*Novak v. Kasaks*,
    216 F.3d 311 (2d Cir. 2000) ...................................................... 19, 30, 35

*Nursing Home Pension Fund v. Oracle Corp.*,
    No. 01-00988, 2006 U.S. Dist. LEXIS 94470 (N.D. Cal. Dec. 20, 2006) ................. 42

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ................................................................. 25

*P. Stoltz Family P'ship L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004) .................................................................. 17

*PR Diamonds Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ........................................................... 39, 40

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ...................................................... 13, 15, 17

*Paracor Fin., Inc. v. GE Cap. Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ............................................................... 50

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ..................................................... 42

*In re Petco Animal Supplies Inc. Sec. Litig.*,
    No. 05-0823, 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31, 2006) .............. 27, 30

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008) .................................................... 11, 28

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ............................................................. 39

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) .................................................... 40

*In re ProQuest Sec. Litig.*,
    527 F. Supp. 2d 728 (E.D. Mich. 2007)................................................................. 41

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) .................................................................... 18

*In re Prudential Sec. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) .......................................................................... 15

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004) .................................................................. 28

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
    387 F. Supp. 2d 1130 (D. Colo. 2005) .................................................................. 22

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001) ................................................................... 37

*In re Rediff.com India Ltd. Sec. Litig.*,
    358 F. Supp. 2d 189 (S.D.N.Y. 2004) ................................................................... 13

*In re Regeneron Pharms, Inc. Sec. Litig.*,
    No. 03-3111, 2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. 2005).................................. 23

*In re Retek Inc. Sec. Litig.*,
    No. 02-4209, 2007 U.S. Dist. LEXIS 181 (D. Minn. Jan. 3, 2007)......................... 26

*In re Retek Inc. Sec.*,
    No. 02-4209, 2005 U.S. Dist. LEXIS 35734 (D. Minn. Mar. 7, 2005) ..................... 25

*In re Rhythms Sec. Litig.*,
    300 F. Supp. 2d 1081 (D. Colo. 2004) .................................................. 9, 28, 35, 37

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................... 9

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ................................................................................... 13

*SEC v. Delphi Corp.*,
    No. 06-14891, 2008 U.S. Dist. LEXIS 78671 (E.D. Mich. Oct. 8, 2008).................. 31

*SEC v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996).................................................................................. 12

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
    No. 3:02-2133, 2004 U.S. Dist. LEXIS 4643 (D. Conn. Mar. 9, 2004)..................... 27

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)......................................................................... 28

*In re Seebeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003).................................................. 40

*In re Sepracor, Inc. Sec. Litig.*,
    308 F. Supp. 2d 20 (D. Mass. 2004) ........................................................ 23

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996) .................................................................... 41

*Shirk v. Fifth Third Bancorp*,
    No. 05-49, 2007 U.S. Dist. LEXIS 26534 (S.D. Ohio Apr. 9, 2007)......................... 26

*Simons v. Dynacq Healthcare, Inc.*,
    No. 03-05825, 2006 U.S. Dist. LEXIS 46503 (S.D. Tex. July 10, 2006).................. 24

*In re SmarTalk*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000).................................................... 28

*Sorkin, LLC v. Fischer Imaging Corp.*,
    No. 03-00631, 2005 U.S. Dist. LEXIS 19934 (D. Colo. June 21, 2005) ............. 35, 50

*In re Sprint Corp. Sec. Litig.*,
    232 F. Supp. 2d 1193 (D. Kan. 2002) .................................................... 28

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008)................................................................... 9, 46, 48

*In re Sun Healthcare Group, Inc. Sec. Litig.*,
    181 F. Supp. 2d 1283 (D.N.M. 2002) ..................................................... 26

*In re Syncor Int'l Corp. Sec. Litig.*,
    No. 05-55748, 2007 U.S. App. LEXIS 14257 (9th Cir. June 12, 2007) ................... 21

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) .................................................... 44

*Tal v. Hogan*,
    453 F.3d 1244 (10th Cir. 2006) .............................................................. 8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05-1898, 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005)...................... 41

*Tellabs v. Makor Issues & Rights, Ltd*,
    551 U.S. 308 (2007) ................................................................... 9, 30, 36

*Thomas v. Metro. Life Ins. Co.*,
    No. 07-0121, 2008 U.S. Dist. LEXIS 82201 (W.D. Okla. Oct. 16, 2008) .................. 15

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) .............................................. 15, 18

*Virginia Bankshares v. Sandberg*,
    501 U.S. 1083 (1991) ............................................................. 12, 17, 22

*In re Viropharma, Inc., Sec. Litig.*,
    No. 02-1627, 2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3, 2003) ........................ 23

*West Palm Firefighters' Union v. Startek, Inc.*,
    No. 05-01265, 2008 U.S. Dist. LEXIS 47748 (D. Colo. Mar. 28, 2008) ................... 22

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1242 (D. Okla. 2003) .............................................. 39, 50

*In re Williams Sec. Litig. - WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) .......................................................... 44

*In re Xcel Energy, Inc.*,
    364 F. Supp. 2d 980 (D. Minn. 2005) ................................................... 38

*In re Xerox Corp. Sec. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001) .................................................. 19

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................... 37

## STATUTES AND RULES

17 C.F.R. §229.303(a)(3)(ii) ................................................................ 13

17 C.F.R. §240.10b-5................................................... 9, 12, 46, 47, 48

Fed. R. Civ. P. 8(a).................................................................................. 8, 9

Fed. R. Civ. P. 9(b)..................................................................................... 9

Fed. R. Civ. P. 12 ....................................................................................... 5

Fed. R. Civ. P. 15(a)................................................................................... 50

D. Colo. L.R. 7.1A ....................................................................................... 5

15 U.S.C. §78j(b) ........................................................................................ 8

## INTRODUCTION AND STATEMENT OF FACTS

This is a case involving the top officers and directors of a publicly traded company who *knowingly* circumvented clearly defined FDA rules and regulations in promoting and testing the Company's proprietary medical devices. These same officers and directors hid this misconduct from investors, who *unknowingly* purchased the Company's securities believing that the Company, through its management, was acting in compliance with federal regulations. Throughout the Class Period, investors were led to believe that the revenue and earnings the Company reported from the sale of its medical devices were earned properly. When investors subsequently learned that various federal agencies raided the Company's headquarters, Spectranetics' stock price plummeted, causing investors to suffer millions of dollars of damages. The federal investigation stemmed from claims, made by a former high-level officer of the Company, that the Company and its management had acted illegally in the testing and marketing of the Company's products.

Spectranetics develops, manufactures, markets and distributes the CVX-300® laser unit and single-use ("disposable") medical devices, including Vascular Intervention ("VI") and Lead Management ("LM") products. ¶¶ 48-49. The VI products are designed to treat cardiovascular disease, including coronary (heart) and peripheral (leg) arterial disease ("PAD"). ¶ 51. The lasers and medical devices sold by Spectranetics are subject to extensive regulations by the Food, Drug, and Cosmetic Act ("FDCA") and the Food and Drug Administration ("FDA"). ¶¶ 54-62. Before the start of the Class Period, Spectranetics obtained FDA approval to market its laser system and disposable products for the treatment of in-stent restenosis ("ISR") in the coronary arteries. ¶¶ 61-62. ISR occurs when stents, placed in arteries to alleviate blockage, themselves become blocked. Spectranetics had FDA approval

to market its laser and associated disposable devices to treat ISR in coronary arteries, but it did not have FDA approval to treat ISR for blocked stents placed in the leg.  ¶ 62.  While doctors are not prohibited from using Spectranetics' products to treat ISR in PAD, FDA rules and regulations strictly prohibit the Company from promoting its products for that purpose.  ¶¶ 5, 62.

Defendants recognized the enormous potential their medical devices had for treating ISR in the leg for PAD, and tempted by that potential, embarked on a plan and scheme to illicitly promote the Company's devices for this non-FDA approved use.  By no later than early spring 2007, Spectranetics' top officers and directors began illegally promoting the use of its medical devices for the off-label use to treat ISR in PAD (¶¶ 6, 8), while stating publicly that the Company did not promote its products for off-label uses.  They did so with full knowledge, as reflected in the Company's SEC filings, that doing so was in violation of the law.  During the Class Period, Defendants also authorized employees of the Company to develop, distribute and use sales and promotional materials promoting this off-label use.  ¶ 69.  Significantly, much of the illegal promotion of the Company's laser system and disposable products was conducted by the Company's own Board member, Dr. Walker, at training sessions where he, along with other doctors who were paid as "consultants," freely promoted the use of the Company's laser system for the non-FDA approved use.  ¶¶ 70, 120-22.

In addition to the illegal promotion of Spectranetics' medical devices, Defendants knowingly and/or recklessly violated other FDA rules and regulations by importing and testing medical devices from overseas, including guidewires from a Japanese company, FMD, Inc. ("FMD") and Percutaneous Transluminal Angioplasty balloons ("BMT") from a German manufacturer.  These products were provided to Dr. Walker and other doctors with the direction

to test them on humans, which they did (¶¶ 81, 82, 85, 86, 88, 97, 170), even though these devices were not FDA-approved for use on humans in the United States and were specifically labeled "not for human use."  ¶¶ 8, 80, 83, 84, 96.  By bypassing FDA rules and regulations, Spectranetics was able to test the devices without the expense and delay of FDA regulated clinical trials.  ¶ 87.

Furthermore, Spectranetics performed "in house" tests on its laser's interaction with a nitinol stent which yielded results that were potentially harmful to humans, and which the Company had a duty to, but failed to, disclose to the FDA or investors.  ¶¶ 8, 74-75, 77, 150. Instead, deliberately and recklessly ignoring the significant health risks to the human subjects, the Company sponsored the so-called PATENT and SALVAGE trials to test the nitinol stents' reaction with the laser **on humans** and continued to actively market products for off-label use, "even going so far as to represent that the device was safe and effective for such procedures." ¶¶ 65, 66, 76, 165.

None of this misconduct was disclosed to investors.  Even worse, the same Defendants who participated actively in the wrongdoing, drafted and authorized the release of SEC filings and press releases touting the Company's compliance with FDA rules and regulations. Defendants' scheme unraveled on September 4, 2008, when the Company revealed that it had been served with a search warrant by the FDA and U.S. Immigration and Customs Enforcement ("ICE"), which raided Spectranetics' headquarters, seeking information showing that Defendants marketed, promoted and sold products for the treatment of ISR in PAD.  The agencies' raid was also made in search of evidence corroborating claims that the Company made payments to medical personnel in connection with the illegal promotions, and tested,

4

promoted and sold guidewires and catheters manufactured by international third parties which were not FDA approved for use in humans. The agencies also sought the details of two studies completed between 2002 and 2005; payments made in connection with those studies; and employees' compensation packages. ¶ 88. These investigations are ongoing.

The investigations seem to have originated from the allegations in the complaint filed by Scott Schlesinger ("Schlesinger"), the former Director of Marketing (the "Whistleblower Complaint"). ¶¶ 10, 89. Schlesinger alleged that he was fired for confronting Defendants about their illegal behavior, including the allegations contained in this Complaint. On September 19, 2008, the Company filed a candid Answer to Schlesinger's complaint, admitting that Spectranetics officials knew of the off-label compliance issues raised in the Whistleblower Complaint, ¶ 16, which Defendants concealed from investors during the Class Period. On June 17, 2009, Spectranetics disclosed that it entered into a confidential settlement agreement with Schlesinger, which prohibits him from discussing his allegations or the settlement (¶ 12), further supporting the veracity of his allegations, and, in turn, the allegations set forth in the Complaint.

Notwithstanding the strength and clarity of the well-pled allegations set forth in the Complaint, Defendants have moved for its dismissal, finding fault with each claim and each allegation.[3] Defendants' arguments on this motion to dismiss are entirely without merit. Plaintiffs have standing to pursue their Exchange Act claims. The Complaint, clearly and in

---

[3] Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Class Action Complaint and Memorandum in Support Thereof (Dkt. No. 92) will be referred to as "Def. Br." While Defendants note that D. Colo. L.R. 7.1A does not require a party to confer concerning a motion under Fed. R. Civ. P. 12 (Def. Br. at 1 n.1), REB Civ. Practice Standard V.I.3 does. Defendants informed Plaintiffs of the general basis for their dismissal motion (see Dkt. No. 83, ¶ 4). As to each element enumerated in the dismissal motion that Defendants contend was not alleged in the Complaint, such contention is **DISPUTED** by Plaintiffs.

detail, sets forth Plaintiffs' claims that it was Defendants' **failure to disclose** their efforts to circumvent FDA rules and regulations, not the legality of the conduct itself, that caused the losses Plaintiffs sustained.  There can be no question that the statements made during the Class Period regarding the Company's compliance with FDA regulations were materially false and misleading when made, and part of an overarching fraudulent scheme that Defendants perpetrated.  Moreover, the financial statements during the Class Period were false and misleading because Defendants did not disclose that a material source of the Company's revenue was generated through the illegal promotion of its products.  Materiality is further supported by the significant stock drop following the September 4, 2008 corrective disclosures, a drop of approximately 47 percent on extremely heavy volume, from $9.00 per share to $4.73 per share. ¶ 218.

