# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02048-REB-KLM

(Consolidated with Civil Action No. 08-cv-02055-CMA-CBS, 08-cv-02078-MSK-BNB,
08-cv-02267-MSK-CBS, 08-cv-02420-PAB, 08-cv-02603-MSK-BNB)

In re SPECTRANETICS CORPORATION SECURITIES LITIGATION

---

**LEAD PLAINTIFF'S SUPPLEMENTAL CONSOLIDATED CLASS ACTION
COMPLAINT**

---

Lead Plaintiff, the Spectranetics Investor Group ("SIG" or "Lead Plaintiff"), by and

through its undersigned attorneys, on behalf of itself and the class it seeks to represent,

for its Supplemental Consolidated Class Action Complaint ("Complaint"), alleges the

following upon information and belief, except as to those allegations concerning Lead

Plaintiff which are alleged upon personal knowledge.  Lead Plaintiff's information and

belief is based on the investigation of its counsel, which included, without limitation: a

review of United States Securities and Exchange Commission ("SEC") filings by

Spectranetics Corporation ("Spectranetics" or the "Company"), regulatory filings and

reports, responses to Freedom of Information Act ("FOIA") requests submitted to

government agencies, securities analysts' reports and advisories about the Company,

press releases and other public statements issued by the Company, media reports and

news articles about the Company, publicly available information concerning

Spectranetics common stock, the search warrant used by government agencies to

investigate suspected wrongdoing at Spectranetics, the Non-Prosecution Agreement,

Corporate Integrity Agreement and Civil Settlement that Spectranetics entered into with

federal agencies, and interviews with former employees of the Company who have

come forward on a confidential basis.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons

and entities that purchased or otherwise acquired the publicly traded common stock of

Spectranetics between March 16, 2007 and September 4, 2008, inclusive (the "Class

Period"), and were damaged thereby (the "Class").  This action pursues remedies under

the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Spectranetics develops, manufactures, markets, and distributes single-use

medical devices for minimally invasive surgical procedures within the cardiovascular

system and excimer laser technology for use with its associated medical devices.  The

Company is incorporated in Delaware and maintains its headquarters in Colorado

Springs, Colorado.

3.      Pursuant to the provisions of the Food, Drug, and Cosmetic Act ("FDCA")

and accompanying Food and Drug Administration ("FDA") regulations, a manufacturer

is prohibited from marketing or promoting a medical device for any uses other than the

uses indicated on the approved device's application.

4.      Throughout the Class Period, Spectranetics had regulatory approval to

promote its excimer laser and its associated disposable medical devices for

atherectomy, which is a procedure to remove arterial blockages in the legs and in the

coronary area.  The laser system is also FDA approved to remove infected, defective, or

abandoned lead wires from patients with pacemakers or ICDs, which are electronic

devices used to regulate the heartbeat. In addition, Spectranetics had FDA approval to market its laser to treat in-stent restenosis in the *coronary* arteries, but **not** the peripheral arteries found in patients' legs. In-stent restenosis involves using the laser to remove blockages in stents placed in arteries.

5. Marketing and promoting the Company's laser system to doctors and medical centers for the non-FDA approved procedure of in-stent restenosis *in the peripheral arteries* represented a material opportunity for Spectranetics, but one which was prohibited because the Company did not have FDA approval to market it for that purpose.

6. At great risk to the Company's business prospects and its shareholders, and without disclosing their plan and conduct to the public, as early as spring 2007, Defendants embarked on a plan and scheme to create the impression in the marketplace that Spectranetics was proceeding in a legal, deliberate manner to obtain the sought-after FDA approval of the use of its laser and medical devices for in-stent restenosis in the peripheral arteries.

7. Unbeknownst to investors and those outside the Company, however, Defendants were proceeding neither legally nor in such a deliberate manner.

8. Defendants, all of whom were integral parts of the plan and scheme described herein, launched a multi-front effort to promote the use of its medical devices for in-stent restenosis in the peripheral arteries without first obtaining FDA approval. This plan included promoting and demonstrating the Company's laser system and medical devices by top Company officials for in-stent restenosis procedures at Spectranetics-sponsored medical education events. Defendants also knowingly or recklessly violated FDA rules and regulations by importing medical devices from overseas and testing them on humans to evaluate their marketability in the United

States, even though these devices were not FDA-approved for use on humans in the United States. Additionally, when the Company experienced adverse test results where stents were damaged when they came in contact with the laser during FDA-required "Worst Case" testing protocols, Defendants elected not to report these adverse results to the FDA.

9.      Defendants' efforts to keep the public and investors from learning about their scheme to circumvent FDA rules and regulations unraveled when, on September 4, 2008, the Company revealed that it had been served with a search warrant by the FDA and U.S. Immigration and Customs Enforcement ("ICE"). FDA and ICE raided Spectranetics' headquarters in Colorado Springs, seeking information and data in conjunction with a criminal investigation showing that Defendants marketed, promoted and sold certain products for the treatment of in-stent restenosis; made payments to medical personnel and a particular institution for this application; and tested, promoted and sold guidewires and catheters manufactured by international third parties, devices which were not FDA approved for use in humans. The government agencies also sought the details of two post-market studies completed during the period between 2002 and 2005; payments made to personnel in connection with those studies; and compensation packages for certain employees.

10.      The federal investigation appears to be the result of a whistleblower action filed on September 5, 2008, by Scott Schlesinger, a Spectranetics employee who was fired by the Company on April 3, 2008. Schlesinger filed a wrongful termination lawsuit, alleging that he discovered the Company was illegally and "extensively" marketing its laser and catheters for uses that had not been approved by the FDA; that the Company failed to report to the FDA that tests found its laser "caused significant damage" to

stents the Company was using in a clinical trial; and that the Company illegally tested several products on humans without FDA approval.

11.     Additional former employees of Spectranetics corroborate and provide additional details to the allegations raised by Schlesinger.

12.     According to a press release issued on June 17, 2009, Spectranetics entered into a settlement agreement with Schlesinger.  As part of the settlement, Schlesinger is prohibited from discussing his allegations or the terms of the settlement with anyone.  The Company also entered into a Civil Settlement Agreement, Non-Prosecution Agreement and Corporate Integrity Agreement with the Department of Justice ("DOJ"), U.S. Attorneys' Office, and the U.S. Department of Health and  Human Services in December, 2009, resolving many but not all of the investigated claims that the Company engaged in improper conduct.[1]   These agreements do not settle any claims that may still be brought against the Individual Defendants or other employees of the Company, and they do not resolve claims that may be brought by other government agencies against the Company, including the FDA.  As part of the Non-Prosecution Agreement, Spectranetics *admitted and agreed not to contest* the government's claims that it did not comply with FDA reporting requirements involving its CORAL and CORAL REEF studies, and that the Company, through its officers and key employees, illegally imported and tested FMD Guidewires and BMT Balloons on human subjects, without FDA approval or clearance.

13.     Like any pharmaceutical or medical device manufacturer, Spectranetics' value to shareholders, as reflected in its trading price, is derived in significant part from the integrity of its relationship with the FDA, its compliance with FDA rules and regulations, the professionalism of its testing procedures, and the professionalism and

---

[1] These agreements are attached hereto as Exhibits ("Ex.") A, B and C respectively.

integrity of those doctors it chooses to represent Spectranetics to the public. Spectranetics lost that value when its deceptive practices were revealed.

14.    The disclosure of the government's investigation on September 4, 2008, caused the Company's stock to plummet from $9.00 per share to $4.73 per share, a one-day decline of nearly 48% on volume of more than 6 million shares, compared to an average 30-day volume of 356,000.  This stunning drop wiped out more than $136 million of the Company's market capitalization.

15.    The one-day drop reflected the market's realization that the previously announced revenue and earnings statements reflected the sale of laser systems and medical devices which were marketed by the Company in violation of FDA rules and regulations, and of equal importance, the market's recognition that going forward, sales would be impacted by the Company's inability to improperly market its products.  The drop also reflected the impact of the investigation and potential for fines, legal fees or worse, and the impact of the investigation on the Company's reputation in the medical device industry and with government agencies.

16.    On September 19, 2008, the Company filed a candid Answer to Schlesinger's complaint in Colorado state court.  In its Answer, Spectranetics admitted that numerous Spectranetics officials were already aware of the off-label compliance issues raised in Schlesinger's complaint.  Despite admitted insider knowledge, Defendants concealed these problems in communications to shareholders when it spoke about its clinical trials and continued to maintain that it did not promote its products for off-label or otherwise unapproved uses.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Spectranetics is headquartered within this Judicial District.

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

21.    Lead Plaintiff SIG, the Court appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, consists of the Genesee County Employees' Retirement System ("Genesee"), the Wayne County Employees' Retirement System ("Wayne") and Peter J. Tortora ("Tortora").

22.    Genesee is a public pension fund that provides retirement and survivor benefits for certain employees of Genesee County, Michigan, embracing the City of Flint and environs.  Genesee purchased Spectranetics common stock in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Spectranetics securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Spectranetics that was misrepresented and omitted during the Class Period was revealed.  Genesee's Certification containing a detailed list of its transactions in Spectranetics securities during the Class Period is attached hereto as Ex. D.

23.    Wayne purchased Spectranetics securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Spectranetics securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Spectranetics that was misrepresented and omitted during the Class Period was revealed.  Wayne's Certification containing a detailed list of its transactions in Spectranetics securities during the Class Period is attached hereto as Ex. E.

24.    Tortora purchased Spectranetics securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Spectranetics securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Spectranetics that was misrepresented and omitted during the Class Period was revealed.  Tortora's

Certification containing a detailed list of its transactions in Spectranetics securities during the Class Period is attached hereto as Ex. F.

25.     Defendant Spectranetics is a Delaware corporation, with its principal place of business in Colorado Springs, Colorado.  Spectranetics common stock is listed and actively traded on the NASDAQ National Market System under the symbol "SPNC." NASDAQ is a well-developed, efficient market for securities.

26.     Defendant John G. Schulte ("Schulte") was President, Chief Executive Officer ("CEO"), and a director of Spectranetics during the Class Period.  Schulte became President and CEO of the Company in January 2003.  Schulte has extensive experience working at high-level positions in this field.  Schulte was formerly President and Chief Executive Officer of Consensus Pharmaceuticals, Inc., a privately held biotechnology company, from October 2001 to January 2003.  Schulte had been President and Chief Executive Officer of Somnus Medical Technologies, Inc., a medical device company specializing in the design, development, manufacturing and marketing of minimally invasive medical devices for the treatment of upper airway disorders, from November 1998 until its acquisition by Gyrus Group, PLC, a European medical device company, in October 2001.  Previously, Schulte was President of the Surgical Products Division of Genzyme Corporation, a medical device company specializing in anti-adhesion products for general surgery and cardiovascular medical devices and instruments, from July 1997 to October 1998.  From November 1996 to June 1997, he served as Senior Vice President and General Manager of the International and Peripheral Division of Target Therapeutics, Inc., a medical device company specializing

in the treatment of vascular disease of the brain, which was acquired by Boston Scientific Corporation in April 1997. Schulte "resigned" from Spectranetics on October 21, 2008, in the wake of the regulatory investigation of the Company by the FDA and ICE. During the Class Period, Schulte signed the Form 10-K and 10-Q reports filed by the Company with the SEC, spoke about the Company's business during earnings conference calls with analysts, and provided interviews to news organizations regarding the Company. Schulte was also a driving force behind the illegal conduct complained of herein.

27.     Defendant Guy A. Childs ("Childs") was Vice-President, Chief Financial Officer ("CFO") and Secretary of Spectranetics during the Class Period. Childs joined the Company in September 1991 and has been CFO and Vice President of the Company since January 2003. Childs has an extensive accounting background. Prior to joining Spectranetics, Childs worked for the public accounting firm of Deloitte & Touche, LLP, serving as a senior accountant on various audit engagements in the financial services, healthcare and manufacturing industries. During the Class Period, Childs signed the Form 10-K and 10-Q reports filed by the Company with the SEC and spoke about the Company's business during earnings conference calls. Childs also participated in the illegal conduct complained of herein.

28.     Defendant Jonathan W. McGuire ("McGuire" or "Will McGuire") was Chief Operating Officer ("COO") of the Company during the Class Period. McGuire joined the Company as COO in October 2005. Prior to joining Spectranetics, McGuire held key positions at Guidant Corporation, most recently as General Manager of the Latin

American division, from March 2003 to August 2005.  Prior to that, he held several marketing positions within Guidant's Vascular Intervention Group, including: General Manager — Puerto Rico and U.S.V.I. from March 2003 to March 2004; Director of U.S. Marketing from March 2002 to March 2003; Director of Global Marketing from May 2001 to March 2002, and Manager of Global Stent Marketing from April 1999 to May 2001. During the Class Period, McGuire was closely involved in the day-to-day operations of the Company and spoke about the Company's business during earnings conference calls.  McGuire participated in the illegal conduct complained of herein.

29.    Defendant Emile Geisenheimer ("Geisenheimer") was Chairman of Spectranetics' Board of Directors ("Board") during the Class Period.  Geisenheimer joined the Company as a director in 1990 and became Chairman of the Board in 1996. Geisenheimer also served as acting President and CEO of the Company from May 2002 until Schulte assumed those posts in January 2003.  Geisenheimer was re-appointed President and CEO on October 23, 2008, after Schulte resigned. Geisenheimer is the founder and President of Madison Investment Partners, Inc., a private equity investment firm, and serves as a General Partner of each of its investment partnerships.  Prior to forming Madison Investment Partners, he was general partner of Nazem and Company, a venture capital management firm, where he was responsible for developing the health care and medical device practices.  Prior to joining Nazem and Company, Geisenheimer served in a number of senior executive positions with North American Philips Corporation (now Philips Electronics), including as President and CEO of Philips Electronic Instruments, Inc. and as a top marketing

executive of Philips Medical Systems, Inc.  During the Class Period, Geisenheimer

signed the Form 10-K reports filed by the Company with the SEC, participated in the

day-to-day operations of the Company, and participated in the illegal conduct

complained of herein.

30.     Defendant Craig M. Walker, M.D. ("Walker") was a director of

Spectranetics during the Class Period.  Dr. Walker has been a director of the Company

since December 2004.  Dr. Walker is a practicing interventional cardiologist.  Dr. Walker

is also the founder, President, and Medical Director of the Cardiovascular Institute of the

South ("CIS"), a position he has held since August 1983.  Additionally, Dr. Walker is the

Medical Director of the CIS Cardiovascular Fellowship Training Program, Associate

Clinical Professor of Medicine at Tulane University School of Medicine and Medical

Director of the Cardiac Catheterization Laboratory at Terrebonne General Medical

Center.  During the Class Period, Dr. Walker signed the Form 10-K reports filed by the

Company with the SEC, participated in the day-to-day operations of the Company and

participated in the illegal conduct complained of herein.  During the Class Period, Dr.

Walker used his medical degree and influence to advance Spectranetics' illegal goals.

31.     Defendants Schulte, Childs, McGuire, Geisenheimer, and Dr. Walker are

collectively referred to herein as the "Individual Defendants."  The Individual Defendants

and Spectranetics are collectively referred to herein as the "Defendants."

32.     Each of the Individual Defendants is or was a senior officer or Board

member during the Class Period.  The Individual Defendants controlled the Company

and its public disclosures regarding its medical devices, regulatory compliance and

revenues.  Each of them made false and misleading statements and/or failed to disclose material adverse information and/or participated in the scheme to defraud the Company's shareholders through their words and conduct as detailed herein.

33.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, compliance and non-compliance with FDA regulations, operational trends, financial statements and markets via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

34.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the collective action of the narrowly defined group of Individual Defendants identified above.  Each of the Individual Defendants identified above, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, as well as compliance and non-compliance with FDA regulations, operations, growth, financial statements, and financial condition,

as alleged herein. The Individual Defendants participated in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

35.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ securities exchange, and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these requirements and obligations.

36.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein. The Individual Defendants were also aware of, or recklessly disregarded the misstatements and/or omissions contained in these reports and communications and were aware of the false and misleading nature of these misstatements or omissions. Because of their Board membership and/or

executive and managerial positions with Spectranetics, each of the Individual

Defendants had access to the adverse undisclosed information about Spectranetics'

financial condition, compliance and non-compliance with FDA regulations, and

performance as particularized herein and knew (or recklessly or negligently

disregarded) that these adverse facts rendered the positive representations made by or

about Spectranetics and its business issued or adopted by the Company materially

false and misleading.

37.    The Individual Defendants, because of their positions of control and

authority as officers and/or directors of the Company, were able to and did control the

contents of the various SEC filings, press releases and other public statements

pertaining to the Company during the Class Period.  Each Individual Defendant was

provided with copies of the documents alleged herein to be misleading prior to or shortly

after their issuance and/or had the ability and/or opportunity to prevent their issuance or

cause them to be corrected.  Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and releases detailed herein and is

therefore primarily liable for the representations contained therein.

38.    Each of the Defendants is also liable as a participant in a fraudulent

scheme and course of business that operated as a fraud or deceit on purchasers of

Spectranetics securities by: disseminating materially false and misleading statements

and/or concealing material adverse facts; deceiving the investing public regarding

Spectranetics' business and operations and financial condition; and causing Lead

Plaintiff and other members of the Class to purchase Spectranetics securities at artificially inflated prices.

39.     A typical Board of Directors has the overall responsibility for the activities of the corporation.  The Board acts on behalf of the shareholders to make **overall** policy decisions and provide oversight.  Spectranetics' Board, however, was unusual in that outside directors Geisenheimer and Dr. Walker acted as insiders as they had day-to-day involvement in the operations of the Company.

40.     Dr. Walker, through his relationships, affiliations and ownership in medical centers throughout the country, provided Spectranetics with approximately 50% to 60% of its revenue.  Dr. Walker personally promoted the off-label use of Spectranetics' laser systems to other physicians and health care providers.  Despite taking an oath to "do no harm," he participated in the illegal and unethical testing of foreign-made, non-FDA approved medical devices on humans on behalf of the Company.  Dr. Walker received lucrative consulting deals with the Company as incentive to engage in these illegal acts. During the Class Period, Dr. Walker received hundreds of thousands of dollars in compensation from the Company.  In exchange, Dr. Walker furthered and supported the illegal goals of the Company.  While the existence of the Company's consulting agreement with Dr. Walker was disclosed generally in a Form 14A, filed with the SEC on April 17, 2009, in a Form 8-K filed on June 22, 2007, and in other SEC filings, the Company never disclosed the illicit nature of the agreements and their purpose: to promote the off-label testing and use of medical devices.

41.    Geisenheimer was Chairman of the Board of Directors during the Class Period and was subsequently re-appointed as CEO following Schulte's resignation. While serving as Chairman of the Board and without an official executive title, Geisenheimer participated with the top officers in running the Company on a day-to-day basis and in the scheme to defraud investors.  Geisenheimer was paid $147,744.00 in 2008 for his services as CEO.  As compensation for serving as a director during the Class Period, he was paid $160,842 in 2008, $91,330 in 2007 and $75,434.00 in 2006.

## CLASS ACTION ALLEGATIONS

42.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons and entities that purchased or acquired the common stock of Spectranetics between March 16, 2007 and September 4, 2008, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Spectranetics had more than 31 million shares of common stock outstanding that traded on NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by Spectranetics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are, whether during the Class Period:

(a)    the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    the statements made by Defendants to the investing public misrepresented material facts about the business, operations and management of Spectranetics;

(c)    Defendants employed any device, scheme, or artifice to defraud Lead Plaintiff and the Class;

(d)     whether Defendants engaged in manipulative or deceptive acts or course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

48.     Based in Colorado Springs, Colorado, Spectranetics develops, manufactures, markets and distributes the CVX-300® laser unit and single-use ("disposable") medical devices.  Spectranetics' products are used by physicians in minimally invasive procedures within the cardiovascular system.

49.     The Company markets two kinds of disposable product lines in addition to its laser.  The Company's Vascular Intervention ("VI") products include a range of laser catheters that aid in delivering laser energy to an artery to remove obstructions such as a build-up of plaque.  These disposable catheters are used in arteries in the legs, or peripheral arteries, and within arteries in the heart, or coronary arteries.  The Company

also markets aspiration catheters, not used with the laser, for the removal of thrombus, or blood clots, and support catheters to facilitate "crossing," or exchange of guiding catheters, for coronary and peripheral artery blockages.

50.     The second line of products marketed by the Company is the Lead Management ("LM") product line.  The LM product line includes laser sheaths and cardiac "lead management" accessories for the removal of cardiac pacemaker and defibrillator leads.  Pacemakers and defibrillator leads, prone to developing infections or scar tissue, oftentimes need to be removed.  The LM products, in conjunction with the laser, vaporize the scar tissue holding problematic leads and pacemakers in place.

51.     Spectranetics' VI products are designed to treat a wide range of cardiovascular disease, including peripheral and coronary arterial disease.  Peripheral arterial disease ("PAD") is characterized by clogged or obstructed arteries in the upper or lower leg.  The resulting lack of blood flow can cause leg pain and lead to tissue loss or amputation.  Similarly, coronary artery disease ("CAD"), also called coronary heart disease, is a condition in which plaque builds up inside the coronary arteries.

52.     The majority of the revenue generated by Spectranetics is from the sale of its disposable products, not its lasers.  Sales of disposables make up almost 85% of the Company's revenue.  Sales of the lasers make up 3%, while service and laser rentals make up the rest.  Thus, more than anything else, the financial condition of the Company is dependent on Spectranetics being able to market and sell its disposable medical devices.

53.     Revenue from the disposable devices is reported by product line—atherectomy (VI products) and lead removal (LM products).  Lead removal products make up 30% of the revenue from disposables, while the sale of atherectomy disposables makes up 70%.  PAD, or arterial disease in the legs, represents an overwhelming 90% of the atherectomy business.  In other words, the sale of disposable medical devices used in the arteries of patients' legs generates a material portion of the Company's revenue.

**FDA Regulation of Spectranetics Products**

54.     The lasers and medical devices sold by Spectranetics are subject to significant FDA regulation.

55.     Prior to receiving FDA clearance to market a medical device, the FDA requires the applicant to prove that the device is safe and effective for its intended use or that it is substantially equivalent to another medical device already on the market.  21 U.S.C. §§ 360(k), 360c(f), 360e(a); 21 C.F.R. §§ 807.92, 807.93.

56.     To show the safety of a medical device, an applicant must first obtain permission from the FDA to conduct pre-clinical, *i.e.*, non human, testing.  Obtaining permission from the FDA to test medical devices on humans is a costly and lengthy process.

57.     In order to clinically test a medical device, Spectranetics must first demonstrate the level of risk associated with the medical device.  21 C.F.R. § 812.2(b)(1)(ii); 21 C.F.R. § 812.3(m).  If the device poses a non-significant risk, the applicant must provide the reviewing regulatory board with information that would help

the regulatory board evaluate the level of risk to patients taking part in the study, including a description of the device, reports of prior investigations with the device, the proposed investigational plan, subject selection criteria, and other information the regulatory board may need.

58.     If the device poses a significant risk to humans, the FDA must approve an Investigational Device Exemption ("IDE") application prior to initiation of investigational use.  An IDE application must be supported by appropriate data, such as animal and laboratory test results, showing that it is safe to test the device on humans and that the testing protocol is scientifically sound.

59.     Once an applicant receives FDA permission to test the device on humans, the applicant must then sponsor clinical trials to test the efficacy of the device under the approved testing protocol.  These clinical trials are costly and can take years to complete.  Once the results are in, the applicant will present its clinical findings to the FDA.

60.     Once a medical device is cleared or approved by the FDA, the applicant may sell and market the device to the public, but only for the FDA-approved use which must appear on the product's labeling.  21 U.S.C. § 352(f); 21 C.F.R. § 801.5.  If the intended use of a product changes, the applicant must obtain FDA approval for the new use, so that the applicant can label the product appropriately.  21 C.F.R. § 807.81(a)(3); 21 C.F.R. § 801.4.  If off-label uses are included in the product's labeling, the product is "adulterated," and if off-label uses are promoted, the product is "misbranded."  21 U.S.C. §§ 351(f)(1)(B), 352(f).  Manufacturing or introducing an adulterated or

misbranded product into interstate commerce is prohibited.  21 U.S.C. § 331(a-c), (g).

***Thus, the FDCA and the corresponding FDA regulations prohibit an applicant from promoting a medical device for off-label uses.***

61.    Before the start of the Class Period, Spectranetics obtained FDA approval to market its laser system and associated disposable products for procedures including atherectomy, which is a procedure using a laser to remove arterial blockages in the peripheral and coronary vasculature and for the removal of infected, defective or abandoned cardiac lead wires from patients with pacemakers or implantable cardiac defibrillators, which are electronic devices that regulate the heartbeat.

62.    Spectranetics also obtained FDA approval to treat in-stent restenosis in the coronary arteries.  When an artery becomes blocked, a stent or tube may be inserted into the artery to prevent or counteract the blocked passageway.  When a stent is placed in an artery, new tissue grows inside the stent covering the struts of the stent. Initially, this new tissue consists of healthy cells from the lining of the arterial wall, which is a favorable effect because development of normal lining over the stent allows blood to flow smoothly over the stented area without clotting.  Later, scar tissue may form underneath the new healthy lining.  The growth of scar tissue underneath the lining of the artery may be so thick that it can obstruct the blood flow and produce a blockage. This is called "in-stent restenosis" or ISR.  **Spectranetics did not and does not have FDA approval to treat ISR in the leg for PAD** (peripheral artery disease).  Therefore, while doctors are not prohibited by FDA rules and regulations from using Spectranetics'

products to treat ISR in PAD, **Spectranetics cannot promote its laser system or medical devices to treat ISR in PAD**.

**Illegal Promotion of FDA Approved Devices**

63.    During the Class Period, the development of ISR technology for use in PAD was at the forefront of the Company's efforts.  Defendants realized that there was a large and growing market for the treatment of blocked stents placed in the arteries of human legs.

64.    An article in the *Colorado Springs Business Journal* by Amy Gillentine, dated October 12, 2007, described laser treatment of ISR for use in peripheral arteries as the "holy grail" for Spectranetics.  The article noted that: "[m]ore than 100,000 patients receive treatment for in-stent restenosis each year, so if the laser is proven to be effective it also could be very profitable."  In the article, Schulte discussed how approval by the FDA for ISR in peripheral arteries could mean up to $200 million for the Company's bottom line.

65.    In September of 2007, the Company initiated a clinical trial in Germany to test its laser in conjunction with a disposable catheter for the treatment of ISR of stents that had been implanted in the leg (the "PATENT trial").

66.    In February of 2008, the Company initiated the SALVAGE trial.  The SALVAGE trial was a physician-sponsored trial in the United States by the Vascular Interventional Advances (VIVA) physicians and was co-funded by W.L. Gore and Spectranetics.  This trial was intended to test the use of the Spectranetics laser in

conjunction with a disposable catheter for treatment of ISR for stents that had been implanted in the leg.

67.    In connection with these studies, the Company publicly expressed its hope that the FDA would one day approve its products for the use of ISR in patients' legs. Spectranetics stated publicly time and time again that having an approved treatment for ISR in peripheral arteries would be a very lucrative "opportunity" for the Company.

68.    Unbeknownst to the public, however, as early as spring 2007, Defendants made the decision to market its laser system and medical devices to treat ISR in the legs without first obtaining FDA approval.

69.    In furtherance of Defendants' decision to market its medical devices for the off-label use of the Company's laser system and medical devices to treat ISR in PAD, during the Class Period, Defendants authorized employees of the Company to perform the following tasks:

(a)    Develop sales and promotional strategies for field sales personnel designed to convince doctors to use their medical device for ISR in PAD;

(b)    Distribute and use sales training materials and promotional materials promoting off-label use; and

(c)    Aggressively solicit and pay doctors to demonstrate and promote the Spectranetics laser system and medical devices for non-FDA approved procedures.

70.    To this end, the Company illegally promoted and marketed its products through Board member Dr. Walker and other doctors at various training sessions attended by targeted doctors including "Gloves On" Peripheral Vascular Disease

("PVD") Training Courses and individualized training sessions targeted to groups of 10-15 doctors.  Dr. Walker and other doctors were paid by the Company as "consultants" in return for their off-label promotion of the Company's products for ISR in peripheral arteries.

71.     Under an agreement with the Company, Dr. Walker was paid at least $97,000 in 2006, $144,000 in 2007 and $117,000 in 2008 as consulting fees for his efforts to market and sell the Company's medical devices for non-FDA approved uses.

72.     The Company's top executives and the Board of Directors, including Geisenheimer, knew about the illegal off-label promotion, use and marketing of the Company's laser system and medical devices.  They also knew about the involvement of Dr. Walker and other doctors in these efforts and that the Company was paying Dr. Walker and others "consulting fees" to promote and market its medical devices for off-label use, but allowed these actions to continue.

**Failure to Report Adverse Effects to the FDA**

73.     Defendants' illegal promotion of its laser system and medical devices for off-label use was not to the exclusion of its efforts to obtain FDA approval in the future for such use.

74.     During the Class Period, Spectranetics performed "in house" studies on the lasers' interaction with a particular kind of stent called a nitinol stent.  Spectranetics failed to disclose to the FDA that these tests yielded negative and potentially dangerous results.

75.    Beginning in the summer of 2007, Kelly W. Elliott, Vice President of Clinical Affairs, worked with an engineer to perform laser tests on a stent made up of nickel and titanium (the "nitinol stent").  As required by the FDA, Elliott and the engineer performed extensive fatigue testing on the stent, pulsing the laser to its highest capacity on the nitinol stents.  The test results revealed that the laser caused major damage to the nitinol stents, a significant negative finding that would likely prevent the laser from obtaining FDA approval for use in ISR procedures.  The Company did not report these significant negative results to the FDA even though they were required to notify the FDA of "every possible way the device can harm humans."

76.    Separately, the PATENT and SALVAGE trials, sponsored by the Company, were also testing the nitinol stents' reaction with the laser.  Unlike the testing done at Spectranetics, which was done in a vacuum, the PATENT and SALVAGE trials were performed on humans.  The Company allowed the PATENT trial (beginning in September 2007) and the SALVAGE trial (beginning in February 2008) to begin and continue throughout the Class Period, even though as early as the summer of 2007 the Company knew that the laser could potentially damage the nitinol stent and cause harm to the human test subjects.

77.    In violation of law and FDA requirements, Spectranetics did not report the adverse results of these tests to the FDA.  To the contrary, ignoring the significant health risks exposed by this testing, Spectranetics continued to actively market its laser system and medical devices for off-label use in peripheral ISR procedures, even going so far as to represent that the device was safe and effective for such procedures, and

lauding the fact that the device was "not contra-indicated" for ISR procedures.

Additionally, Dr. Walker continued to market ISR procedures on humans during training

sessions, using the potentially dangerous nitinol stent.

78.     This was not the first time Spectranetics failed to report adverse test

results to the FDA.  As set forth in the Application and Affidavit for Search Warrant and

Seizure ("Application for Search Warrant"), a copy of which is attached as Ex. G, and as

the Company admitted in the Non-Prosecution Agreement, attached as Ex. B,

Spectranetics previously failed to report serious adverse test results observed in

connection with its CORAL and CORAL REEF Studies.  Defendants Schulte and

McGuire had daily oversight responsibilities for these studies which were conducted

between June 2003 and December 2005, and were therefore aware of the high

mortality rates observed and of the Company's decision not to report those results to

the FDA.  *See* Application for Search Warrant, Ex. G, ¶¶ 64-77, and Non-Prosecution

Agreement, Ex. B.

**Illegal Testing of Foreign Medical Devices**

79.     The illegal practices, supported and carried out by the Company's top

officials and Board members, pervaded throughout the Company and were not limited

to the illegal promotion of its laser system and medical devices for off-label use.

80.     During the Class Period, Spectranetics imported and illegally tested

foreign disposable medical devices on humans.

81.     Beginning in 2005, the Company contracted with a Japanese Company,

FMD, Inc. ("FMD"), to import guidewires into the United States.  FMD manufactures

guidewires that can be used with the type of minimally invasive catheter therapy that Spectranetics engages in for vascular intervention procedures.

82.    While Spectranetics obtained FDA approval to import the guidewires from Japan, it did not obtain FDA approval to test the guidewires on humans.  In fact, the FMD guidewires were specifically labeled **"not for human use"** on the packaging. Regardless, Spectranetics provided these guidewires to Board member, Dr. Walker, with the directive to test the product on humans to determine if the product would be viable and whether it was a product that Spectranetics might look to market in the future.

83.    Dr. Walker tested the FMD guidewires on humans several times beginning in 2006 through early summer 2007.  The Company's top executives, including Schulte, Childs and McGuire knew about the illegal testing on humans.  The Board of Directors, including Geisenheimer, was also informed about the illegal testing performed by Dr. Walker but allowed it to continue.

84.    Spectranetics also illegally tested a second foreign manufactured medical device, Percutaneous Transluminal Angioplasty balloons ("BMT balloons").  BMT balloons were imported by Spectranetics from a German manufacturer, Bavaria MedizinTechnologie ("BMT").  These balloons are used to dilate the arteries of the legs.

85.    The Company began receiving shipments of the BMT balloons as early as the summer of 2007.  The Company imported approximately 28 BMT balloons.  While the Company had obtained permission to import the balloons into the United States, the

Company did not have FDA permission to test these balloons on humans.  In fact, the packaging was specifically labeled **"not for human use."**

86.    CEO Schulte worked with Trung Pham, a Business Development Manager at the Company, to provide the balloons to Dr. Walker and to a friend of Dr. Walker's, Dr. Robert Gallino ("Gallino").  Drs. Walker and Gallino were paid consulting fees to test the BMT balloons on humans.  As early as summer 2007, Pham visited Dr. Walker and Gallino on several occasions to observe the procedures and complete evaluation forms in consultations with them.

87.    At a meeting in December 2007, Spectranetics officials, including Schulte and McGuire, discussed and observed the finding that physicians who had evaluated the BMT balloons at several different sites throughout the United States were very pleased with the product's performance.

88.    By bypassing FDA rules and regulations and having physicians utilize unapproved, imported guidewires and balloons in humans, Spectranetics was able to test and analyze devices without the significant expense and delay of controlled clinical trials, as required by FDA regulations.

**Investigations Into Spectranetics' Wrongdoing**

89.    On September 4, 2008, the Company revealed that it had been served with a search warrant by the FDA and ICE as part of a criminal investigation of wrongdoing.  The government agencies sought information and correspondence relating to violations of the Safe Medical Devices Act and FDCA, including: promotion and sales of certain products for the treatment of "in-stent restenosis," payments made

to medical personnel and a particular institution for this application, and the promotion and sales of guidewires and catheters manufactured by international third parties. Federal authorities also sought information on two post-market studies completed during the period from 2002 to 2005 and payments made to personnel in connection with those studies, as well as compensation packages for certain employees.