Additionally, Plaintiffs sufficiently plead a strong inference of *scienter*.  This is not the typical case where low-level employees are involved in the wrongdoing that the top officers come to learn about.  The Complaint's well-pled allegations make clear that all of the Defendants were active and knowing participants in the fraudulent scheme throughout the Class Period.  The Complaint also alleges that (1) Defendants knew about the illegal off-label promotion, use and marketing of the Company's laser system and medical devices, (2) knew about the involvement of Dr. Walker, a director of the Company, and other doctors in these efforts, (3) knew that the Company was paying Dr. Walker and others "consulting fees" to promote and market its medical devices for off-label use, but allowed these actions to continue, (4) knew about the results of the nitinol stent testing that were potentially harmful to humans, while failing to report this information to the FDA, and (5) knew about the illegal testing of

medical devices on humans.  The *scienter* allegations are supported and corroborated by reliable confidential witnesses ("CW(s)"), the Whistleblower Complaint, Defendants' own admissions, and the numerous ongoing federal investigations.  The *scienter* allegations are further bolstered by the fact that the statements concerned the Company's main business and source of revenue, the timing of the disclosures, and the suspicious circumstances of Defendant Schulte's resignation.  ¶ 26.

Plaintiffs have adequately alleged loss causation by pleading that the stock plummeted from $9.00 to $4.73 per share, a one-day decline of approximately 47% on volume of more than 6 million shares, wiping out more than $136 million of the Company's market capitalization, following the disclosures on September 4, 2008.  ¶¶ 14, 218.  The drop indicated the market's realization that the financial statements during the Class Period were materially false and misleading because they reflected illegal and improper sales, and that the Company's future revenue would be materially impacted by the Company's inability to improperly market its products.  The plummet also reflected the impact of the expense associated with the investigations and the impact of the investigations on the Company's reputation.  ¶ 15.

Finally, the Section 20(a) claim should be sustained because Plaintiffs have adequately alleged a primary violation of Section 10(b) and that the Individual Defendants were control persons.  The claims under Section 10b-5(a) and (c) should also be sustained because the scheme described in the Complaint to circumvent FDA rules and regulations to artificially inflate the Company's revenue and earnings was clearly deceptive.  Therefore, it is respectfully submitted that Defendants' motion to dismiss should be denied in its entirety.

**ARGUMENT**

## I.    THE LEGAL STANDARD ON A MOTION TO DISMISS

When considering a motion to dismiss, the complaint is liberally construed, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *See Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008). A complaint need only allege "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). The pleading need only contain "[f]actual allegations. . . [sufficient] to raise a right to relief above the speculative level." *Id.* As here, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1940-41 (2009).[4] Moreover, the Court may not resolve contests surrounding the facts, the merits of the claims, or the applicability of defenses on a Rule 12(b) motion.[5]

## II.    PLEADING REQUIREMENTS FOR A SECTION 10(B) CLAIM

Under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-

---

[4] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949. Thus, *Ashcroft* makes clear that, for elements of claims subject to Fed. R. Civ. P. 8(a), *Twombly* requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed. R. Civ. P. 9(b). *See id.* at 1954.

[5] Further, the Court must limit itself to facts stated in the Complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See American Cas. Co. v. Glaskin*, 805 F. Supp. 866, 869 (D. Colo. 1992). Even those narrow categories of documents extraneous to a complaint that a court may consider in addition to the complaint itself may only be considered for the fact that they say what they say – not for the truth of the statements made in them. *See Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006). Generally, a district court must convert a motion to dismiss into a motion for summary judgment when matters outside the pleadings are relied upon. *See David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996).

5, 17 C.F.R. § 240.10b-5(b), a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). The heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as interpreted by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd,* 551 U.S. 308 (2007), applies only to the element of *scienter*; all other elements of a Section 10(b) claim are governed by traditional pleading standards under Rule 8(a) or 9(b). *See New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273, 1279 (D. Kan. 2008). Under Rule 9(b), particularity of pleading merely requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statement were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004); *see also In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1090 (D. Colo. 2004).

Further, as the Tenth Circuit has held, this requirement "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098-99 (10th Cir. 2003). Instead, "plaintiffs need only plead with particularity *sufficient* facts to support those beliefs," *id.* at 1099 (emphasis in original), and a "common-sense, case-by-case approach" must be used to test the adequacy of the pleading. *Id.* at 1101-02. *Accord In re ICG Commc'ns, Inc. Sec. Litig.*, No. 00-1864, 2006 U.S. Dist. LEXIS 6695, at *24 (D. Colo. Feb. 7,

2006) (no requirement to allege "every jot and tittle of evidentiary detail").[6]

## III.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS

Focusing on the underlying wrongdoing rather than Defendants' efforts to mislead investors about their wrongful conduct, Defendants claim that Plaintiffs lack standing to pursue their securities law claims because this case involves alleged violations of the FDCA. Def. Br. at 16-18.  Defendants' argument misses the mark.  The focus of Plaintiffs' claims involves the misleading statements Defendants made during the Class Period regarding the Company's compliance with the FDCA and FDA rules and regulations, and even more so, Defendants' failure to disclose these known violations to investors.  In cases like this, where the issue is not the underlying violation of the FDCA, but rather, defendants' failure to disclose the underlying violation, courts have routinely rejected the argument Defendants raise here.

*In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009 (C.D. Cal. 2008), is ***directly on point***.  As in this case, plaintiffs in *Amgen* alleged that the company engaged in an off-label marketing scheme, including creating a "speakers" program and hiring consultants to boost off label sales.  Amgen – like Spectranetics here – issued a statement that it only promotes the use of its drugs consistent with the FDA label.  The defendants in *Amgen* made the ***identical*** argument to the one posed by Defendants here and failed.  *See id.* at 1033.[7]  Amgen

---

[6] Although the Complaint is based on information and belief, "it alleges sufficient 'facts on which that belief is formed' to satisfy the pleading requirement of §78u-4(b)(1).  It adequately puts the defendants on notice of the substance of the plaintiffs' claims, and the range, sources, and level of detail of the facts alleged demonstrate that this complaint is not frivolous or conclusory and deserves to proceed to the next stage of litigation." *Adams*, 340 F.3d at 1105.

[7] Defendants claim that "we are aware of no case that has decided whether certain conduct constituted off label promotion where the FDA (or at least the government of the United States) was not a party" is disingenuous. Def. Br. at 17. Plaintiffs cited *Amgen* in their Reply to Defendants' Opposition to Motion for Partial Modification of the PSLRA Discovery Stay. Dkt. No. 76.

defendants argued that plaintiffs' claims constituted an impermissible attempt to enforce the

FDCA.  In denying defendants' motion to dismiss, the court reasoned:

> Defendants are incorrect in their assertion that the FDA has exclusive authority to enforce Plaintiffs' claims.  The issue before the Court is not whether the FDA improperly approved Amgen's products as safe and effective, but rather whether Defendants violated securities laws by improperly marketing [the products] for off-label uses.  The FDA has no jurisdiction, primary or otherwise, to decide whether disclosures in the market violate the securities laws.  Consequently, the FDA does not preempt Plaintiffs' claims.  [*Id.* (internal quotations and citations omitted)].

Similarly, in *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621 (S.D.N.Y. 2008), involving

allegations that defendants misrepresented and concealed the adverse results of three medical

studies, defendants made the same argument and failed.  In rejecting defendants' claim, the

court held "[t]he present case does not require the Court to [decide whether the FDCA

preempts product liability claims] because Plaintiffs are not asserting product liability claims.

Rather, Plaintiffs are asserting misrepresentation and fraud claims arising primarily under

federal securities laws – claims that are not preempted by the FDA's approval of Celebrex and

Bextra." *Id.* at 637.

In fact, courts routinely sustain allegations like the ones presented in Plaintiffs'

complaint.[8]  *See, e.g., In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056-58 (9th Cir. 2008)

(finding that defendants misled investors by implicitly and falsely warranting that there were no

illegal practices contributing to the Company's success while illegally promoting the product for

---

[8]  Defendants list several cases that are completely inapplicable to the facts and claims raised in the Complaint. ***None*** of the cases cited by Defendants involve allegations that a company failed to disclose material information in violation of the federal securities laws. For example, *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804 (1986), stands for the proposition that in the absence of a federal private right of action, the presence of federal law in a state law claim is insufficient to establish federal jurisdiction. *See id.* at 814. Similarly, *Kemp v. Medtronic, Inc.*, 231 F.3d 216 (6th Cir 2000), involves the question of whether the Medical Device Act preempts state law product liability claims. *See id.* at 218.

off-label use); *In re Forest Labs. Sec. Litig.*, No. 05-2827, 2006 U.S. Dist. LEXIS 97475, at *44 (S.D.N.Y. July 19, 2006) (holding that the complaint "properly pleaded claims with respect to Forest's alleged failure to disclose studies about the safety and efficacy of Celexa and Lexapro as well as the improper off-label promotion of those drugs to children and adolescents"). Indeed, there is no absolute preemption of a private right of action simply because a case involves FDCA violations. *See, e.g., In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290-91 (C.D. Cal. 2008) ("some false statements made in connection with prescription drug marketing are actionable under state or federal law, 'even if their truth may be generally within the purview of the FDA.'") (citation omitted).

## IV.  PLAINTIFFS ALLEGE ACTIONABLE MISSTATEMENTS AND OMISSIONS

### A.  Legal Standard for the Duty to Disclose

Courts have repeatedly found that "the fundamental purpose of the [Exchange] Act [is] implementing a philosophy of full disclosure." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (internal quotations and citations omitted).  The purpose of the disclosure requirements is "to inform, not to challenge the reader's critical wits."  *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991).  Rule 10b-5 imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading.  *See* 17 C.F.R. § 240.10b-5; *see also City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1267 (10th Cir. 2001) ("Plaintiffs correctly argue that it is possible for securities fraud defendants to comply technically with SEC reporting requirements . . . and yet still be omitting information that is material and should therefore be disclosed.") (citation omitted); *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (holding that although the specific regulation may not have required disclosure, Rule 10b-5 imposes a duty to disclose all material facts to make disclosed

statements not misleading and therefore a separate duty arises requiring disclosure).

Additionally, whether or not the law imposes a duty to disclose, a company's voluntary decision to address a particular issue carries with it the duty to make full disclosure, because the "duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994). *See also Kapur v. USANA Health Scis., Inc.*, No. 2:07-00177, 2008 U.S. Dist. LEXIS 58955, at *37-38 (D. Utah July 23, 2008). Thus, once a defendant chooses to make a material public statement, that defendant then has an obligation to speak fully and truthfully: "A defendant may not deal in half-truths." *In re Credit Suisse First Boston Sec. Litig.*, No. 97-4760, 1998 U.S. Dist. LEXIS 16560, at *17 (S.D.N.Y. Oct. 19, 1998). A statement is misleading if a reasonable investor would have received a false impression from it. *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990).

Regulation S-K, Item 303, required Spectranetics to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Here, the illegal promotion would "necessarily impact the business prospects of the Company and subject the Company to an extensive investigation by federal authorities into its business practices, which, when they occurred, would lead to potential fines and certain legal expenses" that would unfavorably and materially impact Spectranetics' revenues. ¶ 101. Further, the termination of the illegal off-label promotion would also affect sales and revenue. Therefore, disclosure of these problems was required. ¶ 206. *See In re Rediff.com India Ltd. Sec. Litig.*, 358 F. Supp. 2d 189, 211-12 (S.D.N.Y. 2004).