90. The federal investigations appear to have originated from allegations brought by Scott Schlesinger, a former employee of Spectranetics. Schlesinger's allegations were contained in a civil complaint filed against Spectranetics on September 5, 2008, for, among other things, wrongful termination (the "Whistleblower Complaint"). Schlesinger, the former Director of Marketing at the Company from April 2007 to April 2008, alleged that Spectranetics fired him for confronting Company officials about the widespread illegal behavior perpetrated by the Company and its top leaders, including: illegally and "extensively" marketing its laser and catheters for uses that had not been approved by the FDA; failing to report to the FDA that tests found its laser "caused significant damage" to the stents it was using in a clinical trial; that the Company illegally tested several products on patients without FDA approval; and that the Company's laser systems failed to meet regulatory requirements.

91. In connection with the Whistleblower Complaint, the Department of Labor ("DOL") also initiated an investigation. In addition, the SEC and the Financial Industry Regulatory Authority ("FINRA") issued document requests and inquiries into the Company's activities.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

**Fiscal Year 2006**

92.    The Class Period begins on March 16, 2007, when Spectranetics filed its

2006 Annual Report with the SEC on Form 10-K (the "2006 10-K").  The 2006 10-K was

signed by Defendants Schulte, Childs, Geisenheimer, and Dr. Walker.

93.    Under Item 1A of the 2006 10-K, listing "Risk Factors," the report

affirmatively states:

> **We do not promote our products for off-label or
> otherwise unapproved usage.**

(Emphasis added.)

94.    In the section of the 2006 10-K regarding "Overview of Medical Device

Regulation," the Company recognizes: "Our products are medical devices subject to

extensive regulation by the FDA under the Federal Food, Drug, and Cosmetic Act, or

FDCA."  The Company goes on to state:

> To be commercially distributed in the United States, medical
> devices must receive either 510(k) clearance or PMA [pre
> market approval] prior to marketing from the FDA pursuant
> to the FDCA.  Devices deemed to pose relatively less risk
> are placed in either Class I or II, which requires the
> manufacturer to submit a premarket notification requesting
> permission for commercial distribution; this is known as
> 510(k) clearance.
>
> Some low risk devices are exempted from this requirement.
> Devices deemed by the FDA to pose the greatest risk, such
> as life-sustaining, life-supporting or implantable devices, or
> devices deemed not substantially equivalent to a previously
> 510(k) cleared device or a preamendment Class III device
> for which the FDA has not yet called for submission of PMA
> applications are placed in Class III requiring PMA.

> **All clinical studies of investigational devices must be conducted in compliance with FDA's requirements.**  If an investigational device could pose a significant risk to patients (as defined in the regulations), the FDA must approve an IDE application prior to initiation of investigational use.

(Emphasis added.)

95.    These statements were materially false and misleading when made because in 2006, the Company had already begun importing a medical device, a guidewire, from Japan that was not FDA-approved for use in humans.

96.    Alarmingly, Spectranetics encouraged and even assisted physicians who "consulted" for Spectranetics to use and test these non-FDA approved guidewires on humans in the United States.

97.    According to Confidential Witness 1 ("CW 1"), an Executive Officer who worked at the Company's headquarters from May 2007 through October 2008, the Company had an arrangement with a Japanese Company, FMD, to import guidewires into the United States.  As Vice President in charge of overall strategic business decisions, CW 1's responsibilities included corporate strategy, acquisitions and new product strategies.  CW 1 has over 20 years experience working in the medical device industry.  CW 1 interacted at a high level with all the Individual Defendants and CW 1 learned of the decision to import and test the Japanese guidewires on humans from CW 1's discussions with the Individual Defendants.

98.    CW 1 confirmed that while Spectranetics obtained FDA approval to import the guidewire from Japan, the Company did not obtain FDA approval to test the guidewire on humans.  In fact, the FMD guidewire was specifically labeled **"not for**

**human use"** on the packaging.  Regardless, in 2006 and 2007, Spectranetics provided

this guidewire to Board member Dr. Walker with the directive to test the product on

humans to determine if it would be a product that Spectranetics might one day look to

promote and sell.

99.     Dr. Walker tested the FMD guidewire on humans several times beginning

in 2006 through the spring of 2007.  As soon as CW 1 arrived at the Company, Schulte

discussed the circumstances under which Spectranetics came to acquire the FMD

guidewire with CW 1, and how it was being evaluated by Dr. Walker on humans.  In

addition, at a meeting of the Board of Directors in Denver, on or about May 7, 2007,

CW 1 was present and heard Schulte updating the Board as to the Company's

acquisition and testing of the FMD guidewire.  At the meeting, Board members,

including Dr. Walker, discussed the human product evaluations.  Additionally, CW 1

discussed the FMD guidewire project with McGuire.

100.    CW 1 was shocked that the Company was testing the product on humans

and discussed this with Schulte.  He recommended that the Company cease its

relationship with FMD.  In addition, CW 1, as part of his responsibilities to consider the

Company's corporate strategy, performed a cost-benefit analysis and determined that

even if the FMD guidewires did work (with proper testing overseas and in the U.S.), the

guidewires would not provide to be cost effective.  Based on CW 1's evaluation, the

Company cancelled its contract with FMD and ultimately had to pay cancellation

penalties to FMD.

101.   Childs, the CFO, also knew that Dr. Walker was conducting illegal tests on humans with the FMD product.  According to CW 1 "[t]he day that I killed the FMD project, he [Childs] thanked me and said that he [Childs] had been trying to stop it for so long but no one would listen to him."

102.   Defendants admitted in the Non-Prosecution Agreement that it illegally imported and tested FMD guidewires on human subjects, in violation of FDA rules and regulations.  In the Application for Search Warrant which preceded the Non-Prosecution Agreement, the government cited the testimony of its own confidential witnesses who knew about the Company's efforts to import and test the devices.  The government's confidential witnesses stated that from May 2005 until November 2007, Spectranetics contracted with FMD to manufacture these non-FDA approved guidewires and that Schulte himself provided these guidewires to physicians, requesting them to evaluate them in patients.  *See* Application for Search Warrant, Ex. G, ¶¶ 41-42.  The Application for Search Warrant also provides additional email evidence showing that Schulte traveled to Japan to tour the FMD facility in 2005, that FMD shipped the guidewires to Spectranetics, that Spectranetics forwarded the guidewires to doctors for testing, and that doctors reported their test results back to Spectranetics.  *See* Application for Search Warrant ¶¶ 43-54.  These same emails show the active involvement of Individual Defendants McGuire and Schulte with the illegal importing, marketing and testing of FMD guidewires.  Under the terms of the Non-Prosecution Agreement, the Company conceded that these allegations were true.

103.    The representations that Spectranetics did not promote its products for unapproved uses and that it conducted clinical trials in compliance with FDA rules and regulations, contained in Spectranetics' 2006 10-K, were materially false and misleading when made because Defendants failed to disclose or indicate that: (1) the Company had illegally tested the FMD guidewires on humans; (2) the Company had made improper payments to medical professionals including Board member Dr. Walker, who participated in human studies of the FMD guidewire; (3) the Company lacked effective regulatory and compliance controls, allowing the FMD guidewires to be tested on humans without FDA approval; and (4) such questionable behavior would necessarily impact the business prospects of the Company and subject the Company to an extensive investigation by federal authorities into its business practices, which, when they occurred, would lead to potential fines and certain legal expenses which otherwise would not have been incurred.

104.    Additionally, pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the 2006 10-K included the following certifications signed by Defendants Schulte and Childs stating that the 2006 10-K did not include any material misrepresentations:

> I, [John G. Schulte/ Guy A. Childs] of Spectranetics Corporation, certify that:
>
> 1.    I have reviewed this annual report on Form 10-K of The Spectranetics Corporation;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were

made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of directors (or persons performing the equivalent functions):

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

105.    The Sarbanes-Oxley certifications signed by Schulte and Childs were materially false and misleading when made because Spectranetics engaged in questionable and illegal behavior as set forth above, the 2006 10-K contained materially false and misleading statements as set forth above, and the systemic flouting of FDA, ICE, SEC, FINRA, and criminal statutes exposed the Company to material liabilities and materially impacted the business prospects of the Company.

**Fiscal Year 2007**

106.    On April 19, 2007, Spectranetics issued a press release entitled "Spectranetics Reports First Quarter Revenue of $17.4 Million as Atherectomy Product Sales Increase 52%." The Company, in relevant part, stated:

**COLORADO SPRINGS, Colo. (April 19, 2007)** – Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the three months ended March 31, 2007.

Revenue for the first quarter of 2007 reached $17.4 million, up 28% compared with revenue of $13.6 million for the first quarter of 2006. For the quarter, disposable product revenue rose 35% to $14.4 million, laser revenue declined

23% to $1.1 million, and service and other revenue
increased 20% to $1.9 million, all compared with the first
quarter of 2006.

107.    Schulte was quoted in the press release, expounding on the important role

of PAD treatment for the Company's bottom line:

> Spectranetics further expanded its role in treating PAD, as
> our atherectomy revenue again exceeded the overall growth
> in that market by a significant margin.  Most importantly, we
> accelerated the progress of the TURBO Booster catheter
> when the FDA allowed us to end the CELLO trial early based
> on the strength of data on 61 patients, instead of continuing
> with the planned 85 patients.  We have completed the
> patient follow-up study, and expect to file the 510(k)
> application within the next 30 days.  The TURBO Booster
> [used to treat ISR in PAD] will greatly increase our market
> opportunity, as approximately two-thirds of the endovascular
> procedures performed in the United States are for above-
> the-knee blockages.

108.    These statements were materially false and misleading when made

because by the time this press release was issued, Defendants' scheme to promote the

Company's laser system and medical devices for off-label use was well underway.  By

this time, the reported revenue and earnings already reflected the impact of these

efforts.  The Company's promotion of its laser system and medical devices for off-label

use began no later than during the quarter ending March 31, 2007.

109.    According to the Whistleblower Complaint, off-label marketing by

representatives of the Company was required and expected.  CEO Schulte made

statements that Spectranetics needed to "control the podium" at conferences and other

events to promote the Company's agenda for off-label use of its lasers to treat ISR in

the peripheral arteries.

110.    Additionally, according to Schlesinger, Schulte and Steve Okland, Vice President of Sales and Marketing, told the marketing department that it needed to aggressively promote Spectranetics' products as the "gold standard" for the treatment of ISR in peripheral arteries.  The marketing department, under the direction of top Company officers, developed and distributed promotional strategies to convince doctors to use the Company's devices in non-approved manners, such as to treat ISR in peripheral arteries.  Spectranetics also engaged in the aggressive solicitation of doctors to use its medical devices for off-label use and paid doctors to demonstrate the use of the Company's products for the treatment of ISR in peripheral arteries.

111.    CW 2 was a former Territory Account Manager for Spectranetics between March 2005 and September 2007.  CW 2 reported to Tom York who was the Regional Manager and worked out of Wisconsin.  CW 2's sales region was Indiana and Illinois and CW 2 was considered to be an experienced sales person.  CW 2 was the only sales person in his or her region authorized to sell lasers on his or her own without the help of his or her supervisor.  Even though CW 2 was an experienced and trusted Territory Manager, CW 2 was taught that ISR in the leg was one of the indications for which the laser system was FDA approved.  CW 2 does not remember ever receiving training explaining that ISR for the treatment of PAD **could not** be promoted by the Company.

112.    Through off-label marketing, Spectranetics increased sales and rentals of its products without incurring the significant additional expenditures needed to obtain FDA approval for these additional uses.

113.    During a conference call with securities analysts on April 19, 2007, Schulte and Childs reiterated the first quarter financial results reported that day. McGuire was also present on the call.  In addition, Schulte described the company's "excitement" at the "potential of the [Company's products] to treat in stent restenosis." Schulte stated: "While laser atherectomy does not have an in-stent indication for the SFA [superficial femoral artery, or leg artery], it also does not have a contraindicated." He also laid out his plan to initiate ISR clinical trails in the United States.  Schulte also stated: "I think the role for atherectomy in that application [ISR in peripheral arteries] will be very large.  So I think that is the area where we're going to gain the most traction the quickest."

114.    These statements were materially false and misleading when made because while acknowledging that the Company could not market the laser to treat ISR in peripheral arteries, the Company did not disclose that it had already begun aggressively marketing, promoting and testing its products for use in the treatment of ISR in peripheral arteries.

115.    On May 10, 2007, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the quarter ending March 31, 2007.  The filing was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results.  The Company's revenue was broken down as follows:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | | **2006** | |
| **Revenue (in thousands):** | | | | |
| Equipment | $ | 1,009 | $ | 1,307 |
| Disposables | | 13,302 | | 9,801 |
| Service | | 1,830 | | 1,479 |
| Other, net of provision for sales returns | | (123) | | (74) |
| Subtotal — U.S. Medical | | 16,018 | | 12,513 |
| Equipment | | 54 | | 73 |
| Disposables | | 1,124 | | 867 |
| Service | | 162 | | 137 |
| Other | | 7 | | 27 |
| Subtotal — Europe Medical | | 1,347 | | 1,104 |
| Total revenue | $ | 17,365 | $ | 13,617 |

116.    The Company's net income was reported as follows:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2007** | | **2006** | |
| **Net loss:** | $ | (65) | $ | (638) |
| Common shares outstanding: | | | | |
| Historical common shares outstanding at beginning of period | | 30,854 | | 26,251 |
| Weighted average common shares issued | | 155 | | 109 |
| Weighted average common shares outstanding — basic | | 31,009 | | 26,360 |
| Effect of dilution — stock options | | - | | - |
| Weighted average common shares outstanding — diluted | | 31,009 | | 26,360 |
| Net loss per share — basic and diluted | $ | (0.00) | $ | (0.02) |

117.    Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included

certifications signed by Defendants Schulte and Childs, substantially similar to those

included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any material misrepresentations.

118.    These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

119.    According to CW 1, the Company spent considerable time, effort, and money on the marketing and promotion of its laser and disposables for off-label use.

120.    The expectation that the Company would successfully market its laser system and medical devices for off-label use was considered in the Company's internal revenue models and projections.  The models showed that revenue from the laser and disposables used for ISR in peripheral arteries and thrombus could be "up to $200 million."  Scott Schlesinger, the Company's marketing manager, Tatiana Zimmerer, and Steve Okland were involved in the revenue modeling and were told to do this revenue modeling by Schulte.

121.    This revenue modeling took into account sales for ISR to treat PAD **before** FDA approval was obtained, and even before testing of the safety and efficacy of Spectranetics' disposables and laser was assessed in clinical trials.  The revenue source created by marketing and promoting the laser for off-label use was important to

the Company for boosting revenue to meet projections and/or to pursue the $200 million goal generated by the revenue modeling performed at Schulte's explicit request.

122.    According to CW 1, Dr. Walker, through his relationships, affiliations and ownership in medical centers throughout the country, provided Spectranetics with approximately 50% to 60% of its revenue.  Additionally, the Company recognized revenue from sales resulting from Dr. Walker's training sessions where he trained doctors to use Spectranetics products for off-label uses.  Dr. Walker personally promoted the off-label use of Spectranetics' laser systems to other physicians and health care providers.  CW 1 explained that every month, starting no later than the first quarter of 2007, Spectranetics would sponsor training sessions across the country.  Dr. Walker, his medical associates and colleagues, including several doctors from Alabama and Southwest Arkansas, would each train 15 to 20 doctors a month.  Many of the training sessions occurred at CIS facilities, medical centers where Dr. Walker is the founding member and medical director.  CIS has 10 locations across the southern United States.

123.    CW 2 confirmed that CW 2 and many of his or her clients attended Dr. Walker's and his associate Dr. David Allie's Master Summits in New Orleans.  CW 2 advised that many of these meetings were held at a restaurant owned by Dr. Walker's wife.

124.    Dr. Walker and his colleagues used the laser in ISR procedures on peripheral arteries on their own patients and taught other doctors how to do this as well. Spectranetics, in turn, compensated these doctors as "consultants."

125.    According to CW 1, Dr. Walker functioned as the mouthpiece for Spectranetics; indeed, according to CW 1, "[i]f you wanted to send a message to the marketplace, you did it through Dr. Walker."  Essentially, Dr. Walker told the medical community what Spectranetics wanted them to hear, and he did it through his relationships with medical centers across the country and with other doctors.

126.    CW 1 stated that the Company actively marketed the laser to treat ISR in peripheral arteries and that it "happened all the time."  At Company meetings, CEO Schulte would instruct the marketing department how he wanted them to promote the Company's products for off-label use.

127.    CW 1 said that "Emile [Geisenheimer] and Dr. Walker had several conversations on marketing and testing" of ISR in peripheral arteries and that the Board was "in on the promotion of off-label usage."  CW 1 said, "All of them knew--Emile, Fletcher [Vice President of Quality System], Childs, and Ruggio [referring to Dr. Ruggio on the Board of Directors]."  Indeed, according to CW 1, it was "common knowledge throughout the Company" that Dr. Walker and other doctors were marketing, promoting and using the lasers systems and medical devices for off-label use.  It was also common to hear Geisenheimer, Schulte and Dr. Walker say during Board meetings and as a message to the Company, generally, that the laser was "the only option" for ISR in peripheral arteries.

128.    CW 1 said that the off-label marketing was so prevalent and widespread at the Company that there was "no way anyone couldn't have known.  All you need to do

is be around Spectranetics to know" that the Company was promoting its products for off-label use.

129.   Defendants' decision to market its medical devices for off-label, ISR use in violation of FDA rules and regulations is also cited in the Application for Search Warrant, Ex. G.  The government cited the testimony of its own confidential witnesses who knew about the Company's efforts to market its medical devices to treat ISR.  The government summarized its claim that Defendants knowingly misbranded its medical devices as follows:

> According to CW-1 and documents he/she provided, Spectranetics, through Schulte and other top management officials, has adulterated and misbranded its CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter and TURBO-Booster guiding catheter for treating infrainguinal ISR without first obtaining approval for such use, ***knowing*** that the SALVAGE trial would not be adequate to support a marketing application and while possessing test results that show that the Spectranetics laser caused potentially grave damage to Nitinol expanding stents.

*See* Application for Search Warrant ¶ 20.  The Application and Search Warrant also provided email evidence showing that Defendants downplayed the known risks attendant with the use of its medical devices during ISR procedures to doctors testing them.  *See* Application for Search Warrant ¶ 21.

130.   The government summarized its claim that Spectranetics promoted its medical devices for off-label use as follows:

> According to CW-1 and the corroborating emails and documents he/she provided, Spectranetics sales staff were directed to promote TurboBooster for the unapproved, "off-label" use for the treatment of ISR.  A common sales methodology at Spectranetics was called "SPIN," an

> acronym for "Situation, Problem, Implication and Need-
> Payoff."

*See* Application for Search Warrant ¶ 22.

131.    In one email, Schulte is quoted telling Spectranetics employees that ISR is

the Company's "meal ticket."  *See* Application for Search Warrant ¶ 25.  During

conversations with the government's confidential witnesses, defendant Schulte brazenly

instructed his sales representatives to push ISR, stating "I want the FDA to slap me on

the hand if it's the wrong thing to do."  *See* Application for Search Warrant ¶ 29.  The

Company's efforts to market its medical devices for non-FDA approved purposes are

described in great detail throughout the Application for Search Warrant ¶¶ 28-38.

132.    On July 25, 2007, Spectranetics issued a press release entitled

"Spectranetics Reports Second Quarter Revenue of $20.4 Million as Atherectomy

Product Sales Increase 43%."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo.  (July 25, 2007)** —
> Spectranetics Corporation (Nasdaq: SPNC) today reported
> financial results for the three and six months ended June 30,
> 2007.
>
> Revenue for the second quarter of 2007 reached $20.4
> million, up 27% compared with revenue of $16.0 million for
> the second quarter of 2006.  For the quarter, disposable
> product revenue rose 35% to $17.4 million, laser revenue
> declined 23% to $1.1 million, and service and other revenue
> increased 11% to $1.9 million, all compared with the second
> quarter of 2006.

133.    Schulte was also quoted in the press release discussing the highlights of

the quarter:

> I'm proud of this quarter's financial performance, which was
> driven by atherectomy product sales and supported by gains

in our lead removal business. The growth in revenue by $3 million as compared with the first quarter of 2007 represents the largest sequential revenue increase we have ever achieved. Our continued strong performance and expanding market share reflect both the advantages of our laser technology in treating PAD and the solid execution of our growth strategy. Over the last several quarters we have introduced improvements to our catheter line, upgraded and expanded our sales force, and conducted an industry-leading physician training and education program. This has resulted in an expanded user base and greater utilization of our technology. We now have in place a broad foundation of leading physicians from which to leverage the introduction of the TURBO-Booster(TM) [used to treat ISR in PAD], which received FDA clearance at the end of June. We have initiated a controlled release of TURBO-Booster to specified accounts, which will allow for collection of valuable feedback to help guide our training and marketing programs. Over the next four to five months, we expect to complete the TURBO-Booster launch to our existing 350 atherectomy accounts.

134.    These statements were materially false and misleading when made because they failed to disclose that a material portion of the Company's revenue was generated from the illegal sale of medical devices resulting from the promotion and marketing of the Company's medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

135.    On June 25, 2007, the Company received approval for use of its new catheter, the "TURBO-Booster," in the United States. In a conference call with securities analysts on July 25, 2007, Schulte said: "Now that the TURBO-Booster has been cleared by the FDA, we plan on initiating two clinical trials for the treatment of In-Stent Restenosis [for PAD]. We believe that In-Stent Restenosis, or ISR, may represent as much as 25% to 35% of all above the knee procedures, and there is currently no good solution for this lesion subset." Schulte also discussed the ISR studies, PATENT

and SALVAGE.  While the Company had not yet enrolled patients, Schulte said their progress was "moving along nicely."  Also present on the call were Childs and McGuire.

136.    These statements were materially false and misleading when made because Defendants failed to disclose that regardless of the Company's efforts to advance clinical trials, the Company had already begun aggressively marketing, promoting and testing its products for use in the treatment of ISR in peripheral arteries, and that such promotion had led to the recognition of revenue from the sale of illegally promoted disposable medical devices.

137.    On August 9, 2007, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the quarter ending June 30, 2007.  The filing was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results.  Revenue was broken down as follows:

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Revenue (in thousands):** | | |
| Equipment | $        916 | $        1,042 |
| Disposables | 15,625 | 11,865 |
| Service | 1,900 | 1,624 |
| Other, net of provision for sales returns | (170) | (43) |
| Subtotal — U.S. Medical | 18,271 | 14,488 |
| Equipment | 174 | 365 |
| Disposables | 1,731 | 987 |
| Service | 165 | 139 |
| Other | 32 | 18 |
| Subtotal — Europe Medical | 2,102 | 1,509 |
| Total revenue | $    20,373 | $    15,997 |

138.    The Company reported net income as follows:

|  | Three Months Ended June 30, | | |
|  | 2007 | | 2006 |
|---|---|---|---|
| **Net income (loss)** | $ | 7,152 | $ 308 |
| Common shares outstanding: | | | |
| Historical common shares outstanding at beginning of period | | 31,104 | 26,448 |
| Weighted average common shares issued | | 36 | 2,023 |
| Weighted average common shares outstanding — basic | | 31,140 | 28,471 |
| Effect of dilution — stock options | | 2,406 | 2,788 |
| Weighted average common shares outstanding — diluted | | 33,546 | 31,259 |
| Net income (loss) per share — basic | $ | 0.23 | $ 0.01 |
| Net income (loss) per share — diluted | $ | 0.21 | $ 0.01 |

139.    Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included certifications, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, signed by Defendants Schulte and Childs stating that the Form 10-Q did not include any material misrepresentations.

140.    These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

141.    Schulte was quoted in the *Colorado Springs Business Journal* article by Amy Gillentine, dated October 12, 2007.  In the article, Schulte reiterated that approval by the FDA for ISR in peripheral arteries could mean up to $200 million for the Company's bottom line.

142.    Schulte's statement was materially false and misleading when made because the Company had already begun promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries.  In addition, the Company was already recognizing revenue from the sales resulting from the illegal promotion and marketing of its medical devices.

143.    On October 31, 2007, Spectranetics issued a press release entitled "Spectranetics Reports Third Quarter Revenue of $21.2 Million as Atherectomy Product Sales Increase 42%."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo.  (October 31, 2007)** — Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the three and nine months ended September 30, 2007.
>
> Revenue for the third quarter of 2007 reached $21.2 million, up 31% compared with revenue of $16.2 million for the third quarter of 2006.  For the quarter, disposable product revenue rose 36% to $17.3 million, laser revenue increased 17% to $2.0 million, and service and other revenue increased 12% to $2.0 million, all compared with the third quarter of 2006.

144.    Schulte was also quoted in the press release, discussing the PAD market and the Company's progress with its ISR clinical trials:

> Our performance in the third quarter reflects our very strong competitive position in the PAD market.  We now offer solutions to treat the entire leg, and our laser is the only

- 51 -

system that can address all three major lesion types - calcium, plaque and thrombus, and treat blocked arteries throughout the leg which range in diameter from 7 millimeters down to 1.5 millimeters.  The limited release of the TURBO-Booster(TM) is right on track with our objectives.  We have penetrated approximately half of our 350 atherectomy accounts, and we have received very positive feedback from physicians regarding performance.  With this initial success, we have narrowed our revenue guidance to the top end of the previous range.  **We are also pleased with the progress in our clinical trials for treating in-stent restenosis.**  We enrolled the first patient in the PATENT trial in Germany in late September, and expect the SALVAGE trial to begin later this quarter.  **We believe in-stent restenosis represents a major unmet medical need, affecting 25% to 35% of all above-the-knee procedures.**

(Emphasis added.)

145.    These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sale of products resulting from the promotion and marketing of medical devices for unapproved use.  In addition, while discussing the Company's progress towards obtaining FDA approval of ISR for PAD, Spectranetics was **already** marketing its products for the treatment of ISR in PAD.

146.    During a conference call with securities analysts on October 31, 2007, Schulte and Childs reiterated the third quarter financial results reported that day.  McGuire was also present on the call.  In addition, Childs stated: "through the third quarter we've held 14 Master Summits and trained just a little over 300 physicians which is right on track with what we anticipated."

147.    This statement was materially false and misleading when made because Defendants omitted to mention that the training sessions sponsored by the Company were used to illegally promote the off-label use of Spectranetics' laser system and medical devices.

148.    On November 9, 2007, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the quarter ending September 30, 2007.  The filing was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results.  The Company's revenue was broken down as follows:

| | Three Months Ended September 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Revenue (in thousands):** | | |
| Equipment | $ 1,628 | $ 1,393 |
| Disposables | 15,772 | 11,770 |
| Service | 1,870 | 1,628 |
| Other, net of provision for sales returns | (137) | (87) |
| Subtotal — U.S. Medical | 19,133 | 14,704 |
| Equipment | 378 | 319 |
| Disposables | 1,480 | 951 |
| Service | 184 | 142 |
| Other | 51 | 78 |
| Subtotal — Europe Medical | 2,093 | 1,490 |
| Total revenue | $ 21,226 | $ 16,194 |

149.    The Company reported net income as follows:

|  | Three Months Ended September 30, | |
|---|---|---|
|  | 2007 | 2006 |
| **Net income (loss)** | $ 231 | $ (165) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 31,157 | 30,761 |
| Weighted average common shares issued | 179 | 30 |
| Weighted average common shares outstanding — basic | 31,336 | 30,791 |
| Effect of dilution — stock options | 2,613 | — |
| Weighted average common shares outstanding — diluted | 33,949 | 30,791 |
| Net income (loss) per share — basic | $ 0.01 | $ (0.01) |
| Net income (loss) per share — diluted | $ 0.01 | $ (0.01) |

150.    Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included

certifications signed by Defendants Schulte and Childs, substantially similar to those

included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any

material misrepresentations.

151.    These statements were materially false and misleading when made

because, as alleged above, the Company failed to disclose that a material portion of the

Company's revenue was generated by the sales of products resulting from the

promotion and marketing of its laser system and medical devices for unapproved uses

and because the Company was promoting its medical devices for ISR in peripheral

arteries.

152.    On November 28, 2007, Schulte spoke at the Piper Jaffray Healthcare

Conference.  At the conference, Schulte stated: "We're doing the work to show that [our

laser] doesn't harm self-expanding nitinol stents."  He also stated that ISR in peripheral arteries "represents an opportunity of almost $200 million for our Company…**In stent restenosis is very key for us** (emphasis added)."

153.    These statements were materially false and misleading when made because as early as the summer of 2007, the Company had tested the nitinol stent and found that the laser did in fact cause harm to nitinol stents.

154.    According to Schlesinger, Spectranetics performed testing of its laser to determine whether it could safely be used with procedures involving nitinol stents.  The test results, obtained prior to November 28, 2007, revealed that the laser caused significant damage to these stents.

155.    CW 1 confirmed Schlesinger's allegation, adding that Kelly Elliott, the Company's Vice President for Clinical Affairs had obtained adverse results when she tested the nitinol stent and informed CW 1 of the results.  CW 1 also stated that the Company did not report these results to the federal agency, even though it was required by law to inform the FDA of "every possible way the device can harm humans." Ignoring the significant health risks exposed by this testing, Spectranetics continued to actively market its device off-label for use in ISR procedures on peripheral arteries, even going so far as to represent that the device was safe and effective for such procedures, and lauding the fact that the device was "not contra-indicated" for ISR procedures.

156.    The statements by Schlessinger and CW 1 are supported by statements made by the government's confidential witnesses in the Application for Search Warrant.

Specifically, the government's confidential witness supplied copies of the Company's tests on Nitinol stents, which showed that the laser caused severe fatigue and "surface melt and splay of material" to Nitinol expanding stents, which, in turn, could create a risk of heart attack, stroke and death. *See* Application for Search Warrant ¶ 16. The government also shows how the Company misled the FDA with regard to the testing of the Nintinol stent and how the FDA would likely have contraindicated the Company's lasers for use on ISR had the test results been properly provided. *See* Application for Search Warrant ¶ 18.

157. Schulte's statements were also materially false and misleading when made because he failed to disclose that the Company had already begun taking advantage of this "opportunity" by illegally promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries. The Company was already recognizing revenue from the sales resulting from the illegal promotion and marketing of these products.

158. On February 20, 2008, Spectranetics issued a press release entitled "Spectranetics Reports Fourth Quarter Revenue Up 35% to $23.9 Million, Features Strong Lead Management and Atherectomy Product Sales." The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo. (February 20, 2008)** — Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the quarter and year ended December 31, 2007.
>
> Revenue for the fourth quarter of 2007 was $23.9 million, up 35% compared with revenue of $17.7 million for the fourth quarter of 2006. Disposable product revenue rose 36% to

> $19.6 million, laser revenue increased 55% to $2.1 million, and service and other revenue increased 14% to $2.2 million, all compared with the fourth quarter of 2006.

159.    Schulte was also quoted in the press release, and discussed the progression of the ISR trials:

> We will continue to make strategic investments in clinical trial programs such as the PATENT and SALVAGE trials for in-stent restenosis, in addition to product development programs related to our laser system and disposable products.  These investments provide us with an opportunity to further penetrate existing markets and to potentially expand the applications and indications for use of our technology.  Our outlook for 2008 reflects confidence in our technology and products, our markets and our employees.

160.    These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the illegal promotion and marketing of the Company's medical devices for unapproved use.  In addition, the Company was already marketing the laser to treat ISR.  Unbeknownst to investors, Spectranetics was already taking advantage of "the opportunity to further…expand the applications and indications for use" of the Company's technology.

161.    During a conference call with securities analysts on February 20, 2008, Schulte and Childs reiterated the fourth quarter financial results reported that day. McGuire was also present on the call.  In addition, Schulte stated: "So, we're focusing a lot of our resources on in-stent restenosis, because we're the only atherectomy technology not contraindicated, we think that's a big opportunity.  That's why we're focusing a lot of clinical resources there."

162. Schulte's statements were materially false and misleading when made because he failed to disclose that the Company had already begun taking advantage of this "opportunity" by illegally promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries. The Company was already recognizing revenue from the sales resulting from the illegal promotion and marketing of these products.

163. On March 17, 2008, Spectranetics filed its 2007 Annual Report with the SEC on Form 10-K (the "2007 10-K") for the fourth quarter and full fiscal year of 2007. The 2007 10-K was signed by Defendants Schulte, Childs, Geisenheimer, and Dr. Walker, and reaffirmed the Company's previously announced financial results. The Company's revenues broken down as follows:

**Revenue by Product Line**

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
|  | (in thousands) | | |
| Disposable products | $ 68,634 | $ 50,643 | $ 33,045 |
| Service and other revenue* | 7,949 | 6,971 | 5,472 |
| Laser equipment | 6,291 | 5,876 | 4,695 |
| Total revenue | $ 82,874 | $ 63,490 | $ 43,212 |

164. The Company reported net income as follows:

| | 2007 | 2006 |
|---|---|---|
| | **(In thousands, except per share amounts)** | |
| **Net income (loss)** | $ 7,229 | $ (1,447) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of year | 30,854 | 26,251 |
| Weighted average common shares issued | 371 | 2,879 |
| Weighted average common shares outstanding — basic | 31,225 | 29,130 |
| Effect of dilution from stock options | 2,558 | — |
| Weighted average common shares outstanding — diluted | 33,783 | 29,130 |
| Net income (loss) per share, basic | $ 0.23 | $ (0.05) |
| Net income (loss) per share, diluted | $ 0.21 | $ (0.05) |

165.    Under Item 1A of the 2007 10-K, listing "Risk Factors," the report

affirmatively states:

> **We do not promote our products for off-label or otherwise unapproved usage.**

(Emphasis added.)

166.    This statement was materially false and misleading when made because

the Company was aggressively marketing and promoting its devices for the treatment of

ISR in peripheral arteries—an off-label use.

167.    According to Schlesinger, the Company's top executives clearly knew that

the Company was illegally promoting its medical devices for off-label use.  Schlesinger

raised the issue of off-label usage with the Company several times.  On December 4,

2007, December 14, 2007, January 10, 2008, and February 5, 2008, Schlesinger met

with Defendant McGuire and specifically discussed the inappropriate pressure on the

marketing department Schulte applied in order to aggressively promote the use of the Company's laser products for ISR in peripheral arteries, thrombus and in combination with lytics – all unapproved uses for the device. Schlesinger told McGuire that Schlesinger could neither condone nor participate in the unethical and illegal practices occurring within the organization. After the December 4, 2007 meeting, McGuire sent Schlesinger an e-mail stating "Thanks for the talk tonight. We'll talk more and things will improve." In fact, during each of these meetings, McGuire told Schlesinger to give him an opportunity to fix the situation.

168. During a January 7, 2008 planning meeting, Schlesinger told Okland that Schlesinger would not instruct the marketing department to promote the TURBO Booster product for use in the treatment of ISR in peripheral arteries nor train the sales force in such off-label promotion as it would be a violation of FDA regulations.

169. During a March 7, 2008 meeting, Schlesinger detailed his concerns about the Company's practices including the off-label promotion and use of unapproved medical devices with McGuire and Roger Wertheimer, Vice President of Human Resources and General Counsel. On March 28, 2008, Schlesinger again met with McGuire to discuss these improper and illegal activities. No effort to investigate this unlawful behavior or put an end to it resulted from this meeting.