**B.    Defendants Made Materially False and Misleading Statements**

Plaintiffs properly plead particularized facts to support their claims that Defendants made materially false and misleading statements during the Class Period.  For example, on March 16, 2007, in the 2006 Form 10-K, the Company stated that it did not promote its products for unapproved uses and that the clinical trials were conducted in compliance with FDA rules and regulations.  ¶¶ 91-93.[9]  At the time, however, as confirmed by the CWs, the Company had already begun importing guidewires from Japan that were not FDA-approved for use in humans and encouraged and assisted physicians who it paid as consultants to use and test these guidewires on humans in the United States.  ¶¶ 94-100.[10]  Thus, the statements made in the Form 10-Ks were materially false and misleading when made because Defendants failed to disclose that the Company was illegally testing the FMD guidewires on humans; the Company had made payments to medical professionals including Dr. Walker, who participated in the human studies of the FMD guidewires; the Company lacked effective regulatory and compliance controls, which allowed the guidewires to be tested on humans without FDA approval; and these improper and illegal acts would impact the Company's business prospects and subject the Company to investigations by federal authorities, which

---

[9] The same statements were made in the March 17, 2008 Form 10-K and were also false and misleading when made as alleged. *See* ¶ 176.

[10] The Complaint sets forth particularized allegations regarding statements Spectranetics made with respect to its participation in illegal activities related to the FMD guidewires and BMT balloons.  Spectranetics made false statements that it does not promote its products for off-label use (because the Company did not exclude any products from the statements, all of its products were included) and that its clinical trials are in compliance with FDA rules.  Plaintiffs have also illustrated that these statements were false using information obtained from the CWs, the Whistleblower Complaint, the candid answer and settlement of the Whistleblower Complaint, and the investigations.  *See, e.g.*, *Chalverus v. Pegasys., Inc.*, 59 F. Supp. 2d 226, 233 (D. Mass. 1999) ("Plaintiff may rely on the defendant's own disclosures . . . to allege that previously-made statements . . . were materially false or misleading"). *See, e.g.*, ¶¶ 94-100.

would inevitably lead to potential fines and legal expenses.  ¶ 101.[11]  Such statements are actionable.  *See, e.g., Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statement that integrity and dedication to complying with letter and spirit of the laws was at the heart of business and that defendant, unlike others, issued "truly independent investment research" was misleading as defendants allegedly knew that company's investment research was beset by pervasive conflicts of interest ); *In re Par Pharm.,* 733 F. Supp. at 677-78 (statements suggesting that defendant had particular ability to obtain FDA approval could have been misleading as defendant's success was due to bribery of FDA employees).[12]

The 2006 10-K also contained statements in the Sarbanes-Oxley ("SOX") certifications stating that the 2006 10-K did not contain any material misrepresentations, that the Company had effective controls, and that all material and immaterial fraud involving management and employees had been disclosed.  ¶ 102.[13]  The SOX certifications were false and misleading

---

[11] Further, simply because the statements about the promotions appeared under risks related to product liability, and not FDA liability, does not make the statements any less misleading. Def. Br. at 21-22.  An investor reading the Form 10-Ks would certainly be misled by the statement that "The FDA actively enforces regulations prohibiting marketing of products for unapproved uses," *See* 2006 Form 10-K (Ex. 1 attached hereto*);* A court may take judicial notice of public disclosure documents which have been filed with the SEC.  *See Thomas v. Metro. Life Ins. Co.*, No. 07-0121, 2008 U.S. Dist. LEXIS 82201, at *14-15 (W.D. Okla. Oct. 16, 2008)) and then a later statement, in whatever context, that "We do not promote our products for off-label or otherwise unapproved uses."  ¶ 92.  Not revealing the illegal promotion "significantly altered the 'total mix' of information made available," *Basic,* 485 U.S. at 231, and disclosing the illegal promotion would clearly have altered the meaning of the statement.  *See* Def. Br. at 24 (citing Tenth Circuit cases).

[12] Defendants are simply incorrect that risk factors cannot be actionable. Def. Br. at 19-20. *See, e.g.*, *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (cautionary statements can give rise to Section 10(b) liability); *In re Prudential Sec. Ltd. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (the law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")

[13] The statements at issue are material because a shareholder would find important to an investment decision whether the Company has effective controls.  *See In re Immucor Inc. Sec. Litig.*, No. 1:05-2276, 2006 U.S. Dist. LEXIS 72335, at *36-37 (N.D. Ga. Oct. 4, 2006).

when made because "Spectranetics engaged in questionable and illegal behavior," and therefore, the financial statements did not fairly represent the Company's financial condition and prospects, the 2006 10-K contained materially false and misleading statements, and "the systemic flouting of FDA, ICE, SEC, FINRA, and criminal statutes exposed the Company to material liabilities and materially impacted the business prospects of the Company." ¶ 103.[14]

On April 19, 2007, the Company issued a press release reporting its first quarter revenue for 2007.  ¶ 104.[15]  The revenue reported was false and misleading because, as confirmed by CWs and the Whistleblower Complaint, Defendants had begun promoting laser systems and medical devices for off-label use no later than the quarter ending March 31, 2007, and the reported revenue and earnings already reflected the impact of this conduct.  ¶¶ 106-10, 117-26.[16]  On the same day, during a conference call, Defendants reiterated the financial results in the press release and although acknowledging that the Company was not allowed to market its laser for ISR in PAD, they failed to disclose that they were "aggressively marketing, promoting and testing its products" for ISR in PAD.  ¶¶ 111-12.  Clearly, disclosing the illegal promotion scheme would have "alter[ed] the meaning" of this statement and others mentioning

---

[14] Almost identical SOX certifications were filed throughout the Class Period with various SEC filings and were false and misleading for the same reasons.  ¶¶ 115, 134, 145, 177, 186, 195.  *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 527 F. Supp. 2d 698 (E.D. Ky. 2007), Def. Br. at 28, cited by Defendants for their argument that general statements about compliance do not trigger a duty to disclose violations of the law, is inapposite.  Unlike here, in *Omnicare*, plaintiffs could not show that defendants were aware of any improprieties when they claimed compliance with the law.  *See id.* at 711. *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894 (N.D. Ill. 2001), is also off point because it dealt with the duty to update, which is not relevant here, because defendants in *Anderson* did not know of the violations at the time of the statements.  *See id.* at 905.

[15] The same revenue was reported in the Form 10-Q filed on May 10, 2007, which was false and misleading for the same reasons as the press release. ¶¶ 113, 116.

[16] Due to the off-label marketing, the Company could increase sales and rentals of its products without the expense needed to receive FDA approval for other uses. ¶ 110.

ISR during the Class Period.  *See* Def. Br. at 25.[17]  The statement would be fundamentally different if Defendants, while acknowledging that the Company was not allowed to market its products for off-label uses, stated that it was doing so anyway.[18]

On July 25, 2007, the Company issued a press release reporting second quarter revenue for 2007, stating that the revenue represents "the largest sequential revenue increase we have ever achieved."  ¶¶ 127-28.[19]  The same information was later repeated in the Form 10-Q filed on August 9, 2007.  ¶¶ 132-33.[20]  The statements in the press release were false

---

[17] Even assuming Defendants had no general duty to opine on the legality of all of the Company's operations, when Defendants chose to speak about the Company's compliance, they had a duty to speak with candor.  *See In re Par Pharm.*, 733 F. Supp. at 675.  Defendants' statements here were not generic opinions, but ones designed to assure the public that Spectranetics was operating within the law.   Similarly, although Defendants purported to acknowledge that "non-compliance" with regulations and regulatory authorities may result in the imposition of various penalties, they failed to disclose that Spectranetics was already noncompliant at the time those representations were made.

[18] The risk disclosures related to the FDA compliance, Def. Br. at 23, do not protect Defendants from liability because not only are they too general, but at the time, Defendants already knew they were violating FDA regulations by their off-label promotion.  *See P. Stoltz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("[K]nowledge within the grasp of the [company] . . . cannot be disclaimed"); *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) ("But neither the bespeaks caution doctrine nor the Safe Harbor provision [ ] protects a defendant from liability if a statement was knowingly false when made").

[19] Defendants' assertion that the "vast majority" of the statements do not even mention ISR, Def. Br. at 24, is inaccurate. *See, e.g.,* ¶ 105 (discussing TURBO Booster, which is used to treat ISR in PAD); ¶ 128 (same); ¶ 140 (states that the financial results, that discussed the PAD market and the Company's progress with its ISR clinical trials, were "reiterated" on the conference call).

[20] While Defendants argue that the revenue figures they published were accurate, this is no defense: "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead." *McMahan & Co. v. Wherehouse Entm't*, 900 F.2d 576, 579 (2d Cir. 1990). Spectranetics' concealment of the true source of its revenue rendered its statements misleading. *See, e.g.*, *Va. Bankshares*, 501 U.S. at 1099 ("Petitioners fail to dissuade us from recognizing the significance of [the] omissions [ ] by arguing that we effectively require them to accuse themselves of breach of fiduciary duty. Subjection to liability

and misleading when made because the Company did not disclose that it was promoting its products for unapproved uses and that a material portion of the revenue was from illegal sales resulting from the illegal promotion and marketing. ¶ 129.[21] These statements are also actionable because when a company "puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices." *See, e.g., Van Der Moolen,* 405 F. Supp. 2d at 388, 393-94, 400-01 ("[A]lthough a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'") (citations omitted);[22] *In re Providian Fin. Corp. Sec. Litig.,* 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) (where defendants' statements attributed successes to "customer-focused approach," complaint stated a claim through specific allegations that illegal or fraudulent business practices were the hidden cause of the company's financial

---

for misleading others does not raise a duty of self-accusation; it enforces a duty to refrain from misleading."); *Decker v. Massey-Ferguson*, 681 F.2d 111, 118 (2d Cir. 1982).

[21] The October 31, 2007 press release and November 9, 2007 Form 10-Q reporting third quarter revenue for 2007, the February 20, 2008 press release reporting fourth quarter revenue for 2007, the April 23, 2008 press release and May 12, 2008 Form 10-Q reporting first quarter revenue for 2008, the July 29, 2008 press release and August 11, 2008 Form 10-Q reporting second quarter revenue for 2008 were all false and misleading for the same reasons. ¶¶ 138, 143-44, 152, 153, 179, 184-85, 188-89, 193.

[22] Although doctors are permitted to promote medical devices for off-label use, it is illegal for a company to promote such use. As such, the law is clear that it was misleading for Defendants to discuss increases in Spectranetics' revenues without disclosing that those sales had been achieved in part through illegal means. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 382 (S.D.N.Y. 2003) ("participants in the securities markets are entitled to presume that all of the actors [acted] legally; silence that conceals illegal activity is therefore intrinsically misleading and (presuming the illegality is also material) is always violative of Rule 10b-5(b)").

success).[23]

On June 25, 2007, in a conference call with analysts, the Company discussed receiving approval for use of its new catheter and stated that it planned to begin two clinical trials for ISR in PAD, yet failed to disclose that although it was making efforts to begin the clinical trials, it was already marketing and promoting the products for unapproved uses and recognizing revenue from these sales.  ¶ 131.  Additionally, on October 12, 2007, Defendant Schulte was quoted in an article discussing ISR approval by the FDA and that it *could* mean up to $200 million for the Company, without disclosing that the Company was already generating revenue from the sales from the illegal promotion.  ¶¶ 136-37.  On October 31, 2007, Defendant Schulte also made a statement that the Company was "pleased with the progress in" its clinical trials, but failed to disclose that the Company was *already* marketing its products for unapproved uses, rendering the statement materially misleading.  ¶ 139.[24]

Furthermore, in a conference call with analysts on October 31, 2007, Defendant Childs

---

[23] The cases cited by Defendants for the notion that "companies do not have to disclose uncharged, unlawful conduct," Def. Br. at 15, do not actually support their argument in the instant case. In *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008), unlike here, plaintiffs could not allege that defendants knowingly provided assistance to those engaged in the illegal schemes, *see id.* at 354, or that the topic was put at issue.  *See id.* at 356, 358. *Lewis v. Chrysler Corp.*, 949 F.2d 644 (3d Cir. 1991) involved an undisclosed motive that did not render any statements false and/or misleading. *See id* at 651.