170. Instead, during the Class Period, the Company spent considerable resources on the marketing and promotion of its laser and disposables for off-label use to increase revenues and make the Company a more attractive acquisition. CW 1 said it was the goal of the Individual Defendants to sell the Company and this was discussed

by top management.  During CW 1's tenure, the Company had been approached

several times by other companies seeking to acquire Spectranetics.

171.    According to CW 1, when Schulte was giving pitches to companies

seeking to acquire Spectranetics, Schulte "implied to the companies" that the laser

would work for certain off-label uses.  At these meetings to sell the Company, where

Schulte, McGuire, Wertheimer and Childs were all present along with representatives of

the potential acquiring company, Schulte would say "the laser works great on

thrombus," even though it had not been approved for use on thrombus.  Schulte would

tell those in attendance that the laser was "a delight" for dealing with ISR in peripheral

arteries, even though the laser had not been approved for such use.

172.    Also under the Risk Factors section of the 2007 10-K, the Company

described how difficult and costly it would be to obtain FDA approval for then off-label

use of its products.  The 2007 10-K states:

> All of our potential products and improvements of our current
> products are subject to extensive regulation and will require
> approval or clearance from the FDA and other regulatory
> agencies prior to commercial sale and distribution.  Pursuant
> to FDA regulations, unless exempt, the FDA permits
> commercial distribution of a new medical device only after
> the device has received 510(k) clearance or is the subject of
> an approved pre-market approval application, or PMA.  The
> FDA will clear marketing of a medical device through the
> 510(k) process if it is demonstrated that the new product is
> substantially equivalent to other 510(k)-cleared products.  In
> some cases, a 510(k) clearance must be supported by
> preclinical and clinical data.  The PMA application process is
> more costly, lengthy and uncertain than the 510(k) process,
> and must be supported by extensive data, including data
> from preclinical studies and human clinical trials. **Therefore,
> in order to obtain regulatory approvals or clearance, we
> typically must, among other requirements, provide the**

> **FDA and similar foreign regulatory authorities with preclinical and clinical data that demonstrate to the satisfaction of the FDA and such other authorities that our products satisfy the criteria for approval or clearance.  Preclinical testing and clinical trials must comply with the regulations of the FDA and other government authorities in the United States and similar agencies in other countries.**

(Emphasis added.)

173.    In the section of the 2007 10-K regarding "Overview of Medical Device Regulation," the Company acknowledged that "[o]ur products are medical devices subject to extensive regulation by the FDA under the Federal Food, Drug, and Cosmetic Act, or FDCA."  The Company went on to state:

> **All clinical studies of investigational devices must be conducted in compliance with FDA's requirements.**  If an investigational device could pose a significant risk to patients (as defined in the regulations), the FDA must approve an IDE application prior to initiation of investigational use.

(Emphasis added.)

174.    These statements were materially false and misleading when made because the Company failed to disclose, in violation of law and in contrast to the Company's description of the law as set forth in the 2007 10-K, that Spectranetics failed to obtain FDA approval to test certain devices imported into the United States, including the FMD guidewires and by this time, a medical balloon manufactured in Germany.

175.    According to CW 1, the Company began receiving overseas shipments of the BMT balloons as early as summer 2007.  CW 1 confirmed that although the Company had obtained permission to import the balloons into the United States, the

Company did not have FDA permission to test these balloons on humans.  In fact, they were specifically labeled **"not for human use"** on the packaging.

176.   CW 1 became aware that the Company was illegally testing the BMT balloons on humans on September 2, 2007.  On that day, CW 1 came across an e-mail exchange between Trung Pham, a Business Development Manager under CW 1's supervision, and Defendant Schulte discussing Defendant Dr. Walker's use of the BMT balloons on humans.  Dr. Walker and his assistant were also on the e-mail exchange.  In the e-mail, Pham wrote to Schulte about his appointment to see Dr. Walker in his lab concerning the human tests of BMT.  Also, Pham asked whether the evaluation Pham sent Schulte regarding the efficacy of the BMT balloons was "good enough."  Schulte's response in the e-mail to Pham's question was "Right on."

177.   CW 1 was put on the "tail end" of the e-mail on the "cc" line.  CW 1 was shocked that the Company was testing BMT balloons on humans and responded to everyone on the e-mail saying: "This must stop.  This product is not approved and not to be used in humans.  Please hold up."  According to CW 1, no one listened and Dr. Walker continued to test the BMT balloons on humans.  In fact, the Company also enlisted the help of Dr. Walker's friend, Dr. Gallino, in the testing of the BMT balloons on humans.  According to CW 1, Pham brought the FMD balloons to Drs. Walker and Gallino so they could conduct the illegal testing.

178.   Schlesinger's account in the Whistleblower Complaint corroborates CW 1's averments.  Schlesinger discovered the illegal BMT testing on humans during a meeting with Company officers in December 2007.

179.    Top executives and the Board of Directors were aware of the illegal use of these foreign devices on humans, and illegally kept this information from the FDA.

180.    According to the Whistleblower Complaint, on December 4, 2007, December 14, 2007, January 10, 2008, and February 5, 2008, Schlesinger met with Defendant McGuire and raised concerns about the apparent evaluation of the BMT balloons in live patients with the Company's assistance even though the products were not FDA approved.  After the December 4, 2007 meeting, McGuire sent Schlesinger an e-mail saying: "Thanks for the talk tonight.  We'll talk more and things will improve."  In fact, during each of these meetings, McGuire told Schlesinger to give him an opportunity to fix the situation.

181.    During a March 7, 2008 meeting, McGuire acknowledged that "the BMT evaluations never should have happened."  Wertheimer was also present at this meeting.  On March 28, 2008, Schlesinger again met with McGuire regarding the illegal evaluations of non-FDA approved products.  Tatiana Zimmerer, Spectranetics' marketing manager, also attended this meeting.  Neither McGuire nor Wertheimer or any other member of the executive team or Board of Directors made any effort to investigate this unlawful behavior or put an end to it.

182.    Defendants **admitted** in the Non-Prosecution Agreement that it illegally imported and tested BMT balloons on human subjects, in violation of FDA rules and regulations.  Details regarding the claims raised by Schlessinger and CW 1 regarding the illegal importing and testing of BMT balloons are also found in the Application for Search Warrant (Ex. G attached hereto), in a section titled "Spectranetics Performs

Clinical Trials Using BMT Balloon Catheters Without An Investigational Device

Exemption (IDE)." The government's confidential witnesses testified that negotiations

with BMT began in May 2007, that the Company obtained samples of the balloons

during the August to September, 2007 time period, and that Spectranetics' personnel

provided samples of the balloons to physicians to evaluate their efficacy on patients.

*See* Application for Search Warrant ¶¶ 55-63. Under the terms of the Non-Prosecution

Agreement, the Company conceded that these allegations were true.

183. The representations detailed above and contained in Spectranetics' press

releases, SEC filings, conference calls, presentations and news articles during fiscal

year 2007 were materially false and misleading when made because Defendants knew

or were reckless in not knowing and failed to disclose that: (1) the Company had

illegally imported and promoted the FMD guidewires and the BMT balloons and tested

these products on humans; (2) the Company had marketed and promoted its lasers and

medical devices for unapproved use; (3) a material portion of the Company's revenue

was generated by the sales of such products intended for unapproved use; (4) the

Company made improper payments to medical professionals including Board member

Dr. Walker, who participated in certain clinical studies for the Company; (5) the

Company lacked effective regulatory and compliance controls; (6) the Company

withheld data from the FDA that indicated that nitinol stents were damaged by use with

lasers; (7) the Company lacked adequate internal and financial controls, (8) such

questionable behavior would necessarily subject the Company to an extensive

investigation by federal authorities into its business practices; and (9) as a result of the

above, the Company's financial statements were materially false and misleading at all relevant times.

184.    Additionally, pursuant to Sarbanes-Oxley, the 2007 Form 10-K included certifications signed by Defendants Schulte and Childs, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-K did not include any material misrepresentations.

185.    The Sarbanes-Oxley certifications signed by Schulte and Childs for fiscal year 2007 were materially false and misleading when made because Spectranetics engaged in questionable and illegal behavior as outlined above and therefore its financial statements did not fairly present its financial condition and results of operations.  Specifically, a material portion of the Company's revenue was generated by the sale of medical devices resulting from the promotion and marketing of those devices for unapproved use.  Further, the statements were materially false and misleading when made because the Defendants' undisclosed fraudulent and systemic flouting of FDA, ICE, SEC, and FINRA rules and regulations, and criminal statutes exposed the Company to material liabilities and materially impacted the business prospects of the Company.

**Fiscal Year 2008**

186.    On April 23, 2008, Spectranetics issued a press release entitled "Spectranetics First Quarter Revenue Up 37% to $23.8 Million, Driven By Strong Vascular Intervention and Lead Management Performance."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo. (April 23, 2008)** —
> Spectranetics Corporation (Nasdaq: SPNC) today reported
> financial results for the quarter ended March 31, 2008.
>
> Revenue for the first quarter of 2008 was $23.8 million, up
> 37% compared with revenue of $17.4 million for the first
> quarter of 2007.  Disposable product revenue rose 39% to
> $20.1 million, laser revenue increased 56% to $1.7 million,
> and service and other revenue increased 11% to $2.1
> million, all compared with the first quarter of 2007.

187.    Schulte was also quoted in the press release discussing the Company's

financial results:

> We achieved significant sales growth both in our vascular
> intervention and lead management product groups, reflecting
> the strength of our technology and the continuing
> opportunities in these markets.  Our financial results to date
> are on track with our expectations, and we look forward to
> continued growth and improving profitability.  As such, we
> are affirming the annual financial guidance we provided in
> February.

188.    These statements were materially false and misleading when made

because, as alleged above, the Company failed to disclose that a material portion of the

Company's revenue was generated by the sale of products resulting from the promotion

and marketing of its medical devices for unapproved use.

189.    During a conference call with analysts on April 23, 2008, Schulte and

Childs reiterated the first quarter financials results reported that day.  McGuire was also

present on the call.  Schulte stated: "I think In Stent Restenosis will be growing as a

percentage of procedures done in the lower leg so those are important."

- 67 -

190.    This statement was materially false and misleading when made because Schulte failed to disclose that the Company had already begun promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries.

191.    On May 12, 2008, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the first quarter ending March 31, 2008, which was signed by Defendants Schulte and Childs.  This report reaffirmed the Company's previously announced financial results.  The revenue was broken down as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2008 | 2007 |
| **Revenue:** | | |
| Equipment | $ 1,338 | $ 1,009 |
| Disposables | 18,442 | 13,302 |
| Service | 2,045 | 1,830 |
| Other, net of provision for sales returns | (163) | (123 |
| Subtotal — U.S. Medical | 21,662 | 16,018 |
| Equipment | 321 | 54 |
| Disposables | 1,647 | 1,124 |
| Service | 191 | 162 |
| Other | 10 | 7 |
| Subtotal — Europe Medical | 2,169 | 1,347 |
| Total revenue | $ 23,831 | $ 17,365 |

192.    The Company reported net income as follows:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Net loss | $ (405) | $ (65) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 31,417 | 30,854 |
| Weighted average common shares issued | 145 | 155 |
| Weighted average common shares outstanding — basic | 31,562 | 31,009 |
| Effect of dilution — stock options | — | — |
| Weighted average common shares outstanding — diluted | 31,562 | 31,009 |
| Net loss per share — basic and diluted | $ (0.01) | $ (0.00) |

193.   Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed by Defendants Schulte and Childs, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any material misrepresentations.

194.   These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

195.   On July 29, 2008, Spectranetics issued a press release entitled "Spectranetics Second Quarter Revenue Up 31% to $26.7 Million, Driven By Solid Performance Across All Business Lines."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo. (July 29, 2008)** —
> Spectranetics Corporation (Nasdaq: SPNC) today reported
> financial results for the quarter and six months ended June
> 30, 2008.
>
> Revenue for the second quarter of 2008 was $26.7 million,
> up 31% compared with revenue of $20.4 million for the
> second quarter of 2007.  Disposable product revenue rose
> 28% to $22.2 million, laser revenue increased 103% to $2.2
> million, and service and other revenue increased 19% to
> $2.3 million, all compared with the second quarter of 2007.

196.     Schulte was also quoted in the press release discussing the Company's

strong revenue growth:

> Our strong revenue growth in the face of a challenging
> economic environment reflects the continuing market
> acceptance of the value of our laser technology, both in
> vascular intervention and lead management.  This
> performance demonstrates the effectiveness of our strategy
> to invest in product development and clinical studies that
> support our sales efforts.  In addition, with the split of our
> sales team into separate VI and lead management groups,
> which we initiated in January, we are now more effectively
> addressing the growing opportunity in lead management.

197.     These statements were materially false and misleading when made

because, as alleged above, the Company failed to disclose that a material portion of the

Company's revenue was generated by the sales of products generated by the

promotion and marketing of its medical devices for unapproved use.

198.     During a conference call with securities analysts on July 29, 2008, Schulte

and Childs reiterated the second quarter financial results reported that day.  McGuire

was also present on the call.  During the call, Schulte brazenly commented on off-label

promotion and revenue from off-label use of the Company's products: "Obviously we

can't promote it for that because we don't have a label indication.  Physicians obviously

could use whatever they want for whatever they want but I would say it's still a relatively small part of our total procedural volume."

199.    These statements were materially false and misleading when made because, despite acknowledging that the Company cannot promote its products for ISR in peripheral arteries, Schulte failed to disclose that the Company was already aggressively promoting, marketing and testing its products for use in the treatment of ISR in peripheral arteries.  In addition, a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses.

200.    On August 11, 2008, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the second quarter ending June 30, 2008, which was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results.  The revenue was broken down as follows:

|  | Three Months Ended June 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| **Revenue (in thousands):** | | |
| Equipment | $ 1,602 | $ 916 |
| Disposables | 19,842 | 15,625 |
| Service | 2,194 | 1,900 |
| Other, net of provision for sales returns | (147) | (170) |
| Subtotal — U.S. Medical | 23,491 | 18,271 |
| Equipment | 606 | 174 |
| Disposables | 2,355 | 1,731 |
| Service | 226 | 165 |
| Other | 20 | 32 |
| Subtotal — Europe Medical | 3,207 | 2,102 |
| Total revenue | $ 26,698 | $ 20,373 |

201.    The Company reported net income as follows:

|  | Three Months Ended June 30, | | | |
|  | 2008 | | 2007 | |
|---|---|---|---|---|
| Net (loss) income | $ | (2,640) | $ | 7,152 |
| Common shares outstanding: | | | | |
| Historical common shares outstanding at beginning of period | | 31,712 | | 31,104 |
| Weighted average common shares issued | | 50 | | 36 |
| Weighted average common shares outstanding — basic | | 31,762 | | 31,140 |
| Effect of dilution — stock options | | — | | 2,406 |
| Weighted average common shares outstanding — diluted | | 31,762 | | 33,546 |
| Net (loss) income per share — basic | $ | (0.08) | $ | 0.23 |
| Net (loss) income per share — diluted | $ | (0.08) | $ | 0.21 |

202.    Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed by Defendants Schulte and Childs, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any material misrepresentations.

203.    These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

204.    In an article entitled "Healthy Outlook at Laser Company" published in the

*Colorado Springs Gazette* on August 29, 2008, **only days before the FDA and ICE**

**raided Spectranetics' headquarters**, Schulte said:

>    Our sales have grown at a compound rate of 35 percent a
> year for the past three years.  Fortune magazine has ranked
> us as one of the fastest-growing public companies for two
> consecutive years.  We have built a solid foundation with the
> investments in research and development, the expanded
> sales force and our new facility.
>
>    Profitability will accelerate once we reach $30 million a
> quarter in sales, which should happen in the fourth quarter of
> this year or the first quarter of next year.  For us, revenue
> growth has been the most important, but profitability will
> become more important in 2009.  Now our lead-removal
> business is growing more than 50 percent per quarter and
> our coronary artery business is growing again after three or
> four years of shrinking.

205.    These statements were materially false and misleading when made

because Schulte failed to disclose that a material portion of the Company's revenue

was generated by the sales of products resulting from the promotion and marketing of

its medical devices for unapproved use.

206.    The representations detailed above and contained in Spectranetics' press

releases, SEC filings, conference calls, presentations and news articles during fiscal

year 2008 were materially false and misleading when made because Defendants knew

or were reckless in not knowing, and failed to disclose that: (1) the Company had

illegally promoted the FMD guidewires and the BMT balloons and tested these products

on humans; (2) the Company had marketed and promoted its lasers and medical

devices for unapproved use; (3) a material portion of the Company's revenue was

generated by the sales of the Company's medical devices intended for unapproved use; (4) the Company had made improper payments to medical professionals including Defendant Dr. Walker, who participated in certain clinical studies for the Company evaluating medical devices not approved for use in humans by the FDA; (5) the Company lacked effective regulatory and compliance controls; (6) the Company withheld data from the FDA that indicated that nitinol stents were damaged by use with lasers; (7) the Company lacked adequate internal and financial controls, (8) such questionable behavior would necessarily subject the Company to an extensive investigation by federal authorities into its business practices; and (9) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

207.    The Sarbanes-Oxley certifications signed by Schulte and Childs during fiscal year 2008 were materially false and misleading when made because Spectranetics engaged in questionable and illegal behavior as outlined above and therefore its financial statements did not fairly present its financial condition and results of operations.  Specifically, a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of unapproved use. Further, the statements were materially false and misleading when made because Defendants' undisclosed fraudulent and systemic flouting of FDA, ICE, SEC and FINRA, and criminal statutes exposed the Company to material liabilities and materially impacted the business prospects of the Company.

**The Truth Is Disclosed**

208.    On September 4, 2008, after the market closed, Spectranetics revealed

that FDA and ICE agents executed a search warrant on its headquarters and plant as

part of a federal investigation into its sales and marketing practices.  The Company's

press release, also filed on Form 8-K with the SEC, stated:

> **COLORADO SPRINGS, Colo. (September 4, 2008)** –
> Spectranetics Corporation (Nasdaq: SPNC) was jointly
> served by the Food and Drug Administration (FDA) and U.S.
> Immigration and Customs Enforcement (ICE) this morning
> with a search warrant issued by the United States District
> Court, District of Colorado.
>
> The search warrant requested information and
> correspondence relating to: (i) the promotion, use, testing,
> marketing and sales regarding certain of the company's
> products for the treatment of in-stent restenosis, payments
> made to medical personnel and an identified institution for
> this application, (ii) the promotion, use, testing,
> experimentation, delivery, marketing and sales of catheter
> guidewires and balloon catheters manufactured by certain
> third parties outside of the United States, (iii) two post-
> market studies completed during the period from 2002 to
> 2005 and payments to medical personnel in connection with
> those studies and (iv) compensation packages for certain of
> the company's personnel.
>
> Spectranetics is cooperating fully with the appropriate
> authorities regarding this matter.  Spectranetics currently
> expects that business operations will continue in the ordinary
> course.
>
> The Company confirmed that NASDAQ halted trading of
> Spectranetics Corporation common stock pending this
> announcement.  Trading will resume tomorrow.

209.    The search warrant was issued pursuant to an Application and Affidavit for

Search Warrant and Seizure, submitted in Case Number 08-SW-5232 pending in the

United States District Court for the District of Colorado.  The Application for Search

Warrant (Ex. G attached hereto), executed by Special Agent Daniel Burke of the U.S.

Food and Drug Administration is summarized in paragraph 7 as follows:

> In summary, probable cause exists to believe that Spectranetics and its officers and employees promoted and sold its infrainguinal (for use below the groin) laser catheters to physicians throughout the United States for an unapproved or "off-label" use and Spectranetics withheld information from the FDA clearly showing that the unapproved use of the infrainguinal catheters could cause significant harm to patients. In addition, this affidavit establishes probable cause to believe that Spectranetics distributed devices that the FDA had not reviewed in any way to physician consultants so that those physicians could implant them into human subjects, and so as part of the company's contract negotiations to become the domestic distributor for the foreign manufacturers of those devices. Finally, this affidavit establishes probable cause to believe that Spectranetics engaged in a marketing study of an approved cardiac catheter which resulted in a significant rate of serious adverse events which were not reported to the FDA and a summary of the study was not reported to the FDA.

210. CW 3 was a Quality Control Manager at the Company between August 2007 and November 2008 and worked in Spectranetics' headquarters during the Class Period. CW 3 reported to Donald Fletcher, Vice President of Quality System. As Manager of Quality Control, CW 3 was responsible for the production of the lasers and the "end-pieces."

211. While the Company said that it was served with a search warrant and that the Company was cooperating, CW 3 described the government's efforts quite differently. According to CW 3, the FDA and ICE entered Spectranetics' headquarters and forced all the employees to leave behind their blackberries, computers and documents and "get out of the building." The employees all convened in the parking lot

where they waited for instructions.  After some time passed, Schulte told all the

employees to go home for the day.  After that incident, CW 3 felt that he or she could no

longer work for Spectranetics.  CW 3 did not want to "jeopardize [his or her] integrity

and reputation."

212.    According to analysts at Roth Capital Partners, "Based on the topics

outlined [in the Company's press release], we assume the issue at hand surrounds off-

label usage for ISR (in-stent restenosis) treatment…"  The Roth Capital analysts noted:

> In addition, we understand this to be a "criminal
> investigation" involving FDA's Office of Criminal Investigation
> (OCI), which (using prior cases unrelated to Spectranetics as
> examples) suggests a level of impropriety beyond the typical
> issue of FDA clearances.  For example, if FDA had an issue
> with the approval of a certain marketed product, that case
> would not be handled with an unsuspected raid of a
> company's facility.

213.    Canaccord Adams analysts viewed the government raid as detrimental to

the Company's business prospects:

> Spectranetics is facing multiple allegations, including: 1)
> unauthorized marketing of certain products used to treat in-
> stent restenosis (e.g. TurboBooster) along with payments to
> docs at least one hospital; 2) promotion/marketing of
> guidewires and balloon catheters manufactured OUS; 3)
> payment to practitioners involved in two of Spectranetics'
> post-marketing studies; and 4) certain employee
> compensation packages.
>
> We believe these serious allegations will distract executives,
> the sales force and customers, and thus believe it could
> impact the business both near- and long-term.

214.    Jefferies & Co. analysts reported on the material impact on Spectranetics

of the illegal off-label promotion of ISR, providing a quantitative estimate of the sales

Spectranetics would lose if it was forced to end its off-label promotion of its laser systems and disposable medical devices:

> Our checks suggest that ISR is likely at the center of the agencies' concern. Since SPNC's system is not approved by the FDA for ISR, off-label promotion of the system for ISR is illegal, as is compensating anyone specifically for ISR use. . . . ISR may represent +/- 20% of above-the-knee interventions, or +/- 13% of total procedures. SPNC's vascular sales are +/- 70% of revenue, so annual ISR-related sales could amount to $10MM at a $100-125MM revenue run rate. If we assume all ISR sales disappear - an unwarranted view at this stage - and that SPNC suffers operations disruption and fine, **we still calculate a $60 -75 MM total impact**.

(Emphasis added.)

215. On September 4, 2008, in reaction to this news, Spectranetics stock fell approximately 47 percent on extremely heavy volume, from $9.00 per share to $4.73 per share before trading was halted for the day, wiping out more than $136 million in market capitalization.

**Post-Class Period Events**

216. On September 15, 2008, Spectranetics announced the suspension of its SALVAGE trial. According to the Company: "VIVA has elected to temporarily suspend enrollment in the study after being contacted by the Food and Drug Administration (FDA) about a potential safety concern relating to the laser device. **Spectranetics believes the potential concern relates to laser interaction with nitinol stents.**" (Emphasis added).

217.    The suspension of the SALVAGE trial based on FDA safety concerns meant that the federal investigation had potentially broader implications for the Company.  According to Roth Capital:

> Based on our prior analysis of the federal investigation (commenced earlier this month), we had suspected the primary issue surrounded the off-label promotion of its devices for use in in-stent restenosis (ISR), with no implication of issues with safety/efficacy…

> While we believe Spectranetics' laser devices remain as safe and effective as they were viewed prior to the investigation initiated on September 4, the suspension of this study by industry thought leaders (VIVA Physicians) could impact the perception of the company's safety profile in the near-term.  **Although the suspension of a clinical study is a more benign event than a federal investigation, we view the nature of the suspension (safety) as potentially having a more significant impact on its customers' usage patterns.**

(Emphasis added.)

218.    On September 19, 2008, Spectranetics disclosed that the Whistleblower Complaint had been filed against the Company.

219.    In its Answer to Schlesinger's lawsuit filed the same day as the Company announced the suit, Spectranetics admitted that the **"off-label compliance issues that Mr. Schlesinger raised were already recognized by numerous Spectranetics employees, including Will McGuire, who even at that time had the Company's best experts working to make sure the Company was and is in compliance."**

220.    When the news regarding the raid by the FDA and ICE became public, the Company claimed that it had hired a law firm to perform an internal investigation of the alleged wrongdoing.  CW 1 characterized the investigation as a bunch of "Emile's

(Geisenheimer) cronies" running the investigation of the Company and that they "did not

look deep enough."  He further described the internal investigation as "myopic."

Notably, CW 1 was on vacation while the investigation was being conducted and was

not interviewed by the law firm conducting the investigation.  CW 1 was adamant,

though, in stating, "Thank goodness the FDA came in."

221.    Not unexpectedly, the announcement of the government investigations

into the Company's illegal practices, the termination of the SALVAGE clinical trial, and

the filing of the Whistleblower complaint led to a decrease in sales of the Company's

medical devices.  Despite double digit increases in VI sales every quarter during the

Class Period, the sale of medical devices in the Company's VI product declined 9% in

the fourth quarter of 2008 compared to the corresponding quarter of 2007.  A 12%

decline in VI sales was reported in the first quarter of 2009 compared to the first quarter

of 2008.  Finally, a 13% decline in VI sales was reported for the second quarter of 2009,

compared to sales during the second quarter of 2008.

222.    On December 29, 2009, Spectranetics filed a Form 8-K with the SEC.  In

the filing, the Company reported that it had reached a resolution of claims brought by

the Department of Justice ("DOJ") and the United States Department of Health and

Human Services.  Attached to the Form 8-K were three separate agreements, including

a Civil Settlement Agreement with the DOJ pursuant to which the Company agreed to

pay a fine of $4.9 million.  Also attached to the filing was a Non-Prosecution Agreement,

pursuant to which the Company admitted that it engaged in improper conduct when it

imported and tested non-FDA approved guidewires and angioplasty balloons and by

failing to timely report the adverse results of the Coral and Coral Reef studies to the FDA. Finally, a third agreement was attached to the Form 8-K, a Corporate Integrity Agreement entered into with the Office of Inspector General of the Department of Health and Human Services, an agreement which created a strict compliance program for Spectranetics to follow going forward.

223. Significantly, while these agreements provided that the Company would not be criminally prosecuted for its admitted wrongdoing, they do not protect the Individual Defendants or any officers or directors of Spectranetics from criminal prosecution, and as explained in paragraph 14 of the Non-Prosecution Agreement (Ex. B attached hereto), the FDA and other administrative agencies retain their claims, causes of action, and rights to continue pursuing their claims against the Company.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

224. At all relevant times, the market for Spectranetics' common stock was an efficient market for the following reasons, among others:

(a)     Spectranetics' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Spectranetics filed periodic public reports with the SEC and the NASDAQ;

(c)     Spectranetics regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and

through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Spectranetics was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

225.    As a result of the foregoing, the market for Spectranetics' common stock promptly digested current information regarding Spectranetics from all publicly available sources and reflected such information in Spectranetics' stock price.  Under these circumstances, all purchasers of Spectranetics' common stock during the Class Period suffered similar injury through their purchase of Spectranetics' common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

226.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-

looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Spectranetics who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

227.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

228.    Because of the misrepresentations, omissions and fraudulent scheme perpetrated during the Class Period and the material information that was finally revealed on September 4, 2008, the Company's shares fell $4.27 per share, or 47 percent, from $9.00 per share to $4.73 per share before trading was halted for the day, on unusually heavy trading volume.  As the chart below demonstrates, Class members suffered economic losses from the curative disclosure made by Defendants on September 4, 2008.



229.    Since September 4, 2008, Spectranetics stock has not traded above the prices at which Class members purchased the stock during the Class Period.  As a result, members of the Class who purchased Spectranetics securities during the Class Period and continue to hold those securities have sustained economic injury resulting from the decline(s) in the value of Spectranetics securities resulting from the revelations of Defendants' misstatements and/or omissions during the Class Period.

230.    Members of the Class who purchased Spectranetics securities during the Class Period, and sold those securities after the end of the Class Period, have suffered economic injury caused by Defendants' fraudulent scheme and misrepresentations and/or omissions during the Class Period that were not fully revealed until September 4, 2008.

231.    Thus, the damage suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' misrepresentations, omissions and fraudulent scheme to artificially inflate the price of Spectranetics securities and the subsequent significant decline in the value of Spectranetics stock when Defendants' prior misrepresentations and omissions during the Class Period were revealed.

232.    The foregoing allegations describe Lead Plaintiff's general theory of damages, demonstrate that Lead Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Lead Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to Defendants' omissions alleged herein.

### COUNT I

**Violation of Section 10(b) of
the Exchange Act and SEC Rule 10b-5(b)
Promulgated Thereunder, Asserted Against All Defendants**

233.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

234.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:

(i) deceive the investing public regarding Spectranetics' business, operations, management and the value of Spectranetics securities; and (ii) cause Lead Plaintiff and other members of the Class to purchase Spectranetics securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

235.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Spectranetics securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated by the SEC. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

236.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and operations of Spectranetics as specified herein.

237.   The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spectranetics' value and performance and continued substantial growth, which included

the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Spectranetics and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Spectranetics securities during the Class Period.

238.    Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading when made.

239.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth

in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spectranetics' operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements of the Company's business, operations and revenue throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

240.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Spectranetics stock were artificially inflated during the Class Period.  In ignorance of the fact that market prices of Spectranetics' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Spectranetics securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements.

241.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Spectranetics' marketing practices and their effect on the Company's financial results, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Spectranetics securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

242.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

243.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT II

**Violation of Section 10(b) of
the Exchange Act and SEC Rule 10b-5(a) and (c)
Promulgated Thereunder, Asserted Against All Defendants**

244.    Lead Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against all of the Defendants.

245.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Lead Plaintiff need not allege in this Count nor prove for this Count that any of the Defendants made any misrepresentations or omissions of

material fact for which they may also be liable under Rule 10b-5(b) or any other provisions of law.

246.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff; (ii) artificially inflate the market price of Spectranetics' common stock; and (iii) cause Lead Plaintiff to purchase Spectranetics' common stock at artificially inflated prices.

247.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the Class in connection with their purchases of Spectranetics' common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

248.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing or reckless suppression and concealment of information regarding Spectranetics' (1) illegal importation and testing of medical devices from Japan and Germany, (2) promotion and marketing of off-label use for its laser to treat ISR in peripheral arteries, (3) illegal payments made to members of its Board of Directors, and (4) lack of effective regulatory and financial controls during the Class Period.  Defendants knowingly suppressed and concealed such information to distort the balance of facts available to Spectranetics' investors that would be included

in the Company's financial statements disseminated to investors during the Class Period.

249.    Lead Plaintiff and the Class reasonably relied upon Spectranetics, a medical device company, to comply with FDA procedures and regulations in conducting its business, reasonably relied upon the integrity of the financial statements to contain accurate reporting on legally made sales, reasonably relied on the belief that Company officials would not engage in illegal conduct, putting the Company at risk of being the subject of multiple federal investigations, and reasonably relied upon the integrity of the market in which Spectranetics' securities traded.

250.    During the Class Period, Lead Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Lead Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Spectranetics' securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

251.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Spectranetics' common stock during the Class Period.

252.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiff and the Class for damages suffered in connection with their purchases of Spectranetics' securities during the Class Period.

**COUNT III**

**Violation of Section 20(a) of the Exchange Act,
<u>Against the Individual Defendants</u>**

253.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

254.    The Individual Defendants acted as controlling persons of Spectranetics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

255.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

256.    As set forth above, Spectranetics and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

(b)    Awarding compensatory damages against all Defendants, jointly and severally, in favor of Lead Plaintiff and the Class, for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Lead Plaintiff' attorneys and experts; and

(d)    Awarding Lead Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated:  January 21, 2010

**/s/ Kip B. Shuman**
**THE SHUMAN LAW FIRM**
Kip B. Shuman
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, CO 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
Kip@Shumanlawfirm.com
Rusty@Shumanlawfirm.com

**Lead Plaintiff's Liaison Counsel**


**LABATON SUCHAROW LLP**
David J. Goldsmith
Mark S. Goldman
Carol C. Villegas
140 Broadway
New York, NY 10005
Telephone: (212) 907-0877
Facsimile: (212) 818-0477
dgoldsmith@labaton.com
mgoldman@labaton.com
cvillegas@labaton.com

**BROWER PIVEN**, A Professional Corporation
Charles J. Piven
Yelena Trepetin
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
piven@browerpiven.com
trepetin@browerpiven.com

**Co- Lead Counsel for Lead Plaintiff and the Class**

**CHIMICLES & TIKELLIS LLP**
Steven A. Schwartz (Pa. I.D. No. 50579)
Denise Davis Schwartzman (Pa. I.D. No. 40659)
Kimberly A. Sanders (Pa. I.D. No. 206431)
One Haverford Centre
361 W. Lancaster Ave.
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
Steveschwartz@chimicles.com
DeniseSchwartzman@chimicles.com
KAS@chimicles.com

**THE MILLER LAW FIRM , PC**
E. Powell Miller
David H. Fink
Darryl Bressack
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 84102200
Facsimile: (248) 652-2852
epm@millerlawpc.com
dhf@millerlawpc.com
dgb@millerlawpc.com

**Additional Lead Plaintiff's Counsel**

**Exhibit A**

**Exhibit 10.2**

<u>SETTLEMENT AGREEMENT</u>

I. <u>PARTIES</u>

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the District of Colorado, on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS"), (collectively the "United States"); and the Spectranetics Corporation ("Spectranetics") (hereafter referred to as "the Parties"), through their authorized representatives.

II. <u>PREAMBLE</u>

As a preamble to this Agreement, the Parties agree to the following:

A. At all relevant times, Spectranetics, a Delaware corporation headquartered in Colorado Springs, Colorado, distributed, marketed and sold the following medical devices in the United States: the CVX-300 Medical Laser and the CliRpath Turbo Laser Catheter, the TURBO Elite Laser Ablation Catheter, and the TURBO-Booster Laser Guide Catheter (collectively the "Subject Medical Devices").

B. In 2008, the United States Attorney for the District of Colorado and the United States Department of Justice, Office of Consumer Litigation, along with the Federal Food and Drug Administration ("FDA"), commenced an investigation of Spectranetics (the "Federal Criminal Investigation"), and, on September 4, 2008 executed a search warrant at the company's headquarters in Colorado Springs, Colorado.