[24] Although Defendants argue that Plaintiffs take statements out of context, it is actually Defendants who take statements out of context to invent their puffery argument.  Def. Br. at 8. Defendants' argument must fail, however, because the statements in question misrepresent existing facts.  *See Novak v. Kasaks*, 216 F.3d 311, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading) (citation omitted); *In re Xerox Corp. Sec. Litig.,* 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (plaintiffs' allegations "go beyond claims of mere puffery" because defendants "made specific statements, including . . . those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation").  Indeed, the best evidence that the investing public did not consider Defendants' statements "mere puffery" was the stock plummet following the September 4, 2008 disclosures.

discussed the progress of the Company's training sessions without disclosing that the training sessions were actually used to illegally promote the Company's products.   ¶ 141.   On November 28, 2007, Defendant Schulte stated the Company was doing work to show that its laser does not harm nitinol stents.   ¶ 147.   The statement was false and misleading when made because as early as the summer of 2007, the Company found that the laser did actually cause harm, as confirmed by Schlesinger and CW1, an Executive Officer who worked at the Company's headquarters from May 2007 through October 2008.  ¶¶ 148-51.[25]

On February 20, 2008, in a press release and a conference call, Defendants discussed the "opportunity" they have to "expand the application and indications for use" of its products, but did not reveal that they were already utilizing that opportunity and recognizing revenue from the illegal schemes.   ¶¶ 154-56.   On July 29, 2008, in a conference call with analysts, Defendant Schulte specifically stated that the Company could not promote off-label use of its products and that although physicians could use the products for off-label use, the revenue generated for the Company was a "small part of [the] total procedural volume,"  ¶ 191,[26] even

---

[25] Defendants' assertion that they did not have a duty to disclose the results of the in-house test (Def. Br. at 25) fails.  First, Defendants' obligation to reveal the results to the FDA, which is supported by CW1 and Schlesinger, is a separate issue from their duty to having to disclose the results to investors. ¶¶ 149-50.  Second, Defendants had to reveal the results of the study only because Defendant Schulte affirmatively stated that the Company was "doing work to show the laser does not harm nitinol stents," while withholding the material information that he already knew that tests showed that it does harm, rendering the affirmative statement false and misleading.  Further, Defendants had a duty to disclose because while knowing that tests showed the product was not safe, Spectranetics "represent[ed] that the device was safe and effective" and "laud[ed] the fact that the device was 'not contra-indicated' for ISR procedures." ¶ 150.  Thus, the cases on "statistically significant evidence" are completely irrelevant.

[26] Defendants also challenge this statement as out of context (Def Br. at 21 n.7) but do not explain how the statement is actually out of context when it is clear from the exhibit they cite, Def. Ex. 23 at 21-22, that Defendant Schulte, after specifically being asked about off-label usage states that "well obviously we can't promote it for [in stent re-stenosis] because we don't have label indication."  Further, whether or not statements were taken out of context, which they were not here, is not appropriate for the motion to dismiss stage.  *See In re CV*

though the Company at the time was already illegally promoting and marketing its products for off-label use, which made up a material portion of its reported revenues. ¶ 192.[27] In fact, only days before the raid on the Company's headquarters, Defendant Schulte was quoted in an article discussing the "healthy outlook" of the Company and its "solid foundation" without revealing that a material portion of its revenue was generated from its illegal schemes. ¶¶ 197-98.

Courts have found similar statements to the ones in the instant case to be materially false and misleading. *See In re Syncor Int'l Corp. Sec. Litig.,* No. 05-55748, 2007 U.S. App. LEXIS 14257, at *4 (9th Cir. June 12, 2007) (public statements attributing successful earnings results "solely to legitimate practices" misleading where plaintiffs alleged the earnings were attributable in part to certain illegal payments); *In re Amgen,* 544 F. Supp. 2d at 1034 (statements that defendant "marketed its [pharmaceutical] products 'for their approved indications'" misleading where plaintiffs alleged defendants "at the same time promoted

---

*Therapeutics Sec. Litig.*, No. 03-03709, 2004 U.S. Dist. LEXIS 17419, at *22 (N.D. Cal. Aug. 5, 2004). Def. Ex. __ refers to exhibits submitted with Def. Br.

[27] The precedent Defendants cite in support of their argument that they had no duty to disclose their illegal conduct is not on point. Def. Br. at 23-24. The plaintiffs' allegations in *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997 (9th Cir. 2002) are distinguishable because, unlike here, they failed to "specify the . . . reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete." *Brody*, 280 F.3d at 1006. Plaintiffs' allegations here explain that Defendants' representations regarding the sources of the Company's revenues were incomplete because they omitted a key source, the illegal off-label marketing scheme, but go further, alleging in detail how the omission served to create the false and misleading impression to investors that the Company's revenue was driven by its competitive position and growth, not by off-label marketing. *See, e.g.*, ¶¶ 128, 139. In short, the omission "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *See Brody*, 280 F.3d at 1006-07. In *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990), the full quote from the case, which Defendants omitted, states that facts need to be revealed "so that what was revealed would not be 'so incomplete as to mislead.'" *Id.* at 16. In *Backman*, defendants did disclose that products were being sold below cost, but just not how much. Here, Defendants outright lied about promoting off-label uses of their products.

unapproved uses and increased per-patient dosages through improper means"); *In re Connetics Corp. Sec. Litig.*, No. 07-02940, 2008 U.S. Dist. LEXIS 62515, at *23 (N.D. Cal. Aug. 14, 2008) (statement regarding strength of data submitted to FDA misleading where defendants knew facts that "seriously undermine[d] the accuracy of the statement").

Defendants assert that the Complaint does not plead particularized allegations showing why the allegedly false or misleading statements were misleading. Def. Br. at 26. In fact, however, the Complaint identifies specific statements by Defendants, and then itemizes the reasons why each statement was false and misleading when made. *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1144 (D. Colo. 2005). Nothing more is required. *See West Palm Firefighters' Union v. Startek, Inc.*, No. 05-01265, 2008 U.S. Dist. LEXIS 47748, at *25-26 (D. Colo. Mar. 28, 2008).

### C.    The Materiality of the Statements Has Been Sufficiently Alleged

A misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision. *See Va. Bankshares,* 501 U.S. at 1090; *Basic*, 485 U.S. at 231 ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). The materiality requirement poses a very low burden; "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Thus, the trier of fact usually decides the issue of materiality. *See Basic*, 485 U.S. at 240. Material facts include information disclosing financial results, "but also facts which affect the probable future of the company and

those which may affect the desire of investors to buy, sell, or hold the company's securities." *Klein v. PDG Remediation*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996) (citation omitted).

The materiality of the false and misleading statements here is adequately pled. The Complaint alleges that the majority of the revenue generated by the Company is from the sale of its disposable products, which "make up almost 85% of the Company's revenue," while sales of the lasers make up 3%, and service and laser rentals make up the rest. ¶ 52. Revenue from the disposable devices is reported by product line — atherectomy (VI products) and lead removal (LM products). LM products make up 30% of the revenue, while the sale of atherectomy disposables makes up 70%. PAD, or arterial disease in the legs, represents an overwhelming 90% of the atherectomy business. ¶ 53. Therefore, the financial condition of the Company depends upon its being able to market and sell its disposable medical devices, the sale of which generates a material portion of the Company's revenue. ¶¶ 52-53.

Courts have repeatedly found that statements concerning a pharmaceutical company's major products are material. *See, e.g., In re Regeneron Pharms, Inc. Sec. Litig.*, No. 03-3111, 2005 U.S. Dist. LEXIS 1350, at *62-63 (S.D.N.Y. 2005) (statements concerning the effectiveness, safety, tolerability, and commercial viability of [a] developmental drug [ ] held to be material); *see also In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004); *In re Viropharma, Inc., Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *23 (E.D. Pa. Apr. 3, 2003) ("it would be a sad day when a court could determine that misstatements about a whether a company's primary product worked did not alter the 'total mix' of information available"). According to CW1, Dr. Walker, a director of the Company who was paid to illegally promote off-label uses of the Company's products, not only provided Spectranetics with

approximately 50% to 60% of its revenue, but also allowed the Company to recognize additional revenue from sales at the training sessions where he and his colleagues trained others in off-label uses of the Company's products.  ¶ 120.

In fact, internal models and projections considered that the Company would market its laser system and medical devices for off-label use and showed that revenue from the products used for ISR in PAD and thrombus could be "up to $200 million."  ¶ 118.  This model considered the sales before FDA approval and before safety was assessed.  "The revenue source created by marketing and promoting the laser for off-label use was important to the Company for boosting revenue to meet projections and/or to pursue the $200 million goal generated by the revenue modeling performed at Schulte's explicit request."  ¶ 119.  Speaking at a conference on November 28, 2007, Defendant Schulte stated that ISR in peripheral arteries "represents an opportunity of almost $200 million for our Company…[ISR] is very key for us."  ¶ 147.[28]  Moreover, analysts reported on the material impact of the off-label promotion, estimating that the Company would lose "$60-75MM" if forced to end their illegal conduct.  ¶ 206.

Further, the Complaint alleges that "[l]ike any pharmaceutical or medical device manufacturer, Spectranetics' value to shareholders, as reflected in its trading price, is derived in

---

[28] Defendants' contention that Plaintiffs must precisely quantify the revenue generated by the off-label promotion is not supported by the case law. Courts do not require such quantification. *See, e.g., Simons v. Dynacq Healthcare, Inc.*, No. 03-05825, 2006 U.S. Dist. LEXIS 46503, at *17-18 (S.D. Tex. July 10, 2006); *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999) ("Plaintiffs need not state the amount by which USN's financial statements were in error").  Even the case Defendants cite for the proposition that a complaint must identify the precise amount of revenue is inapposite because in a subsequent ruling in that very case, *In re Gilead Scis. Sec. Litig*, No. 03-4999, 2009 U.S. Dist. LEXIS 46751, at *12-13 (N.D. Cal. Jan. 26, 2005), the court ruled that the complaint adequately identified materially misleading statements even though the revenue figures were accurate.

significant part from the integrity of its relationship with the FDA, its compliance with FDA rules and regulations, the professionalism of its testing procedures, and the professionalism and integrity of those doctors it chooses to represent Spectranetics to the public." ¶ 13.  This was made clear by the stock plummet following the disclosures of the government's investigation on September 4, 2008 from $9.00 per share to $4.73 per share, a one-day decline of approximately 47% on volume of more than 6 million shares, compared to an average 30-day volume of 356,000, wiping out more than $136 million of the Company's market capitalization. ¶ 14.  This drop supports materiality.  *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *see also In re Retek Inc. Sec.*, No. 02-4209, 2005 U.S. Dist. LEXIS 35734, at *17 (D. Minn. Mar. 7, 2005).

Further, following the disclosures, the filing of the Whistleblower Complaint and the halting of one of the clinical trials, the sale of medical devices in the Company's VI product line declined 9% in the fourth quarter of 2008 compared to the corresponding quarter of 2007; declined 12% in the first quarter of 2009 compared to the first quarter of 2008; and declined 13% in the second quarter of 2009, compared to sales during the second quarter of 2008, although previously sales during every quarter of the Class Period increased by double digits. ¶ 213.[29]  Courts have found that a misstatement or omission that concerns only a small fraction of the company's revenues or assets can be material.  *See Garber v. Legg Mason, Inc.*, 537

---

[29] Defendants' argument that revenue growth in its vascular intervention business "had fallen before September 4, 2008," Def. Br. at 36, is incorrect.  *See, e.g.,* ¶ 180 ("We achieved significant sales growth in our vascular intervention"); ¶ 189 ("Our strong revenue growth in the face of a challenging economic environment reflects the continuing market acceptance of the value of our laser technology, both in vascular intervention and lead management").

F. Supp. 2d 597, 614 n.5 (S.D.N.Y. 2008) (rejecting notion of a bright-line rule that "if an omission or misstatement falls below a certain percentage of a company's total assets or revenue that it is automatically rendered immaterial -- rather a court will assess the entire context of the alleged omission."); *Shirk v. Fifth Third Bancorp*, No. 05-49, 2007 U.S. Dist. LEXIS 26534, at *38-39 (S.D. Ohio Apr. 9, 2007) (declining to hold that a particular financial misstatement could not possibly be significant to a reasonable investor due to its small magnitude).[30]

## V.    THE INDIVIDUAL DEFENDANTS ARE ALL LIABLE

Defendants Schulte, Childs, McGuire, Geisenheimer, and Dr. Walker are all liable for each of the false and misleading statements made during the Class Period.  Here, the false and misleading statements were made in 10-Ks (¶¶ 91, 157), press releases (¶¶ 104, 127, 138, 152, 188), and 10-Qs (¶¶ 113, 132, 143, 184, 193).  Some of the misleading and false statements were also made at conferences, ¶ 147, and in articles.  ¶¶ 136, 195.[31]

To start with, Defendant Spectranetics is liable as the issuer for the false and misleading statements issued in the name of the Company.  *See, e.g.*, ¶¶ 92, 104, 113.  Further, the Complaint adequately alleges that Defendants Schulte and Childs made false and misleading

---

[30] Cases cited by Defendants, Def. Br. at 35, are distinguishable. For example, *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997), is inapplicable here because in *Grossman*, the Court found some of the statements were "vague statements of corporate optimism," others were not actually alleged to be false, and the specific risk disclosures in *Grossman*, unlike the so-called risk disclosures in the instant case, precluded the rest of the statements from being materially misleading. *See id.* at 1119.