Powered by Morningstar® Document Research℠

C. Spectranetics has entered into a non-prosecution agreement with the United States Attorney for the District of Colorado, dated of even date herewith, to conclude the Federal Criminal Investigation of Spectranetics.

D. The United States contends that Spectranetics engaged in the following conduct (hereinafter referred to as the "Covered Conduct"). The United States contends that:

1. From January 1, 2003, through June 30, 2005, Spectranetics conducted a clinical registry, known as CORAL, but failed to ensure that the registry complied with Federal regulations relating to the protection of human subjects and to conduct all aspects of the CORAL clinical registry according to the appropriate standards of scientific integrity, including the requirement to obtain fully-informed consent of all participants pursuant to 45 C.F.R. § 46.116.

2. Spectranetics failed to report to the FDA serious adverse events related to its medical devices and experienced by participants in the CORAL clinical registry and a follow-up clinical registry, known as CORAL REEF, as required under 21 U.S.C. § 360i and 21 C.F.R. § 803, and failed to furnish all information and material required in its post-approval annual report to the FDA as required by 21 U.S.C. § 360i and 21 C.F.R. §§ 814.82(a)(7) and 814.84(b)(2)(i);

3. In 2005, Spectranetics imported surgical guidewires manufactured by Future Medical Designs, Ltd. in Japan into the United States contrary to law (18 U.S.C. § 545 and 21 USC. §§ 331(a)) and provided them to physicians for use in patients despite the fact that such devices had never been approved by the FDA and were not the subject of an Investigational Device Exemption or otherwise approved by the FDA;

United States v. Spectranetics
Settlement Agreement
Page 2

Powered by Morningstar® Document Research℠

4. In 2007, Spectranetics imported percutaneous transluminal angioplasty balloon catheters manufactured by Bavarian Medizin Technologie GmbH in Germany into the United States contrary to law (18 U.S.C. § 545 and 21 USC. §§ 331(a)) and provided them to physicians for use in patients despite the fact that such devices had never been approved by the FDA and were not the subject of an Investigational Device Exemption or otherwise approved by the FDA; and,

5. From July 1, 2007, through September 4, 2008, Spectranetics promoted the Subject Medical Devices for certain procedures involving infra-inguinal in-stent restenosis, a use that has not been approved by the FDA, in violation of the Food Drug & Cosmetic Act (21 U.S.C. §§ 331(a) and 352(f)).

E. The United States alleges that Spectranetics caused certain false and/or fraudulent claims to be submitted to the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395iii, relating to the Covered Conduct.

F. The United States contends that it has certain civil claims against Spectranetics, as specified in Section III, Paragraph 2, below, for engaging in the Covered Conduct.

G. The United States also contends that it has certain administrative claims against Spectranetics as specified in Section III, Paragraph 3, below, for engaging in the Covered Conduct.

H. Except as otherwise expressly provided in the non-prosecution agreement referenced in Paragraph C, Spectranetics denies the contentions of the United States. This Agreement is made in compromise of disputed claims. This Agreement is neither an admission of facts nor liability nor other expression reflecting upon the merits of the dispute by Spectranetics nor a concession by the United States that its claims are not well founded.

United States v. Spectranetics
Settlement Agreement
Page 3

I. To avoid the delay, expense, inconvenience, and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement pursuant to the terms and conditions set forth below.

## III. TERMS AND CONDITIONS

1. Spectranetics agrees to pay to the United States the sum of Four Million Nine Hundred Thousand Dollars ($4,900,000.00) (the "Settlement Amount"). The Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the District of Colorado. Spectranetics agrees to make this electronic funds transfer no later than five (5) working days after the Effective Date of this Agreement.

2. Subject to the exceptions in Paragraph 5 below (concerning excluded claims), in consideration of the obligations of Spectranetics in this Agreement, conditioned upon Spectranetics's full payment of the Settlement Amount, and subject to Paragraph 13 below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment made under this Agreement), the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Spectranetics from any civil or administrative monetary claim the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12; or the common law theories of payment by mistake, unjust enrichment, and fraud. No individuals are released by this Agreement.

United States v. Spectranetics
Settlement Agreement
Page 4

Powered by Morningstar® Document Research℠

3. In consideration of the obligations of Spectranetics set forth in this Agreement, and the Corporate Integrity Agreement entered into between OIG-HHS and Spectranetics, conditioned on Spectranetics's payment in full of the Settlement Amount, and subject to Paragraph 13 below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment under this Agreement), the OIG-HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from the Medicare, Medicaid, and other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Spectranetics under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks or other prohibited activities), for the Covered Conduct, except as reserved in Paragraph 6 (concerning excluded claims), below, and as reserved in this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Spectranetics from Medicare, Medicaid, or other Federal health care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct and/or the Federal Criminal investigation. Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 4, below.

4. Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Spectranetics) are the following claims of the United States:

(a) Any criminal, civil, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

(b) Any criminal liability;

(c) Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

United States v. Spectranetics
Settlement Agreement
Page 5

Powered by Morningstar® Document Research℠

(d) Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

(e) Any liability based upon such obligations as are created by this Agreement;

(f) Any liability for express or implied warranty claims or other claims for defective or deficient products and services, including quality of goods and services;

(g) Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct;

(h) Any liability for failure to deliver items or services due; or

(i) Any liability of individuals, including officers and employees.

5. Spectranetics waives and shall not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution, or the Excessive Fines Clause of the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

6. Spectranetics fully and finally releases, waives and discharges the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Spectranetics has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to or arising from the Covered Conduct or the United States' investigation of the Covered Conduct.

United States v. Spectranetics
Settlement Agreement
Page 6

Powered by Morningstar® Document Research℠

7. Spectranetics agrees to the following:

(a) <u>Unallowable Costs Defined</u>. All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Spectranetics, its predecessors, parents, divisions, subsidiaries, or affiliates, and its present or former officers, directors, employees, and agents in connection with the following shall be "unallowable costs" on all Government contracts and under Federal health care programs:

(1) the matters covered by this Agreement;

(2) the United States' audit and civil and any criminal investigation of the matters covered by this Agreement;

(3) Spectranetics's investigation, defense, and any corrective actions undertaken in response to the United States' audit, civil, and any criminal investigation in connection with the matters covered by this Agreement (including attorneys' fees);

(4) the negotiation and performance of this Agreement;

(5) the payments Spectranetics makes to the United States pursuant to this Agreement; and

(6) the negotiation of and obligations undertaken pursuant to the CIA to:

(i) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and

(ii) prepare and submit reports to the OIG-HHS.

United States v. Spectranetics
Settlement Agreement
Page 7

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

However, nothing in this Paragraph 7.a.(6) affects the status of costs that are not allowable based on any other authority applicable to Spectranetics. (All costs described or set forth in this Paragraph are hereafter, "Unallowable Costs.")

      (b) <u>Future Treatment of Unallowable Costs</u>. These Unallowable Costs shall be separately determined and accounted for by Spectranetics and Spectranetics shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States of any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Spectranetics or any of its subsidiaries or affiliates to any Federal health care program.

      (c) <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>. Spectranetics further agrees that, within 90 days of the Effective Date of this Agreement, it shall identify to applicable Medicare fiscal intermediaries, carriers, and/or contractors and other Federal health care program fiscal intermediaries or fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States or any State Medicaid program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Spectranetics, or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Spectranetics agrees that the United States, at a minimum, shall be entitled to recoup from Spectranetics any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

United States v. Spectranetics
Settlement Agreement
Page 8

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice and/or of the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Spectranetics or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs on Spectranetics' or any of its subsidiaries' or affiliates' cost reports, cost statements, or information reports.

(d) Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or re-examine Spectranetics's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

8. Spectranetics agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, Spectranetics shall encourage and agrees not to impair the cooperation of its directors, officers, and employees and use reasonable efforts to make available and encourage the cooperation of its former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals.

9. This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 10 (Waiver for Beneficiaries paragraph), below.

10. Spectranetics agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

United States v. Spectranetics
Settlement Agreement
Page 9

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

11. Spectranetics warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(1), and shall remain solvent following its payment to the United States of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for the new value given to Spectranetics, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity that Spectranetics was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

12. If within 91 days of the Effective Date of this Agreement or of any payment made under this Agreement, Spectranetics commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking to have any order for relief of Spectranetics's debts, or seeking to adjudicate Spectranetics as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or similar official for Spectranetics or for all or any substantial part of Spectranetics's assets, Spectranetics agrees as follows:

   (a) Spectranetics's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. § 547 or 548, and Spectranetics shall not argue or otherwise take the position in any such case, proceeding, or action that: (i) Spectranetics's obligations under this Agreement may be avoided under 11 U.S.C. § 547 or 548; (ii) Spectranetics was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the United States; or (iii) the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to Spectranetics.

United States v. Spectranetics
Settlement Agreement
Page 10

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                Powered by Morningstar® Document Research℠

(b) If Spectranetics' obligations hereunder are avoided for any reason, including, but not limited to, the exercise of a trustee's avoidance powers under the Bankruptcy Code, the United States, at its sole option, may rescind the releases in this Agreement, and bring any civil and/or administrative claim, action, or proceeding against Spectranetics for the claims that would otherwise be covered by the releases provided in this Agreement. Spectranetics agrees that (i) any such claims, actions or proceedings brought by the United States (including any proceedings to exclude Spectranetics from participation in Medicare, Medicaid, or other federal health care programs) are not subject to an "automatic stay" pursuant to 11 U.S.C. Section 362(a) as a result of the action, case or proceeding described in the last clause of this Paragraph, and that Spectranetics shall not argue or otherwise contend that the United States' claims, actions or proceedings are subject to an automatic stay; (ii) that Spectranetics will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or proceedings which are brought by the United States within 30 calendar days of written notification to Spectranetics that the releases herein have been rescinded pursuant to this Paragraph, except to the extent such defenses were available before the Effective Date of this Agreement; and (iii) the United States has a valid claim against Spectranetics in the amount of at least $4,900,000, plus applicable multipliers and penalties, and the United States may pursue its claims in the case, action or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding; and,

United States v. Spectranetics
Settlement Agreement
Page 11

Source: SPECTRANETICS CORP, 8-K, December 29, 2009          Powered by Morningstar® Document Research℠

(c) Spectranetics acknowledges that its agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

13. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

14. Spectranetics represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

15. This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement shall be the United States District Court for the District of Colorado, except that disputes arising under the CIA shall be resolved exclusively through the dispute resolution provisions set forth in the CIA.

16. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

17. The individuals signing this Agreement on behalf of Spectranetics represent and warrant that they are authorized by Spectranetics to execute this Agreement. The United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

18. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

19. This Agreement is binding on Spectranetics's successors, transferees, heirs, and assigns.

United States v. Spectranetics
Settlement Agreement
Page 12

20. This Agreement is effective on the date of signature of the last signatory to the Agreement (the "Effective Date"). Facsimiles of signatures shall constitute acceptable binding signatures for purposes of this Agreement.

21. For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to the Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

UNITED STATES OF AMERICA

DAVID M. GAOUETTE
Acting United States Attorney
District of Colorado

By:   /s/ Edwin Winstead _____   Dated: 12-18-09
      EDWIN WINSTEAD
      Assistant U.S. Attorney
      Civil Health Care Fraud Coordinator
      United States Attorney's Office
      District of Colorado

By:   /s/ Jamie Ann Yavelberg _____   Dated: 12-22-09
      JAMIE ANN YAVELBERG
      Assistant Director
      Commercial Litigation Branch Civil Division
      United States Department of Justice

By:   /s/ Gregory Demske _____   Dated: 12-22-09
      GREGORY DEMSKE
      Office of Counsel to the Inspector General
      U.S. Department of Health and Human Services

United States v. Spectranetics
Settlement Agreement
Page 13

Powered by Morningstar® Document Research℠

THE SPECTRANETICS CORPORATION

By:    /s/ Emile Geisenheimer    Dated: 12-17-09
    EMILE GEISENHEIMER
    Chief Executive Officer
    Spectranetics Corporation

HOGAN & HARTSON LLP

By:    /s/ Michael Theis    Dated: 12-18-09
    PETER S. SPIVACK
    MICHAEL C. THEIS
    Hogan & Hartson LLP
    Counsel for the Spectranetics Corporation

United States v. Spectranetics
Settlement Agreement
Page 14

Powered by Morningstar® Document Research℠

**Exhibit B**

**Exhibit 10.1**

Michael Theis, Esq.
Peter Spivack, Esq.
Hogan and Hartson LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, Colorado 80202

December 17, 2009

Re: Spectranetics Non-Prosecution Agreement

Dear Messrs. Theis & Spivack:

1. On the understandings specified below, the United States Attorney's Office for the District of Colorado and the United States Department of Justice's Office of Consumer Litigation (collectively the "Offices") will not criminally prosecute The Spectranetics Corporation ("Spectranetics"), or any of its direct or indirect subsidiaries, for any crimes (except for criminal tax violations as to which these Offices cannot and do not make any agreement), of which the Offices are aware, related to the conduct by or attributable to Spectranetics that is described in Exhibit A to this agreement, attached hereto, in the District of Colorado concerning a conspiracy to commit mail and wire fraud, smuggling and or other import violations, and to violate provisions of the Food, Drug and Cosmetic Act relating to Spectranetics medical devices from 2003 to 2008.

2. This Non-Prosecution Agreement ("NPA") does not provide any protection against prosecution for any crimes or other wrongdoing during the relevant time period except as set forth above, and applies only to Spectranetics and its direct and indirect subsidiaries, and not to any other entities nor any individuals.

3. Spectranetics expressly understands that the protections provided to it by this Agreement shall not apply to any successor entities, whether the successor's interest arises through a merger or plan of reorganization, unless and until such successor formally adopts and executes this Agreement, with the written consent of the Offices herein. The protections arising from this Agreement will not apply to any purchasers of all or substantially all of the assets of Spectranetics, unless such purchaser enters into a written agreement, on terms acceptable to these Offices, agreeing in substance to undertake all obligations set forth in this Agreement. Without limiting the effect of any other provision of this agreement, these Offices understand and Spectranetics agrees that should Spectranetics acquire, directly or indirectly, another entity, via merger, purchase of all or substantially all of their assets or otherwise, Spectranetics will make reasonable efforts to, and will be afforded a prudent period of time to ensure, that the newly-acquired entity adopts and implements a compliance program substantially similar in substance to that adopted by Spectranetics as part of this Agreement and the Corporate Integrity Agreement as described in Paragraph 7 herein.

Powered by Morningstar® Document Research℠

4. It is understood that Spectranetics:

    a.    shall truthfully and completely disclose all information with respect to the activities of Spectranetics, its present and former officers and employees, and others concerning all matters about which these Offices inquire of it, and that such information can be used for any purpose except as otherwise limited by this Agreement;

    b.    shall cooperate fully with these Offices, the United States Food and Drug Administration ("FDA"), Immigration and Customs Enforcement, and any other law enforcement or regulatory agencies designated by these Offices. This continued cooperation shall include consenting to any order sought by these Offices permitting disclosure to these Offices of any materials relating to compliance with federal laws that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure;

    c.    shall, at these Offices' request, use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent, or employee at any meeting or interview or before the grand jury or at any trial or any court proceedings;

    d.    shall promptly provide these Offices, upon request, any document, record, or other tangible evidence within its possession, custody, or control relating to matters or conduct about which these Offices or any designated law enforcement agency inquires;

    e.    shall promptly bring to these Offices' attention all criminal conduct by or criminal investigations of Spectranetics or its respective senior managerial employees that come to the attention of Spectranetics' Board of Directors or senior management, as well as any administrative proceeding or civil action brought by any governmental authority that alleges criminal violations by Spectranetics; and,

    f.    acknowledges and understands that its future cooperation is an important factor in the decision of these Offices to enter into this NPA, and Spectranetics agrees to continue to cooperate fully with these Offices, and with any other government agency designated by these Offices, regarding any issue about which Spectranetics has knowledge or information with respect to compliance with federal laws.

5. This agreement to cooperate does not apply to any information protected by the attorney-client or attorney work-product privileges ("privileged information") and nothing in this NPA, including paragraphs 4(a) through (f) above, shall be construed to require Spectranetics to provide any privileged information to these Offices or any other government agency. This agreement to cooperate shall not apply in the event that these Offices pursue a criminal prosecution against Spectranetics. In the event that any materials or information requested pursuant to paragraph 4 of this NPA contains trade secrets, confidential commercial information, or other proprietary information ("proprietary information"), such material or information shall be accompanied by a prominent warning notifying the Offices of the proprietary status of the materials and information, and these Offices will make every good faith effort to protect the proprietary information from public disclosure.

Source: SPECTRANETICS CORP, 8-K, December 29, 2009        Powered by Morningstar® Document Research℠

6. Spectranetics accepts and acknowledges responsibility for, and agrees that it will not contest, the facts as set forth in Exhibit A, incorporated herein by reference. Spectranetics further agrees that neither it nor its subsidiaries, through its present or future board of directors, attorneys, officers, agents, or management employees, will make any public statements contradicting any of the facts as set forth in Exhibit A. Any such contradictory public statement by Spectranetics, its subsidiaries, its present or future board of directors, attorneys, officers, agents or management employees, shall constitute a breach of this Agreement, and Spectranetics would be subject to prosecution by these Offices pursuant to the terms of this Agreement. The decision of whether any public statement by any such person contradicting a fact contained in Exhibit A will be imputed to Spectranetics for the purposes of determining whether Spectranetics has breached this agreement shall be at the sole discretion of these Offices. Upon these Offices' reaching a determination that such a contradictory statement has been made by Spectranetics, these Offices shall notify Spectranetics and Spectranetics may avoid a breach of this Agreement by publicly repudiating such statement after notification by these Offices. This paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by the United States against such individuals unless the individual is speaking on behalf of Spectranetics.

7. It is further understood that Spectranetics shall, in conjunction with this agreement: (a) adhere to and maintain the enhanced corporate compliance procedures Spectranetics has implemented, including but not limited to the measures described in Exhibit A; (b) execute a Civil Settlement Agreement with the United States Attorney for the District of Colorado and the Frauds Section of the Commercial Litigation Branch of the Department of Justice, and; (c) execute a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General for the United States Department of Health and Human Services that will specify additional protections and procedures to prevent future violations of law.

8. This Agreement, and Spectranetics' obligations hereunder, shall remain in effect for a term of (a) twenty-four (24) months from the day this Agreement is executed or (b) the date upon which all prosecutions arising out of the conduct described in the opening paragraph of this Agreement (involving Spectranetics, its employees, or any others) are final, whichever is later.

9. It is understood that, should these Offices determine that Spectranetics has committed any crimes during the term of this agreement, or that Spectranetics or any of its representatives have given false, incomplete, or misleading testimony or information, or should Spectranetics otherwise violate any provision of this Agreement, Spectranetics shall thereafter be subject to prosecution for any federal violation of which these Offices have knowledge, including perjury and obstruction of justice; and, any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Spectranetics, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution.

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

10. Should these Offices determine, in good faith and in their sole discretion, that during the term of this NPA that Spectranetics has committed any criminal conduct subsequent to the Effective Date of this NPA, Spectranetics shall, in the discretion of these Offices, thereafter be subject to prosecution by these Offices for any criminal conduct subsequent to the Effective Date.

11. It is understood that if these Offices determine that Spectranetics has committed any crime after signing this Agreement or that Spectranetics or any of its representatives have given false, incomplete, or misleading testimony or information, or has otherwise violated any provision of this Agreement, (a) all statements made by Spectranetics' representatives to these Offices, FDA, Immigration and Customs Enforcement, or other designated law enforcement agents, and any testimony given by Spectranetics' representatives before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads from such statement or testimony shall be admissible in evidence in any criminal proceeding brought against Spectranetics; and (b) Spectranetics shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

12. Nothing in this Agreement shall be construed as a waiver of any attorney-client or work-product privileges. Without limiting the generality of the foregoing, Spectranetics specifically notes that the Offices executed a search warrant at the premises of Spectranetics business on September 4, 2008, and that Spectranetics did not and has not voluntarily waived any privileges with respect to those documents. The Offices acknowledge that Spectranetics promptly informed them that the Offices had likely taken certain privileged information in executing the search warrants and that the Offices agreed not to review such material as part of its investigation, thereby assuring that no privileges were waived. Spectranetics agrees that any disclosure of material or information to these Offices since January 1, 2009, that might otherwise be protected under an attorney-client or any other privilege was done so by Spectranetics voluntarily and of its own free will, and further agrees that such disclosure was not predicate to the decision by these Offices to enter into this agreement with Spectranetics.

13. It is further understood that Spectranetics and these Offices shall disclose this Agreement to the public.

14. Nothing in this NPA affects in any way any civil, administrative, regulatory claims, causes of action, or rights of any federal or state agency.

15. Nothing in this NPA restricts in any way the ability of these Offices to investigate and prosecute any current or former Spectranetics officer, employee, agent, or attorney.

Page 4 of 11

Powered by Morningstar® Document Research℠

16. It is understood that this NPA is limited to Spectranetics and these Offices, and it cannot bind other federal, state, or local authorities. These Offices will bring this NPA and the cooperation of Spectranetics, including its compliance with its obligations under this NPA, to the attention of other prosecuting offices, if accurate and requested to do so.

17. It is understood that by signing this Agreement, the parties representing Spectranetics are certifying that they possess the authority to do so on behalf of Spectranetics, and have obtained all necessary authority from the Board of Directors of Spectranetics as required by the corporate by-laws that govern such grants or authority.

18. With respect to this matter, from the date of the execution of this Agreement forward, the Agreement supersedes all prior, if any, understandings, promises and/or conditions between these Offices and Spectranetics. No additional promises, agreements, and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

Sincerely,

DAVID GAOUETTE
Acting United States Attorney

By:  /s/ Jaime Pena
JAIME PENA
Assistant U.S. Attorney
1225 17th Street
Suite 700
Denver, CO 80202 (303) 454-0100
Jaime.Pena2@usdoj.gov

/s/  John W. M. Claud                                    12/28/09
JOHN W. M. CLAUD
Trial Attorney
Office of Consumer Litigation
Department of Justice
P.O. Box 386
Washington, D.C. 20044 (202) 514-5747
John.Claud@usdoj.gov

Counsel for the United States

Page 5 of 11

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                          Powered by Morningstar® Document Research℠

OF COUNSEL:

DAVID S. CADE
Acting General Counsel

MICHAEL M. LANDA
Acting Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

MICHAEL VARRONE
Associate Chief Counsel
U.S. Department of Health and
Human Services
Office of the General Counsel
5600 Fishers Lane, GCF-1
Rockville, Maryland 20857

Page 6 of 11

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

AGREED AND CONSENTED TO

/s/ Emile Geisenheimer
_____
Emile Geisenheimer
Chairman of the Board and Chief Executive Officer
The Spectranetics Corporation

12/17/2009
_____
Date

APPROVED:

/s/ Peter Spivack
_____
Peter Spivack, Esq.
Attorney for The Spectranetics Corporation

12/22/2009
_____
Date

/s/ Michael Theis
_____
Michael Theis, Esq.
Attorney for The Spectranetics Corporation

12/18/2009
_____
Date

Page 7 of 11

Source: SPECTRANETICS CORP, 8-K, December 29, 2009          Powered by Morningstar® Document Research℠

EXHIBIT A

In any criminal prosecution or regulatory action brought by the United States, the following statement shall be admissible against the Spectranetics Corporation (hereafter, "Spectranetics") and/or any of its subsidiaries, as agreed to in Paragraph 11 of the Non-Prosecution Agreement.

Spectranetics is based in Colorado Springs, Colorado. Spectranetics manufactures medical lasers and peripheral devices associated with them. Those peripheral devices include catheters that serve as intravenous sleeves that contain optical fibers that deliver laser energy to the treatment location within the vasculature. Physicians use the lasers and peripheral devices to perform a number of different procedures, including atherectomies, which are types of procedures that remove plaque buildup from arteries or vein grafts in order to ease blood flow.

The U.S. Food and Drug Administration's ("FDA") Center for Devices and Radiological Health ("CDRH") has determined that Spectranetics' lasers are Class III medical devices. Spectranetics' laser catheters are Class II and III devices.

**CORAL and CORAL REEF Studies**

Spectranetics is the holder of an FDA-approved pre-market application ("PMA") for the CVX-300 Excimer Laser system, PMA P910001, for use in patients with coronary artery disease. As part of that PMA, FDA has approved the Spectranetics ELCA ("Excimer Laser Coronary Angioplasty") Laser Catheters for the treatment of saphenous vein bypass grafts that have become occluded; that is, to remove arterial plaque constricting blood flow through the transplanted vessels that form the bypass.[1] Spectranetics' FDA-approved PMA does not include a conditional requirement that physicians also use distal protection when using the device. Distal protection is a device such as a mesh basket or other vascular safety device that collects plaque and other debris that may become dislodged during such procedures.

Spectranetics devised, implemented, and maintained a study named "CORAL" (COronary graft Results after Atherectomy with Lasers), which occurred between May 2003 and December 2004. CORAL's clinical objectives were to: (1) test the ability of Spectranetics' lasers to dissolve or disintegrate plaque, obviating the need for the use of distal protection; and, (2) study angiographic results and 30-day major adverse cardiac events ("MACE") after procedures in which doctors used Spectranetics' excimer laser. The procedures included in CORAL did not use distal protection.

---

[1]    Occluded vessels can be treated by either angioplasty, the widening of the vessel through the use of stents and balloons, or through atherectomy, the removal of plaque from the vessel.

Page 8 of 11

The objective of CORAL was to compare the MACE rates from CORAL patients to those of a previous study in 2002, the "SAFER" study,[2] that measured MACE rates in procedures using only stents and balloon catheters. The SAFER study concluded that distal protection was warranted in angioplasty procedures using stents and balloon catheters in order to markedly decrease the risk of adverse events.

Spectranetics compensated each participating doctor per patient whom he or she enrolled in the study, apart from the doctor's Medicare or insurance billing for the procedure. Spectranetics maintained oversight over the study, and was fully aware of the results. The original enrollment goal of the study was for 250 patients. Following initial difficulty with enrollments, Spectranetics reduced the goal to 150 patients in late 2003 or early 2004. The final enrollment of 142 total patients consisted of 97 patients whose angiographic results Spectranetics actually assessed.

Also in 2003, Spectranetics initiated the CORAL REEF (COronary graft Results after Atherectomy with Laser: REtrieval of Emboli with a Filter) study, which enrolled ten patients. In CORAL REEF, the participating physicians used distal protection to collect embolic plaque and/or debris that lasers dislodged but did not disintegrate. The objective of CORAL REEF was to study outcomes after laser coronary atherectomy and stenting in saphenous vein bypass grafts, which included an analysis of embolic debris collected by use of distal protection. Spectranetics arranged for the examination of the volume and size of retrieved particles in order to demonstrate the feasibility of retrieval and measurement of debris produced by vascular intervention in vein grafts.

Spectranetics ended both CORAL and CORAL REEF in late 2004. MACE rates in the CORAL study were higher than expected. CORAL REEF ended upon its completed enrollment of ten patients.

A Spectranetics 10-Q filing with the Securities and Exchange Commission on May 11, 2005, summarized the results from CORAL and CORAL REEF.

Spectranetics first reported to the FDA a summary and bibliography of the results from the CORAL and CORAL REEF registries in its 2008 annual report for the CVX-300, which was filed in September 2009.

---

2    The Saphenous vein graft Angioplasty Free of Emboli Randomized ("SAFER") trial was an 801-patient study in which patients undergoing saphenous vein graft intervention underwent either stenting with a conventional guidewire or stenting with a distal protection device.

Page 9 of 11

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

**FMD Guidewires**

From approximately May 2005 until November 2007, Spectranetics was negotiating with Japanese manufacturer Future Medical Design Co., Ltd. ("FMD") to become a distributor for catheter guidewires that FMD would produce in Japan. During the relevant time period, no catheter guidewires manufactured by FMD were the subject of: (1) an FDA-approved pre-market approval application, under 21 U.S.C. § 360e(a)(2) and 21 C.F.R. Part 814; (2) a "510(k) clearance" based on substantial equivalency to a device already placed into one of the three statutory classification categories, under 21 U.S.C. §§ 360c(a)(1) and 360(k) and 21 C.F.R. Part 807 — Subpart E; (3) an investigational device exemption under 21 U.S.C. § 360j(g), for the use of a device on humans on an experimental basis; or (4) an exemption for certain devices as set forth in 21 U.S.C. § 360(l).

Spectranetics, through the actions of officers, managers, agents, and other employees acting on behalf of Spectranetics, caused the FMD guidewires, which lacked FDA approval and clearance, and lacked any exemption from such approval or clearance, to be imported into the United States, and, knowing the devices did not have FDA approval or clearance, or an exemption from such approval or clearance, distributed them in interstate commerce to physicians for use in humans. Spectranetics concluded that no more than ten wires were distributed for such purposes. Certain Spectranetics officers, managers, agents, and other employees involved in this distribution were aware that the physicians were using guidewires that lacked approval, clearance, or any exemption from approval or clearance. Upon their entry into the United States, the guidewires were not accurately declared or classified to Customs as medical devices or medical equipment by the individuals who brought them in, or caused them to be imported.

**BMT Balloons**

From approximately October 2007 until September 2008, Spectranetics was also negotiating with German manufacturer Bavaria Medizin Technologie ("BMT") to become a distributor for Percutaneous Transluminal Angioplasty ("PTA") balloons, which BMT manufactures in Germany. Additionally during this time, certain Spectranetics officers, managers, agents, and other employees accepted receipt from BMT of guidewires manufactured by BMT. During the relevant time period, neither PTA balloon catheters nor guidewires manufactured by BMT were the subject of an FDA-approved pre-market approval application, under 21 U.S.C. § 360e(a)(2) and 21 C.F.R. Part 814; (2) a "510(k) clearance" based on substantial equivalency to a device already placed into one of the three statutory classification categories, under 21 U.S.C. §§ 360c(a)(1) and 360(k) and 21 C.F.R. Part 807 — Subpart E; (3) an investigational device exemption under 21 U.S.C. § 360j(g), for the use of a device on humans on an experimental basis; or (4) an exemption for certain devices as set forth in 21 U.S.C. § 360(l).

Page 10 of 11

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

Spectranetics, through the actions of officers, managers, agents, and other employees acting on behalf of Spectranetics, caused the BMT balloons, which lacked FDA approval and clearance, and lacked any exemption from such approval or clearance to be imported into the United States and, knowing the devices did not have FDA approval or clearance, or an exemption from such approval or clearance, distributed them in interstate commerce to physicians for use in humans. Spectranetics concluded that no more than five balloons were distributed for such purposes. Certain Spectranetics officers, managers, agents, and other employees involved in this distribution were aware that the physicians were using balloons that lacked approval, clearance, or any exemption from approval or clearance. Upon their entry into the United States, the balloons were not accurately declared or classified to Customs as medical devices or medical equipment by the individuals who brought them in, or caused them to be imported.

### The Offices' Investigation and Responsive Corporate Actions

As discussed above, on September 4, 2008, agents from FDA's Office of Criminal Investigations and from Immigrations and Customs Enforcement executed a federal search warrant at Spectranetics corporate headquarters in Colorado Springs, Colorado. After the execution of the search warrant, Spectranetics revised its FDA compliance procedures, and its internal investigation determined that wrongdoing was limited to a certain number of officers, managers, agents, and other employees.

Spectranetics has cooperated with these Offices in their investigation into any wrongdoing committed by officers or employees, and continues to do so. Spectranetics has also taken remedial measures, including but not limited to: (1) responsive personnel actions; (2) disclosing its own research and scientific information relating to the above described incidents that was helpful to the investigation by these Offices; (3) providing additional specific company wide formal training on FDA compliance procedures; (4) issuing further FDA compliance guidelines to all of its officers or employees; (5) continuing to retain and consult with counsel familiar with FDA laws and regulations; (6) improving its FDA compliance hotline complaint process, and providing additional training to compliance personnel on procedures for investigating complaints; (7) creating a corporate compliance charter and compliance auditing system; and (8) appointing a Chief Compliance Officer.

Page 11 of 11

**Exhibit C**

<div align="right">**Exhibit 10.3**</div>

# CORPORATE INTEGRITY AGREEMENT
## BETWEEN THE
## OFFICE OF INSPECTOR GENERAL
### OF THE
## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### AND
## SPECTRANETICS CORPORATION

## I. PREAMBLE

The Spectranetics Corporation (Spectranetics) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and with the statutes, regulations, and written directives of the Food and Drug Administration (FDA requirements). Contemporaneously with this CIA, Spectranetics is entering into a Settlement Agreement with the United States.

Spectranetics represents that before the effective date of this CIA (as defined below) and before commencement of the government's investigation, Spectranetics initiated a voluntary compliance program applicable to all Spectranetics employees. Spectranetics's compliance program (Compliance Program) includes a Chief Compliance Officer, who reports to the Board of Directors and the Chief Executive Officer, a Board of Directors Compliance Committee, and a Management Compliance Committee. The Compliance Program also includes a Code of Conduct for all employees, written policies and procedures, educational and training initiatives, review and disciplinary procedures, a disclosure program that allows for the confidential disclosure and investigation of potential compliance violations and appropriate disciplinary procedures, an ineligible persons screening program, and regular internal audit and review procedures, an arrangements database and a Commercial Activities and Grants Committee to monitor Anti-kickback statute compliance.

Spectranetics shall continue its Compliance Program throughout the term of this CIA and shall do so in accordance with the terms set forth below. Spectranetics may modify its Compliance Program as appropriate, but, at a minimum, Spectranetics shall ensure that during the term of this CIA it shall comply with the obligations enumerated herein.

Powered by Morningstar® Document Research℠

## II. TERM AND SCOPE OF THE CIA

A. The period of the compliance obligations assumed by Spectranetics under this CIA shall be five years from the effective date of this CIA, unless otherwise specified. The effective date shall be the date on which the final signatory of this CIA executes this CIA (Effective Date). Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

B. Sections VII, IX, X, and XI shall expire no later than 120 days after OIG=s receipt of: (1) Spectranetics' final annual report; or (2) any additional materials submitted by Spectranetics pursuant to OIG=s request, whichever is later.

C. The scope of this CIA shall be governed by the following definitions:

1. "Covered Persons" includes:

a. all owners of Spectranetics who are natural persons, (other than shareholders who: (1) have an ownership interest of less than 5%; and (2) acquired the ownership interest through public trading);

b. all officers and directors of Spectranetics; all U.S.-based employees of Spectranetics; and all employees of Spectranetics who are based outside the United States and have responsibilities relating to Promotional and Product Services Related Functions (as defined below in Section II.C.2) in the U.S., Clinical Investigation Related Functions related to FDA requirements (as defined below in Section II.C.3), or Reporting Related Functions (as defined below in Section II.C.4);

c. all contractors, subcontractors, agents, and other persons who perform Promotional and Product Services Related Functions (as defined below in Section II.C.2) on behalf of Spectranetics;

d. all contractors, subcontractors, agents, and other persons who perform Clinical Investigation Related Functions (as defined below in Section II.C.3) on behalf of Spectranetics and

e. all contractors, subcontractors, agents, and other persons who perform Reporting Related Functions (as defined below in Section II.C.4) on behalf of Spectranetics.