[31] Notwithstanding Defendants' arguments, they are liable for the statements Defendant Schulte made, in the name of the Company, in news articles were he discussed the Company's financial performance and the impact that FDA approval of ISR in PAD would have for the Company's bottom line because Defendants knew at the time that the Company was already recognizing revenue from these illegal sales. *See In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1293 (D.N.M. 2002) (finding statements in a business report interview actionable); *In re Retek Inc. Sec. Litig.*, No. 02-4209, 2007 U.S. Dist. LEXIS 181, at *24-25 (D. Minn. Jan. 3, 2007) (finding defendant liable for statements by analysts).

statements during the Class Period and that at the time they made them, they had information that flatly contradicted the statements.[32]    Additionally, Defendants Geisenheimer and Dr. Walker signed Spectranetics' false Form 10-Ks, ¶¶ 91, 157, and are liable for the statements made in those filings.[33] "[T]hose who sign the documents (even if there are no facts showing they were involved in the preparation) can be held liable as a primary violator." *In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-0823, 2006 U.S. Dist. LEXIS 97927, at *44 (S.D. Cal. July 31, 2006) (citation omitted).[34]

The Complaint also alleges that Defendant McGuire, who served as the Company's COO during the Class Period (¶ 28), took part in several conference calls where Defendants made false and misleading statements.    ¶¶ 111, 130, 141, 155, 182, 191.    "[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, the

---

[32] Defendants Schulte and Childs signed and certified the Company's SEC filings during the Class Period, including the 10-Qs and the 10-Ks, as well as issuing statements in press releases and in conference calls with analysts. *See, e.g.*, ¶¶ 91, 102, 105, 111, 113, 115, 128, 132, 134.

[33] Defendants' attempt to argue that outside directors cannot be liable for the contents of documents they sign (Def. Br. at 46) must fail here because the Complaint alleges that Defendant Geisenheimer "participated with the top officers in running the Company on a day-to-day basis and in the scheme to defraud investors," ¶ 41, and that Dr. Walker also acted as an insider. ¶ 39.    Furthermore, Dr. Walker personally promoted the off-label use of the Company's laser systems and received "lucrative consulting deals" as incentive. ¶ 40.  *See Middlesex Ret. Sys. v. Quest Software, Inc.*, No. 06-6863, 2008 U.S. Dist. LEXIS 68419, at *28-29 (C.D. Cal. July 10, 2008) (outside director found liable for his signature on an SEC filing); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 3:02-2133, 2004 U.S. Dist. LEXIS 4643, at *17-18 (D. Conn. Mar. 9, 2004) (finding that if an outside director's position is "more akin to 'insiders' than to 'outside' directors," the application of the group pleading doctrine is appropriate).

[34] *See also In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 587-88 (S.D. Tex. 2003) ("SEC has attempted to make signatures on corporate documents that are filed with the SEC carry significant weight"); *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 163 (D. Mass. 2002); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000).

[] official is at fault for a material omission in failing to correct such statements in that context." *See In re SmarTalk*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000); *see also In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1225 (D. Kan. 2002).

In addition, the Individual Defendants are also liable for the wide variety of the false and misleading group-published statements alleged in the Complaint. "The plaintiff did specifically allege that all of the individual defendants were corporate directors or officers who possessed power and authority to control the contents of the market statements made through press releases and other means. Such allegations are sufficient, under the group-published doctrine, to state a claim against all the individual defendants under §10(b)." *In re NPS Pharms.*, Inc., No. 2:06-00570, 2007 U.S. Dist. LEXIS 48713, at *17 (D. Utah July 3, 2007). *See also In re Rhythms*, 300 F. Supp. 2d at 1087-88.[35]  Contrary to Defendants' contention (Def. Br. at 45-47), the group publication doctrine has survived the PSLRA in this Circuit, and, therefore, the Individual Defendants are liable for the misleading statements issued in Company's name. *See, e.g.*, *Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1268 (D. Colo. 2006); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1193-94 (D. Colo. 2004).

## VI.    THE ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF *SCIENTER*

### A.    The Legal Standard for Alleging *Scienter*

The Complaint pleads in detail the facts which demonstrate what is required in this

---

[35]  The Individual Defendants each had direct involvement in the everyday business of Spectranetics. *See* ¶¶ 26-41 (describing the Individual Defendants' particular roles and their involvement with the business of the Company). *See In re Pfizer,* 584 F. Supp. 2d at 637-38 ("Plaintiffs allege that all of the Individual Defendants . . . were directly involved with the day-to-day operations of the company, and that all participated in drafting, reviewing, approving, ratifying, and/or disseminating the [] financial statements and press releases during the Class Period . . . these allegations are sufficient"). Even if the doctrine did not apply, senior officers, like the Individual Defendants, may be held liable for statements made by others. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001).

Circuit: that Defendants "acted with scienter, that is with intent to defraud or recklessness." *Adams*, 340 F.3d at 1095. The Tenth Circuit has defined recklessness as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Fleming*, 264 F.3d at 1260. When examining a plaintiff's *scienter* allegations, "courts must . . . accept all factual allegations in the complaint as true [and] "consider the complaint in its entirety." *Tellabs*, 551 U.S. at 322-23. "The inquiry . . . is whether **all of the facts** alleged, **taken collectively**, give rise to a strong inference of scienter, **not whether any individual allegation scrutinized in isolation, meets that standard.**" *Id*. at 322-33. This "holistic" approach, *id*. at 326, no longer permits courts to ignore any factual allegation that could support *scienter* simply because, standing alone, that fact would not suffice to meet the requisite strong inference of *scienter*; rather each such fact must be given some weight, and all facts are weighed together to determine whether the totality of the facts alleged gives rise to a strong inference of *scienter*. This, of course, has long been the law in this Circuit. *See Fleming*, 264 F.3d at 1263.[36]

As with any motion to dismiss, in conducting its "comparative assessment of plausible inferences," the Court must do so "constantly assuming plaintiff's allegations to be true," *Tellabs*, 551 U.S. at 326-27, and the Court may only consider inferences that can be "draw[n] from the facts alleged [in the Complaint]." *Id*. at 324. Additionally, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even

---

[36]Faced with a virtual avalanche of indicia of *scienter*, Defendants harken back to the pre-*Tellabs* approach of separately challenging each fact supporting *scienter* in isolation. *See* Def. Br. at 37-42. As *Tellabs* made clear, Defendants' piecemeal approach is improper and all of Plaintiffs' allegations going to Defendants' *scienter* must be considered collectively.

the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Thus, if the inferences properly drawn from the facts alleged in the Complaint are in "equipoise," Plaintiffs have satisfied their burden to plead *scienter* here. *See id.* at 331, 328-29 ("A plaintiff alleging fraud in a *§10(b)* action . . . must plead facts rendering an inference of scienter **at least as likely as** any plausible opposing inference. At trial, she must . . . demonstrate that it is *more likely* than not that the defendant acted with scienter").

### B.    The Complaint's *Scienter* Allegations Are Powerful and Detailed

#### 1.    Defendants Were Aware of Facts or Had Access to Information Contrary to Their Public Statements

Plaintiffs have far exceeded the requisite standard for pleading *scienter* here by adequately pleading that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. Such "allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 622 (S.D.N.Y. 2008).

The Complaint alleges that each Individual Defendant was an active participant in the fraud and had full knowledge that the statements made during the Class Period were false and misleading. *See In re CornerStone Propane Partners., L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 791 (N.D. Cal. 2005) (finding *scienter* because defendant was "implicated as an author of CornerStone financials as well as a primary perpetrator of a fraudulent scheme"). The Complaint alleges that Dr. Walker personally promoted the off-label use of Spectranetics' laser systems to other medical professionals and received "lucrative consulting deals" from the Company as incentive to engage in these illegal acts. ¶ 40. *See In re Petco*, 2006 U.S. Dist.

LEXIS 97927, at *45 ("Though Defendants [ ] are not alleged to have made any statements . . .
Plaintiffs allege that they participated in the scheme to defraud investors" are thus liable); *SEC
v. Delphi Corp.*, No. 06-14891, 2008 U.S. Dist. LEXIS 78671, at *26 (E.D. Mich. Oct. 8, 2008)
(finding *scienter* because "[s]he is alleged to have been responsible for GAAP accounting . . .
yet she participated in a scheme to mischaracterize the $20 million payment as income").

Specifically, the Complaint alleges that the illegal promotion and marketing were done
at various training sessions, including "Gloves On" Peripheral Vascular Disease Training
Courses and individualized training sessions targeted to groups of 10-15 doctors.   ¶ 70.
Furthermore, the Complaint alleges that the other Individual Defendants knew about the
involvement of Dr. Walker and other doctors in these efforts, especially because the Company
was paying them fees for these promotions.  ¶ 72.  Defendant Schulte, in fact, worked with a
Business Development Manager at the Company to provide BMT balloons to Dr. Walker and
another doctor, Dr. Robert Gallino, who were then paid to test these balloons on humans.
¶ 85.  At a meeting in December of 2007, the Individual Defendants, including Schulte and
McGuire, discussed the BMT balloons' performance based on information provided by doctors
who had tested the products at different sites throughout the United States.  ¶ 86.[37]

---

[37]  Defendants' arguments that Plaintiffs engage in "pleading games," Def. Br. at 34, are
wholly unsupported. For example, as to paragraph 98 of the Complaint, both the FMD
guidewire information and the human product evaluations are attributed to CW1 and the
Complaint explains that CW1 came to know the information from Defendant Schulte when he
arrived at the Company, from the Board meeting he attended on May 7, 2007, and from
discussions with Defendants McGuire and Childs. *See* ¶¶ 98-99. As to paragraph 100, read
correctly, it is clear that CW1 is stating that he knew that Defendant Childs knew about the
illegal tests on humans with the FMD because he thanked CW1 after the project was "killed"
and claimed that he was trying to stop the project himself.  The rest of the paragraphs
challenged by Defendants are also properly supported.  Paragraph 118 explains that the
internal revenue models and projections included the revenues from the "off-label use" of the
products, as stated by Schlesinger, who was involved with the revenue modeling with others,

CWs confirm the allegations in the Complaint that Defendants participated in and were aware of the wrongful conduct and the misleading nature of the statements made to the public. CW1 stated that "the Company had an arrangement with a Japanese Company, FMD, to import guidewires into the United States," even though the Company did not have FDA approval to test the guidewires on humans, and in 2006 and 2007 provided the products to Dr. Walker "with the directive" to test them, which he did.   ¶¶ 96-98.[38]   CW1 learned this information from discussions with the Individual Defendants.  ¶ 96.[39]   Further, according to the Whistleblower Complaint, "off-label marketing by representatives of the Company was required and expected."   See ¶ 107 ("CEO Schulte made statements that Spectranetics needed to 'control the podium' at conferences and other events to promote the Company's agenda for off-label use of its lasers to treat ISR in the peripheral arteries");  ¶ 108 (detailing Schulte telling the marketing department that "it needed to aggressively promote Spectranetics' products as the 'gold standard' for the treatment of ISR in peripheral arteries" and the marketing department, "develop[ing] and distribut[ing] promotional strategies to convince doctors to use the Company's devices in non-approved manners," "aggressive[ly] solicitati[ing] of doctors to use

---

performed at Defendant Schulte's "explicit request." ¶ 118-19. Then paragraphs 120-126 provide further details from reliable sources on how the revenue was actually recognized during the illegal training sessions and that Defendants were fully aware of this conduct.

[38] See In re Anicom Inc. Sec. Litig., No. 00-4391, 2001 U.S. Dist. LEXIS 6607, at *15-16 (N.D. Ill. May 15, 2001) (sustaining allegations; "the complaint alleges that [defendants] knew of the prebilling and fictitious invoices because they were procured at the defendants' direction"); Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (finding scienter allegations adequate when the complaint "alleged that [defendant] . . . supplied the information used to generate invoices for the fictitious sales, and reviewed such invoices").