Spectranetics Corporate Integrity Agreement

2

Notwithstanding the above, this term does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to work more than 160 hours per year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year.

2. "Promotional and Product Services Related Functions" includes: (a) the selling, detailing, marketing, advertising, and promotion of Spectranetics products; and (b) the preparation and dissemination of materials or information about, or the provision of services relating to, devices that are distributed within the United States.

3. "Clinical Investigation Related Functions" includes organizing, coordinating, administering, providing training for, monitoring, and FDA reporting related to clinical investigations and patient registries as well as all relevant obligations under FDA's Investigational Device Exemption regulations, 21 C.F.R. Part 812.

4. "Reporting Related Functions" includes identifying, tracking, and gathering information and preparing and submitting reports to the FDA for Spectranetics devices. This includes reporting of adverse events (including reports required under 21 U.S.C. § 360i and the Medical Device Reporting (MDR) regulation at 21 C.F.R. Part 803 and other reporting under FDA requirements, (including those required under 21 C.F.R. § 814.84).

5. "Relevant Promotional and Product Services Covered Persons" includes all Covered Persons whose job responsibilities relate to Promotional and Product Services Related Functions.

6. "Relevant Clinical Investigation Covered Persons" includes all Covered Persons whose job responsibilities relate to Clinical Investigation Related Functions.

7. "Relevant Reporting Covered Persons" includes all Covered Persons whose job responsibilities relate to Reporting Related Functions.

Spectranetics Corporate Integrity Agreement

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

## III. CORPORATE INTEGRITY OBLIGATIONS

Spectranetics shall establish and maintain a Compliance Program that includes the following elements:

A. Chief Compliance Officer and Committee.

1. *Chief Compliance Officer*. Prior to the Effective Date, Spectranetics appointed a Chief Compliance Officer and Spectranetics shall maintain a Chief Compliance Officer for the term of the CIA. The Chief Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA, with Federal health care program requirements and with FDA requirements. The Chief Compliance Officer shall be a member of senior management of Spectranetics, shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors of Spectranetics, and shall be authorized to report on such matters to the Board of Directors at any time. The Chief Compliance Officer shall not be or be subordinate to the General Counsel or Chief Financial Officer. The Chief Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by Spectranetics as well as for any reporting obligations created under this CIA. Any noncompliance job responsibilities of the Chief Compliance Officer shall be limited and must not interfere with the Chief Compliance Officer's ability to perform the duties outlined in this CIA.

Spectranetics shall report to OIG, in writing, any changes in the identity or position description of the Chief Compliance Officer, or any actions or changes that would affect the Chief Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within 5 days after such a change.

2. *Compliance Committee*. Prior to the Effective Date, Spectranetics formed a Board of Directors Compliance Committee (Board Compliance Committee), consisting of two non-management members of the Board. Spectranetics also formed a Management Compliance Committee (Compliance Committee), consisting of the Chief Compliance Officer and other members of senior management, including the Chief Operating Officer; the Chief Financial Officer; the General Counsel, the Senior Vice President, Vascular Intervention and Lead Management; Vice President, Clinical Affairs; and the Chief Compliance Officer. Spectranetics's Compliance Committee shall continue to have members of senior management necessary to meet the requirements of this CIA, (e.g. senior executives of relevant departments, such as legal, regulatory affairs, clinical affairs, finance, and vascular intervention and lead management). Spectranetics shall maintain a Compliance Committee and Board Compliance Committee for the term of the CIA. The Chief Compliance Officer shall chair the Compliance Committee and the Committee shall support the Chief Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of the organization's risk areas and shall oversee monitoring of internal and external audits and investigations).

Spectranetics Corporate Integrity Agreement

4

Spectranetics shall report to OIG, in writing, any changes in the composition of the Compliance Committee, or any actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

3. *Board of Directors Compliance Obligations.* Spectranetics' Board of Directors shall be responsible for the review and oversight of matters related to compliance with Federal health care program requirements, FDA requirements, and the obligations of this CIA.

a. The Board shall meet at least quarterly to review and oversee Spectranetics' Compliance Program, including but not limited to receiving reports from the Chief Compliance Officer to evaluate the effectiveness of Spectranetics' Compliance Program, Chief Compliance Officer, and Compliance Committee. The Board may also meet with the Board Compliance Committee and the Compliance Committee to evaluate the effectiveness of Spectranetics' Compliance Program, Chief Compliance Officer, and Compliance Committee.

b. For each Reporting Period of the CIA, the Board shall, in reliance upon the aforementioned reports and its reasonable further inquiry, adopt a resolution, signed by each individual member of the Board, summarizing its review and oversight of Spectranetics' compliance with Federal health care program requirements, FDA requirements, and obligations of this CIA.

Spectranetics Corporate Integrity Agreement

5

Powered by Morningstar® Document Research℠

     i.   <u>Resolution</u>: At a minimum, the resolution shall address whether:

        (a)   The Board has made a reasonable inquiry into the effectiveness of Spectranetics' Compliance Program for the Reporting Period; and

        (b)   Based on its reasonable inquiry, the Board concludes that Spectranetics is implementing an effective Compliance Program.

        (c)   If the Board is unable to reach a conclusion that Spectranetics has implemented an effective Compliance Program, the Board shall include in the resolution a written explanation of the reason(s) why it has been unable to reach such a conclusion and the steps that it is taking to implement an effective compliance program.

     ii.   The Board resolution and any attachments shall be submitted with Spectranetics' Annual Report to the OIG.

B. <u>Written Standards</u>.

   1. *Code of Conduct*. Within 120 days after the Effective Date, Spectranetics shall develop, implement, and distribute a revised written Code of Conduct to all Covered Persons. Spectranetics shall make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct shall, at a minimum, set forth:

     a. Spectranetics' commitment to full compliance with all FDA and Federal health care program requirements;

     b. Spectranetics' requirement that all of its Covered Persons shall be expected to comply with all FDA and all Federal health care program requirements and with Spectranetics' own Policies and Procedures as implemented pursuant to Section III.B (including the requirements of this CIA);

     c. the requirement that all of Spectranetics' Covered Persons shall be expected to report to the Chief Compliance Officer, or other appropriate individual designated by Spectranetics, suspected violations of any FDA or Federal health care program requirements or of Spectranetics' own Policies and Procedures; and

     d. the right of all individuals to use the Disclosure Program described in Section III.E, and Spectranetics' commitment to nonretaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

Spectranetics Corporate Integrity Agreement

6

Powered by Morningstar® Document Research℠

Within 120 days after the Effective Date, each Covered Person shall certify, in writing or electronically, that he or she has received, read, understood, and shall abide by Spectranetics' Code of Conduct. Spectranetics shall maintain documentation of such certification. New Covered Persons shall receive the Code of Conduct and shall complete the required certification within 30 days after becoming a Covered Person or within 120 days after the Effective Date, whichever is later. Spectranetics shall maintain documentation of the Code of Conduct certifications consistent with section VIII of the CIA.

Spectranetics shall periodically review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such review. Any revised Code of Conduct shall be distributed within 30 days after any revisions are finalized. Each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by the revised Code of Conduct within 30 days after the distribution of the revised Code of Conduct.

2. *Policies and Procedures*. To the extent not already accomplished, within 120 days after the Effective Date, Spectranetics shall implement written Policies and Procedures regarding the operation of Spectranetics' compliance program and its compliance with Federal health care program and FDA requirements. At a minimum, the Policies and Procedures shall address:

a. The subjects relating to the Code of Conduct identified in Section III.B.1;

b. The appropriate manner in which to conduct Promotional and Product Services Related Functions and Clinical Investigation Related Functions in compliance with all applicable Federal healthcare program requirements, including, but not limited to the False Claims Act (codified at 31 U.S.C. § 3729-3733), and the Federal anti-kickback statute (codified at 42 U.S.C. § 1320a-7b);

Spectranetics Corporate Integrity Agreement

7

c. The appropriate manner in which to conduct Promotional and Product Services Related Functions and Clinical Investigation Related Functions in compliance with all applicable FDA requirements, including the requirements applicable to investigational devices under 21 C.F.R. §812.7;

d. The materials and information that may be distributed by Spectranetics sales representatives and account executives about Spectranetics' products and the manner in which Spectranetics sales representatives and account executives respond to requests for information about unapproved or uncleared uses (or "off label" uses) of Spectranetics' products;

e. The materials and information that may be distributed by Spectranetics' Medical Services Department and the mechanisms through, and manner in which, such medical personnel receive and respond to requests for information about off-label uses of the products; the form and content of the information disseminated by Spectranetics in response to such requests; and the internal review process for the information disseminated.

The Policies and Procedures shall include a requirement that Spectranetics develop a database (Inquiry Database) to track all requests for information about Spectranetics' products that are submitted by Spectranetics' sales representatives and account executives or by physicians or members of the public regarding off-label uses of Spectranetics products. The Inquiry Database shall include the following items of information for each inquiry received for information about Spectranetics' products: 1) date of inquiry; 2) form of inquiry (*e.g.*, email, letter, fax, phone, etc.); 3) name of the requesting health care professional (HCP) or health care institution (HCI) in accordance with applicable privacy laws; 4) nature and topic of the request, including the exact language of the inquiry; 5) the nature/form of the response from Spectranetics to the HCP or HCI in response to the request; 6) the name of the Spectranetics representative or account executive who called on or interacted with the HCP or HCI, if known;

Spectranetics Corporate Integrity Agreement

8

Powered by Morningstar® Document Research℠

f. The appropriate manner in which to conduct Reporting Related Functions in compliance with all applicable FDA requirements;

g. The protection of human subjects, as required by 45 C.F.R. Part 45 and 21 C.F.R. Parts 50 and 56, and financial disclosure, as required by 21 C.F.R. Part 54;

h. Systems, processes, policies and procedures for ensuring that all devices Spectranetics introduces or causes to be introduced into interstate commerce are the subject of: (1) an FDA-approved pre-market approval application, under 21 U.S.C. § 360e(a)(2) and 21 C.F.R. Part 814; (2) a "510(k) clearance" by FDA for marketing because it is found to be substantially equivalent to an appropriate, legally marketed device, under 21 U.S.C. §§ 360c(a)(1) and 360(k) and 21 C.F.R. Part 807 — Subpart E; (3) an investigational device exemption under 21 U.S.C. § 360j(g), for the use of a device on humans on an experimental basis; or (4) an exemption for certain devices as set forth in 21 U.S.C. § 360(l); and

i. Disciplinary policies and procedures for violations of Spectranetics' Code of Conduct and Policies and Procedures.

Within 120 days after the Effective Date, the relevant portions of the Policies and Procedures shall be distributed to all individuals whose job functions relate to those Policies and Procedures. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

At least annually (and more frequently, if appropriate), Spectranetics shall assess and update, as necessary, the Policies and Procedures. Within 30 days after the effective date of any revisions, the relevant portions of any such revised Policies and Procedures shall be distributed to all individuals whose job functions relate to those Policies and Procedures.

Spectranetics Corporate Integrity Agreement

9

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

C. <u>Training and Education</u>.

1. *General Training*. Within 120 days after the Effective Date, Spectranetics shall provide at least two hours of General Training to each Covered Person. This training, at a minimum, shall explain Spectranetics':

    a. CIA requirements; and

    b. Spectranetics' Compliance Program (including the Code of Conduct and the Policies and Procedures as they pertain to general compliance issues).

New Covered Persons shall receive the General Training described above within 30 days after becoming a Covered Person or within 120 days after the Effective Date, whichever is later. After receiving the initial General Training described above, each Covered Person shall receive at least one hour of General Training in each subsequent Reporting Period.

2. *Specific Promotional and Product Services Training*. Within 120 days after the Effective Date, each Relevant Promotional and Product Services Covered Person shall receive at least 4 hours of Specific Promotional and Product Services Training in addition to the General Training required above. This Specific Training shall include a discussion of:

    a. all applicable Federal health care program and FDA requirements and all Spectranetics' Policies and Procedures relating to Promotional and Product Services Related Functions;

    b. the personal obligation of each individual involved in Promotional and Product Services Related Functions to comply with all applicable Federal health care program and FDA requirements and with Spectranetics Policies and Procedures;

    c. the legal sanctions for violations of the Federal health care program and FDA requirements, the False Claims Act, and the Anti-kickback statute;

    d. examples of proper and improper practices related to Promotional and Product Services Related Functions; and

    e. the possible consequences to both Spectranetics and Relevant Covered Promotional and Product Services Persons of failure to comply with FDA and Federal health care program requirements and with Spectranetics' own Policies and Procedures and the failure to report such noncompliance.

Spectranetics Corporate Integrity Agreement

10

Source: SPECTRANETICS CORP, 8-K, December 29, 2009    Powered by Morningstar® Document Research℠

New Relevant Promotional and Product Services Covered Persons shall receive this training within 30 days after the beginning of their employment or becoming Relevant Promotional and Product Services Covered Persons, or within 120 days after the Effective Date, whichever is later. A Spectranetics employee who has completed the Specific Promotional and Product Services Training shall review a new Relevant Promotional and Product Services Covered Person's work, to the extent that the work relates to Promotional and Product Services Functions, until such time as the new Relevant Promotional and Product Services Covered Person completes his or her Specific Promotional and Product Services Training.

After receiving the initial Specific Promotional and Product Services Training described in this Section, each Relevant Promotional and Product Services Covered Person shall receive at least three hours of Specific Promotional and Product Services Training in each subsequent Reporting Period.

3. *Specific Clinical Investigation and Reporting Training*. Within 120 days after the Effective Date, each Relevant Clinical Investigation Covered Person and Reporting Covered Person shall receive at least 4 hours of Specific Clinical Investigation and Reporting Training in addition to the General Training required above. This Specific Clinical Investigation and Reporting Training shall include a discussion of:

a. all applicable Federal health care program and FDA requirements and all Spectranetics' Policies and Procedures relating to Clinical Investigation Related Functions and Reporting Related Functions;

Spectranetics Corporate Integrity Agreement

11

b. the personal obligation of each individual involved in Clinical Investigation Related Functions and Reporting Related Functions to comply with all applicable Federal health care program and FDA requirements and with Spectranetics' Policies and Procedures, including the requirement to submit complete and accurate information to the FDA;

c. the legal sanctions for violations of the Federal health care program and FDA requirements;

d. examples of proper and improper practices related to Clinical Investigation Related Functions and Reporting Related Functions, including those that address the following issues:

  (i) when a patient registry is, in fact, a clinical investigation;

  (ii) when FDA approval, FDA clearance, or an applicable Investigational Device Exemption is necessary for interstate distribution of a device; and

  (iii) the receipt, investigation, and evaluation of events and the record keeping requirements under 21 C.F.R. § 803.17(b); and

e. the possible consequences to both Spectranetics and Relevant Clinical Investigation Covered Persons and Relevant Reporting Covered Persons of failure to comply with FDA and Federal health care program requirements and with Spectranetics' own Policies and Procedures and the failure to report such noncompliance.

New Relevant Clinical Investigation Covered Persons and New Relevant Reporting Covered Persons shall receive this training within 30 days after the beginning of their employment or becoming Relevant Clinical Investigation Covered Persons or Relevant Reporting Covered Persons, or within 120 days after the Effective Date, whichever is later. A Spectranetics who has completed the Specific Clinical Investigation and Reporting Training shall review (a) a new Relevant Clinical Investigation Covered Person's work, to the extent that the work relates to Clinical Investigation Related Functions, until such time as the new Relevant Clinical Investigation Covered Person completes his or her Specific Training and (b) a new Relevant Reporting Covered Person's work, to the extent that the work relates to Reporting Related Functions, until such time as the new Relevant Reporting Covered Person completes his or her Specific Training.

Spectranetics Corporate Integrity Agreement

12

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

After receiving the initial Specific Clinical Investigation and Reporting Training described in this Section, each Relevant Clinical Investigation Covered Person and Relevant Reporting Covered Person shall receive at least three hours of Specific Clinical Investigation and Reporting Training in each subsequent Reporting Period.

4. *Certification.* Each individual who is required to attend training shall certify, in writing, or in electronic form, if applicable, that he or she has received the required training. The certification shall specify the type of training received and the date received. The Chief Compliance Officer (or designee) shall retain the certifications, along with all course materials. These shall be made available to OIG, upon request.

5. *Qualifications of Trainer.* Persons providing the training shall be knowledgeable about the subject area, including applicable Federal health care program and FDA requirements.

6. *Update of Training.* Spectranetics shall review the training annually, and, where appropriate, update the training to reflect changes in Federal health care program and FDA requirements, any issues discovered during internal audits or the IRO Review, and any other relevant information.

7. *Computer-based Training.* Spectranetics may provide the training required under this CIA through appropriate computer-based training approaches. If Spectranetics chooses to provide computer-based training, it shall make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the individuals receiving such training.

Spectranetics Corporate Integrity Agreement

13

D. <u>Review Procedures</u>.

    1. *General Description.*

        a. Engagement *of Independent Review Organization*. Within 120 days after the Effective Date, Spectranetics shall engage an entity (or entities), such as an accounting, auditing, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform reviews to assist Spectranetics in assessing and evaluating its Clinical Investigation Related Functions, Reporting Related Functions, and certain of its Promotional and Product Services Related Functions. The applicable requirements relating to the IRO are outlined in Appendix A to this CIA, which is incorporated by reference.

        Each IRO engaged by Spectranetics shall have expertise in applicable Federal health care program and FDA requirements as may be appropriate for the Review for which the IRO is retained. Each IRO shall assess, along with Spectranetics, whether it can perform the engagement in a professionally independent and objective fashion, as appropriate to the nature of the review, taking into account any other business relationships or other engagements that may exist.

        The IRO(s) shall conduct reviews that assess Spectranetics' systems, processes, policies, procedures, and practices relating to Clinical Investigation Related Functions, Reporting Related Functions and Promotional and Product Services Related Functions (collectively, "IRO Review").

Spectranetics Corporate Integrity Agreement

14

b. *Frequency and Brief Description of Reviews*. As set forth more fully in Appendix B, the IRO Review shall consist of two components – a Systems Review and a Transaction Review.

i. *Systems Review*. The Systems Review shall assess Spectranetics' systems, processes, policies, and procedures relating to Clinical Investigation Related Functions, Reporting Related Functions, and Promotional and Product Services Related Functions. If there are no material changes in Spectranetics' systems, processes, policies, and procedures relating to Clinical Investigation Related Functions, Reporting Related Functions, and Promotional and Product Services Related Functions, the Systems Review shall be performed in the first and fourth Reporting Periods. If Spectranetics materially changes its systems, processes, policies, and procedures relating to Clinical Investigation Related Functions, Reporting Related Functions, and Promotional and Product Services Related Functions, the IRO shall perform a Systems Review for the Reporting Period in which such changes were made in addition to conducting the Systems Review for the first and fourth Reporting Periods.

ii. *Transactions Review*. The Transactions Review shall be performed annually and shall cover each of the five Reporting Periods. The IRO(s) shall perform all components of each annual Transactions Review.

c. *Retention of Records*. The IRO and Spectranetics shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports (those exchanged between the IRO and Spectranetics) related to the reviews.

2. *IRO Review Reports*. The IRO shall prepare a report (or reports) based upon each Review performed (IRO Review Report). Information to be included in the IRO Review Report is described in Appendix B.

3. *Validation Review*. In the event OIG has reason to believe that: (a) any IRO Review fails to conform to the requirements of this CIA; or (b) the IRO's findings or Review are inaccurate, OIG may, at its sole discretion, conduct its own review to determine whether the applicable Review complied with the requirements of the CIA and/or the findings or Review results are inaccurate (Validation Review). Spectranetics shall pay for the reasonable cost of any such review performed by OIG or any of its designated agents. Any Validation Review of Reports submitted as part of Spectranetics' final Annual Report shall be initiated no later than one year after Spectranetics' final submission (as described in Section II) is received by OIG.

Spectranetics Corporate Integrity Agreement

15

Source: SPECTRANETICS CORP, 8-K, December 29, 2009    Powered by Morningstar® Document Research℠

Prior to initiating a Validation Review, OIG shall notify Spectranetics of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, Spectranetics may request a meeting with OIG to: (a) discuss the results of any Review submissions or findings; (b) present any additional information to clarify the results of the applicable Review or to correct the inaccuracy of the Review; and/or (c) propose alternatives to the proposed Validation Review. Spectranetics agrees to provide any additional information as may be requested by OIG under this Section III.D.3 in an expedited manner. OIG will attempt in good faith to resolve any Review issues with Spectranetics prior to conducting a Validation Review. However, the final determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

4. *Independence and Objectivity Certification*. The IRO shall include in its report(s) to Spectranetics a certification or sworn affidavit that it has evaluated its professional independence and objectivity, as appropriate to the nature of the engagement, with regard to the applicable Review and that it has concluded that it is, in fact, independent and objective.

E. Disclosure Program.

To the extent not already accomplished, within 120 days after the Effective Date, Spectranetics shall establish a Disclosure Program that includes a mechanism (e.g., a toll-free compliance telephone line) to enable individuals to disclose, to the Chief Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with Spectranetics' policies, conduct, practices, or procedures with respect to a Federal health care program or FDA requirements believed by the individual to be a potential violation of criminal, civil, or administrative law. Spectranetics shall appropriately publicize the existence of the disclosure mechanism (e.g., via periodic "all-hands meetings," newsletters and/or e-mails to employees or by posting the information in prominent common areas).

Spectranetics Corporate Integrity Agreement

16

The Disclosure Program shall emphasize a nonretribution, nonretaliation policy, and shall include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. Upon receipt of a disclosure, the Chief Compliance Officer (or designee) shall gather all relevant information from the disclosing individual. The Chief Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, Spectranetics shall conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Chief Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews. The disclosure log shall be made available to OIG upon request.

F. <u>Ineligible Persons</u>.

    1. *Definitions*. For purposes of this CIA:

        a. an "Ineligible Person" shall include an individual or entity who:

            i. is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or

            ii. has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

        b. "Exclusion Lists" include:

            i. the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); and

            ii. the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://www.epls.gov).

Spectranetics Corporate Integrity Agreement

17

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

2. *Screening Requirements.* Spectranetics shall ensure that all prospective and current Covered Persons are not Ineligible Persons, by implementing the following screening requirements.

    a. Spectranetics shall screen all prospective and current Covered Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Covered Persons to disclose whether they are Ineligible Persons.

    b. Spectranetics shall screen all Covered Persons against the Exclusion Lists within 120 days after the Effective Date and on an annual basis thereafter.

    c. Spectranetics shall implement a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in this Section affects the responsibility of (or liability for) Spectranetics to refrain from billing Federal health care programs for items or services furnished, ordered, or prescribed by an Ineligible Person. Spectranetics understands that items or services furnished by excluded persons are not payable by Federal health care programs and that Spectranetics may be liable for overpayments and/or criminal, civil, and administrative sanctions for employing or contracting with an excluded person regardless of whether Spectranetics meets the requirements of Section III.F.

Spectranetics Corporate Integrity Agreement

18

Powered by Morningstar® Document Research℠

3. *Removal Requirement*. If Spectranetics has actual notice that a Covered Person has become an Ineligible Person, Spectranetics shall remove such Covered Person from responsibility for, or involvement with, Spectranetics' business operations related to the Federal health care programs and shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Covered Person is reinstated into participation in the Federal health care programs.

4. *Pending Charges and Proposed Exclusions*. If Spectranetics has actual notice that a Covered Person is charged with a criminal offense that falls within the scope of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during the Covered Person's employment or contract term, Spectranetics shall take all appropriate actions to ensure that the responsibilities of that Covered Person have not and shall not adversely affect the accuracy of any claims submitted to any Federal health care program.

G. <u>Notification of Government Investigation or Legal Proceedings</u>.

Within 30 days after discovery, Spectranetics shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to Spectranetics conducted or brought by a governmental entity or its agents involving an allegation that Spectranetics has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. Spectranetics shall also provide written notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

Spectranetics Corporate Integrity Agreement

Source: SPECTRANETICS CORP, 8-K, December 29, 2009     Powered by Morningstar® Document Research℠

H. <u>Reporting</u>.

    1. *Reportable Events.*

        a. Definition *of Reportable Event*. For purposes of this CIA, a "Reportable Event" means anything that involves:

            i. a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to FDA requirements and/or applicable to any Federal health care program for which penalties or exclusion may be authorized; or

            ii. an adverse event that Spectranetics: (1) was required to report as an MDR and (2) failed to report to the FDA under 21 U.S.C. § 360i and 21 C.F.R. Part 803 within 30 days; or

            iii. the filing of a bankruptcy petition by Spectranetics.

        A Reportable Event may be the result of an isolated event or a series of occurrences.

        b. *Reporting of Reportable Events*. If Spectranetics determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, Spectranetics shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists. The report to OIG shall include the following information:

            i. a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program and/or FDA authorities implicated;

            ii. a description of Spectranetics' actions taken to correct the Reportable Event;

            iii. any further steps Spectranetics plans to take to address the Reportable Event and prevent it from recurring;

            iv. If the Reportable Event involves the filing of a bankruptcy petition, the report to the OIG shall include documentation of the filing and a description of any Federal health care program and/or FDA authorities implicated.

Spectranetics Corporate Integrity Agreement

20

I. Notification of Communication with FDA.

Within 30 days after the date of any written report, correspondence, or communication between Spectranetics and the FDA that materially discusses Spectranetics' or a Covered Person's actual or potentially unlawful or improper promotion of Spectranetics' products (including any improper dissemination of information about off-label indications) or improper practices relating to Clinical Investigation Related Functions, Spectranetics shall provide a copy of the report, correspondence or communications to the OIG. Spectranetics shall also provide written notice to the OIG within 30 days after the resolution of any matter disclosed in accordance with the requirements set forth above, and it shall provide the OIG with a description of the findings and/or results of the matter, if any.

## IV. CHANGES TO BUSINESS UNITS OR LOCATIONS

A. Change or Closure of Unit or Location. In the event that, after the Effective Date, Spectranetics changes locations or closes a business unit or location engaged in Promotional or Product Services Related Functions, Reporting Related Functions, or Clinical Investigation Related Functions, Spectranetics shall notify OIG of this fact as soon as possible, but no later than within 30 days after the date of change or closure of the location.

B. Purchase or Establishment of New Unit or Location. In the event that, after the Effective Date, Spectranetics purchases or establishes a new business unit or location engaged in Promotional or Product Services Related Functions, Reporting Related Functions, or Clinical Investigation Related Functions, Spectranetics shall notify OIG at least 30 days prior to such purchase or the operation of the new business unit or location. This notification shall include the address of the new business unit or location, phone number, fax number, Federal health care provider number and/or supplier number (if applicable), and the name and address of the contractor that issued such number (if applicable). Each new business unit or location and all Covered Persons at each new business unit or location shall be subject to the applicable requirements of this CIA.

C. Sale of Unit or Location. In the event that, after the Effective Date, Spectranetics proposes to sell any or all of its business units or locations that are subject to this CIA, Spectranetics shall notify OIG of the proposed sale at least 30 days prior to the sale of such business unit or location. This notification shall include a description of the business unit or location to be sold, a brief description of the terms of the sale, and the name and contact information of the prospective purchaser. This CIA shall be binding on the purchaser of such business unit or location, unless otherwise determined and agreed to in writing by the OIG.

Spectranetics Corporate Integrity Agreement

21

Powered by Morningstar® Document Research℠

## V. **IMPLEMENTATION AND ANNUAL REPORTS**

A. <u>Implementation Report</u>. Within 150 days after the Effective Date, Spectranetics shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA (Implementation Report). The Implementation Report shall, at a minimum, include:

1. the name, address, phone number, and position description of the Chief Compliance Officer required by Section III.A.1, and a summary of other noncompliance job responsibilities the Chief Compliance Officer may have;

2. the names and positions of the members of the Compliance Committee required by Section III.A.2;

3. the names of the members Spectranetics' Board of Directors referenced in Section III.A.3;

4. a copy of Spectranetics' Code of Conduct required by Section III.B.1;

5. a copy of all Policies and Procedures required by Section III.B.2;

6. the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be available to OIG, upon request);

7. the following information regarding each type of training required by Section III.C:

a. a description of such training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions; and

b. the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions.

Spectranetics Corporate Integrity Agreement

22

Powered by Morningstar® Document Research℠

A copy of all training materials and the documentation supporting this information shall be available to OIG, upon request.

8. a description of the Disclosure Program required by Section III.E;

9. the following information regarding the IRO(s): (a) identity, address, and phone number; (b) a copy of the engagement letter; and (c) a summary and description of any and all current and prior engagements and agreements between Spectranetics and the IRO;

10. a certification from the IRO regarding its professional independence and objectivity with respect to Spectranetics;

11. a description of the process by which Spectranetics fulfills the requirements of Section III.F regarding Ineligible Persons;

12. the name, title, and responsibilities of any person who is determined to be an Ineligible Person under Section III.F; the actions taken in response to the screening and removal obligations set forth in Section III.F;

13. a list of all of Spectranetics' locations (including locations and mailing addresses) at which it performs Promotional and Product Services Related Functions, Reporting Related Functions, and Clinical Investigation Related Functions; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Federal health care provider number and/or supplier number(s) (if applicable); and the name and address of each Federal health care program contractor to which Spectranetics currently submits claims (if applicable);

14. a description of Spectranetics' corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business; and

15. the certifications required by Section V.C.

Spectranetics Corporate Integrity Agreement

23

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

B. <u>Annual Reports</u>. Spectranetics shall submit to OIG annually a report with respect to the status of, and findings regarding, Spectranetics' compliance activities for each of the five Reporting Periods (Annual Report).

Each Annual Report shall include, at a minimum:

1. any change in the identity, position description, or other noncompliance job responsibilities of the Chief Compliance Officer and any change in the membership of the Compliance Committee, or the membership of the Board of Directors described in Section III.A;

2. a copy of the Board's resolution described in Section III.A.3.b;

3. a summary of any significant changes or amendments to the Policies and Procedures required by Section III.B and the reasons for such changes (<u>e.g.</u>, change in applicable requirements);

4. the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be available to OIG, upon request);

5. the following information regarding each type of training required by Section III.C:

a. a description of such training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions; and

b. the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions.

A copy of all training materials and the documentation supporting this information shall be available to OIG, upon request.

6. a complete copy of all reports prepared pursuant to Section III.D, along with a copy of the IRO's engagement letter (if applicable);

Spectranetics Corporate Integrity Agreement

24

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

7. Spectranetics' response and corrective action plan(s) related to any issues raised by the reports prepared pursuant to Section III.D;

8. a summary and description of any and all current and prior engagements and agreements between Spectranetics and the IRO, if different from what was submitted as part of the Implementation Report;

9. a certification from the IRO regarding its professional independence and objectivity with respect to Spectranetics;

10. a summary of Reportable Events (as defined in Section III.H) identified during the Reporting Period and the status of any corrective and preventative action relating to all such Reportable Events;

11. a summary of the disclosures in the disclosure log required by Section III.E that relate to Federal health care programs;

12. any changes to the process by which Spectranetics fulfills the requirements of Section III.F regarding Ineligible Persons;

13. the name, title, and responsibilities of any person who is determined to be an Ineligible Person under Section III.F;

14. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.G. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

15. a summary describing any written communication with the FDA required to have been reported pursuant to Section III.I. This summary shall include a description of the matter and the status of the matter;

16. a description of all changes to the most recently provided list of Spectranetics' locations (including addresses) as required by Section V.A.14; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Federal health care program provider number(s) and/or supplier number(s); and the name and address of each Federal health care program contractor to which Spectranetics currently submits claims; and

17. the certifications required by Section V.C.

Spectranetics Corporate Integrity Agreement

25

Powered by Morningstar® Document Research℠

The first Annual Report shall be received by OIG no later than 60 days after the end of the first Reporting Period. Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

C. <u>Certifications</u>. The Implementation Report and Annual Reports shall include a certification by the Chief Compliance Officer that:

1. to the best of his or her knowledge, except as otherwise described in the applicable report, Spectranetics is in compliance with Federal health care program and FDA requirements and all of the requirements of this CIA;

2. he or she has reviewed the Report and has made reasonable inquiry regarding its content and believes that the information in the Report is accurate and truthful; and

3. to the best of his or her knowledge, Spectranetics has complied with its obligations under the Settlement Agreement: (a) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such denials of claims; (b) not to charge to or otherwise seek payment from federal or state payors for unallowable costs (as defined in the Settlement Agreement); and (c) to identify and adjust any past charges or claims for unallowable costs; and

4. Spectranetics': 1) Policies and Procedures as referenced in Section III.B.2 above; 2) templates for standardized contracts and other similar documents related to Promotional and Product Services Related Functions and Clinical Investigation Related Functions; and 3) training materials used for purposes of Section III.C all have been reviewed by competent legal counsel and/or legal personnel working at Spectranetics and have been found to be in compliance with all applicable Federal health care program and FDA requirements. In addition, Spectranetics' promotional material containing claims or information about Spectranetics products and other materials and information to be distributed outside of Spectranetics have been reviewed by competent regulatory, medical, and/or legal personnel to ensure that legal, medical, and regulatory concerns are properly addressed and are elevated when appropriate and to ensure that the materials and information when finally approved are in compliance with all applicable Federal health care program and FDA requirements. If the applicable legal requirements have not changed, after the initial review of the documents listed above, only material changes to the documents must be reviewed by competent regulatory, medical, and/or legal personnel. The certification shall include a description of the documents reviewed and approximately when the review was completed. The documentation supporting this certification shall be available to the OIG upon request.

Spectranetics Corporate Integrity Agreement

26

D. Designation of Information. Spectranetics shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Spectranetics shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI. NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

OIG:

> Administrative and Civil Remedies Branch
> Office of Counsel to the Inspector General
> Office of Inspector General
> U.S. Department of Health and Human Services
> Cohen Building, Room 5527
> 330 Independence Avenue, S.W.
> Washington, DC 20201
> Telephone: 202.619.2078
> Facsimile: 202.205.0604

Spectranetics:

> Michael K. Handley
> Chief Compliance Officer
> Vice President, Global Regulatory Affairs
> Spectranetics Corporation
> 9965 Federal Drive
> Colorado Springs, CO 80921
> Email: michael.handley@spnc.com
> Phone: 719.447.2318
> Fax: 719.447.2070

Spectranetics Corporate Integrity Agreement

27

Powered by Morningstar® Document Research℠

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received. For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt. Upon request by OIG, Spectranetics may be required to provide OIG with an electronic copy of each notification or report required by this CIA in searchable portable document format (pdf), either instead of or in addition to, a paper copy.