[39] Specifically, CW1 stated that as soon as he/she arrived at the Company, Defendant Schulte discussed this information with CW1.  Later at a meeting of the Board in Denver around May 7, 2007, which CW1 also attended, Schulte updated the Board "as to the Company's acquisition and testing of the FMD guidewire," and Dr. Walker discussed the human evaluations. CW1 also stated that he/she discussed the FMD guidewire project with Defendant McGuire.  ¶ 98.  Thus, Defendants' attack on the allegations by CW1, Def. Br. at 32, must fail because they ignore the well-pled allegations in the Complaint.

its medical devices for off-label use and paid doctors to demonstrate the use of the Company's products for the treatment of ISR in peripheral arteries").[40]  Moreover, the Company's internal revenue models and projections assumed that the Company would market its products for off-label uses, resulting in revenue of "up to $200 million." ¶ 118.[41]  *See also* ¶ 120 (according to CW1, Dr. Walker provided the Company with about 50% to 60% of its revenue; the Company received revenue from the sales at the training sessions; every month, starting no later than the first quarter of 2007, the Company would sponsor training sessions where Dr. Walker and his colleagues would train other doctors in the off-label uses of the Company's products); ¶ 121 (CW2 confirming CW1's statements on the training sessions).[42]  Finally, during a March 7,

---

[40]  *See also* ¶ 124 (CW1's statement that the Company marketed for off-label uses "all the time" and that Schulte would instruct the marketing department how the products should be marketed); ¶ 125 (statements by CW1 that the illegal conduct "was common knowledge"; that Defendants Geisenheimer and Dr. Walker had several conversations about it and that the Board had knowledge; "It was also common to hear Geisenheimer, Schulte and Dr. Walker say during Board meetings and as a message to the Company, generally, that the laser was 'the only option' for ISR in peripheral arteries"); ¶ 126  (CW1: "off-label marketing was so prevalent and widespread at the Company that there was 'no way anyone couldn't have known. All you need to do is be around Spectranetics to know'"); *see also* ¶¶ 161-63. These emails and direct meetings, where the problems at issue were discussed with the Individual Defendants, evidence *scienter*. *See, e.g., Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (finding *scienter* based on allegations regarding meetings with defendants "to discuss the difficulties"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) (finding *scienter* when defendant made statements revealing that he knew the company's ratings were compromised).

[41]  Defendants' attack on the allegations in the Whistleblower Complaint, Def. Br. at 30-31, must fail.  The confidential settlement and Defendants' candid Answer both support the veracity of the allegations. Further, allegations based on information from various sources are in fact proper and can be relied on.  *See, e.g., Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 278 (D. Conn. 2005) ("The SEC Complaint is attached to and incorporated into the Complaint by reference."); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1080-81 (N.D. Cal. 2001). *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008), is distinguishable.  In *In re Connetics*, plaintiffs solely relied on the SEC complaint without any other "investigative effort." *Id.* at 1005.  Here, Plaintiffs relied on other sources besides the Whistleblower Complaint and all the allegations are corroborated by other sources.

[42]  *See* ¶ 170 (CW1 discussing how on September 2, 2007, he/she learned about the illegal testing of the BMT balloons on humans through an e-mail exchange between Trung Pham, a

2008 meeting, according to Schlesinger, Defendant McGuire acknowledged that "the BMT evaluations never should have happened." ¶ 175. Also, the Company's September 19, 2008 candid Answer to Schlesinger's complaint in Colorado state court "admitted that numerous Spectranetics officials were already aware of the off-label compliance issues raised in Schlesinger's complaint." ¶ 16. These specific facts provided by Plaintiffs' sources undermine any arguments by Defendants that the allegations are too general. *See* Def. Br. at 33-34.[43]

Unable to withstand the compelling evidence of their *scienter*, Defendants resort to attacking Plaintiffs' facially reliable sources. These attempts fail.[44] Information from

_____

Business Development Manager under CW1's supervision, Defendant Schulte, and Dr. Walker, discussing Dr. Walker's use of the BMT balloons on humans); ¶ 172 (Schlesinger's discovery of the illegal BMT testing on humans during a meeting with Company officers in December 2007).

[43] For example, Defendants challenge paragraph 117 of the Complaint regarding a statement by CW1 that the Company "spent considerable time, effort, and money on the marketing and promotion of its laser and disposables for off-label use" as too general. Def. Br. at 33. However, the Complaint makes clear how the Company was, notwithstanding its statements to the contrary to the public, promoting the off-label use of the laser systems to other physicians and health care providers, sponsoring training sessions across the country, and paying the "promoters" as "consultants," leaving no doubt that the conduct was fraudulent and illegal. ¶¶ 117-126. Further, as to Defendants' notion that the "sales material" could have been proper, Def. Br. at 34, is completely undermined by the actual allegations in the Complaint in context that state "the Company illegally promoted and marketed its products" and "[i]n furtherance of Defendants' decision to" illegally promote and market, "Defendants authorized employees of the Company to perform the following tasks: (a) Develop sales and promotional strategies for field sales personnel designed to convince doctors to use their medical device for ISR in PAD; [and] (b) Distribute and use sales training materials and promotional materials promoting off-label use . . ." ¶ 69-70.

[44] *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711-12 (7th Cir. 2008), essentially overruled the *per se* rule of *Higginbotham v. Baxter*, 495 F.3d 753 (7th Cir. 2007) (relied on by Defendants) discounting all confidential source allegations. Thus, Defendants' reliance on *In re FX Energy, Inc.*, No. 2:07-874, 2009 U.S. Dist. LEXIS 54551 (D. Utah June 25, 2009) is also misplaced because the court in *FX Energy* relies on *Higginbotham*, and unlike here, the complaint "does not make clear to whom the witness spoke, when the conversations occurred, or what was said in response to the witness" and simply describes three opinions held by the witness. Moreover, no corroborating evidence was provided. *See id.* at *29-30. In *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), the court made clear that **a broad range of possible witnesses are reliable sources**. *See id.* at 985 (citations omitted).

confidential witnesses can be relied upon provided the witnesses are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314.[45]   Plaintiffs have pled with particularity the knowledgeable positions occupied by each of the CWs, many of whom had first-hand interactions with the Individual Defendants concerning the matters alleged in the Complaint.  Because Plaintiffs have provided specific information about the CWs' positions, this fact "supports the probability that the employees possessed the information alleged" and "'significantly strengthen'[s] Plaintiffs' pleading." *In re Rhythms*, 300 F. Supp. 2d at 1089 (quoting *Adams,* 340 F.3d at 1102).[46]  The fact that this case involves "[c]orroboration from multiple sources also supports an inference of a scienter." *Makor*, 513 F.3d at 712.[47]

### 2.    The Individual Defendants Were Certain to Know About the Company's Effort to Promote Off-Label Uses

The inference that the Individual Defendants knew about the illegal and fraudulent

---

[45] *See also In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004) ("plaintiff is not required to plead internal reports to demonstrate [] contradictory facts were available"; "it is sufficient to plead statements [] from confidential sources with pertinent knowledge").

[46] In reality, Defendants are asking this Court to weigh the credibility of the CWs, which is not permitted.  *See In re NPS Pharms.,* 2007 U.S. Dist. LEXIS 48713, at *18-19 ("But just as the court will not weigh evidence at this stage, it will not entertain a challenge to the credibility of confidential witnesses.  As to reliability, the confidential witness statements are sufficiently specific, detailed, and concrete to be reliable upon at this juncture").  Further, *Sorkin, LLC v. Fischer Imaging Corp.*, No. 03-00631, 2005 U.S. Dist. LEXIS 19934 (D. Colo. June 21, 2005), cited by Defendants, is distinguishable. In *Sorkin*, the court found that "the "second-hand information [provided] was inherently unreliable" and "plaintiffs' allegations about obsolete inventory [were] so intertwined with unreliable statements that it [was] not possible to sort the well-pleaded allegations from conclusory statements and speculation." *Id.* at *28.  Here, the information is provided by reliable witnesses who corroborate each other's statements, who worked at the Company during the Class Period, and who witnessed, first hand, the alleged fraud.

[47] A comprehensive survey of employees is not needed at the pleading stage. *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1059 n.10 (C.D. Cal. 2008) (rejecting argument that plaintiffs only referenced 14 "former mostly low-level employees out of more than 50,000 in 600 offices").

schemes and their non-disclosure is not only clear from the CWs, but also is a matter of common sense.  Because the false and misleading statements at issue concerned a material portion of the Company's revenue (*see* ¶ 53), there is a strong inference that top management knew.  *See, e.g., In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001) (courts reasonably assume "that principal managers [] are aware of matters central to that business's operation").  *See also Makor*, 513 F.3d at 709 (the pleading was sufficient to show *scienter* by top officers, regardless of the evidence tying them to the statements' preparation, because the fraud centered on statements central to the Company's profitability).[48] In the final analysis, Plaintiffs' burden is not to show that Defendants personally ordered the creation of false statements, although the facts alleged provide ready support for that conclusion.[49]  Rather,  Plaintiffs' duty is to plead facts permitting a strong inference of at least

---

[48] *See also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (strong inference was raised that directors had knowledge of restrictions that eliminated a "potentially significant source of income"); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006) ("knowledge of contradictory information [may] be imputed to individual defendants" if the statements involve matters that are "sufficiently significant" to the company).  *Fleming*, Def. Br. at 39-40, is distinguishable because the allegation that defendants occupied senior positions was the only allegation provided to show *scienter*, 264 F.3d at 1265, unlike here.

[49] Further, notwithstanding Defendants' arguments (Def. Br. at 40), the issue is not whether the products were safe for use, but that Defendants knew or recklessly ignored that they did not have FDA approval to treat ISR in the leg for PAD, and therefore could not promote its products for that purpose, which they did. ¶ 62.  Moreover, the Complaint does allege that in-house tests, kept secret from the FDA and investors, "revealed that the laser caused major damage to the nitinol stents, a significant negative finding that would likely prevent the laser from obtaining FDA approval for use in ISR procedures." ¶ 75.  *See also* ¶ 77.  Further, the CWs specifically allege that Defendants knew that the FMD wires and BMT balloons were not approved for clinical testing. As made clear by the CWs, the Company had FDA approval to import the guidewires and balloons, but did not have FDA approval to test them on humans and the labels specifically stated "not for human use."  *See, e.g.*, ¶¶ 81, 84, 97. CWs also confirm that Defendants knew that they were violating FDA rules in that they knew that they did not have FDA approval for the treatment of ISR in the leg for PAD and the FDCA and the FDA regulations clearly "prohibit an applicant from promoting a medical device for off-label uses." ¶¶ 61, 62.

*recklessness*, which Plaintiffs have done here.  *See In re Rhythms*, 300 F. Supp. 2d at 1090.[50]

### 3.    The Resignations and Investigations Provide Evidence of *Scienter*

The suspicious circumstances of resignations of top executives supports an inference of *scienter*.  *See, e.g., Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter"); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (CEO's forced resignation "add[ed] to the overall pleading of circumstantial evidence of fraud").  Following the end of the Class Period, in the wake of the regulatory investigation of the Company by the FDA and ICE, Defendant Schulte, a "driving force behind the illegal conduct," resigned.  ¶ 26.  The most plausible explanation is that his resignation related to his involvement in the fraud.

Defendants' attempt to argue, without citing any cases in support, that the FDA and ICE search warrants cannot add to the *scienter* inference because those entities "are not charged with enforcing the securities laws" (Def. Br. at 41), must fail.  Courts have found that investigations by various organizations can factor into the *scienter* analysis.  *See, e.g., In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (finding that the

---

[50] Defendants claim that courts are reluctant to find *scienter* when the rules at issue are vague, as they believe they are here.  However, not only does the Complaint allege that the rules were clear and that Defendants were fully aware they were violating the applicable rules, but courts have rejected similar arguments in other cases.  *See, e.g., In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("The fact that the application of GAAP tolerates a range of reasonable treatments does not, however, vindicate the defendants so easily.  There are indeed numerous occasions for judgment calls in the application of GAAP.  But GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred."); *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998) ("[A]t this stage of the litigation, the Court must reject defendants' contention that their accounting treatment cannot support an inference of fraud because [ ] accounting principles are complex and subject to differing interpretations . . .").