## VII. OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of Spectranetics' books, records, and other documents and supporting materials and/or conduct on-site reviews of any of Spectranetics' locations for the purpose of verifying and evaluating: (a) Spectranetics' compliance with the terms of this CIA; and (b) Spectranetics' compliance with the requirements of the Federal health care programs in which it participates and with all applicable FDA requirements. The documentation described above shall be made available by Spectranetics to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of Spectranetics' employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. Spectranetics shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. Spectranetics' employees may elect to be interviewed with or without a representative of Spectranetics present.

Spectranetics Corporate Integrity Agreement

28

Powered by Morningstar® Document Research℠

## VIII. DOCUMENT AND RECORD RETENTION

Spectranetics shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs, or to compliance with this CIA, for six years (or longer if otherwise required by law) from the Effective Date.

## IX. DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify Spectranetics prior to any release by OIG of information submitted by Spectranetics pursuant to its obligations under this CIA and identified upon submission by Spectranetics as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, Spectranetics shall have the rights set forth at 45 C.F.R. § 5.65(d).

## X. BREACH AND DEFAULT PROVISIONS

Spectranetics is expected to fully and timely comply with all of its CIA obligations.

A. <u>Stipulated Penalties for Failure to Comply with Certain Obligations</u>. As a contractual remedy, Spectranetics and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

Spectranetics Corporate Integrity Agreement

29

Powered by Morningstar® Document Research℠

1. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Spectranetics fails to establish and implement any of the following obligations as described in Section III:

a. a Chief Compliance Officer;

b. a Compliance Committee;

c. a resolution from the Board of Directors;

d. a written Code of Conduct;

e. written Policies and Procedures;

f. the training of Covered Persons and Relevant Covered Persons;

g. a Disclosure Program;

h. Ineligible Persons screening and removal requirements;

i. notification of Government investigations or legal proceedings;

j. notification of written communications with FDA as required by Section III.I; and

k. reporting of Reportable Events.

2. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Spectranetics fails to engage an IRO, as required in Section III.D and Appendix A.

3. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Spectranetics fails to submit the Implementation Report or any Annual Reports to OIG in accordance with the requirements of Section V by the deadlines for submission.

4. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Spectranetics fails to submit the IRO Review Reports in accordance with the requirements of Section III.D and Appendix B.

Spectranetics Corporate Integrity Agreement

30

Powered by Morningstar® Document Research℠

5. A Stipulated Penalty of $2,000 (which shall begin to accrue on the date the failure to comply began) for each day Spectranetics employs or contracts with an Ineligible Person and that person: (i) has responsibility for, or involvement with, Spectranetics' business operations related to the Federal health care programs; or (ii) is in a position for which the person=s salary or the items or services rendered, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds (the Stipulated Penalty described in this paragraph shall not be demanded for any time period during which Spectranetics can demonstrate that it did not discover the person=s exclusion or other ineligibility after making a reasonable inquiry (as described in section III.F) as to the status of the person).

6. A Stipulated Penalty of $1,500 for each day Spectranetics fails to grant access as required in Section VII. (This Stipulated Penalty shall begin to accrue on the date Spectranetics fails to grant access.)

7. A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of Spectranetics as part of its Implementation Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

8. A Stipulated Penalty of $1,000 for each day Spectranetics fails to comply fully and adequately with any obligation of this CIA. OIG shall provide notice to Spectranetics stating the specific grounds for its determination that Spectranetics has failed to comply fully and adequately with the CIA obligation(s) at issue and steps Spectranetics shall take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after Spectranetics receives this notice from OIG of the failure to comply.) A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1-7 of this Section.

B. Timely Written Requests for Extensions. Spectranetics may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after Spectranetics fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three business days after Spectranetics receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

Spectranetics Corporate Integrity Agreement

31

C. <u>Payment of Stipulated Penalties</u>.

1. *Demand Letter*. Upon a finding that Spectranetics has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify Spectranetics of: (a) Spectranetics' failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties (this notification is referred to as the "Demand Letter").

2. *Response to Demand Letter*. Within 10 days after the receipt of the Demand Letter, Spectranetics shall either: (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E. In the event Spectranetics elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until Spectranetics cures, to OIG's satisfaction, the alleged breach in dispute. Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

3. *Form of Payment*. Payment of the Stipulated Penalties shall be made by electronic funds transfer to an account specified by OIG in the Demand Letter.

4. *Independence from Material Breach Determination*. Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that Spectranetics has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

Spectranetics Corporate Integrity Agreement

32

Powered by Morningstar® Document Research℠

D. Exclusion for Material Breach of this CIA.

1. *Definition of Material Breach*. A material breach of this CIA means:

a. a failure by Spectranetics to report a Reportable Event, and take corrective action as required in Section III.H;

b. a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

c. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C;

d. a failure to engage and use an IRO in accordance with Section III.D; or

e. a failure of the Board to issue a resolution in accordance with Section III.A.3.

2. *Notice of Material Breach and Intent to Exclude*. The parties agree that a material breach of this CIA by Spectranetics constitutes an independent basis for Spectranetics' exclusion from participation in the Federal health care programs. Upon a determination by OIG that Spectranetics has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify Spectranetics of: (a) Spectranetics' material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion (this notification is hereinafter referred to as the "Notice of Material Breach and Intent to Exclude").

3. *Opportunity to Cure*. Spectranetics shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

a. Spectranetics is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;

b. the alleged material breach has been cured; or

c. the alleged material breach cannot be cured within the 30-day period, but that: (i) Spectranetics has begun to take action to cure the material breach; (ii) Spectranetics is pursuing such action with due diligence; and (iii) Spectranetics has provided to OIG a reasonable timetable for curing the material breach.

Spectranetics Corporate Integrity Agreement

33

4. *Exclusion Letter*. If, at the conclusion of the 30-day period, Spectranetics fails to satisfy the requirements of Section X.D.3, OIG may exclude Spectranetics from participation in the Federal health care programs. OIG shall notify Spectranetics in writing of its determination to exclude Spectranetics (this letter shall be referred to hereinafter as the "Exclusion Letter"). Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of Spectranetics' receipt of the Exclusion Letter. The exclusion shall have national effect and shall also apply to all other Federal procurement and nonprocurement programs. Reinstatement to program participation is not automatic. After the end of the period of exclusion, Spectranetics may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

E. Dispute Resolution

1. *Review Rights*. Upon OIG's delivery to Spectranetics of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, Spectranetics shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42 C.F.R. § 1005.2-1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 days after receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after receipt of the Exclusion Letter.

2. *Stipulated Penalties Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether Spectranetics was in full and timely compliance with the obligations of this CIA for which OIG demands payment; and (b) the period of noncompliance. Spectranetics shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any. OIG shall not have the right to appeal to the DAB an adverse ALJ decision related to Stipulated Penalties. If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders Spectranetics to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless Spectranetics requests review of the ALJ decision by the DAB. If the ALJ decision is properly appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

Spectranetics Corporate Integrity Agreement

34

3. *Exclusion Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

    a. whether Spectranetics was in material breach of this CIA;

    b. whether such breach was continuing on the date of the Exclusion Letter; and

    c. whether the alleged material breach could not have been cured within the 30-day period, but that:
(i) Spectranetics had begun to take action to cure the material breach within that period; (ii) Spectranetics has pursued and is pursuing such action with due diligence; and (iii) Spectranetics provided to OIG within that period a reasonable timetable for curing the material breach and Spectranetics has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for Spectranetics, only after a DAB decision in favor of OIG. Spectranetics' election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude Spectranetics upon the issuance of an ALJ's decision in favor of OIG. If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that Spectranetics may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. Spectranetics shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of Spectranetics, Spectranetics shall be reinstated effective on the date of the original exclusion.

4. *Finality of Decision*. The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

Spectranetics Corporate Integrity Agreement

Source: SPECTRANETICS CORP, 8-K, December 29, 2009    Powered by Morningstar® Document Research℠

## XI. EFFECTIVE AND BINDING AGREEMENT

Spectranetics and OIG agree as follows:

A. This CIA shall be binding on the successors, assigns, and transferees of Spectranetics;

B. This CIA shall become final and binding on the date the final signature is obtained on the CIA;

C. This CIA constitutes the complete agreement between the parties and may not be amended except by written consent of the parties to this CIA;

D. OIG may agree to a suspension of Spectranetics' obligations under the CIA in the event of Spectranetics' cessation of participation in Federal health care programs. If Spectranetics ceases participating in Federal health care programs and is relieved of its CIA obligations by OIG, Spectranetics shall notify OIG at least 30 days in advance of Spectranetics' intent to resume participating as a provider or supplier with any Federal health care program. Upon receipt of such notification, OIG shall evaluate whether the CIA should be reactivated or modified.

E. The undersigned Spectranetics signatories represent and warrant that they are authorized to execute this CIA. The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

F. This CIA may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same CIA. Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this CIA.

Spectranetics Corporate Integrity Agreement

36

Powered by Morningstar® Document Research℠

**ON BEHALF OF THE SPECTRANETICS CORPORATION**

By:    /s/ Emile Geisenheimer                           Dated: 12/18/2009
       EMILE GEISENHEIMER
       Chief Executive Officer
       Spectranetics Corporation

By:    /s/ Roger Wertheimer                             Dated: 12/18/2009
       ROGER WERTHEIMER
       Spectranetics Corporation
       Vice President, General Counsel & Secretary
       Vice President, Human Resources

By:    /s/ Michael C. Theis                             Dated: 12/18/2009
       PETER S. SPIVACK
       MICHAEL C. THEIS
       Hogan & Hartson LLP
       Counsel for the Spectranetics Corporation

Spectranetics Corporate Integrity Agreement

37

**ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

/s/ Gregory E. Demske                                    12/22/09
GREGORY E. DEMSKE                                    DATE
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human Services

Spectranetics Corporate Integrity Agreement

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

## APPENDIX A

### INDEPENDENT REVIEW ORGANIZATION

*This Appendix contains the requirements relating to the Independent Review Organization (IRO) required by Section III.D of the CIA.*

A. <u>IRO Engagement</u>

Spectranetics shall engage an IRO that possesses the qualifications set forth in Paragraph B, below, to perform the responsibilities in Paragraph C, below. The IRO shall conduct the review in a professionally independent and objective fashion, as set forth in Paragraph D. Within 30 days after OIG receives written notice of the identity of the selected IRO, OIG will notify Spectranetics if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Spectranetics may continue to engage the IRO.

If Spectranetics engages a new IRO during the term of the CIA, this IRO shall also meet the requirements of this Appendix. If a new IRO is engaged, Spectranetics shall submit the information identified in Section V.A.9 of the CIA to OIG within 30 days of engagement of the IRO. Within 30 days after OIG receives written notice of the identity of the selected IRO, OIG will notify Spectranetics if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Spectranetics may continue to engage the IRO.

B. <u>IRO Qualifications</u>.

The IRO shall:

1. assign individuals to conduct the IRO Reviews who have expertise in all applicable Federal health care program and FDA requirements relating to Promotional and Product Services Related Functions, Clinical Investigation Related Functions, and Reporting Related Functions. The assigned individuals shall also be knowledgeable about the general requirements of the Federal health care program(s) under which Spectranetics products are reimbursed;

*2. assign individuals to design and select the samples for the Transaction Reviews who are knowledgeable about the appropriate statistical sampling techniques; and*

3. have sufficient staff and resources to conduct the reviews required by the CIA on a timely basis.

Spectranetics Corporate Integrity Agreement

39

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

C. IRO Responsibilities.

The IRO shall:

    1. perform each component of the IRO Review in accordance with the specific requirements of the CIA;

    ***2. follow all applicable Federal health care program and FDA requirements in making assessments in each IRO Review;***

    3. if in doubt of the application of a particular Federal health care program or FDA requirement, policy, or regulation, request clarification from the appropriate authority (e.g., CMS or FDA);

    4. respond to all OIG inquires in a prompt, objective, and factual manner; and

    ***5. prepare timely, clear, well-written reports that include all the information required by Appendix B to the CIA.***

D. IRO Independence and Objectivity.

    The IRO must perform the IRO Reviews in a professionally independent and objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or engagements that may exist between the IRO and Spectranetics.

E. IRO Removal/Termination.

    1. *Spectranetics Termination of IRO*. If Spectranetics terminates its IRO during the course of the engagement, Spectranetics must submit a notice explaining its reasons to OIG no later than 30 days after termination. Spectranetics must engage a new IRO in accordance with Paragraph A of this Appendix.

    2. *OIG Removal of IRO*. In the event OIG has reason to believe that the IRO does not possess the qualifications described in Paragraph B, is not independent and/or objective as set forth in Paragraph D, or has failed to carry out its responsibilities as described in Paragraph C, OIG may, at its sole discretion, require Spectranetics to engage a new IRO in accordance with Paragraph A of this Appendix.

Spectranetics Corporate Integrity Agreement

Source: SPECTRANETICS CORP, 8-K, December 29, 2009        Powered by Morningstar® Document Research℠

Prior to requiring Spectranetics to engage a new IRO, OIG shall notify Spectranetics of its intent to do so and provide a written explanation of why OIG believes such a step is necessary. To resolve any concerns raised by OIG, Spectranetics may request a meeting with OIG to discuss any aspect of the IRO's qualifications, independence or performance of its responsibilities and to present additional information regarding these matters. Spectranetics shall provide any additional information as may be requested by OIG under this Paragraph in an expedited manner. OIG will attempt in good faith to resolve any differences regarding the IRO with Spectranetics prior to requiring Spectranetics to terminate the IRO. However, the final determination as to whether or not to require Spectranetics to engage a new IRO shall be made at the sole discretion of OIG.

Spectranetics Corporate Integrity Agreement

41

Powered by Morningstar® Document Research℠

**Appendix B to CIA**

I. General Description

    As specified more fully below, Spectranetics shall retain an Independent Review Organization (IRO) to perform reviews to assist Spectranetics in assessing and evaluating its systems, processes, policies, procedures, and practices related to Spectranetics's Clinical Investigation Related Functions, Reporting Related Functions, and Promotional and Product Services Related Functions (IRO Review). The IRO Review shall consist of two components — a systems review (Systems Review), and a transactions review (Transactions Review) as described more fully below. Spectranetics may engage, at its discretion, a single IRO to perform both components of the IRO Review provided that the entity has the necessary expertise and capabilities to perform both.

    If there are no material changes in Spectranetics's systems, processes, policies, and procedures relating to Clinical Investigations, Reporting, and Promotional and Product Services Related Functions, the IRO shall perform the Systems Review for the first and fourth Reporting Periods. If Spectranetics materially changes its systems, processes, policies, and procedures relating to Clinical Investigation Related Functions, Reporting Related Functions, and Promotional and/or Product Services Related Functions, the IRO shall perform a Systems Review for the materially changed Related Function for the Reporting Period(s) in which such changes were made in addition to conducting the Review for the first and fourth Reporting Periods. The additional Systems Review(s) shall consist of: 1) an identification of the material changes; 2) an assessment of whether other systems, processes, policies, and procedures previously reported did not materially change; and 3) a review of the systems, processes, policies, and procedures that materially changed. The IRO shall conduct the Transactions Review for each Reporting Period of the CIA.

II. Systems Review

    A. Description of Reviewed Policies and Procedures

    The Systems Review shall be a review of Spectranetics's systems, processes, policies, and procedures (including the controls on those systems, processes, policies, and procedures) relating to certain Clinical Investigation Related Functions, Reporting Related Functions, and Promotional and Product Services Related Functions. Where practical, Spectranetics personnel may compile documentation, schedule and organize interviews, and undertake other efforts to assist the IRO in performing the Systems Review. The IRO is not required to undertake a de novo review of the information gathered or activities undertaken by Spectranetics pursuant to the preceding sentence.

Spectranetics Corporate Integrity Agreement

Source: SPECTRANETICS CORP, 8-K, December 29, 2009          Powered by Morningstar® Document Research℠

Specifically, the IRO shall review certain of Spectranetics's systems, processes, policies, and procedures associated with the following (hereafter "Reviewed Policies and Procedures").

1. The IRO shall review Spectranetics's systems, policies, processes, and procedures applicable to Promotional and Product Services Related Functions:

    a. Spectranetics's systems, policies, processes, and procedures applicable to the manner in which Spectranetics sales representatives and account executives handle and submit requests or inquiries about the off-label uses of Spectranetics's products to Spectranetics's Medical Services Department;

    b. the manner in which Spectranetics's Medical Services Department handles and responds to requests and inquiries regarding off-label uses of Spectranetics's products (including tracking the requests and using pre-approved materials for purposes of responding to the request);

    c. the form and content of information and materials Spectranetics provides to physicians, pharmacists, or other health care professionals (collectively "HCPs") or health care institutions (HCIs) regarding off-label uses of Spectranetics's products;

    d. Spectranetics's systems, policies, processes, and procedures, including those associated with Spectranetics's Promotional and Advertising Committee (PARC), relating to Spectranetics's internal review of information and materials regarding Spectranetics's products that Spectranetics disseminates to HCPs or HCIs;

    e. Spectranetics's systems, processes, policies, and procedures relating to the development and review of call plans for Spectranetics's products. This shall include a review of the bases upon which HCPs and HCIs belonging to specified medical specialties or types of practice are included in, or excluded from, the call plans based on expected utilization of Spectranetics products for FDA-approved uses or non-FDA-approved uses;

    f. the processes and procedures by which Spectranetics's Compliance Office and Spectranetics Medical Services Department monitor and identify situations in which it appears that improper off-label promotion may have occurred; and

    g. Spectranetics's systems, processes, policies, and procedures for investigating, documenting, resolving, and taking appropriate disciplinary action for potential situations involving off-label promotion.

Spectranetics Corporate Integrity Agreement

43

Powered by Morningstar® Document Research℠

2. The IRO shall review Spectranetics's systems, policies, processes, and procedures applicable to Clinical Investigation Related Functions:

   a. Spectranetics's systems, policies, processes, and procedures for ensuring that Spectrenetics does not introduce or cause to be introduced into interstate commerce devices prior to complying with one of the methods of FDA authorization: (1) an FDA-approved pre-market approval application, under 21 U.S.C. § 360e(a)(2) and 21 C.F.R. Part 814; (2) a "510(k) clearance" by FDA for marketing because it is found to be substantially equivalent to an appropriate, legally marketed device, under 21 U.S.C. §§ 360c(a)(1) and 360(k) and 21 C.F.R. Part 807 — Subpart E; (3) an investigational device exemption under 21 U.S.C. § 360j(g), for the use of a device on humans on an experimental basis; or (4) an exemption for certain devices as set forth in 21 U.S.C. § 360(l);

   b. Spectranetics's systems, processes, policies, and procedures to identify or evaluate when the use of a Spectranetics device, including use of a Spectranetics device in connection with a patient registry, is a clinical investigation;

   c. Spectranetics's systems, processes, policies, and procedures to provide for the protection of human subjects, including obtaining informed consent, as provided in 21 C.F.R. Part 50 and 56 and in 45 C.F.R. Part 45;

   d. Spectranetics's systems, processes, policies, and procedures for clinical investigations site audits;

   e. Spectranetics's processes, policies, and procedures regarding disclosure of financial interests of clinical investigators, as required by 21 C.F.R. Part 54, for studies using Spectranetics's products;

   f. Spectranetics's systems, processes, policies, and procedures for complying with reporting obligations provided in 21 C.F.R. § 812.150 for devices with an approved investigational device exception.

   g. the processes and procedures by which Spectranetics's Compliance Office identifies situations in which it appears that non-compliance occurred with regard to the requirements for, or Spectranetics's policies and procedures relating to Clinical Investigations Related Functions; and

   h. Spectranetics's processes, policies, and procedures for investigating, documenting, resolving, and taking appropriate disciplinary action for situations potentially involving non-compliant Clinical Investigations Related Functions.

Spectranetics Corporate Integrity Agreement

44

Powered by Morningstar® Document Research℠

3. The IRO shall review Spectranetics's systems, policies, processes, and procedures applicable to Reporting Related Functions:

    a. Spectranetics's processes, policies, and procedures for reporting adverse events, including processes to ensure compliance with MDR regulations at 21 C.F.R. Part 803;

    b. Spectranetics's processes, policies, and procedures relating to reporting obligations as provided in 21 C.F.R. § 814.84, including submission of summaries and bibliographies of information not submitted as part of a pre-market application, for devices with FDA premarket approval under 21 U.S.C. § 360(e)(2),

    c. the processes and procedures by which Spectranetics's Compliance Office monitors and identifies situations in which it appears that Spectranetics has failed to comply with FDA Reporting Related requirements and/or Spectranetics's own Reporting Related policies and procedures; and

    d. Spectranetics's processes, policies, and procedures for investigating, documenting, resolving, and taking appropriate disciplinary action for failure to comply with Reporting Related requirements and/or Spectranetics's own Reporting Related policies and procedures.

B. Systems Review Report.

***The IRO shall prepare a report based upon each Systems Review. For each of the Reviewed Policies and Procedures identified in Section II.A above, the report shall include the following items:***

    1. a description of the documentation (including policies) reviewed and any personnel interviewed;

Spectranetics Corporate Integrity Agreement

45

Source: SPECTRANETICS CORP, 8-K, December 29, 2009

Powered by Morningstar® Document Research℠

2.  a detailed description of Spectranetics's systems, policies, processes, and procedures relating to the items identified in Sections II.A.1-3 above, including a general description of Spectranetics's control and accountability systems (e.g., documentation and approval requirements, and tracking mechanisms) and written policies regarding the Reviewed Policies and Procedures;

3.  a description of the manner in which the control and accountability systems and the written policies relating to the items identified in Sections II.A.1-3 above are made known or disseminated within Spectranetics;

4.  a detailed description of any system(s) used to track and respond to requests and inquiries regarding off-label uses of Spectranetics products;

5.  findings and supporting rationale regarding any weaknesses in Spectranetics's systems, processes, policies, and procedures relating to the Reviewed Policies and Procedures, if any; and

6.  recommendations to improve any of the systems, policies, processes, or procedures relating to the Reviewed Policies and Procedures, if any.

III. Transactions Review

As described more fully below in Sections III.A-E, the Transactions Review shall be based upon a review of a sample of documents, including patient records and other documents relating to patients participating in clinical investigations or clinical registries involving Spectranetics products. The IRO shall report on all aspects of the Transactions Review in the Transactions Review Reports.

A. Definitions.

1.  Sampling Unit: A patient participating in a Clinical Investigation or clinical registry using a Spectranetics product conducted inside the United States.

2.  Population: All patients participating in a Clinical Investigation or clinical registry using a Spectranetics product conducted inside the United States during the reporting period.

3.  Error: Sampled patients whose medical record and associated documents is missing documentation described in the methodology in Section III.C, below, or for whom there in an adverse finding for Inquiries III.C.3-7 below.

Spectranetics Corporate Integrity Agreement

46

B.  Sample: The IRO shall randomly select 40 patients from all patients participating in a Clinical Investigation or clinical registry using a Spectranetics product conducted inside the United States during the reporting period. The IRO shall conduct the review based on supporting documentation in Spectranetics' possession and copies of supporting documentation and patient records obtained from Spectranetics Clinical Investigation and clinical registry sites.

C.  Methodology: For each Sampling Unit, the IRO shall review the documentation and evaluate or identify the following ("Inquiries"):

1.  Identify the legal authority under which the Spectranetics may distribute, or cause the distribution of, the device used in the Clinical Investigation or Registry;

2.  After evaluating the purpose of the study, whether the study was a Clinical Investigation;

3.  Whether the patient was clinically eligible for inclusion in the Clinical Investigation or Registry;

4.  If applicable, whether Institutional Review Board approval was obtained for the study;

5.  Whether patient's informed consent was obtained;

6.  If an adverse event occurred, whether it was appropriately reported within Spectranetics; and

7.  If an adverse event occurred, whether it was appropriately reported to the FDA under the appropriate reporting requirements at 21 C.F.R. Part 803 or 21 C.F.R. § 812.150.

D.  Other Requirements.

1.  Replacement Sampling. Replacement sampling is not permitted for Sampling Units with missing documentation.

2.  Use of First Samples Drawn. Sampling Units selected in each first sample shall be used (i.e., it is not permissible to generate more than one list of random samples and then select one for use).

Spectranetics Corporate Integrity Agreement

47

E.  Transaction Review Report. For each Reporting Period, the IRO shall prepare a report based on its Transactions Review. The report shall include the following:

1.  General Elements to Be Included in Report

   a.  Review Objectives: A clear statement of the objective intended to be achieved by the review;

   b.  Population: A description of the Population;

   c.  Review Protocol: A detailed narrative description of the procedures performed and a description of the Sampling Unit and universe utilized in performing the procedures for each Sample Unit reviewed; and

   d.  Sources of Data: A full description of documentation and other information, if applicable, relied upon by the IRO in performing the Transactions Review.

2.  Statistical Sampling Documentation.

   a.  The number of Sampling Units in the sample;

   b.  The number of Sampling Units for which an Error was identified and an explanation of the Error;

   c.  A copy of the printout of the random numbers generated by the "Random Numbers" function of the statistical sampling software used by the IRO, including the seed number; and

   d.  A description or identification of the statistical sampling software package used to select the sample.

Spectranetics Corporate Integrity Agreement

48

Powered by Morningstar® Document Research℠

3.  Results to be Included in Report. The following results shall be included in each Promotional and Product Services Review Report:

    a.  A narrative explanation of the IRO's findings and supporting rationale (including reasons for Errors and patterns noted, etc.) based on the Inquiries conducted as part of the Transactions Review.

    b.  A narrative explanation of the IRO's findings and supporting rationale regarding any weaknesses in Spectranetics's systems, processes, policies, procedures, and practices relating to the Inquiries, if any;

    c.  recommendations for improvement in Spectranetics's systems, processes, policies, procedures, and practices relating to the Inquiries; and

    d.  a spreadsheet identifying by Sampling Unit the results of each Inquiry.

4.  Credentials. The names and credentials of the individuals who: (a) designed the statistical sampling procedure for the Transactions Review and (b) performed the Transactions Review.

Spectranetics Corporate Integrity Agreement

Created by Morningstar® Document Research℠
http://documentresearch.morningstar.com

Source: SPECTRANETICS CORP, 8-K, December 29, 2009                    Powered by Morningstar® Document Research℠

**Exhibit D**

## CERTIFICATION

I, George Martini, as Controller of Genesee County and Plan Administrator of the Genesee County Employees' Retirement System ("Genesee"), hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of Genesee. I have reviewed a complaint prepared against Spectranetics Corporation ("Spectranetics") alleging violations of the federal securities laws and I authorized the filing of this complaint;

2. Genesee did not purchase Spectranetics at the direction of counsel or in order to participate in any private action under the federal securities laws;

3. Genesee is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4. Genesee's transactions in Spectranetics during the class period are reflected in Exhibit A, attached hereto;

5. Genesee has not sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years preceding the date of this certification, except for the following:

*HCL Partners Limited Partnership v. Leap Wireless International, Inc. et al*
Civil Action No. 3:07-cv-02245-BTM-NLS (S.D. Cal.) – (Withdrew)

*Manson v. Schering-Plough Corporation et al*
Civil Action No. 2:08-cv-00397-DMC-MF (D.N.J.) – (Withdrew)

*City of Ann Arbor Employees' Retirement System v. MoneyGram International, Inc. et al*
Civil Action No. 0:08-cv-00883-DSD-JJG (D. Minn.) – (Not Appointed)

*In Re Cbeyond, Inc. Securities Litigation*
Civil Action No. 1:08-cv-01666-CC (N.D. Ga.) – (Appointed)

6.    Beyond its pro rata share of any recovery, Genesee will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24th day of September, 2008.

George Martini
Controller
*Genesee County Employees' Retirement System*

EXHIBIT A

## TRANSACTIONS IN
## SPECTRANETICS CORPORATION

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/ Proceeds |
|---|---|---|---|---|
| Purchase | 04/19/07 | 317.00 | $ 11.00 | ($3,501.90) |
| Purchase | 04/19/07 | 953.00 | $ 11.00 | ($10,527.79) |
| Purchase | 04/20/07 | 143.00 | $ 11.05 | ($1,587.30) |
| Purchase | 04/23/07 | 4,499.00 | $ 11.01 | ($49,773.34) |
| Purchase | 04/23/07 | 1,499.00 | $ 11.01 | ($16,583.74) |
| Purchase | 04/24/07 | 100.00 | $ 10.69 | ($1,073.80) |
| Purchase | 04/24/07 | 1,487.00 | $ 10.69 | ($15,967.41) |
| Purchase | 04/25/07 | 538.00 | $ 10.59 | ($5,726.20) |
| Purchase | 04/25/07 | 100.00 | $ 10.59 | ($1,064.35) |
| Purchase | 04/26/07 | 105.00 | $ 10.35 | ($1,092.20) |
| Purchase | 04/26/07 | 315.00 | $ 10.35 | ($3,276.60) |
| Purchase | 04/27/07 | 401.00 | $ 10.60 | ($4,270.69) |
| Purchase | 04/27/07 | 134.00 | $ 10.60 | ($1,427.11) |
| Purchase | 05/02/07 | 314.00 | $ 10.09 | ($3,176.11) |
| Purchase | 05/03/07 | 330.00 | $ 10.05 | ($3,332.87) |
| Purchase | 05/04/07 | 710.00 | $ 10.04 | ($7,162.34) |
| Purchase | 05/04/07 | 236.00 | $ 10.04 | ($2,380.72) |
| Purchase | 05/08/07 | 310.00 | $ 10.05 | ($3,130.04) |
| Purchase | 06/20/07 | 1,937.00 | $ 10.96 | ($21,320.37) |
| Purchase | 06/20/07 | 646.00 | $ 10.96 | ($7,110.46) |
| Purchase | 07/02/07 | 2,175.00 | $ 12.22 | ($26,689.86) |
| Purchase | 07/02/07 | 725.00 | $ 12.22 | ($8,896.62) |
| Purchase | 02/28/08 | 3,900.00 | $ 9.40 | ($36,853.83) |
| Purchase | 02/28/08 | 1,300.00 | $ 9.40 | ($12,284.61) |
| Sale | 05/21/08 | -1,400.00 | $ 10.30 | $14,395.13 |

**EXHIBIT E**

## SWORN CERTIFICATION OF RICHARD NOELKE
## DEPUTY DIRECTOR OF WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM

I, Richard Noelke, as Deputy Director of the Wayne County Employees' Retirement System ("Wayne ERS"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Wayne ERS.

2.      On behalf of Wayne ERS, I have reviewed a complaint filed against The Spectranetics Corporation ("Spectranetics") and others alleging violations of the federal securities laws.

3.      Wayne ERS did not purchase or otherwise acquire any security that is the subject of this action at the direction of counsel or in order to participate in this private action or other litigation arising under the federal securities laws.

4.      Wayne ERS is willing to serve as a lead plaintiff in this matter and a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and has authorized counsel to file a Motion seeking lead plaintiff status.

5.      Wayne ERS's transactions in Spectranetics securities that are the subject of this action, as reported by the Wayne ERS custodian, are set forth in the chart attached hereto as Exhibit A.

6.      Wayne ERS has sought to serve or has served as a representative party on behalf of a class in the actions attached hereto as Exhibit B, filed under the federal securities laws during the 3-year period preceding the date of this Certification.

7.      Wayne ERS will not accept any payment for serving as a lead plaintiff or representative party on behalf of the class beyond its pro rata share of any recovery, except

reimbursement of reasonable costs and expenses (including lost wages) directly relating to the

representation of the class as ordered or approved by the Court.

    I, Richard Noelke, declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of _November_____, 2008.

                    Richard Noelke, Deputy Director
                    Wayne County Employees' Retirement System

EXHIBIT A

WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM

| | | | | |
|---|---|---|---|---|
| Purchase | 4,400 | $15.60 | $68,640.00 | 10/25/2007 |
| Purchase | 1,900 | $14.78 | $28,082.00 | 11/8/2008 |
| Purchase | 1,300 | $15.50 | $20,150.00 | 11/30/2007 |
| Sale | 4,000 | $5.77 | $23,062.00 | 9/5/2008 |
| Sale | 3,600 | $4.80 | $17,280.00 | 9/10/2008 |

**EXHIBIT F**

### PLAINTIFF'S CERTIFICATION

Peter J. Tortora ("Plaintiff") declares that:

1.  Plaintiff has reviewed the complaint and authorized its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.  Plaintiff's transactions in The Spectranetics Corporation securities during the Class Period are attached hereto.

5.  During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court. Plaintiff understands that this is not a claim form, and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this _t7_ day of November, 2008.