Department of Justice launching an investigation relevant to the "'holistic' view of the purported facts as they relate to scienter" in a securities fraud case). Further, here, in connection with the Whistleblower Complaint, the Department of Labor, the SEC and the Financial Industry Regulatory Authority also launched investigations. ¶ 90. Investigations by the SEC also add to an inference of *scienter*. *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (investigations "into the primary allegations of securities fraud" in a private case are included among the "usual indicia of securities fraud."). Moreover, here, although the Company publicly stated that it was cooperating with the authorities, CW3 stated otherwise. *See* ¶ 203. Also, interestingly, after news regarding the FDA and ICE became public, the Company told investors that it was launching an internal investigation into the wrongdoings. CW1, however, characterized the investigation as "myopic," a "bunch of 'Emile's (Geisenheimer) cronies' running the investigation" and that they "did not look deep enough." ¶ 212.

### 4. Motive Has Been Adequately Pleaded

Personal pecuniary motive is not required to plead *scienter*. *See Tellabs*, 551 U.S. at 325.[51] Further, particularized corporate motives can demonstrate *scienter*. Plaintiffs have alleged that "[t]he expectation that the Company would successfully market its laser system

---

[51] The absence of motive allegations is not dispositive of *scienter*. *See In re Apollo Group Inc. Sec. Litig.,* 395 F. Supp. 2d 906, 922 n.4 (D. Ariz. 2005) (finding that *scienter* was adequately pled despite failure to allege motive). However, here, for example, the Complaint alleged that Dr. Walker "received lucrative consulting deals with the Company to engage in these illegal acts" and "hundreds of thousands of dollars in compensation." ¶¶ 40, 71. Further, according to the Company's Proxy Statement, Ex. 2 attached hereto, Defendant Schulte was paid $603,099 in compensation in 2007 (including $172,850 in non-equity incentive plan compensation) and $388,914 in 2008; Defendant Childs received $258,497 in 2007 (including $51,005 in non-equity incentive plan compensation) and $268,858 in 2008 (including $47,891 in non-equity incentive plan compensation); Defendant McGuire received $819,945 in 2007 (including $106,369 in non-equity incentive plan compensation) and $762,367 in 2008 (including $96,525 in non-equity incentive plan compensation); and Defendant Geisenheimer received $147,744 for being CEO and $160,842 for serving as director in 2008 and $91,330 in 2007. ¶ 41.

and medical devices for off-label use was considered in the Company's internal revenue models and projections. The models showed that revenue from the laser and disposables used for ISR in peripheral arteries and thrombus could be 'up to $200 million.'" ¶ 118. *See also* ¶ 119. Additionally, the Company also recognized revenue from sales from Dr. Walker's training sessions. ¶ 120. Further, Plaintiffs have alleged that it was the ultimate goal of the Defendants to sell the Company and that Individual Defendants were working to make the Company appear more attractive for acquisition. ¶¶ 164-65. These allegations support a cogent inference of *scienter*. *See In re Williams*, 339 F. Supp. 2d at 1234 ("the Complaint alleges that Defendants had a strong motive to misrepresent [the] financial statements because [the] continued viability was dependent upon . . . financial performance"); *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 648-49 (E.D. Va. 2000) (particularized allegations that company was "further motivated [by a desire] . . . to portray the Company favorably with actual and potential creditors from whom" it needed to borrow funds was sufficient to plead motive). Additionally, a motivation to make the company seem more profitable and artificially inflate its stock has repeatedly been found, in totality with other allegations, to give rise to a strong inference of *scienter*. *See*, *e.g.*, *In re Complete Mgmt.*, 153 F. Supp. 2d at 327-28.

Also, notwithstanding Defendants' arguments to the contrary (Def. Br. at 38-39), a strong inference of *scienter* can be established even if Defendants did not sell stock during the Class Period.[52] *See Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We

---

[52] The cases cited by Defendants are inapposite. While *PR Diamonds Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) and *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881 (8th Cir. 2002), mention that failure to allege insider trading *may* dull inferences of *scienter* (depending on the circumstances of the case), the court in *PR Diamonds* made clear that "we have never held

will not . . . infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.") (citations omitted); *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

Further, Defendants' similar argument that their purchase of shares during the Class Period affirmatively negates any inference of *scienter* (Def. Br. at 38-39) is misplaced given the specific circumstances in the instant case.  *See, e.g., In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1107 (N.D. Cal. 2006); *PR Diamonds*, 364 F.3d at 691 ("We also reject the Individual Defendants' contention that their purchase of shares during the class period refutes any inference that they knowingly or recklessly misled the market to increase the stock's price"); *see also In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003).  Courts have found that stock purchases by insiders may even **contribute** towards a finding of *scienter* where the purchases were made out of a desire to cover up defendants' fraud.  *See, e.g., Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378-79 (S.D. Fla. 2001).

### 5.    The Proximity of the Misleading Statements and the Disclosure

On August 11, 2008, Spectranetics filed its quarterly report with the SEC on Form 10-Q, which was materially false and misleading.  *See* ¶¶ 194-96.  Further, only days before the FDA and ICE executed their search warrants on the Company, in an article on August 29, 2009, Defendant Schulte made false and material statements on behalf of the Company touting the

---

that the absence of insider trading defeats an inference of scienter." *See* 364 F.3d at 691. Similarly, while the court in *K-tel* indicated that absence of trading "*may* undercut allegations of motive," that case differs from this case in that the plaintiffs in *K-tel* had also alleged and based their *scienter* allegations on insider trading. *See* 300 F.3d at 894 (emphasis added).

Company's growth and profitability without disclosing the improper sources of revenue. *See* ¶¶ 197-98. The short time period between the misstatements and the disclosure of the search warrants evidences *scienter*. *See Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 9 (1st Cir. 2006); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224-25 (1st Cir. 1996).

### 6.    False SOX Certifications Provide Additional Evidence of *Scienter*

The Complaint alleges false SOX certifications by Defendants Schulte and Childs, which report on management's evaluation of internal controls, among other things. *See, e.g.*, ¶¶ 102, 115, 134. Those certifications were knowingly or recklessly false, based on the facts then existing, as alleged in the Complaint, and provide evidence of *scienter*. *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of [ ] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").[53]

## VII.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Rule 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47 (citations omitted). There is

---

[53] Further, high-level corporate officers who sign SEC filings and SOX certifications, such as Defendants Schulte and Childs here, have a duty to familiarize themselves with the operations that would have revealed the improprieties (if unknown). *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-1898, 2005 U.S. Dist. LEXIS 19506, at *63 (S.D.N.Y. Sept. 6, 2005) (signatories to SEC filings have a duty to familiarize themselves with facts relevant to the financial reporting of a company's core operations) (citation omitted). Thus, Defendants' argument that the SOX certifications "'add nothing' to the 'scienter calculus,'" Def. Br. at 38 n.12, is baseless.

no heightened standard for pleading loss causation. *See In re Bristol*, 586 F. Supp. 2d at 163. For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

A "corrective disclosure" is not required under post-*Dura* case law. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss"). A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices. *In re Parmalat*, 375 F. Supp. 2d at 307. *See also Heller*, 590 F. Supp. 2d at 624. Here, the materialization of concealed risks sufficed to plead loss causation. *See Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198-99 (2d Cir. 2003) (cited with approval in *Dura*, 544 U.S. at 344-45). Moreover, neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a "mirror image" tantamount to a confession of fraud. Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the ***underlying circumstance that is concealed or misstated.***" *Lentell*, 396 F.3d at 173 (emphasis added).[54] Thus, the ***"relevant truth"*** required under *Dura* is ***not that a fraud was committed*** *per se*, but that the "truth" about the company's underlying condition, when revealed, causes the "economic loss."

---

[54] *See also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("a disclosure . . . can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity"); *Nursing Home Pension Fund v. Oracle Corp.*, No. 01-00988, 2006 U.S. Dist. LEXIS 94470, at *35 (N.D. Cal. Dec. 20, 2006) (*Dura* does not require a corrective disclosure).

On September 4, 2008, the last day of the Class Period, after the market closed, Spectranetics revealed that the "FDA and ICE agents executed a search warrant on its headquarters and plant as part of a federal investigation into its sales and marketing practices." ¶ 201.  As a result of the disclosure of the government's investigation, the stock plummeted from $9.00 per share to $4.73 per share, a one-day decline of approximately 47% on volume of more than 6 million shares.  The drop "wiped out more than $126 million of the Company's market capitalization." ¶ 14.  This drop indicated the market's realization that the previously announced revenue and earnings statements reflected the sale of products which were marketed by the Company in violation of FDA rules and regulations and that going forward, sales would be impacted by the Company's inability to improperly market its products.  ¶ 15. Further, the drop also "reflected the impact of the investigation and potential for fines, legal fees or worse, and the impact of the investigation on the Company's reputation in the medical device industry and with government agencies."  *Id.*  The market's reaction to this disclosure evidences Defendants' concealment of these risks until the end of the Class Period.  Plaintiffs here have clearly pleaded that the "share price fell significantly after the truth became known." *Dura*, 544 U.S. at 346.[55]  This is sufficient to plead loss causation.  *See In re Bradley Pharms.*, *Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (announcement of an informal SEC inquiry at the end of the class period that did not disclose the reason for the inquiry, but resulted in significant stock price drop, was sufficient to connect that price drop to the improprieties that triggered the SEC inquiry, even though the nature of the improprieties was revealed later).

---

[55] Much smaller market reactions have evidenced loss causation.  *See, e.g., City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (4.3% share price decline after company's holdings in WorldCom became public, "supports attributing the loss to [the company]'s concealment of its investment risk").

In fact, numerous "[o]ther courts have found that similar allegations of significant stock drops in response to announced [ ] investigations are sufficient to plead loss causation under *Dura* and its progeny." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 286-287 (S.D.N.Y. 2008) (collecting cases). In *Take-Two*, a 7.5% drop in share price in response to an announcement that the SEC was "conducting an informal non-public investigation into certain stock option grants made by the Company" sufficed to plead loss causation. *Id.* The price drop here in response to the investigations was over six times larger, and clearly pleads loss causation. Moreover, the investigations are linked to the purportedly fraudulent misconduct, and thus are "akin to a corrective disclosure," *In re Bristol*, 586 F. Supp. 2d at 164-65, and was not merely "'bad news' followed by a stock price decline." *Id.*[56] Defendants also cannot argue that the risks which materialized here were unforeseeable as a matter of law. To prove that a loss-inducing event was foreseeable, plaintiffs merely need to establish that the risk of the event occurring was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor. *Lentell*, 396 F.3d at 173. The investigations were within the concealed "zone of risk" emanating from the Company's practices.[57]

---

[56] The September 4, 2009 announcement stated that the FDA and ICE investigations concerned precisely the area of the fraudulent misconduct alleged in the Complaint. ¶ 201. At the very least, the Company's disclosure of the investigations materialized concealed risks.

[57] The cases cited by Defendants, *see* Def. Br. at 43-44, are distinguishable. *In re Williams Sec. Litig. - WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) was an appeal from the exclusion of certain expert testimony and the grant of summary judgment, not a motion to dismiss. *See id.* at 1132. However, in *Williams*, even the plaintiff's expert admitted that the market already had some knowledge of the company's true financial condition, and therefore, other factors for the stock drop should have been considered and ruled out, especially because the same day, the complaint in the case was filed and could have easily been the cause of the decline. *See id.* at 1141-42. In the instant case, the information revealed on September 4, 2008 was not previously known and no other information came out on that day that could have caused the decline. In *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal. 2007), the company only received a letter from the SEC asking for it to "voluntarily produce documents"

## VIII.    PLAINTIFFS STATE ACTIONABLE 10B-5(A) AND (C) CLAIMS

Plaintiffs allege that Defendants engaged in a "device, scheme, or artifice to defraud," and/or a "course of business which operated as a fraud or deceit" upon investors.  Plaintiffs detail Defendants' well orchestrated scheme to promote medical devices it manufactured for off-label (non-FDA approved) use in order to artificially inflate revenues.[58]    Rather than addressing these allegations, Defendants argue that "there is no such thing as scheme liability" after *Stoneridge.*  Def. Br. at 44. Defendants are wrong.  As the Supreme Court made clear in *Stoneridge*, "conduct itself can be deceptive."  *See id.* at 158.  *See also Lautenberg Found. v. Madoff*, No. 09-816, 2009 U.S. Dist. LEXIS 82084, at *35 (D.N.J. Sept. 9, 2009) (a private right of action remains under Rule 10b-5(a) and (c) post-*Stoneridge*).