Peter J. Tortora

Brower Piven, A Professional Corporation
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
Facsimile:  410-685-1300
www.browerpiven.com

# Peter J. Tortora

## The Spectranetics Corporation Securities Litigation

### Schedule of Transactions

| Date | Type | Shares | Price |
|---|---|---|---|
| 7/1/2005 | BUY | 5134 | $6.7200 |
| 7/1/2005 | BUY | 900 | $6.7045 |
| 7/1/2005 | BUY | 400 | $6.7146 |
| 7/1/2005 | BUY | 366 | $6.6943 |
| 7/1/2005 | BUY | 100 | $6.7341 |
| 7/1/2005 | BUY | 100 | $6.6842 |
| 10/12/2005 | BUY | 1051 | $7.9091 |
| 10/12/2005 | BUY | 800 | $7.8862 |
| 10/12/2005 | BUY | 249 | $7.8989 |
| 10/12/2005 | BUY | 100 | $7.8888 |
| 10/12/2005 | BUY | 800 | $7.9634 |
| 10/12/2005 | BUY | 5000 | $7.8000 |
| 10/12/2005 | BUY | 2000 | $7.7760 |
| 11/15/2005 | BUY | 1030 | $10.1500 |
| 11/16/2005 | BUY | 970 | $10.1200 |
| 1/12/2006 | BUY | 400 | $11.2600 |
| 1/12/2006 | BUY | 200 | $11.2700 |
| 1/12/2006 | BUY | 4400 | $11.2800 |
| 1/13/2006 | BUY | 1400 | $10.9400 |
| 1/13/2006 | BUY | 1600 | $10.9500 |
| 1/26/2006 | BUY | 2000 | $10.9198 |
| 3/28/2006 | BUY | 600 | $11.2397 |
| 3/28/2006 | BUY | 200 | $11.1852 |
| 3/28/2006 | BUY | 100 | $11.1648 |
| 3/28/2006 | BUY | 100 | $11.1954 |
| 4/27/2006 | SELL | 4817 | $13.1000 |
| 4/27/2006 | SELL | 2285 | $13.1500 |
| 4/27/2006 | SELL | 1598 | $13.1200 |
| 4/27/2006 | SELL | 1100 | $13.2000 |
| 4/27/2006 | SELL | 200 | $13.1700 |
| 4/28/2006 | BUY | 5000 | $12.7290 |
| 5/2/2006 | BUY | 2000 | $13.0900 |
| 5/2/2006 | BUY | 1000 | $13.1300 |
| 5/2/2006 | BUY | 1000 | $13.0500 |
| 5/2/2006 | BUY | 1000 | $13.0198 |
| 5/15/2006 | BUY | 3000 | $12.9022 |

| 5/16/2006 | BUY | 2000 | $13.8441 |
| 5/16/2006 | BUY | 2000 | $13.4399 |
| 5/17/2006 | BUY | 1800 | $12.7000 |
| 5/17/2006 | BUY | 300 | $12.7300 |
| 5/17/2006 | BUY | 2900 | $12.7400 |
| 1/3/2008 | BUY | 3000 | $14.9696 |
| 1/3/2008 | BUY | 2000 | $14.9677 |
| 2/20/2008 | BUY | 10000 | $9.0000 |

**Exhibit G**

## United States District Court

_____ DISTRICT OF ____COLORADO_____

**In the Matter of the Search of:**
Name, address or brief description of person or property to be searched)

**THE SPECTRANETICS CORPORATION**
96 Talamine Court
Colorado Springs, CO 80907
and
9965 Federal Drive
Colorado Springs, CO 80921
more fully described in Attachment A

### APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT AND SEIZURE

**CASE NUMBER:** 08-SW-5232

I, <u>Special Agent Daniel Burke</u>, being duly sworn depose and say:

I am a <u>Special Agent - U.S. Food and Drug Administration</u>, and have reason to believe
<div align="center" style="font-size:small">Official Title</div>

that on the property known as:

See Attachment A, attached hereto and incorporated herein by reference.

in the <u>State and</u> District of <u>Colorado</u> there is now concealed certain evidence, namely

See Attachment B, attached hereto and incorporated herein by reference.

which is contraband, and evidence of the commission of a criminal offense and property designed and intended for use in committing a criminal offense concerning violations of **Title 21, United States Code, Sections 331, 545, 371, 1341 and 1343**. The facts to support a finding of Probable Cause for issuance of a Search Warrant are set forth in the attached affidavit which is continued on the attached sheet and made a part hereof:

_____
Signature of Affiant - S/A Daniel Burke
U.S. Food and Drug Administration

Sworn to before me, and subscribed in my presence

_____  at  Denver, Colorado
Date                              City and State

**KATHLEEN M. TAFOYA**
**United States Magistrate Judge**
_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT FOR SEARCH WARRANT

1.     I, Special Agent Daniel Burke, being of lawful age and duly sworn upon my oath, depose and state as follows:

## I. INTRODUCTION

2.     I am currently employed as a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations (hereafter "FDA-OCI"). I am assigned to the Kansas City Field Office which is located in Mission, Kansas. I have been a Special Agent with FDA-OCI since October 2005. Previously, I supervised criminal investigations as a Supervisory Special Agent with U.S. Immigration and Customs Enforcement and was a Customs Special Agent for seven years. Prior to being a Customs Agent, I was a Special Agent with the Criminal Investigation Division of the Internal Revenue Service for two years. Throughout my career, I have attended basic and continuing training on federal law and criminal investigative techniques and I am also certified as a Seized Computer Evidence Recovery Specialist. As a Special Agent with FDA-OCI, I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 et seq., and other applicable violations of Title 18 of the United States Code.

3.     The information contained in this affidavit is based upon information personally known to me as an agent working on this investigation, my previous investigative experience, and information and observations conveyed to me by other agents involved in this case. It is also based upon consultations I have had with persons knowledgeable about FDA laws and regulations. In addition, this affidavit contains information provided through witness interviews and confidential sources.

4.    The FDCA provisions cited herein are detailed below in Section III. In general, the FDCA requires approval of devices before they are imported or marketed, prohibits the promotion of devices for unapproved uses, and requires reporting of adverse events regarding devices to the FDA.

5.    This affidavit is submitted in support of an application for a search warrant to search the premises of Spectranetics Corporation (hereafter "Spectranetics"), which is located at 96 Talamine Court, Colorado Springs, Colorado, 80907 and 9965 Federal Drive, Colorado Springs, CO, 80921. Spectranetics manufactures medical lasers and peripheral devices associated with them. Those peripheral devices include catheters that serve as intravenous sleeves that contain the lasers and wires that guide the lasers through vascular tissue. Physicians use the lasers to perform atherectomies, which are types of procedures that remove plaque buildup from arteries or vein grafts in order to ease blood flow. Based on information developed during this investigation, there is probable cause to believe that Spectranetics and its officers have committed, and continue to commit, criminal violations of Titles 18 and 21 of the United States Code, and that evidence of these violations will be found on the premises of Spectranetics.

6.    Specifically, there is probable cause to believe that Spectranetics and its officers have violated, and continue to violate, the law, including several sections of the FDCA and Title 18 of the United States Code. They violated and are violating the FDCA by: (1) introducing into interstate commerce adulterated and misbranded medical devices in violation of 21 U.S.C. § 331(a); (2) receiving in interstate commerce adulterated and misbranded devices and delivering them or proffering them for delivery thereof for pay or otherwise in violation of 21 U.S.C. § 331(c); failing to establish records or make reports to the FDA as required under the FDCA and

2

FDA regulations in violations of 21 U.S.C. §§ 331(e) and 331(q)(1)(2); (4) doing acts to medical devices while they were held for sale after their shipment in interstate commerce, resulting in such devices being adulterated or misbranded in violation of 21 U.S.C. § 331(k); and, (5) submitting false or misleading reports to FDA in violation of 21 U.S.C. § 331(q)(2). This affidavit also establishes probable cause to believe that Spectranetics and its officers have conspired to defraud the FDA, in violation of 18 U.S.C. § 371. There is also probable cause to believe that Spectranetics and its officers have violated, and continue to violate, the law by importing and/or facilitating the sale or distribution of imported merchandise contrary to law in violation of 18 U.S.C. § 545. Finally, this affidavit establishes probable cause to believe that Spectranetics and its officers violated 18 U.S.C. §§ 1341 and 1343 by creating a scheme and artifice to defraud using mail and wire.

7.    In summary, probable cause exists to believe that Spectranetics and its officers and employees promoted and sold its infrainguinal (for use below the groin) laser catheters to physicians throughout the United States for an unapproved or "off-label" use and Spectranetics withheld information from the FDA clearly showing that the unapproved use of their infrainguinal catheters could cause significant harm to patients. In addition, this affidavit establishes probable cause to believe that Spectranetics distributed devices that the FDA had not reviewed in any way to physician consultants so that those physicians could implant them into human subjects, and did so as part of the company's contract negotiations to become the domestic distributor for the foreign manufacturers of those devices. Finally, this affidavit establishes probable cause to believe that Spectranetics engaged in a marketing study of an

3

approved cardiac catheter which resulted in a significant rate of serious adverse events which were not reported to the FDA and a summary of the study was not reported to the FDA.

## II. STATEMENT OF PROBABLE CAUSE

8.     Based on my investigation, there is probable cause to believe that the information and evidence described in Attachment B is located at Spectranetics Corporation, 96 Talamine Court, Colorado Springs, CO, 80907 and 9965 Federal Drive Colorado Springs, CO, 80921. A description of the premises of Spectranetics is set forth in Attachment A to this affidavit.

**A.     Background**

9.     At various times from July 2008 through the present, I interviewed four current or former Spectranetics employees, all of whom are confidential witnesses ("CW"). These current and former employees independently presented documents, emails, data, and other information obtained during the course of their employment that detail illegal conduct committed by Spectranetics through some of its employees, executives, and a member of its board. I conducted the interviews of the witnesses separately and established that the information they related was specific and consistent. In addition, through the course of this investigation, I have been able to corroborate some of the information initially related by these witnesses. These interviews, and subsequent investigative findings, form the primary basis of this affidavit.

**B.     Spectranetics Promoted Its Laser Catheters for Uses the FDA Has Not Approved.**

10.     As part of my investigation, I conducted research with the FDA's Center for Devices and Radiological Health ("FDA-CDRH" or "the Center"). FDA-CDRH is the entity that reviews medical devices and possesses the authority to clear them for marketing. FDA-CDRH

4

has determined that Spectranetics' lasers are Class III devices. Class III devices require stringent scientific and regulatory review of their specific intended uses to obtain premarket approval ("PMA") because the Center deems them to have the highest level of risk to patients of all devices. The company's laser catheters and guide wires are Class II devices. I know based on my training and experience that FDA-CDRH reviews specific indications for Class II medical devices through premarket notification ("510(k)") submissions. "510(k)" refers to section 510(k) of the Food, Drug, and Cosmetic Act ("FDCA"), codified at 21 U.S.C. § 360. Through its 510(k) submissions, a manufacturer must demonstrate that the device under review is substantially equivalent in safety and effectiveness to predicate devices that the Center has previously cleared for marketing. Spectranetics manufactures and markets three types of laser catheters that are implicated in this matter. According to records at FDA-CDRH, the Spectranetics CLiRpath Turbo laser catheter and TURBO elite Excimer laser catheter were cleared for marketing in the United States on July 11, 2007, under 510(k) number K071227, and are intended to treat infrainguinal stenosis and occlusions. Stenosis is the abnormal narrowing of blood vessels; occlusions are vascular blockages.

11.    Further, according to FDA-CDRH records, the Spectranetics TURBO-Booster guiding catheters were cleared for marketing in the United States on June 29, 2007, under 510(k) number K071226, and intended to direct and support Spectranetics laser catheters in the treatment of infrainguinal stenosis and occlusions. The TURBO-Booster offsets or bends the laser catheter so that the laser can fire at the plaque on the walls of the vessels in which it travels, instead of simply passing directly through the vessel creating a canal through the obstruction. The TURBO-Booster is cleared only for use infrainguinally, FDA has neither approved nor

5

cleared it for any other use.

12.    Infrainguinal in-stent restenosis (ISR) is a narrowing of, or blockage in, a blood vessel below the groin, that occurs within a surgically-placed stent. The treatments for stenosis, occlusions, and in-stent restenosis are types of atherectomy procedures. Based upon my own research, training, experience, and interviews with doctors and regulators at FDA-CDRH, I know that a stent is a medical device that, when inserted into an artery or vein, supports the vessel so as to prevent its collapse. In the course of my investigation, I have learned that stents implanted below the waist are frequently made of soft metal that provides support to blood vessels but are also flexible and resilient. Stents themselves may become blocked or occluded after implantation.

13.    According to FDA-CDRH, there are currently no atherectomy laser catheters, including the Spectranetics CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter, or TURBO-Booster guiding catheter, approved or cleared for marketing for the treatment of ISR. As noted previously, the TURBO-Booster is cleared for use in infrainguinal stenosis; it is not cleared for re-stenosis, which involves the clearing of a metal stent. In addition, Dr. David Buckles, Chief of the Peripheral Vascular Disease Branch, Division of Cardiovascular Devices within FDA-CDRH, advised me in July 2008 that in order to receive approval for re-stenosis, because it is a new intended use, Spectranetics would first have to apply for and obtain an Investigational Device Exemption ("IDE") from FDA-CDRH to study the safety and effectiveness of its laser on implanted stents.

14.    An IDE functions as an exemption from other provisions of the FDCA. Devices that are under a clinical investigation conducted in accordance with the IDE regulations are

6

exempted from FDCA provisions regarding misbranding, registration, listing, 510(k)

performance standards, and PMA applications, among other things. Manufacturers normally

sponsor such trials to support PMA applications for Class III devices or a 510(k) submission for

Class II devices. FDA-CDRH sets forth regulations at 21 C.F.R. § 812 that generally dictate the

responsibilities of sponsors and investigators, contain recordkeeping and reporting requirements,

and prohibit promotion and sale of the investigational device. The failure or refusal to comply

with any IDE requirement, or to furnish any information required by the IDE regulations, is a

prohibited act under the FDCA. If a device has been granted an exemption for investigational

use under 21 U.S.C. § 360j(g), and a sponsor who was granted the exemption uses the device

under such exemption but fails to comply with a requirement prescribed by or under the IDE

provisions, the device is adulterated under 21 U.S.C. § 351(i). I am informed by Dr. Buckles

that Spectranetics has had preliminary discussions about a proposed IDE relating to the use of its

laser and the attending peripheral devices for ISR. However, FDA-CDRH has not issued an IDE

for any Spectranetics device relating to an indication for ISR.

15.    On July 23, 2008, I interviewed a cooperating witness ("CW-1"). CW-1 stated

he/she was the Director of Marketing for Vascular Intervention at Spectranetics for

approximately one year, ending in April 2008. CW-1 informed me that he/she is familiar with

the efforts of Spectranetics to market and distribute its medical devices for the treatment of ISR.

Based upon research he/she and other Spectranetics employees conducted during time with the

company as part of their duties there, CW-1 stated that he/she believes that receiving approval for

the treatment of ISR would enter Spectranetics into a global surgical market worth $227 million

in sales.

16.    CW-1 informed me that Spectranetics conducted tests of its laser on stents used in ISR procedures on or about May 14, 2007, which attempted to simulate what the test report termed the "most likely clinical case" involving the use of laser catheters for the treatment of infrainguinal ISR in Nitinol expanding stents. Nitinol is a flexible nickel-titanium alloy commonly used in stents implanted in infrainguinal locations of the body. Nitinol stents are cooled and compressed prior to insertion into vasculature; they expand once they come into contact with body-temperature blood vessels but do not lose their flexibility. However, Nitinol stents are susceptible to re-stenosis, as is any other such stent. CW-1 reported that the company believed that such tests were thought necessary in an effort to pursue an IDE for its infrainguinal atherectomy laser catheters for the treatment of ISR. The test results, which CW-1 supplied to me, showed that the laser caused severe fatigue and "surface melt and splay of material" to Nitinol expanding stents. Spectranetics subsequently classified the use of lasers on Nitinol stents as "high risk." CW-1 reported that he/she spoke with his/her superiors at Spectranetics, including Chief Executive Officer John Schulte ("Schulte"), about this test and they believed that it was significant because the laser damaged the structural integrity of stent struts and compromised the surface finish of the Nitinol stent, which could lead to corrosion or stent failure in a human subject. According to CW-1, such corrosion or stent failure creates a risk of heart attack, stroke, and death.

17.    Beginning on or about July 29, 2008, and ongoing until the present, I have spoken with Dr. Buckles. Dr. Buckles participated in several telephone calls during 2007 and January 2008 with Spectranetics personnel regarding their 510(k) submissions detailed above, and their later request for pre-IDE discussions preparatory to filing an application to study their

8

infrainguinal devices to treat ISR in the superficial femoral artery ("SFA") on human subjects. The SFA is a large artery in the thigh. During the conversations, Dr. Buckles indicated that bench testing would be expected prior to allowing the device to be used for ISR in human trials. "Bench testing" is that which is done outside the body. He specifically recalled asking Michael Handley, Spectranetics' Manager of Global Regulatory Submission, if Spectranetics had tested the laser by aiming it directly at a stent. According to Dr. Buckles, Handley said that they had done so and that they had observed no damage or any other adverse interactions. This statement directly contradicts the study conducted by Spectranetics and supplied to me by CW-1.

18. On July 28, 2008, I furnished Dr. Buckles with a copy of the internal company test results that CW-1 supplied to me. After reviewing the results, Dr. Buckles explained that if Spectranetics had supplied the Nitinol stent test data to his staff, FDA-CDRH would have likely considered contraindicating the CLiRpath Turbo laser catheter, the TURBO elite Excimer laser catheter, and the TURBO-Booster guiding catheter for the treatment of ISR. A contraindication is a condition that makes a particular treatment, procedure, or use of a device inadvisable because of the potential for harm to human subjects.

19. Without the benefit of the test data withheld by representatives of Spectranetics, on February 1, 2007, FDA-CDRH cleared IDE number G060231 to study the use of the Spectranetics devices to treat ISR. VIVA Physicians, Inc. conducted the clinical trial in the superficial femoral artery. The IDE also included a device manufactured by W.L. Gore called "Viabahn endoprosthesis with PTA." PTA is the abbreviation for Percutaneous Transluminal Angioplasty, which refers to the mechanical widening of openings in blood vessels other than the coronary arteries. Spectranetics funded this study, which was called the SALVAGE trial. In its

9

initial response letter and in subsequent correspondence with the company, FDA-CDRH made clear that the SALVAGE trial was for academic study only and would not lead to an indication for ISR. The initial letter states:

> We do not believe that it will be possible to attribute beneficial, detrimental, or silent effects to either of the two devices (ClirPath Laser [catheter] or Viabahn endoprosthesis with PTA) with the protocol as currently designed. Similarly, since the role of synergism cannot be separated from single device effect, combination therapeutic effect cannot easily be elucidated. Please acknowledge that, as we have previously indicated to you in our pre-IDE meetings, you understand that the FDA will not be able to utilize the data from this protocol to make a reasonable determination of contribution to benefit or risk from either of the individual devices, or from the combination of any of the devices.

In follow-up correspondence on March 20, 2007, FDA-CDRH reiterated its position regarding the use of the resulting data:

> . . . we wish to emphasize to you our assessment that the results of this clinical trial will, in all probability, not be adequate to support a marketing application, either for the individual devices or for the combined use of these devices for the indication for in-stent restenosis.

20.    According to CW-1 and documents he/she provided, Spectranetics, through Schulte and other top management officials, has adulterated and misbranded its CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter and TURBO-Booster guiding catheter by promoting these devices directly to doctors as a treatment for infrainguinal ISR without an FDA-approved PMA. The company has promoted its CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter, and TURBO-Booster guiding catheter for treating infrainguinal ISR without first obtaining approval for such use, knowing that the SALVAGE trial would not be adequate to support a marketing application, and while possessing test results that show that the Spectranetics laser caused potentially grave damage to Nitinol expanding stents.

10

21.    The following documents and emails, among numerous others, were provided by CW-1 in support of this assertion. CW-1 explained that, unless otherwise specifically qualified, all references to "ISR" in these emails refer specifically to infrainguinal ISR, as they either directly reference lower body surgical procedures or implicate the use of the TURBO-Booster, which was only cleared for used infrainguinally.

a.    In an email to Matthew T. Menard, M.D., an endovascular surgeon in Boston, Massachusetts, dated July 9, 2007, and copied to several members of Spectranetics' management, Schulte wrote, *"Hi Matt: Thanks for taking time to meet with me during my recent visit to Boston. I enjoyed our discussion regarding the possible use of laser for treating SFA* [superficial femoral artery] *ISR. This may be the most difficult to get a lasting result and debulking with the laser is very safe and can remove a lot of tissue, particularly with the recently approved Turbo Booster."* Schulte continued, *"Before you use the Booster, I would suggest you do a few cases with the standard Turbo Elite catheters to get a feel for the technology. ISR is a perfect place to start as te* [sic] *safety profile is unparralled."*

b.    In an email dated August 2, 2007, entitled, *"TURBO-Booster Launch Follow-up"* to CW-1 and others, Schulte wrote, *"Good meeting with barry* [sic] *and his team. 5 MDs showed up and I gave them the TB* [TurboBooster] *presentation. Good interest in ISR and infrapopliteal use."* CW-1 asserted that "barry" was Dr. Barry Katzer, an interventional radiologist in Florida. The popliteal area of the anatomy is that which is behind the knee.

c.    In an email to CW-1 and others dated August 14, 2007, Schulte discussed a dinner meeting he had with Dr. Manish "Manny" Mehta, an endovascular surgeon in Albany, NY. Schulte wrote, *"I think you will find ISR a very nice application for our technology, followed by*

11

*debulking prior to stenting for calcified lesions and finally selected tibial disease."* The tibia is a bone in the lower leg.

      d.     In an email to CW-1 dated August 14, 2007, discussing the meeting with Dr. Mehta, Schulte said, *"Meeting with Mehta went well. He agreed to do some ISR cases in the next few weeks . . . . Keith* [referring to Keith Reinhardt, a regional sales manager for Spectranetics] *to follow up to get some ISR cases on the board."*

      e.     In an e-mail to Eric J. Dippel, M.D., a cardiologist in Iowa, dated September 28, 2007, Schulte wrote, *"We continue to try to improve our effectiveness versus calcium and believe it represents a great workhorse device for . . . ISR . . . . While we don't have an indication for ISR, we are the only atherectomy device without a contraindication and are currently doing two studies to evaluate its effectiveness here."* CW-1 informs me that the two studies referred to in this email are the SALVAGE trial and a study the company sponsored in Europe called the PATENT study.

      22.     According to CW-1 and the corroborating e-mails and documents he/she provided, Spectranetics sales staff were directed to promote TurboBooster for the unapproved, "off-label" use for the treatment of ISR. A common sales methodology at Spectranetics was called "SPIN," an acronym for "Situation, Problem, Implication and Need-Payoff." In an email dated August 28, 2007, from Jason Bottiglieri, Spectranetics' National Training and Education Manager, to Spectranetics' sales representatives and Steve Okland, Vice President for Sales and Marketing, Bottiglieri included an attachment entitled "The SPIN Zone." He provided the following questions for doctors as guidance to the Spectranetics sales force:

*1. How are you currently treating in-stent restenosis? 2. What devices are approved for in-stent restinosis? 3. What percentage of your peripherals is coming back with in-stent restenosis? 4. How do you treat in-stent restenosis? So how would one device to treat...ISR help you...the hospital...the lab?*

23.     Further, in an email from Okland to executive, sales and marketing staff dated October 26, 2007, Okland stated that TurboBooster sales had increased, but added:

*I need to underscore a critical point – like most all products in the peripheral space (given the number of competitive options), this product will not sell itself. Whether we're solving physician stated needs in preparing vessels of longer lesions prior to stent deployment, <u>or for recurrence of stenosis in previously stented patients</u>, etc...we have a unique technology that has proven in clinical trial and post market commercialization to be very effective and safe* [emphasis added]. "

24.     That same day, in an email to sales and marketing staff, Bottiglieri told TurboBooster sales representatives how to address doctors who use a competitor's catheter named "Silverhawk," which is manufactured by Fox Hollow Technologies.  The email is entitled, *"5 Questions to Ask a Hawker."*  Bottiglieri directed representatives to ask doctors what Silverhawk can do that TurboBooster cannot.  He instructed representatives to ask, *"How are you currently treating patients w/in-stent restenosis?"*  This question was clearly meant to lead the discussion and market the "off-label" use of TURBO-Booster.

25.     In an email dated December 26, 2007, addressed to CW-1 and others, Schulte wrote:

*ISR is our meal ticket as we are the only atherectomy device not contraindicated. In addition, we are the only atherectomy device indicated for coronary ISR and have two studies underway to gather clinical evidence.  If we become synonymous with ISR, the laser would be in the lab for every ISR case, just as the Rotablator was there for every calcium case.*

13

26.     On or about December 22, 2007, in preparation for a "Master Laser Symposium" held at the Capital Cardiovascular Conference in Baltimore, MD, Schulte wrote to Dr. Rajesh Dave, an endovascular surgeon at the Pinnacle Health Heart and Vascular Institute at Harrisburg Hospital in Pennsylvania. Dr. Dave was preparing to present at the symposium. As part of the correspondence Schulte wrote, *". . . I would like to focus on ISR treatment in the SFA."* Dr. Dave replied to Schulte that Dave had altered his presentation to include the discussion topic *"Is laser atherectomy the treatment of choice for ISR: Update on Salvage and Patent studies."* In response, Schulte wrote, *"Perfect, Raj . . . ."*

27.     In an email dated December 19, 2007, Schulte wrote to Dr. Robert Gallino in preparation for a training and sales exhibition called the "International Congress XXI." Schulte wrote: *"Rob, We are working all angles here. Our guys are meeting with Grayson Wheatly, [a vascular surgeon in Arizona] to discuss a live TB ISR case."* In response, Gallino replied *"[h]opefully we cam [sic] make this happen."* Schulte replied on December 22, 2007, *"We will od [sic] everything possible to get you to doa [sic] live ISR TB."* CW-1 explained that a "TB ISR" was an ISR procedure utilizing the TURBO-Booster.

28.     Dr. Craig Walker is Medical Director of Cardiovascular Institute of the South located in Louisiana. Dr. Walker is also a member of the Board of Directors for Spectranetics as currently listed on the Spectranetics website. In an email dated January 3, 2008, from Dr. Walker to Schulte, Walker wrote, *"We should ask physicians about instent restenosis and position ourselves as the only tool that can safely remove the intimal hyperplasia in self-expanding stents . . . . The points we must clearly establish are . . . Laser is safe in instent restenosis."*

29.     During a conversation with CW-1 and another cooperating witness ("CW-4") in

14

CW-1's office sometime during January 2008, Schulte instructed CW-1 and CW-4 to *"[p]ush ISR. I want the FDA to slap me on the hand if it's the wrong thing to do."* CW-4 is a former employee who worked with CW-1 in his department. I initially interviewed CW-4 on August 6, 2008. CW-1 also recalled a conversation during this same time period where VP Steve Okland told him, *"John has basically said to keep pushing ISR until he gets a letter from the FDA."* Both CW-1 and CW-4 independently explained that in these conversations, Schulte was directly referencing the use of the TURBO-Booster for infrainguinal ISR procedures.

30.     In an email dated January 8, 2008, Schulte wrote to CW-1 regarding a marketing video they were arranging and conversations Schulte had with Mark W. Mewissen, M.D., Director of the Vascular Center at St. Luke's Medical Center in Milwaukee. Schulte wrote, *"I told him our interests were with ISR . . . ."*

31.     In an email dated January 11, 2008, to Schulte and others from Price Jones, a Spectranetics sales representative, Jones stated that he had dinner on January 9, 2008, with several physicians including Dr. Arun Chervu, a vascular surgeon of Douglasville, Georgia. During the meeting, Jones stated he *"booked first case (for Jan 21st – ISR) during dinner."* In response, CEO Schulte wrote, *". . . ISR is a perfect first case."* Again, both CW-1 and CW-4 independently explained that in these emails, Schulte was directly referencing the use of the TURBO-Booster for infrainguinal ISR procedures.

32.     CW-1 also provided the agenda for the Spectranetics Global Sales Meeting ("GSM"), which was held from January 27 to January 30, 2008, that listed topics to be discussed including "vessel prep / ISR" and "Off Label Positioning/Training."

33.     According to CW-1 and the supporting documents he/she provided, Spectranetics

15

arranged with the Arizona Heart Institute to have Dr. Gallino perform a live operation on a patient for educational and sales purposes for the Arizona Heart Institutes's International Congress XXI in February 2008. In the internal email correspondence discussing the amount of money to be given to Arizona Heart, Kurt Kerzic, Western Area Sales Director, wrote to Schulte, "*John: Arizona Heart is covering all the costs for Gallino at their meeting. Delia* [Delia Wilson-Parker, Arizona Heart's head of education] *says our 10K grant would maybe get us one case. I explained our current contract and support of this meeting should count for something. I then told her in order of priority we want an ISR TB case before the SVG* [saphenous vein graft] *case Gallino is doing.*" In reply, CEO Schulte writes, "*Guys, Lets* [sic] *stick with the 10k. Need a TB ISR. They may not give Rob [Gallino] the SVG anyway. If not that's ok. Kurt, really need the ISR can you confirm.*" In reply, Kerzic wrote, "*They are now asking for 30k to do three cases. A SVG, a ISR and a popliteal. Dietrich was insulted by the 10k offer. John, you might have to talk with him directly. They are saying 30K or they can't guarantee any cases. Total blackmail!! K*".

34.    In an email dated February 14, 2008, to the Vascular Intervention Sales Team, Kerzic wrote, "*It has been two weeks since the Global sales meeting and by now many of you have presented the case for using TurboElite with TurboBooster for ISR . . . . Here is what I need from you. Please email me with objections you are hearing. Include ones you have not been able to overcome . . . keep these focused on ISR . . . .*"

35.    In an email dated February 21, 2008 to sales and marketing staff, Schulte provided his thoughts in advance of a planned sales summit. In the email, Schulte advises that they should "*describe where the laser fits in a petriphral practice . . . it should cover: . . . SFA:*

16

*ISR . . . . TB* [Turbo Booster] *should be highlighted here and step by step for CTOs"* [Cronic Total Occlusion, which is a total blockage of a blood vessel.] Schulte went on to say, *"For the live cases, it would be great to have the following: 1. TB ISR for 1st case."*

36.     An email dated February 21, 2008, that Kerzic sent to a group of sales representatives called the "TB Team" provides a scenario for a hypothetical Spectranetics sales territory with a story of a fictitious sales representative named "Scott." In the email, Kerzic wrote, *"Scott then goes to the GSM* [Global Sales Meeting] *and learns a ton! He agrees the big area to focus on is ISR . . . . He is also concerned about promoting ISR without an indication . . . . He just wished he . . . had a more specific talk track as it relates to ISR."* Kerzic then writes, *"Below is a list of items that need to be accomplished at the upcoming TB Team meeting next Wednesday Feb 27th. I have assigned everyone on the team a task that needs to be complete before this meeting. Doing so will allow us to spend all day sharing these ideas and leaving with a specific plan that will allow us to get Scott to feel invincible when it comes to selling TB for ISR . . . ."* Kerzic assigned the topic of *"How to sell ISR the right way with the right verbage"* to Okland, Handley, and CW-1.

37.     In an email dated March 4, 2008, sent by sales representative Michael Ferguson to Schulte and others, Ferguson recalls a dinner he and other Spectranetics sales representative had with Dr. Neisman where they discussed the use of the TURBO-Booster for infrainguinal ISR, among other topics.

38.     In an email dated March 24, 2008, sent by sales representative Stephan Schafeitel to Joe Urban, Spectranetics' National Manager of Training and Corporate Programs, Schafeitel attached a photograph of various marketing items he produced to sell the TURBO-Booster

17

guiding catheter. The photograph also depicts an exhibit which displays an image of the superficial femoral artery entitled, "Laser/PTA ISR Case – 2/28/2008." As noted above, "PTA" is the abbreviation for Percutaneous Transluminal Angioplasty, which refers to the mechanical widening or opening of blood vessels other than the coronary arteries. The email was forwarded by Urban to Schulte who responded, *"These are fabulous ideas. Do you think it would make sense to create a binder and send these out to the sales force as a 'how to' do a fast start."*

39.    According to the publicly-available transcript of a conference call held on April 23, 2008 with financial analysts that discussed the company's earnings in the first quarter of 2008, Schulte made the following statement:

> *A second area is the treatment of in-stent re-stenosis, as we have stated many times today, there is no device indicated for the treatment of in-stent re-stenosis, and that includes an angioplasty balloon. However, if you talk to physicians, when you ask them how they treat in-stent re-stenosis, most of them will say, "Well, I use balloon [sic]." And you ask them, "Well, how's that working out for you?" and they'll say, "Well, not very well."*
>
> *And so the concept of tissue removal prior to balloon or putting in a second stent seems to make a lot of sense, because you can't over-expand a nitinol stent. So that's an area. And I think in-stent re-stenosis will be growing as a percentage of procedures done in the lower leg. So those are important. So we believe that our form of atherectomy because it has the ability to go right down into the foot, because it has the ability to treat thrombus, plaque and moderately hard calcium. And the fact that it can now treat vessels as large as 6 millimeters to 7 millimeters in diameter gives them great flexibility.*
>
> *So those are all the things that we are trying to promote. Obviously we are also trying to grow the market because there's an unmet need in terms of patients who have these symptoms and they're not properly diagnosed and I think as we get the word out through symposiums and public relations activities we are continuing to try to grow the pie. So it is really a confluence of things.*

40.    On August 13, 2008, Schulte made a presentation in Boston at the CanaccordAdams Annual Global Growth Conference. Schulte's entire presentation was recorded and is available via the Spectranetics website. On that same date, I accessed and

recorded a portion of the presentation where Schulte promoted seeking ISR indication to potential investors. Schulte stated that Spectranetics' *"biggest opportunity for the Turbo Booster is the treatment of instent re-stenosis"* and added, *"We just completed the safety data required by the FDA to determine that laser energy does not harm nitinol stents and were going to submit that to the FDA within the next 30 days . . .* [emphasis in original]*."*

**C.    Spectranetics Performed Clinical Trials Using FMD Catheter Guidewires Without An Investigational Device Exemption (IDE) from FDA**

41.    CW-1, CW-2, and CW-4 all independently report that, from approximately May 2005 until November 2007, Spectranetics was negotiating with a Japanese manufacturer called Future Medical Design Co., Ltd. ("FMD") to become a distributor for catheter guidewires that FMD produced in Japan. CW-2 is a current employee of Spectranetics who has direct knowledge of Spectranetics' dealings with FMD, as detailed below. I initially interviewed CW-2 on July 25, 2008.

42.    According to CW-1, FMD manufactured guidewires specifically for Spectranetics called the "Quick-Cross OTC guidewire," otherwise identified by Spectranetics as Model number C01-180. During the distributorship negotiations, Spectranetics filed a 510(k) with FDA that FDA-CDRH received on June 18, 2007. Spectranetics did not complete the 510(k) application process and FDA-CDRH subsequently deemed the submission withdrawn due to inactivity on February 19, 2008. My research at FDA-CDRH reveals that Spectranetics has filed no other premarket applications with FDA-CDRH relating to FMD guidewires. CW-1 advised me that negotiations with FMD ceased in November 2007. However, CW-1, CW-2, CW-3, and CW-4 all independently contend that, prior to June 18, 2007, Spectranetics, through

19

Schulte and as part of the company's due diligence for the distributorship deal, provided

unapproved FMD guidewires to physicians and requested those doctors to evaluate the

guidewires in patients. CW-3 is a former employee of Spectranetics who managed a clinical

study the company sponsored and had frequent and direct contact with senior officers, as detailed

below. I initially interviewed CW-3 on August 5, 2008.

43.    Email correspondence supplied by CW-2 showed that Schulte traveled to Japan

and toured the FMD facility sometime in July 2005.

44.    In an email from Tsuyoshi Terashi of FMD to CW-2, Terashi stated that coronary

FMD guidewires were shipped from Japan to the United States via UPS on September 21, 2005,

via tracking number M0376759901. In addition, CW-2 supplied two invoices from FMD to

Spectranetics. The first invoice accounts for five guidewires of varying sizes with a declared

customs value of $150.00. The second invoice totals $18,400.00 for five guidewires. CW-2 was

unaware of the reason for the massive increase in price on the invoicing. In an email discussing

the shipment of the guidewires dated September 13, 2005, from a Spectranetics sales

representative named Hernan Ricaurte to Terashi, Ricaurte states, "As for shipping the sample

wires . . . please do not add any additional labeling which specifies use etc.".

45.    In an email dated October 21, 2005, from Julia Reynolds of the Spectranetics

Finance Department to CW-2, Reynolds acknowledged a wire transfer in the amount of

$18,400.000 to FMD for the second invoice described above.

46.    In an email dated November 2, 2005, from Schulte to CW-2, Schulte asked, "Did

you have a chance to send the FMD wires to Dr. Bruce Murphy for evaluation." CW-2 replied

that he/she had sent the shipment.

47.    In an email from Terashi to CW-2, Terashi stated that peripheral FMD guidewires were shipped from Japan to the United States via UPS on November 6, 2005, via tracking number M0376759885. Two invoices from FMD were attached to the email. The first details two guidewires, with a declared customs value of $30.00. The second is an invoice totaling $3,480.00.