### A.    Plaintiffs' Scheme Allegations Fall Under Rule 10b-5(a) and (c)

Plaintiffs' scheme allegations fall squarely under Rule 10b-5(a) and (c).  Plaintiffs' claims do not, as Defendants posit, merely allege a failure to "disclose uncharged unlawful conduct," nor do the claims merely attempt an end-run around the bar to private rights of action under the FDCA.  Def. Br. at 48.  Plaintiffs' claims describe an elaborate scheme and course of conduct specifically calculated to artificially inflate revenues and mislead investors.[59]    The fact that

---

and stated that the request for documents "should not be construed as an indication by the SEC or its staff of any violations of law have occurred."  *See id.* at 1162.  Here, the Company revealed that the FDA and ICE agents "executed a search warrant on its headquarters and plant as part of a federal investigation."  ¶ 201.  Further, the FDA's Office of Criminal Investigation was involved, suggesting a "level of impropriety beyond the typical issue of FDA clearances."  ¶ 204.  Defendant also rely on one sentence in *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932 (S.D. Ind. 2005), which was not even in the context of loss causation.  *See id.* at 941.  Further, the criminal investigation and the SEC investigation were also terminated in that case.  *See id.*

[58] *See, e.g.*, ¶¶ 52-87, 95-100, 108-110, 117-126, 149-150, 161-165, 169-175, 201-215, 217-222.

[59] *See, e.g.*, ¶¶ 52-87, 95-100, 108-110, 117-126, 149-150, 161-165, 169-175, 201-215, 217-222.

Defendants' deceptive conduct included underlying violations of another federal law (here the FDCA) does not excuse Defendants from their parallel liability under the securities laws.

*In re Micron Tech. Sec. Litig.*, No. 06-85-S, 2009 U.S. Dist. LEXIS 13793 (D. Idaho Feb. 23, 2009), is instructive. In *Micron*, plaintiffs brought 10b-5(a) and (c) claims based on the issuer's participation in an illegal price-fixing conspiracy. Even though the issuer's underlying conduct amounted to a violation of antitrust laws, the court refused to dismiss the 10b-5(a) and (c) claims, reasoning that the price-fixing activity was reflected in the company's stock price, harming investors. *See id.*, at *9-13. Here Defendants' conduct in illegally promoting off-label uses of its medical devices in violation of the FDCA was also reflected in the stock price. As in *Micron*, Defendants' deceptive conduct violates two laws contemporaneously.

### B.    The Misrepresentations and Omissions do not Foreclose Liability

The mere fact that Defendants' deceptive course of conduct involves misrepresentations and omissions does not convert Plaintiffs' 10b-5(a) and (c) claims into 10b-5(b) claims. The misrepresentations and omissions alleged by Plaintiffs in violation of 10b-5(b) state the *results* of Defendants' deceptive scheme, *i.e.* Plaintiffs' 10b-5(a) and (c) claims arise from the deceptive *conduct itself*. Defendants' scheme to promote medical devices for off-label use was designed to artificially inflate revenues and mislead the market regarding the performance and growth potential of Spectranetics.[60] That conduct is a scheme or artifice to defraud, separate and apart from Plaintiffs' 10b-5(b) claims.

In fact, allegations of misrepresentations or omissions are common in cases alleging 10b-5(a) and (c) violations. *See Stoneridge*, 552 U.S. at 158-59 (noting that defendants'

---

[60] *See, e.g.*, ¶¶ 52-87, 95-100, 108-10, 117-26, 149-50, 161-65, 169-75, 201-15, 217-22, 234-42.

allegedly deceptive course of conduct included both oral and written statements, but examining whether defendants' conduct itself satisfied the requirements of Rule 10b-5(a) and (c)); *In re Bristol*, 586 F. Supp. 2d at 170 (examining whether a corporate officer's deceptive course of conduct in negotiating a misleading settlement, which included making oral and written statements regarding the settlement, violated Rule 10b-5(a) and (c)). The misstatements upon which investors here relied are not, as Defendants argue, the sole basis for Plaintiffs' 10b-5 (a) and (c) claims. But, as explained below, the publicly released statements relied upon by investors served to communicate Defendants' unlawful conduct to the public.

### C.    Plaintiffs' Allegations are Sufficient to Establish Reliance

Plaintiffs alleged that investors relied on the publicly-disclosed results of Defendants' deceptive conduct, and that the Company's stock traded in an efficient market.[61] This is sufficient to establish reliance under 10b-5(a) and (c). Defendants cite *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009), for the principle that *Stoneridge* prohibits any presumption of reliance in all scheme liability cases. Def. Br. at 48-49. *Desai* actually held that the fraud-on-the-market presumption can apply to deceptive conduct because it "allows the plaintiff to connect causally the defendants' bad act with the plaintiff's decision to buy or sell the security" and the security price incorporates the bad acts. *See* 573 F.3d at 940.[62]

In *Stoneridge*, the Supreme Court noted that the fraud-on-the-market presumption is

---

[61] *See* ¶¶ 21-24, 44, 214-24, 239-42.

[62] The *Desai* court's ruling in favor of Defendants was based on plaintiffs' admitted failure to allege an efficient market. *See* 573 F.3d at 940. Here, Plaintiffs have alleged an efficient market. ¶¶ 214-15. Furthermore, *Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000), fails to provide any support to Defendants' argument, as it does not concern the fraud-on-the-market presumption of reliance. *See id.* at 1163 n.2 (noting that the fraud-on-the-market presumption of reliance is functionally distinct from the fraud-created-the market presumption of reliance at issue before the court).

applicable to establish reliance where the fraudulent conduct at issue becomes public. *See* 552 U.S. at 159. Here, Defendants' scheme was disclosed to the market in the public statements of revenues, as well as statements deliberately designed to cover up the deception.[63]  Unlike *Stoneridge,* Plaintiffs' claims here are not raised against removed, outside entities or third parties, but against the Company's officers and/or directors. *Compare Stoneridge*, 552 U.S. at 152 (finding no 10b-5(a) and (c) liability where the deceptive acts were committed by suppliers and customers of defendants remote from investors' injury), *with Micron*, 2009 U.S. Dist. LEXIS 13793, at *12 (finding 10b-5(a) and (c) liability could attach where the issuer itself committed the deceptive acts that caused investors injury). Plaintiffs allege sufficient facts to support a finding of reliance under Rule 10b-5(a) and (c). *See id*. at *10-12 (defendant liable under 10b-5(a) and (c) for price-fixing conduct where the resulting inflated prices are disclosed to the public even if the acts leading to the price-fixing are not*); In re Bristol,* 586 F. Supp. 2d at 170 (reliance on attorney's misleading conduct in negotiating a settlement established where the settlement terms, but not the misleading conduct in negotiating the settlement, was disclosed to the public).

## IX.    THE COMPLAINT STATES A CLAIM FOR CONTROL PERSON LIABILITY

To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person. *See Maher v. Durango Metals*, 144 F.3d 1302, 1305 (10th Cir. 1998). The primary violation has plainly been established. As for control, "[a]s long as a plaintiff pleads facts from which the court can reasonably infer the defendants were control persons, the control person determination is a factual question not ordinarily subject to resolution on a

---

[63] *See* ¶¶ 91-213.

motion to dismiss." *In re NPS*, 2007 U.S. Dist. LEXIS 48713, at *23-24 (citation omitted).[64]

Plaintiffs have pled that the Individual Defendants were senior officers or Board members and "by virtue of [their] high-level positions with the Company, directly participated in the management of the Company, w[ere] directly involved in the day-to-day operations of the Company at the highest levels and w[ere] privy to confidential proprietary information concerning the Company." ¶ 34. Plaintiffs have also pled that the Individual Defendants "participated in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws." ¶¶ 32-38. Each also actively participated in the illegal conduct. ¶¶ 26-30. *See also* ¶¶ 244-46. *See Adams*, 340 F.3d at 1108 (finding that high level officers are control persons).

The Complaint further alleges that the Company's Board was "unusual in that outside directors Geisenheimer and Dr. Walker acted as insiders as they had day-to-day involvement in the operations of the Company." ¶ 39. Additionally, Dr. Walker received lucrative deals from the Company and personally promoted the illegal conduct. ¶ 40. Geisenheimer also "participated with the top officers in running the Company on a day-to-day basis and in the scheme to defraud investors." ¶ 41. Thus, both a primary violation of the securities laws and control has been established to support a valid claim against the Individual Defendants under

---

[64] The Tenth Circuit has "'rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.' Rather, once the plaintiff establishes the prima facie case, the burden shifts to the defendant to show lack of culpable participation or knowledge." *Maher*, 144 F.3d at 1305 (internal citations omitted).

§20(a).  *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1262 n.11 (D. Okla. 2003).[65]

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its

entirety.[66]

Dated:  November 18, 2008                                    Respectfully submitted,

| | | |
|---|---|---|
| **THE SHUMAN LAW FIRM** | **LABATON SUCHAROW LLP** | **BROWER PIVEN, A Professional Corporation** |
| */s/ Kip B. Shuman* | Mark S. Goldman | Charles J. Piven |
| Kip B. Shuman | David J. Goldsmith | Yelena Trepetin |
| Rusty E. Glenn | Carol C. Villegas | The World Trade Center- |
| 885 Arapahoe Avenue | 140 Broadway | Baltimore |
| Boulder, CO 80302 | New York, NY 10005 | 401 East Pratt Street |
| Tel: (303) 861-3003 | Tel: (212) 907-0702 | Suite 2525 |
| Fax: (303) 484-4886 | Fax: (212) 883-7010 | Baltimore, MD 21202 |
| Kip@Shumanlawfirm.com | mgoldman@labaton.com | Tel:  (410) 332-0030 |
| Rusty@Shumanlawfirm.com | dgoldsmith@labaton.com | Fax: (410) 685-1300 |
| | cvillegas@labaton.com | piven@browerpiven.com |
| *Liaison Counsel for* | | |
| *Lead Plaintiff* | *Co-Lead Counsel For* | *Co-Lead Counsel* |
| | *Lead Plaintiff* | *For Lead Plaintiff* |

---

[65] In *Maher*, 144 F.3d at 1306, plaintiff alleged that defendants "possessed only the ability to acquire the power to control," not the actual power to control, or the actual exercise of control. *See* 144 F.3d at 1306.  In *Sorkin*, 2005 U.S. Dist. LEXIS 19934, plaintiffs could not show that a member of the board "exerted control or influence over the day-to-day operations of the Company during the Class Period."  *See id.,* at *35.  *Paracor Fin., Inc. v. GE Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996), was a summary judgment decision, but even there the court noted that a director could be considered a control person depending on several factors, *see id.* at 1163-64, which have all been alleged in the instant case.

[66] In the alternative, if any particular allegations are deemed insufficient, Plaintiffs request that any dismissal be without prejudice to the filing of an amended complaint pursuant to Fed. R. Civ. P. 15(a).  *See Carol Gamble Trust 86 v. E-Rex, Inc.*, No. 03-15032, 2004 U.S. App. LEXIS 88, at *9 (9th Cir. Jan. 5, 2004) ("In light of the difficulty the courts have in establishing a bright-line test for pleading securities fraud . . . 'adherence to [the principle of 'liberal' grants of leave to amend] is *especially* important in the context of the PSLRA.'") (internal citation omitted; emphasis in original).

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2009, I electronically filed Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss with Exhibits 1 and 2 and Plaintiffs' Appendix of Unpublished Authorities in Support of Their Memorandum of Law in Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*/s/ Kip B. Shuman*
Kip B. Shuman

**Mailing Information for a Case 1:08-cv-02048-REB-KLM**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net

- **W. Gordon Dobie**
  wdobie@winston.com,ECF_CH@winston.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Mark S. Goldman**
  mgoldman@labaton.com,mclaughlin@gsk-law.com

- **David J. Goldsmith**
  dgoldsmith@labaton.com,ElectronicCaseFiling@labaton.com

- **John F. Head**
  jfhead@headlawyers.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **Charles J. Piven**
  piven@browerpiven.com

- **Stephen C. Schulte**
  sschulte@winston.com,psenica@winston.com,mdaun@winston.com,
  ECF_CH@winston.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

- **Trig Randall Smith**
  trigs@csgrr.com,stremblay@csgrr.com,e_file_sd@csgrr.com

- **Bruce G. Vanyo**
  bruce@kattenlaw.com,sandy.broff@kattenlaw.com

- **Carol C. Villegas**
  cvillegas@labaton.com,ElectronicCaseFiling@labaton.com

- **Marisa Gayle Westervelt**
  marisa.westervelt@kattenlaw.com,paula.phillips@kattenlaw.com

- **Richard H. Zelichov**
  richard.zelichov@kattenlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

(No manual recipients)