48.    In addition to the shipment of guidewires from CW-2 to Dr. Murphy described above, CW-3 stated that during September or October 2005, he/she traveled to Little Rock, Arkansas, and met with Murphy. During the meeting, and at the behest of Schulte, CW-3 provided the unapproved FMD guidewires to Dr. Murphy. CW-3 subsequently became aware that Murphy used them in a patient, and Murphy provided CW-3 with a video of that surgery to give to Schulte.

49.    Based on their conversations with senior executives, CW-1 and CW-2 related that the officers of Spectranetics were aware that the guidewires were not approved for marketing or use in the United States, nor were they subject to any kind of exemption from FDA-CDRH.

50.    In an email dated November 14, 2006, sent to Schulte and others, Ricaurte provided feedback from a physician who used FMD guidewires who, according to CW-1, was in the United States. In the email, Ricaurte called the physician the "operator" and referred to patients as "models." For example, Ricaurte wrote, *"The operator also went sub-intimal and back into the true lumen with the model."* In addition, Ricaurte wrote, *"In general, the operator stressed that the wires far exceeded his expectations. 'I knew they would be good, but this is incredible.' The operator will use all week in various models."* CW-1 confirmed that the euphemisms "operator" and "models" referred to the surgeon and the patients, respectively. The

21

medical terms used in the email further confirm this. The intima is the inner-most layer of a blood vessel; the lumen is the canal or cavity of the vessel through which blood flows. In this context, for Dr. Murphy to take the guidewires "sub-intimal" can only refer to inserting the guidewires into the first layers of the wall of human vasculature.

51.    CW-2 advised that on or about November 16, 2006, he/she realized that the FMD guidewires were being used in patients because of the emails and conversations he/she had with other employees including McGuire and Ricaurte. CW-2 brought his/her concerns about the clinical use of FMD guidewires in patients to Schulte and McGuire. CW-2 said that McGuire responded that he would "look into it."

52.    Approximately one week later, in an email dated November 22, 2005, from McGuire to CW-2, McGuire wrote, *"John [Schulte] just got off the phone with Bruce Murphy and Hernan wasn't BS'ing. Murphy said these wires rock."*

53.    CW-2 provided an email which details a shipment of peripheral FMD guidewires to Dr. Bruce Murphy via UPS on November 23, 2005, via tracking number 1Z68X5860153420315. In discussing the shipment, Ricaurte wrote, *"GREAT! It will be a nice surprise for him when he returns to the cath lab over the weekend or on Monday. You may know that he does cases on the weekends too."*

54.    CW-2 also provided me with a copy of the contract between FMD and Spectranetics. According to corresponding email correspondence, the contract was shipped to FMD in Japan via Federal Express on April 6, 2006, via tracking number 839261786622. CW-2 advised me that the deal never consummated, as Spectranetics eventually determined that it would not be profitable.

**D.**    **Spectranetics Performs Clinical Trials Using BMT Balloon Catheters Without An Investigational Device Exemption (IDE)**

55.    According to CW-1 and CW-4, from approximately October 2007 to the present, Spectranetics has been negotiating with a manufacturer in Germany called Bavaria Medizin Technologie ("BMT") to become a distributor for PTA balloon catheters, which BMT makes in Germany.   According to FDA-CDRH, no PTA balloon catheters manufactured by BMT are approved or cleared for use in the United States.   In addition, Spectranetics does not possess, and has never possessed, an IDE to conduct clinical trials or product evaluations of the BMT PTA balloon catheters.

56.    CW-1 said that negotiations with BMT began sometime around May 2007. During the due diligence period, specifically sometime during August or September 2007, Spectranetics obtained samples of the balloon catheters from BMT.   According to CW-1 and CW-4, Larry Adighije, Spectranetics' Vice President of Business Development and Strategy, provided samples of the BMT PTA balloon catheters to business development and marketing staff.

57.    According to CW-1 and CW-4, Spectranetics, through Schulte, McGuire, Adighije, and other officers, requested that the business development and marketing staff obtain evaluations of the BMT balloons in humans.   In furtherance of these requests, Spectranetics personnel provided the unapproved and uncleared balloons to physicians to evaluate on patients. CW-1 and CW-4 obtained physician evaluation forms completed by Trung Pham, Spectranetics' Business Development Manager.   According to CW-1, under the direction of company management, Pham provided the unapproved BMT balloon catheters to physicians and observed

23

the subsequent *in vivo* procedures, recording the doctors' comments on the forms. When handing copies of the physician evaluation forms to CW-1 and CW-4, Pham stated to them *"These are the evaluations forms, they exist but they don't exist."* CW-1 provided copies of the forms to me during a meeting on July 24, 2008. The forms are entitled, "BMT PTA Catheter Product Evaluation" and there are seven forms in total. One form is an evaluation by "Dr. Rob Gallino -- Montgomery." According to CW-1, Gallino, a cardiologist in Montgomery County, Maryland, is paid by Spectranetics as a consultant. The form is dated October 23, 2007.

58.     The other six forms are evaluations preformed by "Dr. Walker -- CIS" and are not dated. According to CW-1 and CW-2, "Dr. Walker" is Dr. Craig Walker.

59.     In an email dated October 29, 2007, sent to Pham, Adighije, Schulte and others, Knut Sauerteig of BMT stated: *"It was a pleasure meeting with you in Washington. Especially with the good clinical feedback from the physicians regarding the PTA catheters, we hope that the baseline for a fruitful collaboration between Spectranetics and BMT is made."*

60.     While discussing the evaluations of the unapproved BMT PTA balloon catheters during a meeting held on December 13, 2007, CW-1 and CW-4 were both present for a conversation between Adighije and Vice President of Compliance Don Fletcher. Both CWs reported that Adighije told Fletcher *"Don, you may want to cover your ears for this next part."* Adighije then went on to describe how the balloons were provided to physicians who used them during *in vivo* evaluations. CW-1 also recalled hearing Schulte say *"Dr. Walker loved it"* in reference to the unapproved balloon catheters.

61.     CW-1 and CW-4 reported that, during a meeting attended by Schulte, Adighije, CW-1, CW-4, and others on March 14, 2008, Adighije offered to have additional physicians

24

perform testing on the BMT PTA Balloons. During this time, CW-1 said he/she asked McGuire to stop evaluating unapproved or uncleared devices.

62.    During a meeting held on March 7, 2008, McGuire acknowledged to CW-1 that the BMT evaluations should not have occurred. CW-1 recalled a conversation with McGuire on or about April 3, 2008, where McGuire referred to the human BMT balloon evaluations as a "lack of judgment."

63.    CW-2 advised that during the later part of June or early July, 2008, he/she was directed by Handley to hand over any BMT PTA balloon catheters in his/her possession as the company had decided to quarantine the balloons. CW-2 was not aware of what happened to the balloons after they were collected by Handley or his staff.

**E.    Spectranetics Failed to Report Serious Adverse Events and Summaries of Clinical Data to the FDA as Part of the CORAL and CORAL REEF Studies**

64.    CW-3 advised that he/she was the Spectranetics program manager for a marketing study named CORAL. This study, which occurred between June 2003 and December 2005, sought to catalog outcomes of excimer laser coronary angioplasty in patients who had degenerated or occluded saphenous vein grafts ("SVG"), which physicians use in heart bypass surgeries. Angioplasty is the widening of blood vessel suffering stenosis; the saphenous vein is located in the lower leg and interventional cardiologists commonly use it as a source of graft vasculature in coronary artery bypass operations. The CORAL study was designed to examine the effect of angioplasty in simple occluded vein grafts as well as those in which interventional cardiologists had placed stents due to a failure of the original bypass. Stents employed for coronary vascular support are normally tubular and made of rigid stainless steel, as they do not

require the flexibility of those used infrainguinally. The results of the study were to be used by Spectranetics for marketing purposes.

65. According to FDA-CDRH records, the Spectranetics CVX-300 Excimer Laser system is indicated for the treatment of occluded saphenous vein bypass grafts pursuant to PMA number P910001.

66. In the course of this investigation, I have learned that as of 2002 or 2003, interventional cardiologists clearing grafts in similar procedures normally use a mesh basket or other device, collectively called embolic protection devices, to collect plaque that comes free during an angioplasty or stenting procedures in SVG. This is to prevent plaque from traveling through the bloodstream and lodging itself in other areas, which may cause additional complications such as ischemia, which is a restriction in bloodflow, or heart attack. CORAL was intended to test the ability of Spectranetics lasers to dissolve or disintegrate the plaque, obviating the need for a mesh collection basket. Spectranetics' indication for angioplasty procedures of this type does not include a conditional requirement that physicians also use a embolic protection device, as the laser itself was approved prior to their development. However, doing so during angioplasty and stenting procedures is generally recognized as a safe method of minimizing the flow of loosened plaque down the bloodstream.

67. Dr. Ashley Boam, Chief of the Interventional Cardiology Devices Branch at FDA-CDRH, informs me that because the FDA has approved the CVX-300 laser system for use in the treatment of degenerated saphenous vein grafts and for treatment of in-stent restenosis, and based on the information provided by Spectranetics to FDA-CDRH about the study, Spectranetics may not have required an IDE for the initial CORAL marketing study. This could be so even though

26

the procedure Spectranetics was testing involved some stented grafts as well as bypasses that were simply occluded but otherwise free of stents. Once Spectranetics generated and analyzed data from the two marketing studies at issue, the company was required to report the data to FDA-CDRH as part of it PMA annual report under 21 C.F.R. § 814.84(b)(2). Device sponsors must submit a summary and bibliography of unpublished reports and published literature. Manufacturers must also report major adverse coronary events to FDA-CDRH as "Medical Device Reports." Dr. Boam informed me that FDA-CDRH would use that information, with other available data, to determine if the new devices' use has raised new safety or effectiveness concerns, whether FDA-CDRH should add new or additional warnings or contraindications to the labeling, whether the Center or the sponsor should initiate specific communication with practitioners, or whether additional studies are appropriate to develop further information about a particular safety concern.

68.    The primary physician investigators Spectranetics hired to complete the CORAL Study were Dr. Tony S. Das and Dr. Steven R. Bailey. CW-3 advised that he/she enrolled approximately 20 doctors as investigators and enrolled approximately 150 patients. Each doctor was paid $1,500 per patient he or she enrolled in the study. This payment from Spectranetics was separate from the doctor's Medicare or insurance billing for the procedure. CW-3 characterized these payments as "kick-backs" for doctors to enroll in the study.

69.    CW-3 reported that the methods Spectranetics employed in this study resulted in a dramatic increase in the major adverse cardiac event ("MACE") rates of the patients involved. According to CW-3, the generally accepted procedure of using a mesh collection basket when clearing out a vein graft normally carries a 6 percent MACE rate; the CORAL study resulted in a

MACE rate of approximately 22 percent, or twenty-six patients. CW-3 stated that of the 120 patients involved in this study, eight patients died within the time frame of the study in what was determined to be a procedurally related adverse event. According to CW-3, this represents a grossly abnormal mortality rate for any study regardless of the cause of the deaths, and at least twenty suffered "silent" heart attacks in which the symptoms of their attacks were not readily apparent to them but the damage from which was evident in later testing, and two others suffered full myocardial infarctions that resulted in hospitalization. CW-3 noted that the 22 percent MACE rate did not include other complications such as perforations or tears in cardiac tissue that occurred during the surgeries themselves. CW-3 advised that one participating doctor in New Mexico lodged patients in a motel near his hospital the day immediately following their respective surgeries so that he could free up beds to admit more subjects and perform more procedures. CW-3 advised that he/she was forced to exclude thirty patients from this doctor's site because he failed to complete follow-up testing. However, Spectranetics still paid the doctor. CW-3 stated the company did not report any of this information to FDA-CDRH, and my research at the Center confirms that.

70.    CW-3 said Schulte and McGuire had daily oversight of the study, and therefore were fully aware of the results and fully aware of the harm to its participants. CW-3 further reported that Schulte and others discussed manipulating the data from the study so that Spectranetics could somehow use its results for marketing purposes. CW-3 reported that he/she personally overheard Schulte, as well as Pham, discuss methods to use data only from patients who were not harmed for the company's marketing purposes, thereby concealing the overall scope and size of the study as well as its ramifications.

71.    CW-3 advised that during the course of the CORAL study, several of the surgeons

participating became concerned that the plaque that the Spectranetics laser dislodged was large

enough to cause silent heart attacks or other serious complications. As a result, Schulte initiated

the CORAL REEF study, which CW-3 also managed. This sub-study of CORAL enrolled ten

patients through Dr. Charles Simonton at the Carolinas Medical Center in Charlotte and Dr.

Chris Cates at Emory University in Atlanta.

72.    In CORAL REEF, a basket was placed along with the catheter to catch embolic

plaque and debris that the lasers dislodged but did not disintegrate. Dr. Renu Virmani, then of

the Armed Forces Institute of Pathology, subsequently analyzed the material caught in the

baskets. According to CW-3, Dr. Virmani's pathology reports showed that a significant amount

of the dislodged plaque and debris was significantly larger than blood cells, and thus was at risk

of lodging in other vasculature. According to CW-3, this material was large enough to put

patients at risk for ischemia and heart attack. According to the pathology report, these results

emphasized the need for the use of a collection basket in such procedures.

73.    According to CW-3, when informed of this in November or December 2005,

Schulte instructed him/her to *"make sure Chuck [Simonton] doesn't get these results . . . talk to*

*him about not publishing this data and perhaps starting a new study or project."* In spite of

Schulte's instructions, CW-3 informed the Steering Committee of the CORAL Registry of the

CORAL REEF results since he/she knew the information was vital to the decision as to whether

to continue enrollment in the larger study. Based on the results of CORAL REEF as well as the

high MACE rate of CORAL, the physicians determined the study had to be stopped as soon as

possible. CW-3 reported that Schulte was opposed to this and tried unsuccessfully to revive

29

CORAL. Schulte has refused to share the results of either study with the physicians involved or publish them. As far as CW-3 is aware, the study was never made public or reported to FDA-CDRH.

74.    Dr. Boam reported to me that Spectranetics made no reports to it in any form about CORAL, CORAL REEF, or any of the adverse events associated with either study. Dr. Boam's search included a review of the annual reports Spectranetics has filed with FDA-CDRH since 2003. One published article from a 2004 edition of the Journal of Endovascular Therapy noted that initiation of CORAL, but Dr. Boam was unable to locate any articles that provide any information about its completion or results.

75.    On August 18, 2008, I conducted a search of the publicly available documents maintained by the Securities and Exchange Commission ("SEC"). I located a 10-Q report, which is a quarterly financial report the SEC requires of publicly traded corporations, that Spectranetics filed on May 7, 2005. The report states, *"We have begun clinical research studying the use of our technology to treat thrombus-laden lesions in saphenous vein grafts (CORAL and CORAL REEF)."* A thrombus is a blood clot, and is one type of vascular occlusion. Through additional research from various sources, I was unable to locate any published data on either of the studies.

76.    CW-3 advised he/she repeatedly asked Schulte and McGuire to terminate the study because of the high MACE rate and abusive tactics like those employed by the doctor in New Mexico, detailed above. CW-3 stated he/she ultimately resigned his/her position because he/she felt he/she could no longer ethically continue managing the study.

77.    All CWs confirm, independently of each other, that the records and computer files that contain the information sought through this warrant as described in Attachment B, are

located at the locations described in Attachment A. According to CW-1 and CW-4,

Spectranetics issues laptops and desktop computers to conduct company business. CW-1 and

CW-4 also stated that it is not uncommon for company personnel to purchase additional

computers, communications devices and storage media to conduct company business.

### III. APPLICABLE STATUTES

#### A.     The Food Drug and Cosmetic Act.

78.     The United States Food and Drug Administration (FDA) is the federal agency

charged with the responsibility of protecting the health and safety of the American Public by

enforcing the FDCA. One of the purposes of the FDCA is to ensure that medical devices sold for

administration to humans, or for other use on or in humans, are safe, effective, and bear labeling

containing true and accurate information.

79.     The FDCA defines a "device" (often referred to as a "medical device") as "an

instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other

similar or related article, including any component, part, or accessory, which is . . . intended for

use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or

prevention of disease, in man or other animals, or . . . intended to affect the structure or any

function of the body of man or other animals, and which does not achieve its primary intended

purposes through chemical action within or on the body of man or other animals and which is not

dependent upon being metabolized for the achievement of its primary intended purposes."

21 U.S.C. § 321(h)(2) and (3).

#### B.     Device Investigations, Approvals, and Clearances

80.     Pursuant to 21 U.S.C. § 360c(f)(1), any device that was not in commercial

distribution prior to May 28, 1976, is initially classified as a Class III device unless it is shown to be "substantially equivalent" to a device marketed prior to May 28, 1976.

81.     Pursuant to 21 U.S.C. § 360e(a)(2), a device classified as a Class III device under 21 U.S.C. § 360c(f)(1) is required to obtain a PMA by FDA-CDRH.  If the manufacturer or sponsor of the device believes its device is substantially equivalent to an existing device marketed before May 28, 1976, it can submit a pre-market notification, or "510(k) notification," pursuant to 21 U.S.C. § 360c(i)(E)(i) instead of the PMA, and attempt to establish to the FDA's satisfaction that the new device is substantially equivalent to the existing device.   If the FDA finds that the device is "substantially equivalent" to an existing device marketed before May 28, 1976, the agency refers to the device as having been "cleared" for marketing, rather than "approved."

82.     A device is "substantially equivalent" to another device if it has the same intended use and either the same technological characteristics or, if different technological characteristics, is as safe and effective as the predicate device and does not raise different questions of safety or effectiveness than the legally marketed predicate device.  21 U.S.C.§ 360c(i)(1)(A).

83.     Pursuant to 21 U.S.C. § 360j(g), if a firm wants to use a device on humans on an experimental basis to investigate its safety and effectiveness, the firm is required to submit to the FDA an application for an IDE for permission to use such device.

84.     A Class III device is deemed to be adulterated under 21 U.S.C. § 351(f)(1) if, among other things, it is not the subject of an approved application for pre-market approval ("PMA") under 21 U.S.C. § 360e(a), it is not exempt from FDA's pre-market approval requirements under an IDE under 21 U. S. C. § 360j(g), and it has not been found by FDA to be

substantially equivalent to a previously marketed predicate device through a 510(k) notification under 21 U.S.C. § 360c(i).

85.    A device is deemed to be misbranded under 21 U.S.C. § 352(o) if notice or other information respecting the device was not provided to the FDA, as required by 21 U.S.C. § 360(k), of the Act. As detailed herein, there is probable cause to believe that Spectranetics and its officers violated this provision of the FDCA, among others.

## C.    Notification Of A New Intended Use For A Currently Marketed Device

86.    Pursuant to 21 U.S.C. § 360(k) and 21 C.F.R. § 807.81(a)(3)(ii), a manufacturer must submit pre-market notification to FDA for a major change or modification in the intended use of a device that is currently in commercial distribution.

87.    A device is misbranded under 21 U.S.C. § 352(o) if notice or other information respecting a new intended use of the device was not provided to the FDA, as required by 21 U.S.C. § 360(k) and 21 C.F.R. § 807.81(a)(3)(ii). As detailed herein, there is probable cause to believe that Spectranetics and its officers violated this provision of the FDCA, among others.

## D.    Adverse-Event and Post-Approval Reporting Requirements

88.    Under 21 U.S.C. § 360i, manufacturers and importers of devices must establish and maintain such records, make such reports, and provide such information, as FDA may by regulation reasonably require to assure that the devices are not adulterated or misbranded and to otherwise assure their safety and effectiveness.

89.    Pursuant to 21 U.S.C. § 360i, section 519 of the Act, FDA has promulgated regulations that require Medical Device Reports ("MDRs") for adverse events. 21 U.S.C. § 360i(a), (b) & (c); 21 C.F.R. § 803. Pursuant to 21 C.F.R. § 803.50(a), a

33

manufacturer must submit an adverse event report to the FDA within 30 days whenever the manufacturer receives or otherwise becomes aware of information, from any source, that reasonably suggests that a device it markets may have caused or contributed to a death or serious injury.

90.    Pursuant to 21 U.S.C. § 360i and 21 U.S.C. § 360e, FDA has promulgated regulations that require manufacturers to submit post-approval periodic reports, i.e., annual reports. 21 C.F.R. 814.82(a)(7). Pursuant to 21 C.F.R. § 814.84(b)(2)(i), the periodic reports shall contain a summary and bibliography of: (1) unpublished reports of data from any clinical investigations or non-clinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the PMA applicant and that have not been previously submitted as part of the PMA; and (2) reports in the scientific literature concerning the device and known to or that reasonably should be known to the PMA applicant.

91.    A device is deemed to be misbranded under 21 U.S.C. § 352(t) if the firm fails or refuses to furnish any material or information respecting the device that is required by or under 21 U.S.C. § 360i. As detailed herein, there is probable cause to believe that Spectranetics and its officers violated this provision of the FDCA.

**E.    Prohibited Acts Under the FDCA**

92.    Pursuant to 21 U. S. C. § 331, the following acts and the causing thereof are prohibited:

(a)    the introduction or delivery for introduction into interstate commerce of any device that is adulterated or misbranded, or the causing thereof. 21 U.S.C. § 331(a);

(b)    the receipt in interstate commerce of any device that is adulterated or misbranded,

34

and the delivery or proffered delivery thereof for pay or otherwise. 21 U.S.C. § 331(c);

(c)     the failure to establish or maintain any record, or make any report required under section 519 of the Act, codified at 21 U.S.C. § 360i. 21 U.S.C. § 331(e);

(d)     the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling, or the doing of any other act with respect to, a device if such act is done while such article is held for sale after shipment into interstate commerce and results in such article being adulterated or misbranded. 21 U.S.C. 331(k);

(e)     the failure or refusal to furnish any notification or other material or information required by 21 U.S.C. § 360i. 21 U.S.C. § 331(q)(1); and,

(f)     the submission of any report that is required by or under this chapter that is false or misleading in any material respect. 21 U.S.C. § 331(q)(2).

93.     Any person who commits a prohibited act under the FDCA commits a misdemeanor, regardless of any *mens rea*, punishable by a maximum of one year imprisonment and a $100,000 fine. 21 U.S.C. § 333(a)(1) and 18 U.S.C. § 3571. If committed with the intent to defraud or mislead, the violation constitutes a felony and is punishable by up to three years imprisonment and a $250,000 fine. 21 U.S.C. § 333(a)(2) and 18 U.S.C. § 3571. The defrauding element can be met by a showing that Spectranetics conspired to conceal information from the FDA. United States v. Mitcheltree, 940 F.2d 1329, 1350 (10th Cir. 1991).

94.     As detailed herein, there is probable cause to believe that Spectranetics and its officers are violating or have violated all of these provisions of the FDCA, among others.

**F.     Title 18 Violations**

95.     In addition to FDCA violations, there is probable cause to believe that

35

Spectranetics and its officers may be committing or have committed violations of Title 18 of the United States Code.

96.    18 U.S.C. § 545 prohibits the distribution of merchandise brought into the United States contrary to law. As detailed herein, I have probable cause to believe that Spectranetics and its officers imported the unapproved devices described herein contrary to law in that Spectranetics brought them into the United States with the intention of adulterating and misbranding them under to the FDCA, as the company neither sought nor received approval to import either guidewires or balloons as investigational devices prior to facilitating their implantation into human subjects.

97.    18 U.S.C. § 371 prohibits conspiracy commit offense against the United States and prohibits conspiracy to defraud a governmental agency. As detailed herein, there is probable cause to believe that Spectranetics and its officers conspired by acts and omissions to defraud the FDA by not seeking proper approvals for its medical devices, by not reporting adverse effects related to its medical devices, and by concealing these violations from the FDA.

98.    18 U.S.C. §§ 1341 and 1343 prohibit creating a scheme and artifice to defraud using wire and mail, respectively. As detailed herein, there is probable cause to believe that Spectranetics and its officers violated these provisions of Title 18 by using the mail and wires in their schemes and artifices to defraud.

## IV. COMPUTERS

**A.    Computer Definitions**

99.    I am certified by the Federal Law Enforcement Training Center as a Seized Computer Evidence Recovery Specialist (SCERS). I have specialized training and experience in

36

the execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation, and authentication of evidence. I have participated in search warrants which resulted in seizure of both computer data in the form of exact images (copies) and the computer systems themselves, as well as the recovery, reproduction, and analysis of the computer data. From my experience and the advice of other SCERS Agents, I know that to properly retrieve and analyze all electronically stored (computer) data, to document and authenticate such data, and to prevent the loss of data either from accidental or deliberate programmed destruction, requires on-site analysis, as well as off-site laboratory analysis by a qualified computer technician.

100. Based on my training, experience, participation in other investigations, and previous computer seizures in business settings, I have found that computers are the typical mode used to prepare and store all types of data and documents used during the usual course of business (e.g., training literature, sales records, marketing and promotional materials, device studies, prescription compliance policy, and financial records). For example, cited herein are numerous e-mail communications that are created and stored on computers and network servers owned and operated by the company.

101. Additionally, I know that persons involved in fraud and corporate criminal activity often maintain in their businesses facsimile messages, letters, e-mails, and records of telephone calls reflecting the identities of their accomplices and co-conspirators, as well as descriptions of their *modus operandi*. Persons involved in fraud and corporate criminal activity often maintain these records electronically on computers or computer disks at their businesses.

102. As used in this affidavit, the terms records, documents, and materials carry the

37

normal meaning of tangible (usually paper) forms. The terms could also include records and documents created, modified, or stored in electronic or magnetic form and any data, image, or information that is capable of being read or interpreted by a computer.

103.    Title 18 U.S.C. § 1030(e) defines the term computer, in pertinent part, as: "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device . . . ."

104.    Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks). It also includes related communications devices such as Blackberrys, personal digital assistants or "PDAs," smart phones, iPhones, and any other personal communication or storage device issued by Spectranetics to its employees for the purposes of doing business, or

38

such personal items as Spectranetics employees conduct business upon or through.

105.    The relevant information may be found on hardware, and also is present in the software programs.  Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

**B.    Methods Used to Search Computers:**

106.    In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will do the following: Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be "imaged" on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

107.    If the computer equipment and storage devices cannot be searched on-site, the computer expert will attempt to create an electronic image of those parts of the computer that are likely to store the files described in the warrant.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware.  The computer expert or another technical expert will then conduct an off-site search for the computer files described in the search warrant from the "imaged" copy at a later date.  If the computer expert successfully images the Spectranetics

39

computers, the agents will not conduct any additional search and seizure of the Spectranetics computers.

108. If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those computers of Spectranetics that the computer expert believes must be seized to permit the agents to locate the computer files described in the warrant at an off-site location.

## C.    Volume of Evidence:

109. Computer storage devices (like hard disks, diskettes, tapes, laser disks, external hard drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he/she might store it in random order with deceptive file names. Therefore, searching authorities may have to examine cursorily all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored. It would be impractical to attempt this kind of data search on-site.

## D.    Technical Requirements:

110. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to

40

inadvertent or intentional modification or destruction (both from external sources or from a destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

111.    Any components, systems, or other items will be seized and taken into custody. If employees of Spectranetics so request, the computer expert will, to the extent practicable, attempt to provide the employees with copies of any files not within the scope of the warrant that may be necessary or important to the continuing function of Spectranetics. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

112.    Searching the Spectranetics computer systems for the evidence described in Attachment B to the search warrant may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, agents may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant. Similarly, agents may be able to locate the materials covered in the warrant by looking for particular directory or file names. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning

41

its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, I request permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B to the search warrant.

## V. CONCLUSION

Based on the foregoing facts, and on my experience and training, and on information from witnesses involved with this case, I conclude there is probable cause to believe that Spectranetics illegally marketed and promoted, and continues to illegally market and promote the "off-label" use of the CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter and TURBO-Booster guiding catheter, knowing that the use of the laser in the treatment of infrainguinal in-stent restenosis could cause significant bodily harm; and, Spectranetics illegally imported into the United States balloon catheters manufactured by Bavaria Medizin Technologie in Germany and catheter guidewires manufactured by FMD Co. Ltd. in Japan, which are unapproved medical devices, and caused them to be used for *in vivo* evaluation; and, Spectranetics failed to report test results and serious adverse events involving the use of their laser systems to the FDA.

While conducting all these acts, Spectranetics violated Title 21 U.S.C. §§ 331(a), 331(c), 331(k), 331 (q)(1), 331(q)(2), 352(o) and 352(t); and, Title 18 U.S.C. §§ 2, 371, 545, 1341 and 1343. Furthermore, I conclude the foregoing facts establish probable cause to believe the documents and items reflected in Attachment B, showing knowledge and willful intent to violate said statutes, are currently located at Spectranetics, 96 Talamine Court, Colorado Springs, Colorado, 80907 and 9965 Federal Drive, Colorado Springs, Colorado, 80921, more fully described in Attachment A.

42

DANIEL BURKE, SPECIAL AGENT
U.S. FOOD AND DRUG ADMINISTRATION
OFFICE OF CRIMINAL INVESTIGATIONS

Subscribed and sworn to before me this ___ day of September, 2008

UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

43

## ATTACHMENT A

Places to Be Searched

1.    **96 Talamine Court,Colorado Springs, Colorado  80907**

This location is described as a one-story cinder block and glass warehouse and office building

located at 96 Talamine Court, Colorado Springs, Colorado.  The front entrance to the building

has glass windows and doors and the roof of the building is blue-green.  In the parking lot, a sign

reads in part, *"Parking for Spectranetics, Employee and Visitors Only."*  In addition, a sign

towards the rear of the building reads, *"Spectranetics, Shipping and Receiving."*  Finally, a sign

affixed to the south side of the building reads, *Spectranetics, We get your blood flowing."*







2.     **9965 Federal Drive, Colorado Springs, Colorado 80921**

This location is described as a three story reddish-colored office building located at 9965 Federal

Drive, Colorado Springs, Colorado. On the road leading to the building, a blue and white sign

reads, *"Spectranetics, Corporate Headquarters, 9965 Federal Drive."* The building is situated

to the south of Federal Drive, north of Old Ranch Road and East of Interstate 25. On the very top

of the building are large white letters which read, "Spectranetics."






**ATTACHMENT B**

Items to be Seized

**I.    For the period January 2005 until the present:**

   1.    All tests, studies, reports, databases, diaries, journals, films, photographs, presentations or documents related to the promotion, use, testing, marketing or sales of the CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter or TURBO-Booster guiding catheter for the treatment of in-stent restenosis.

   2.    All internal or external correspondence or emails related to the promotion, use, testing, marketing, or sales of the CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter or TURBO-Booster guiding catheter for the treatment of in-stent restenosis.

   3.    Compensation packages for the following Spectranetics personnel: John G. Schulte, Jonathan W. McGuire, Stephen D. Okland, Larry Adighije, Don Fletcher, Michael Handley, Trung T. Pham, D. Craig Walker, Anton Benitez, Jennifer Vaughan, Kurt Kerzic.

   4.    Payments made to the following medical personnel for the use of the CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter or TURBO-Booster guiding catheter for the treatment of in-stent restenosis.: Rajesh Dave, Matthew T. Menard, Barry Katzer, Manish Mehta, Eric J. Dippel, Robert Gallino, Mark W. Mewissen, Arun Chervu

   5.    Records of payments made to Arizona Heart Institutes's

   6.    Computers, laptops, storage devices, and any other electronic media as described herein that may contain the above-described documents.

**II.    For the period January 2005 until the present:**

   1.    All tests, studies, reports, databases, diaries, presentations, journals, films, or documents related to the promotion, use, testing, experimentation, delivery, marketing or sales of catheter guidewires manufactured by FMD Co. Ltd. in Japan.

   2.    All internal or external correspondence, consultations, or emails related to the acquisition, promotion, use, testing, experimentation, delivery, marketing or sales of catheter guidewires manufactured by FMD Co. Ltd. in Japan.

3.   Shipping records, bills of lading, invoices, importation documents or inventories, related to catheter guidewires manufactured by FMD Co. Ltd. in Japan.

4.   Any and all guidewires or guide wire labels or containers manufactured by FMD Co. Ltd

5.   Contracts or agreements between FMD Co. Ltd and Spectranetics.

6.   Records of payments, purchase orders, invoices, or other financial transactions relating to guide wires produced by FMD Co. Ltd.

7.   Records of payments, wire transfers, checks or other compensation made to medical personnel for the evaluation, acquisition, promotion, use, testing, experimentation, delivery, marketing, or sales of catheter guidewires manufactured by FMD Co. Ltd. in Japan.

8.   Computers, laptops, storage devices, and any other electronic media as described herein that may contain the above-described documents.

**III.    For the period January 2007 until the present**

1.   All tests, studies, reports, databases, diaries, presentations, journals, films, or documents related to the promotion, use, testing, delivery, marketing or sales of balloon catheters manufactured by Bavaria Medizin Technologie in Germany.

2.   All internal or external correspondence, consultations, or emails related to the acquisition, promotion, use, testing, delivery, marketing or sales of balloon catheters manufactured by Bavaria Medizin Technologie in Germany.

3.   Shipping records, bills of lading, invoices, importation documents or inventories, related to balloon catheters manufactured by Bavaria Medizin Technologie in Germany.

4.   Records of payments, wire transfers, checks or other compensation made to medical personnel for the evaluation, acquisition, promotion, use, testing, experimentation, delivery, marketing or sales of balloon catheters manufactured by Bavaria Medizin Technologie in Germany.

5.   Any balloon catheters, labels or containers manufactured by Bavaria Medizin Technologie.

6.   Contracts or agreements between Bavaria Medizin Technologie and Spectranetics.

47

7. Records of payments, purchase orders, invoices, or other financial transactions relating to balloon catheters manufactured by Bavaria Medizin Technologie.

8. Computers, laptops, storage devices, and any other electronic media as described herein that may contain the above-described documents.

**IV.    For the period of June 2002 to the present:**

1. All study-related documents, including but not limited to, reports, site data, investigator data, patient data, study plans, outcome data, clinical data and pathology reports, in vitro studies, SVG studies and spreadsheets, pertaining to the CORAL and CORAL REEF studies.

2. All correspondence with Investigational Review Boards regarding the CORAL and CORAL REEF studies.

3. All correspondence with doctors, investigators or other medical personnel regarding the CORAL and CORAL REEF studies.

4. All payments made to any and all medical personnel participating in the CORAL and CORAL REEF studies, including, but not limited to checks, invoices, bills, statements, deposits, and wire transfers.

5. Documents pertaining to Spectranetics equipment donated, loaned, sold or leased to doctors or hospitals involved in the CORAL and CORAL REEF studies.

6. Internal and external correspondence, documents, or emails related to the CORAL and CORAL REEF studies.

7. Documents or other data showing information on any Serious Adverse Events related to the CORAL and CORAL REEF studies.

8. All contracts or agreements between Spectranetics and medical personnel, hospitals, clinics, Investigational Review Boards, laboratories or patients involved in the CORAL and CORAL REEF studies.

9. Computers, laptops, storage devices, and any other electronic media as described herein that may contain the above-described documents.