**Exhibit B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02048-REB-KLM

(Consolidated with Civil Action No. 08-cv-02055-CMA-CBS, 08-cv-02078-MSK-BNB, 08-cv-02267-MSK-CBS, 08-cv-02420-PAB, 08-cv-02603-MSK-BNB)


In re SPECTRANETICS CORPORATION SECURITIES LITIGATION

---

**LEAD PLAINTIFF'S SUPPLEMENTAL CONSOLIDATED CLASS ACTION COMPLAINT**

---

Lead Plaintiff, the Spectranetics Investor Group ("SIG" or "Lead Plaintiff"), by and through its undersigned attorneys, on behalf of itself and the class it seeks to represent, for its Supplemental Consolidated Class Action Complaint ("Complaint"), alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff which are alleged upon personal knowledge.  Lead Plaintiff's information and belief is based on the investigation of its counsel, which included, without limitation: a review of United States Securities and Exchange Commission ("SEC") filings by Spectranetics Corporation ("Spectranetics" or the "Company"), regulatory filings and reports, responses to Freedom of Information Act ("FOIA") requests submitted to government agencies, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports and news articles about the Company, publicly available information concerning Spectranetics common stock, the search warrant used by government agencies to

investigate suspected wrongdoing at Spectranetics, the Non-Prosecution Agreement, Corporate Integrity Agreement and Civil Settlement that Spectranetics entered into with federal agencies, and interviews with former employees of the Company who have come forward on a confidential basis.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Spectranetics between March 16, 2007 and September 4, 2008, inclusive (the "Class Period"), and were damaged thereby (the "Class").  This action pursues remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Spectranetics develops, manufactures, markets, and distributes single-use medical devices for minimally invasive surgical procedures within the cardiovascular system and excimer laser technology for use with its associated medical devices.  The Company is incorporated in Delaware and maintains its headquarters in Colorado Springs, Colorado.

3.      Pursuant to the provisions of the Food, Drug, and Cosmetic Act ("FDCA") and accompanying Food and Drug Administration ("FDA") regulations, a manufacturer is prohibited from marketing or promoting a medical device for any uses other than the uses indicated on the approved device's application.

4.      Throughout the Class Period, Spectranetics had regulatory approval to promote its excimer laser and its associated disposable medical devices for atherectomy, which is a procedure to remove arterial blockages in the legs and in the coronary area.  The laser system is also FDA approved to remove infected, defective, or abandoned lead wires from patients with pacemakers or ICDs, which are electronic

devices used to regulate the heartbeat. In addition, Spectranetics had FDA approval to market its laser to treat in-stent restenosis in the *coronary* arteries, but **not** the peripheral arteries found in patients' legs. In-stent restenosis involves using the laser to remove blockages in stents placed in arteries.

5.    Marketing and promoting the Company's laser system to doctors and medical centers for the non-FDA approved procedure of in-stent restenosis *in the peripheral arteries* represented a material opportunity for Spectranetics, but one which was prohibited because the Company did not have FDA approval to market it for that purpose.

6.    At great risk to the Company's business prospects and its shareholders, and without disclosing their plan and conduct to the public, as early as spring 2007, Defendants embarked on a plan and scheme to create the impression in the marketplace that Spectranetics was proceeding in a legal, deliberate manner to obtain the sought-after FDA approval of the use of its laser and medical devices for in-stent restenosis in the peripheral arteries.

7.    Unbeknownst to investors and those outside the Company, however, Defendants were proceeding neither legally nor in such a deliberate manner.

8.    Defendants, all of whom were integral parts of the plan and scheme described herein, launched a multi-front effort to promote the use of its medical devices for in-stent restenosis in the peripheral arteries without first obtaining FDA approval. This plan included promoting and demonstrating the Company's laser system and medical devices by top Company officials for in-stent restenosis procedures at Spectranetics-sponsored medical education events. Defendants also knowingly or recklessly violated FDA rules and regulations by importing medical devices from overseas and testing them on humans to evaluate their marketability in the United

States, even though these devices were not FDA-approved for use on humans in the United States.  Additionally, when the Company experienced adverse test results where stents were damaged when they came in contact with the laser during FDA-required "Worst Case" testing protocols, Defendants elected not to report these adverse results to the FDA.

9.    Defendants' efforts to keep the public and investors from learning about their scheme to circumvent FDA rules and regulations unraveled when, on September 4, 2008, the Company revealed that it had been served with a search warrant by the FDA and U.S. Immigration and Customs Enforcement ("ICE").  FDA and ICE raided Spectranetics' headquarters in Colorado Springs, seeking information and data in conjunction with a criminal investigation showing that Defendants marketed, promoted and sold certain products for the treatment of in-stent restenosis; made payments to medical personnel and a particular institution for this application; and tested, promoted and sold guidewires and catheters manufactured by international third parties, devices which were not FDA approved for use in humans.  The government agencies also sought the details of two post-market studies completed during the period between 2002 and 2005; payments made to personnel in connection with those studies; and compensation packages for certain employees.

10.    The federal investigation appears to be the result of a whistleblower action filed on September 5, 2008, by Scott Schlesinger, a Spectranetics employee who was fired by the Company on April 3, 2008.  Schlesinger filed a wrongful termination lawsuit, alleging that he discovered the Company was illegally and "extensively" marketing its laser and catheters for uses that had not been approved by the FDA; that the Company failed to report to the FDA that tests found its laser "caused significant damage" to

stents the Company was using in a clinical trial; and that the Company illegally tested several products on humans without FDA approval.

11.    Additional former employees of Spectranetics corroborate and provide additional details to the allegations raised by Schlesinger.

12.    According to a press release issued on June 17, 2009, Spectranetics entered into a settlement agreement with Schlesinger.  As part of the settlement, Schlesinger is prohibited from discussing his allegations or the terms of the settlement with anyone.  The Company also entered into a Civil Settlement Agreement, Non-Prosecution Agreement and Corporate Integrity Agreement with the Department of Justice ("DOJ"), U.S. Attorneys' Office, and the U.S. Department of Health and  Human Services in December, 2009, resolving many but not all of the investigated claims that the Company engaged in improper conduct.[1]   These agreements do not settle any claims that may still be brought against the Individual Defendants or other employees of the Company, and they do not resolve claims that may be brought by other government agencies against the Company, including the FDA.  As part of the Non-Prosecution Agreement, Spectranetics *admitted and agreed not to contest* the government's claims that it did not comply with FDA reporting requirements involving its CORAL and CORAL REEF studies, and that the Company, through its officers and key employees, illegally imported and tested FMD Guidewires and BMT Balloons on human subjects, without FDA approval or clearance.

13.    Like any pharmaceutical or medical device manufacturer, Spectranetics' value to shareholders, as reflected in its trading price, is derived in significant part from the integrity of its relationship with the FDA, its compliance with FDA rules and regulations, the professionalism of its testing procedures, and the professionalism and

---

[1] These agreements are attached hereto as Exhibits ("Ex.") A, B and C respectively.

integrity of those doctors it chooses to represent Spectranetics to the public. Spectranetics lost that value when its deceptive practices were revealed.

14.     The disclosure of the government's investigation on September 4, 2008, caused the Company's stock to plummet from $9.00 per share to $4.73 per share, a one-day decline of nearly 48% on volume of more than 6 million shares, compared to an average 30-day volume of 356,000.  This stunning drop wiped out more than $136 million of the Company's market capitalization.

15.     The one-day drop reflected the market's realization that the previously announced revenue and earnings statements reflected the sale of laser systems and medical devices which were marketed by the Company in violation of FDA rules and regulations, and of equal importance, the market's recognition that going forward, sales would be impacted by the Company's inability to improperly market its products.   The drop also reflected the impact of the investigation and potential for fines, legal fees or worse, and the impact of the investigation on the Company's reputation in the medical device industry and with government agencies.

16.     On September 19, 2008, the Company filed a candid Answer to Schlesinger's complaint in Colorado state court.  In its Answer, Spectranetics admitted that numerous Spectranetics officials were already aware of the off-label compliance issues raised in Schlesinger's complaint.  Despite admitted insider knowledge, Defendants concealed these problems in communications to shareholders when it spoke about its clinical trials and continued to maintain that it did not promote its products for off-label or otherwise unapproved uses.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Spectranetics is headquartered within this Judicial District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

21.     Lead Plaintiff SIG, the Court appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, consists of the Genesee County Employees' Retirement System ("Genesee"), the Wayne County Employees' Retirement System ("Wayne") and Peter J. Tortora ("Tortora").

22.     Genesee is a public pension fund that provides retirement and survivor benefits for certain employees of Genesee County, Michigan, embracing the City of Flint and environs.  Genesee purchased Spectranetics common stock in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Spectranetics securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Spectranetics that was misrepresented and omitted during the Class Period was revealed.  Genesee's Certification containing a detailed list of its transactions in Spectranetics securities during the Class Period is attached hereto as ~~Exhibit A~~Ex. D.

23.     Wayne purchased Spectranetics securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Spectranetics securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Spectranetics that was misrepresented and omitted during the Class Period was revealed.  Wayne's Certification containing a detailed list of its transactions in Spectranetics securities during the Class Period is attached hereto as ~~Exhibit B~~Ex. E.

24.     Tortora purchased Spectranetics securities, in reliance on Defendants' false and misleading statements and omissions of material facts and/or the integrity of the market for Spectranetics securities, at artificially inflated prices during the Class Period and suffered economic loss and damages when the truth about Spectranetics that was misrepresented and omitted during the Class Period was revealed.  Tortora's

Certification containing a detailed list of its transactions in Spectranetics securities during the Class Period is attached hereto as ~~Exhibit C~~Ex. F.

25.     Defendant Spectranetics is a Delaware corporation, with its principal place of business in Colorado Springs, Colorado.  Spectranetics common stock is listed and actively traded on the NASDAQ National Market System under the symbol "SPNC." NASDAQ is a well-developed, efficient market for securities.

26.     Defendant John G. Schulte ("Schulte") was President, Chief Executive Officer ("CEO"), and a director of Spectranetics during the Class Period.  Schulte became President and CEO of the Company in January 2003.  Schulte has extensive experience working at high-level positions in this field.  Schulte was formerly President and Chief Executive Officer of Consensus Pharmaceuticals, Inc., a privately held biotechnology company, from October 2001 to January 2003.  Schulte had been President and Chief Executive Officer of Somnus Medical Technologies, Inc., a medical device company specializing in the design, development, manufacturing and marketing of minimally invasive medical devices for the treatment of upper airway disorders, from November 1998 until its acquisition by Gyrus Group, PLC, a European medical device company, in October 2001.  Previously, Schulte was President of the Surgical Products Division of Genzyme Corporation, a medical device company specializing in anti-adhesion products for general surgery and cardiovascular medical devices and instruments, from July 1997 to October 1998.  From November 1996 to June 1997, he served as Senior Vice President and General Manager of the International and Peripheral Division of Target Therapeutics, Inc., a medical device company specializing

in the treatment of vascular disease of the brain, which was acquired by Boston Scientific Corporation in April 1997. Schulte "resigned" from Spectranetics on October 21, 2008, in the wake of the regulatory investigation of the Company by the FDA and ICE. During the Class Period, Schulte signed the Form 10-K and 10-Q reports filed by the Company with the SEC, spoke about the Company's business during earnings conference calls with analysts, and provided interviews to news organizations regarding the Company. Schulte was also a driving force behind the illegal conduct complained of herein.

27.    Defendant Guy A. Childs ("Childs") was Vice-President, Chief Financial Officer ("CFO") and Secretary of Spectranetics during the Class Period. Childs joined the Company in September 1991 and has been CFO and Vice President of the Company since January 2003. Childs has an extensive accounting background. Prior to joining Spectranetics, Childs worked for the public accounting firm of Deloitte & Touche, LLP, serving as a senior accountant on various audit engagements in the financial services, healthcare and manufacturing industries. During the Class Period, Childs signed the Form 10-K and 10-Q reports filed by the Company with the SEC and spoke about the Company's business during earnings conference calls. Childs also participated in the illegal conduct complained of herein.

28.    Defendant Jonathan W. McGuire ("McGuire" or "Will McGuire") was Chief Operating Officer ("COO") of the Company during the Class Period. McGuire joined the Company as COO in October 2005. Prior to joining Spectranetics, McGuire held key positions at Guidant Corporation, most recently as General Manager of the Latin

American division, from March 2003 to August 2005.  Prior to that, he held several

marketing positions within Guidant's Vascular Intervention Group, including: General

Manager — Puerto Rico and U.S.V.I. from March 2003 to March 2004; Director of U.S.

Marketing from March 2002 to March 2003; Director of Global Marketing from May 2001

to March 2002, and Manager of Global Stent Marketing from April 1999 to May 2001.

During the Class Period, McGuire was closely involved in the day-to-day operations of

the Company and spoke about the Company's business during earnings conference

calls.  McGuire participated in the illegal conduct complained of herein.

    29.    Defendant Emile Geisenheimer ("Geisenheimer") was Chairman of

Spectranetics' Board of Directors ("Board") during the Class Period.   Geisenheimer

joined the Company as a director in 1990 and became Chairman of the Board in 1996.

Geisenheimer also served as acting President and CEO of the Company from May

2002 until Schulte assumed those posts in January 2003.  Geisenheimer was re-

appointed President and CEO on October 23, 2008, after Schulte resigned.

Geisenheimer is the founder and President of Madison Investment Partners, Inc., a

private equity investment firm, and serves as a General Partner of each of its

investment partnerships.  Prior to forming Madison Investment Partners, he was general

partner of Nazem and Company, a venture capital management firm, where he was

responsible for developing the health care and medical device practices.  Prior to joining

Nazem and Company, Geisenheimer served in a number of senior executive positions

with North American Philips Corporation (now Philips Electronics), including as

President and CEO of Philips Electronic Instruments, Inc. and as a top marketing

executive of Philips Medical Systems, Inc.  During the Class Period, Geisenheimer signed the Form 10-K reports filed by the Company with the SEC, participated in the day-to-day operations of the Company, and participated in the illegal conduct complained of herein.

30.     Defendant Craig M. Walker, M.D. ("Walker") was a director of Spectranetics during the Class Period.  Dr. Walker has been a director of the Company since December 2004.  Dr. Walker is a practicing interventional cardiologist.  Dr. Walker is also the founder, President, and Medical Director of the Cardiovascular Institute of the South ("CIS"), a position he has held since August 1983.  Additionally, Dr. Walker is the Medical Director of the CIS Cardiovascular Fellowship Training Program, Associate Clinical Professor of Medicine at Tulane University School of Medicine and Medical Director of the Cardiac Catheterization Laboratory at Terrebonne General Medical Center.  During the Class Period, Dr. Walker signed the Form 10-K reports filed by the Company with the SEC, participated in the day-to-day operations of the Company and participated in the illegal conduct complained of herein.  During the Class Period, Dr. Walker used his medical degree and influence to advance Spectranetics' illegal goals.

31.     Defendants Schulte, Childs, McGuire, Geisenheimer, and Dr. Walker are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and Spectranetics are collectively referred to herein as the "Defendants."

32.     Each of the Individual Defendants is or was a senior officer or Board member during the Class Period.  The Individual Defendants controlled the Company and its public disclosures regarding its medical devices, regulatory compliance and

revenues.  Each of them made false and misleading statements and/or failed to disclose material adverse information and/or participated in the scheme to defraud the Company's shareholders through their words and conduct as detailed herein.

33.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, compliance and non-compliance with FDA regulations, operational trends, financial statements and markets via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

34.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the collective action of the narrowly defined group of Individual Defendants identified above.  Each of the Individual Defendants identified above, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, as well as compliance and non-compliance with FDA regulations, operations, growth, financial statements, and financial condition,

as alleged herein.  The Individual Defendants participated in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

35.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ securities exchange, and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management and earnings and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these requirements and obligations.

36.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein.  The Individual Defendants were also aware of, or recklessly disregarded the misstatements and/or omissions contained in these reports and communications and were aware of the false and misleading nature of these misstatements or omissions.  Because of their Board membership and/or

executive and managerial positions with Spectranetics, each of the Individual

Defendants had access to the adverse undisclosed information about Spectranetics'

financial condition, compliance and non-compliance with FDA regulations, and

performance as particularized herein and knew (or recklessly or negligently

disregarded) that these adverse facts rendered the positive representations made by or

about Spectranetics and its business issued or adopted by the Company materially

false and misleading.

37.    The Individual Defendants, because of their positions of control and

authority as officers and/or directors of the Company, were able to and did control the

contents of the various SEC filings, press releases and other public statements

pertaining to the Company during the Class Period.  Each Individual Defendant was

provided with copies of the documents alleged herein to be misleading prior to or shortly

after their issuance and/or had the ability and/or opportunity to prevent their issuance or

cause them to be corrected.  Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and releases detailed herein and is

therefore primarily liable for the representations contained therein.

38.    Each of the Defendants is also liable as a participant in a fraudulent

scheme and course of business that operated as a fraud or deceit on purchasers of

Spectranetics securities by: disseminating materially false and misleading statements

and/or concealing material adverse facts; deceiving the investing public regarding

Spectranetics' business and operations and financial condition; and causing Lead

Plaintiff and other members of the Class to purchase Spectranetics securities at artificially inflated prices.

39.    A typical Board of Directors has the overall responsibility for the activities of the corporation.  The Board acts on behalf of the shareholders to make ***overall*** policy decisions and provide oversight.  Spectranetics' Board, however, was unusual in that outside directors Geisenheimer and Dr. Walker acted as insiders as they had day-to-day involvement in the operations of the Company.

40.    Dr. Walker, through his relationships, affiliations and ownership in medical centers throughout the country, provided Spectranetics with approximately 50% to 60% of its revenue.  Dr. Walker personally promoted the off-label use of Spectranetics' laser systems to other physicians and health care providers.  Despite taking an oath to "do no harm," he participated in the illegal and unethical testing of foreign-made, non-FDA approved medical devices on humans on behalf of the Company.  Dr. Walker received lucrative consulting deals with the Company as incentive to engage in these illegal acts. During the Class Period, Dr. Walker received hundreds of thousands of dollars in compensation from the Company.  In exchange, Dr. Walker furthered and supported the illegal goals of the Company.  While the existence of the Company's consulting agreement with Dr. Walker was disclosed generally in a Form 14A, filed with the SEC on April 17, 2009, in a Form 8-K filed on June 22, 2007, and in other SEC filings, the Company never disclosed the illicit nature of the agreements and their purpose: to promote the off-label testing and use of medical devices.

41.    Geisenheimer was Chairman of the Board of Directors during the Class Period and was subsequently re-appointed as CEO following Schulte's resignation. While serving as Chairman of the Board and without an official executive title, Geisenheimer participated with the top officers in running the Company on a day-to-day basis and in the scheme to defraud investors.  Geisenheimer was paid $147,744.00 in 2008 for his services as CEO.  As compensation for serving as a director during the Class Period, he was paid $160,842 in 2008, $91,330 in 2007 and $75,434.00 in 2006.

## CLASS ACTION ALLEGATIONS

42.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons and entities that purchased or acquired the common stock of Spectranetics between March 16, 2007 and September 4, 2008, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Spectranetics had more than 31 million shares of common stock outstanding that traded on NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by Spectranetics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are, whether during the Class Period:

(a)     the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     the statements made by Defendants to the investing public misrepresented material facts about the business, operations and management of Spectranetics;

(c)     Defendants employed any device, scheme, or artifice to defraud Lead Plaintiff and the Class;

(d)      whether Defendants engaged in manipulative or deceptive acts or course of business which operated as a fraud and deceit upon Lead Plaintiff and the Class; and

(e)      to what extent the members of the Class have sustained damages and the proper measure of damages.

47.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

48.      Based in Colorado Springs, Colorado, Spectranetics develops, manufactures, markets and distributes the CVX-300® laser unit and single-use ("disposable") medical devices.  Spectranetics' products are used by physicians in minimally invasive procedures within the cardiovascular system.

49.      The Company markets two kinds of disposable product lines in addition to its laser.  The Company's Vascular Intervention ("VI") products include a range of laser catheters that aid in delivering laser energy to an artery to remove obstructions such as a build-up of plaque.  These disposable catheters are used in arteries in the legs, or peripheral arteries, and within arteries in the heart, or coronary arteries.  The Company

also markets aspiration catheters, not used with the laser, for the removal of thrombus, or blood clots, and support catheters to facilitate "crossing," or exchange of guiding catheters, for coronary and peripheral artery blockages.

50.    The second line of products marketed by the Company is the Lead Management ("LM") product line.  The LM product line includes laser sheaths and cardiac "lead management" accessories for the removal of cardiac pacemaker and defibrillator leads.  Pacemakers and defibrillator leads, prone to developing infections or scar tissue, oftentimes need to be removed.  The LM products, in conjunction with the laser, vaporize the scar tissue holding problematic leads and pacemakers in place.

51.    Spectranetics' VI products are designed to treat a wide range of cardiovascular disease, including peripheral and coronary arterial disease.  Peripheral arterial disease ("PAD") is characterized by clogged or obstructed arteries in the upper or lower leg.  The resulting lack of blood flow can cause leg pain and lead to tissue loss or amputation.  Similarly, coronary artery disease ("CAD"), also called coronary heart disease, is a condition in which plaque builds up inside the coronary arteries.

52.    The majority of the revenue generated by Spectranetics is from the sale of its disposable products, not its lasers.  Sales of disposables make up almost 85% of the Company's revenue.  Sales of the lasers make up 3%, while service and laser rentals make up the rest.  Thus, more than anything else, the financial condition of the Company is ~~dependant~~dependent on Spectranetics being able to market and sell its disposable medical devices.

53.     Revenue from the disposable devices is reported by product line—atherectomy (VI products) and lead removal (LM products).  Lead removal products make up 30% of the revenue from disposables, while the sale of atherectomy disposables makes up 70%.  PAD, or arterial disease in the legs, represents an overwhelming 90% of the atherectomy business.  In other words, the sale of disposable medical devices used in the arteries of patients' legs generates a material portion of the Company's revenue.

**FDA Regulation of Spectranetics Products**

54.     The lasers and medical devices sold by Spectranetics are subject to significant FDA regulation.

55.     Prior to receiving FDA clearance to market a medical device, the FDA requires the applicant to prove that the device is safe and effective for its intended use or that it is substantially equivalent to another medical device already on the market.  21 U.S.C. §§ 360(k), 360c(f), 360e(a); 21 C.F.R. §§ 807.92, 807.93.

56.     To show the safety of a medical device, an applicant must first obtain permission from the FDA to conduct pre-clinical, *i.e.*, non human, testing.  Obtaining permission from the FDA to test medical devices on humans is a costly and lengthy process.

57.     In order to clinically test a medical device, Spectranetics must first demonstrate the level of risk associated with the medical device.  21 C.F.R. § 812.2(b)(1)(ii); 21 C.F.R. § 812.3(m).  If the device poses a non-significant risk, the applicant must provide the reviewing regulatory board with information that would help

the regulatory board evaluate the level of risk to patients taking part in the study, including a description of the device, reports of prior investigations with the device, the proposed investigational plan, subject selection criteria, and other information the regulatory board may need.

58.      If the device poses a significant risk to humans, the FDA must approve an Investigational Device Exemption ("IDE") application prior to initiation of investigational use.  An IDE application must be supported by appropriate data, such as animal and laboratory test results, showing that it is safe to test the device on humans and that the testing protocol is scientifically sound.

59.      Once an applicant receives FDA permission to test the device on humans, the applicant must then sponsor clinical trials to test the efficacy of the device under the approved testing protocol.  These clinical trials are costly and can take years to complete.  Once the results are in, the applicant will present its clinical findings to the FDA.

60.      Once a medical device is cleared or approved by the FDA, the applicant may sell and market the device to the public, but only for the FDA-approved use which must appear on the product's labeling.  21 U.S.C. § 352(f); 21 C.F.R. § 801.5.  If the intended use of a product changes, the applicant must obtain FDA approval for the new use, so that the applicant can label the product appropriately.  21 C.F.R. § 807.81(a)(3); 21 C.F.R. § 801.4.  If off-label uses are included in the product's labeling, the product is "adulterated," and if off-label uses are promoted, the product is "misbranded."  21 U.S.C. §§ 351(f)(1)(B), 352(f).  Manufacturing or introducing an adulterated or

misbranded product into interstate commerce is prohibited.  21 U.S.C. § 331(a-c), (g).

***Thus, the FDCA and the corresponding FDA regulations prohibit an applicant from promoting a medical device for off-label uses.***

61.     Before the start of the Class Period, Spectranetics obtained FDA approval to market its laser system and associated disposable products for procedures including atherectomy, which is a procedure using a laser to remove arterial blockages in the peripheral and coronary vasculature and for the removal of infected, defective or abandoned cardiac lead wires from patients with pacemakers or implantable cardiac defibrillators, which are electronic devices that regulate the heartbeat.

62.     Spectranetics also obtained FDA approval to treat in-stent restenosis in the coronary arteries.  When an artery becomes blocked, a stent or tube may be inserted into the artery to prevent or counteract the blocked passageway.  When a stent is placed in an artery, new tissue grows inside the stent covering the struts of the stent. Initially, this new tissue consists of healthy cells from the lining of the arterial wall, which is a favorable effect because development of normal lining over the stent allows blood to flow smoothly over the stented area without clotting.  Later, scar tissue may form underneath the new healthy lining.  The growth of scar tissue underneath the lining of the artery may be so thick that it can obstruct the blood flow and produce a blockage. This is called "in-stent restenosis" or ISR.  **Spectranetics did not and does not have FDA approval to treat ISR in the leg for PAD** (peripheral artery disease).  Therefore, while doctors are not prohibited by FDA rules and regulations from using Spectranetics'

products to treat ISR in PAD, **Spectranetics cannot promote its laser system or**
**medical devices to treat ISR in PAD**.

**Illegal Promotion of FDA Approved Devices**

63.     During the Class Period, the development of ISR technology for use in
PAD was at the forefront of the Company's efforts.  Defendants realized that there was
a large and growing market for the treatment of blocked stents placed in the arteries of
human legs.

64.     An article in the *Colorado Springs Business Journal* by Amy Gillentine,
dated October 12, 2007, described laser treatment of ISR for use in peripheral arteries
as the "holy grail" for Spectranetics.  The article noted that: "[m]ore than 100,000
patients receive treatment for in-stent restenosis each year, so if the laser is proven to
be effective it also could be very profitable."  In the article, Schulte discussed how
approval by the FDA for ISR in peripheral arteries could mean up to $200 million for the
Company's bottom line.

65.     In September of 2007, the Company initiated a clinical trial in Germany to
test its laser in conjunction with a disposable catheter for the treatment of ISR of stents
that had been implanted in the leg (the "PATENT trial").

66.     In February of 2008, the Company initiated the SALVAGE trial.  The
SALVAGE trial was a physician-sponsored trial in the United States by the Vascular
Interventional Advances (VIVA) physicians and was co-funded by W.L. Gore and
Spectranetics.  This trial was intended to test the use of the Spectranetics laser in

conjunction with a disposable catheter for treatment of ISR for stents that had been implanted in the leg.

67.    In connection with these studies, the Company publicly expressed its hope that the FDA would one day approve its products for the use of ISR in patients' legs. Spectranetics stated publicly time and time again that having an approved treatment for ISR in peripheral arteries would be a very lucrative "opportunity" for the Company.

68.    Unbeknownst to the public, however, as early as spring 2007, Defendants made the decision to market its laser system and medical devices to treat ISR in the legs without first obtaining FDA approval.

69.    In furtherance of Defendants' decision to market its medical devices for the off-label use of the Company's laser system and medical devices to treat ISR in PAD, during the Class Period, Defendants authorized employees of the Company to perform the following tasks:

(a)    Develop sales and promotional strategies for field sales personnel designed to convince doctors to use their medical device for ISR in PAD;

(b)    Distribute and use sales training materials and promotional materials promoting off-label use; and

(c)    Aggressively solicit and pay doctors to demonstrate and promote the Spectranetics laser system and medical devices for non-FDA approved procedures.

70.    To this end, the Company illegally promoted and marketed its products through Board member Dr. Walker and other doctors at various training sessions attended by targeted doctors including "Gloves On" Peripheral Vascular Disease

("PVD") Training Courses and individualized training sessions targeted to groups of 10-15 doctors. Dr. Walker and other doctors were paid by the Company as "consultants" in return for their off-label promotion of the Company's products for ISR in peripheral arteries.

71.    Under an agreement with the Company, Dr. Walker was paid at least $97,000 in 2006, $144,000 in 2007 and $117,000 in 2008 as consulting fees for his efforts to market and sell the Company's medical devices for non-FDA approved uses.

72.    The Company's top executives and the Board of Directors, including Geisenheimer, knew about the illegal off-label promotion, use and marketing of the Company's laser system and medical devices. They also knew about the involvement of Dr. Walker and other doctors in these efforts and that the Company was paying Dr. Walker and others "consulting fees" to promote and market its medical devices for off-label use, but allowed these actions to continue.

**Failure to Report Adverse Effects to the FDA**

73.    Defendants' illegal promotion of its laser system and medical devices for off-label use was not to the exclusion of its efforts to obtain FDA approval in the future for such use.

74.    During the Class Period, Spectranetics performed "in house" studies on the lasers' interaction with a particular kind of stent called a nitinol stent. Spectranetics failed to disclose to the FDA that these tests yielded negative and potentially dangerous results.

75.     Beginning in the summer of 2007, Kelly W. Elliott, Vice President of Clinical Affairs, worked with an engineer to perform laser tests on a stent made up of nickel and titanium (the "nitinol stent").  As required by the FDA, Elliott and the engineer performed extensive fatigue testing on the stent, pulsing the laser to its highest capacity on the nitinol stents.  The test results revealed that the laser caused major damage to the nitinol stents, a significant negative finding that would likely prevent the laser from obtaining FDA approval for use in ISR procedures.  The Company did not report these significant negative results to the FDA even though they were required to notify the FDA of "every possible way the device can harm humans."

76.     Separately, the PATENT and SALVAGE trials, sponsored by the Company, were also testing the nitinol stents' reaction with the laser.  Unlike the testing done at Spectranetics, which was done in a vacuum, the PATENT and SALVAGE trials were performed on humans.  The Company allowed the PATENT trial (beginning in September 2007) and the SALVAGE trial (beginning in February 2008) to begin and continue throughout the Class Period, even though as early as the summer of 2007 the Company knew that the laser could potentially damage the nitinol stent and cause harm to the human test subjects.

77.     In violation of law and FDA requirements, Spectranetics did not report the adverse results of these tests to the FDA.  To the contrary, ignoring the significant health risks exposed by this testing, Spectranetics continued to actively market its laser system and medical devices for off-label use in peripheral ISR procedures, even going so far as to represent that the device was safe and effective for such procedures, and

lauding the fact that the device was "not contra-indicated" for ISR procedures. Additionally, Dr. Walker continued to market ISR procedures on humans during training sessions, using the potentially dangerous nitinol stent.

78.     This was not the first time Spectranetics failed to report adverse test results to the FDA.  As set forth in the Application and Affidavit for Search Warrant and Seizure ("Application for Search Warrant"), a copy of which is attached as Ex. G, and as the Company admitted in the Non-Prosecution Agreement, attached as Ex. B, Spectranetics previously failed to report serious adverse test results observed in connection with its CORAL and CORAL REEF Studies.  Defendants Schulte and McGuire had daily oversight responsibilities for these studies which were conducted between June 2003 and December 2005, and were therefore aware of the high mortality rates observed and of the Company's decision not to report those results to the FDA.  *See* Application for Search Warrant, Ex. G, ¶¶ 64-77, and Non-Prosecution Agreement, Ex. B.

**Illegal Testing of Foreign Medical Devices**

79.     78. The illegal practices, supported and carried out by the Company's top officials and Board members, pervaded throughout the Company and were not limited to the illegal promotion of its laser system and medical devices for off-label use.

80.     79. During the Class Period, Spectranetics imported and illegally tested foreign disposable medical devices on humans.

81.     80. Beginning in 2006,2005, the Company contracted with a Japanese Company, FMD, Inc. ("FMD"), to import guidewires into the United States.  FMD

manufactures guidewires that can be used with the type of minimally invasive catheter therapy that Spectranetics engages in for vascular intervention procedures.

82. ~~81.~~ While Spectranetics obtained FDA approval to import the guidewires from Japan, it did not obtain FDA approval to test the guidewires on humans.  In fact, the FMD guidewires were specifically labeled **"not for human use"** on the packaging. Regardless, Spectranetics provided these guidewires to Board member, Dr. Walker, with the directive to test the product on humans to determine if the product would be viable and whether it was a product that Spectranetics might look to market in the future.

83. ~~82.~~ Dr. Walker tested the FMD guidewires on humans several times beginning in 2006 through early summer 2007.  The Company's top executives, including Schulte, Childs and McGuire knew about the illegal testing on humans.  The Board of Directors, including Geisenheimer, was also informed about the illegal testing performed by Dr. Walker but allowed it to continue.

84. ~~83.~~ Spectranetics also illegally tested a second foreign manufactured medical device, Percutaneous Transluminal Angioplasty balloons ("BMT balloons"). BMT balloons were imported by Spectranetics from a German manufacturer, Bavaria MedizinTechnologie ("BMT").  These balloons are used to dilate the arteries of the legs.

85. ~~84.~~ The Company began receiving shipments of the BMT balloons as early as the summer of 2007.  The Company imported approximately 28 BMT balloons. While the Company had obtained permission to import the balloons into the United

States, the Company did not have FDA permission to test these balloons on humans. In fact, the packaging was specifically labeled **"not for human use."**

86. ~~85.~~ CEO Schulte worked with Trung Pham, a Business Development Manager at the Company, to provide the balloons to Dr. Walker and to a friend of Dr. Walker's, Dr. Robert Gallino ("Gallino").  Drs. Walker and Gallino were paid consulting fees to test the BMT balloons on humans.  As early as summer 2007, Pham visited Dr. Walker and Gallino on several occasions to observe the procedures and complete evaluation forms in consultations with them.

87. ~~86.~~ At a meeting in December 2007, Spectranetics officials, including Schulte and McGuire, discussed and observed the finding that physicians who had evaluated the BMT balloons at several different sites throughout the United States were very pleased with the product's performance.

88. ~~87.~~ By bypassing FDA rules and regulations and having physicians utilize unapproved, imported guidewires and balloons in humans, Spectranetics was able to test and analyze devices without the significant expense and delay of controlled clinical trials, as required by FDA regulations.

**Investigations Into Spectranetics' Wrongdoing**

89. ~~88.~~ On September 4, 2008, the Company revealed that it had been served with a search warrant by the FDA and ICE as part of a criminal investigation of wrongdoing.  The government agencies sought information and correspondence relating to violations of the Safe Medical Devices Act and FDCA, including: promotion and sales of certain products for the treatment of "in-stent restenosis," payments made

to medical personnel and a particular institution for this application, and the promotion and sales of guidewires and catheters manufactured by international third parties. Federal authorities also sought information on two post-market studies completed during the period from 2002 to 2005 and payments made to personnel in connection with those studies, as well as compensation packages for certain employees.

90. 89. The federal investigations appear to have originated from allegations brought by Scott Schlesinger, a former employee of Spectranetics. Schlesinger's allegations were contained in a civil complaint filed against Spectranetics on September 5, 2008, for, among other things, wrongful termination (the "Whistleblower Complaint"). Schlesinger, the former Director of Marketing at the Company from April 2007 to April 2008, alleged that Spectranetics fired him for confronting Company officials about the widespread illegal behavior perpetrated by the Company and its top leaders, including: illegally and "extensively" marketing its laser and catheters for uses that had not been approved by the FDA; failing to report to the FDA that tests found its laser "caused significant damage" to the stents it was using in a clinical trial; that the Company illegally tested several products on patients without FDA approval; and that the Company's laser systems failed to meet regulatory requirements.

91. 90. In connection with the Whistleblower Complaint, the Department of Labor ("DOL") also initiated an investigation. In addition, the SEC and the Financial Industry Regulatory Authority ("FINRA") issued document requests and inquiries into the Company's activities.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

**Fiscal Year 2006**

92. 91. The Class Period begins on March 16, 2007, when Spectranetics filed

its 2006 Annual Report with the SEC on Form 10-K (the "2006 10-K").  The 2006 10-K

was signed by Defendants Schulte, Childs, Geisenheimer, and Dr. Walker.

93. 92. Under Item 1A of the 2006 10-K, listing "Risk Factors," the report

affirmatively states:

> **We do not promote our products for off-label or
> otherwise unapproved usage.**

(Emphasis added.)

94. 93. In the section of the 2006 10-K regarding "Overview of Medical Device

Regulation," the Company recognizes: "Our products are medical devices subject to

extensive regulation by the FDA under the Federal Food, Drug, and Cosmetic Act, or

FDCA."  The Company goes on to state:

> To be commercially distributed in the United States, medical
> devices must receive either 510(k) clearance or PMA [pre
> market approval] prior to marketing from the FDA pursuant
> to the FDCA.  Devices deemed to pose relatively less risk
> are placed in either Class I or II, which requires the
> manufacturer to submit a premarket notification requesting
> permission for commercial distribution; this is known as
> 510(k) clearance.
>
> Some low risk devices are exempted from this requirement.
> Devices deemed by the FDA to pose the greatest risk, such
> as life-sustaining, life-supporting or implantable devices, or
> devices deemed not substantially equivalent to a previously
> 510(k) cleared device or a preamendment Class III device
> for which the FDA has not yet called for submission of PMA
> applications are placed in Class III requiring PMA.

> **All clinical studies of investigational devices must be
> conducted in compliance with FDA's requirements.** If an
> investigational device could pose a significant risk to patients
> (as defined in the regulations), the FDA must approve an
> IDE application prior to initiation of investigational use.

(Emphasis added.)

95. ~~94.~~ These statements were materially false and misleading when made because in 2006, the Company had already begun importing a medical device, a guidewire, from Japan that was not FDA-approved for use in humans.

96. ~~95.~~ Alarmingly, Spectranetics encouraged and even assisted physicians who "consulted" for Spectranetics to use and test these non-FDA approved guidewires on humans in the United States.

97. ~~96.~~ According to Confidential Witness 1 ("CW 1"), an Executive Officer who worked at the Company's headquarters from May 2007 through October 2008, the Company had an arrangement with a Japanese Company, FMD, to import guidewires into the United States. As Vice President in charge of overall strategic business decisions, CW 1's responsibilities included corporate strategy, acquisitions and new product strategies. CW 1 has over 20 years experience working in the medical device industry. CW 1 interacted at a high level with all the Individual Defendants and CW 1 learned of the decision to import and test the Japanese guidewires on humans from CW 1's discussions with the Individual Defendants.

98. ~~97.~~ CW 1 confirmed that while Spectranetics obtained FDA approval to import the guidewire from Japan, the Company did not obtain FDA approval to test the guidewire on humans. In fact, the FMD guidewire was specifically labeled **"not for**

**human use"** on the packaging.  Regardless, in 2006 and 2007, Spectranetics provided this guidewire to Board member Dr. Walker with the directive to test the product on humans to determine if it would be a product that Spectranetics might one day look to promote and sell.

99. 98. Dr. Walker tested the FMD guidewire on humans several times beginning in 2006 through the spring of 2007.  As soon as CW 1 arrived at the Company, Schulte discussed the circumstances under which Spectranetics came to acquire the FMD guidewire with CW 1, and how it was being evaluated by Dr. Walker on humans.  In addition, at a meeting of the Board of Directors in Denver, on or about May 7, 2007, CW 1 was present and heard Schulte updating the Board as to the Company's acquisition and testing of the FMD guidewire.   At the meeting, Board members, including Dr. Walker, discussed the human product evaluations.  Additionally, CW 1 discussed the FMD guidewire project with McGuire.

100. 99. CW 1 was shocked that the Company was testing the product on humans and discussed this with Schulte.  He recommended that the Company cease its relationship with FMD.  In addition, CW 1, as part of his responsibilities to consider the Company's corporate strategy, performed a cost-benefit analysis and determined that even if the FMD guidewires did work (with proper testing overseas and in the U.S.), the guidewires would not provide to be cost effective.  Based on CW 1's evaluation, the Company cancelled its contract with FMD and ultimately had to pay cancellation penalties to FMD.

101.  ~~100.~~ Childs, the CFO, also knew that Dr. Walker was conducting illegal tests on humans with the FMD product.  According to CW 1 "[t]he day that I killed the FMD project, he [Childs] thanked me and said that he [Childs] had been trying to stop it for so long but no one would listen to him."

102.  Defendants admitted in the Non-Prosecution Agreement that it illegally imported and tested FMD guidewires on human subjects, in violation of FDA rules and regulations.  In the Application for Search Warrant which preceded the Non-Prosecution Agreement, the government cited the testimony of its own confidential witnesses who knew about the Company's efforts to import and test the devices.  The government's confidential witnesses stated that from May 2005 until November 2007, Spectranetics contracted with FMD to manufacture these non-FDA approved guidewires and that Schulte himself provided these guidewires to physicians, requesting them to evaluate them in patients.  *See* Application for Search Warrant, Ex. G, ¶¶ 41-42.  The Application for Search Warrant also provides additional email evidence showing that Schulte traveled to Japan to tour the FMD facility in 2005, that FMD shipped the guidewires to Spectranetics, that Spectranetics forwarded the guidewires to doctors for testing, and that doctors reported their test results back to Spectranetics.  *See* Application for Search Warrant ¶¶ 43-54.  These same emails show the active involvement of Individual Defendants McGuire and Schulte with the illegal importing, marketing and testing of FMD guidewires.  Under the terms of the Non-Prosecution Agreement, the Company conceded that these allegations were true.

103. 101. The representations that Spectranetics did not promote its products for unapproved uses and that it conducted clinical trials in compliance with FDA rules and regulations, contained in Spectranetics' 2006 10-K, were materially false and misleading when made because Defendants failed to disclose or indicate that: (1) the Company had illegally tested the FMD guidewires on humans; (2) the Company had made improper payments to medical professionals including Board member Dr. Walker, who participated in human studies of the FMD guidewire; (3) the Company lacked effective regulatory and compliance controls, allowing the FMD guidewires to be tested on humans without FDA approval; and (4) such questionable behavior would necessarily impact the business prospects of the Company and subject the Company to an extensive investigation by federal authorities into its business practices, which, when they occurred, would lead to potential fines and certain legal expenses which otherwise would not have been incurred.

104. 102. Additionally, pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the 2006 10-K included the following certifications signed by Defendants Schulte and Childs stating that the 2006 10-K did not include any material misrepresentations:

> I, [John G. Schulte/ Guy A. Childs] of Spectranetics Corporation, certify that:
>
> 1.      I have reviewed this annual report on Form 10-K of The Spectranetics Corporation;
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were

made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

> 5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of directors (or persons performing the equivalent functions):
>
>          a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
>          b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

105.    ~~103.~~ The Sarbanes-Oxley certifications signed by Schulte and Childs were materially false and misleading when made because Spectranetics engaged in questionable and illegal behavior as set forth above, the 2006 10-K contained materially false and misleading statements as set forth above, and the systemic flouting of FDA, ICE, SEC, FINRA, and criminal statutes exposed the Company to material liabilities and materially impacted the business prospects of the Company.

**Fiscal Year 2007**

106.    ~~104.~~ On April 19, 2007, Spectranetics issued a press release entitled "Spectranetics Reports First Quarter Revenue of $17.4 Million as Atherectomy Product Sales Increase 52%." The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo.  (April 19, 2007)** – Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the three months ended March 31, 2007.
>
> Revenue for the first quarter of 2007 reached $17.4 million, up 28% compared with revenue of $13.6 million for the first quarter of 2006.  For the quarter, disposable product revenue rose 35% to $14.4 million, laser revenue declined

> 23% to $1.1 million, and service and other revenue increased 20% to $1.9 million, all compared with the first quarter of 2006.

107. 105. Schulte was quoted in the press release, expounding on the important role of PAD treatment for the Company's bottom line:

> Spectranetics further expanded its role in treating PAD, as our atherectomy revenue again exceeded the overall growth in that market by a significant margin. Most importantly, we accelerated the progress of the TURBO Booster catheter when the FDA allowed us to end the CELLO trial early based on the strength of data on 61 patients, instead of continuing with the planned 85 patients. We have completed the patient follow-up study, and expect to file the 510(k) application within the next 30 days. The TURBO Booster [used to treat ISR in PAD] will greatly increase our market opportunity, as approximately two-thirds of the endovascular procedures performed in the United States are for above-the-knee blockages.

108. 106. These statements were materially false and misleading when made because by the time this press release was issued, Defendants' scheme to promote the Company's laser system and medical devices for off-label use was well underway. By this time, the reported revenue and earnings already reflected the impact of these efforts. The Company's promotion of its laser system and medical devices for off-label use began no later than during the quarter ending March 31, 2007.

109. 107. According to the Whistleblower Complaint, off-label marketing by representatives of the Company was required and expected. CEO Schulte made statements that Spectranetics needed to "control the podium" at conferences and other events to promote the Company's agenda for off-label use of its lasers to treat ISR in the peripheral arteries.

110. ~~108.~~ Additionally, according to Schlesinger, Schulte and Steve Okland, Vice President of Sales and Marketing, told the marketing department that it needed to aggressively promote Spectranetics' products as the "gold standard" for the treatment of ISR in peripheral arteries. The marketing department, under the direction of top Company officers, developed and distributed promotional strategies to convince doctors to use the Company's devices in non-approved manners, such as to treat ISR in peripheral arteries. Spectranetics also engaged in the aggressive solicitation of doctors to use its medical devices for off-label use and paid doctors to demonstrate the use of the Company's products for the treatment of ISR in peripheral arteries.

111. ~~109.~~ CW 2 was a former Territory Account Manager for Spectranetics between March 2005 and September 2007. CW 2 reported to Tom York who was the Regional Manager and worked out of Wisconsin. CW 2's sales region was Indiana and Illinois and CW 2 was considered to be an experienced sales person. CW 2 was the only sales person in his or her region authorized to sell lasers on his or her own without the help of his or her supervisor. Even though CW 2 was an experienced and trusted Territory Manager, CW 2 was taught that ISR in the leg was one of the indications for which the laser system was FDA approved. CW 2 does not remember ever receiving training explaining that ISR for the treatment of PAD **could not** be promoted by the Company.

112. ~~110.~~ Through off-label marketing, Spectranetics increased sales and rentals of its products without incurring the significant additional expenditures needed to obtain FDA approval for these additional uses.

113.    111. During a conference call with securities analysts on April 19, 2007,

Schulte and Childs reiterated the first quarter financial results reported that day.

McGuire was also present on the call.  In addition, Schulte described the company's

"excitement" at the "potential of the [Company's products] to treat in stent restenosis."

Schulte stated: "While laser atherectomy does not have an in-stent indication for the

SFA [superficial femoral artery, or leg artery], it also does not have a contraindicated."

He also laid out his plan to initiate ISR clinical trails in the United States.  Schulte also

stated: "I think the role for atherectomy in that application [ISR in peripheral arteries] will

be very large.  So I think that is the area where we're going to gain the most traction the

quickest."

114.    112. These statements were materially false and misleading when made

because while acknowledging that the Company could not market the laser to treat ISR

in peripheral arteries, the Company did not disclose that it had already begun

aggressively marketing, promoting and testing its products for use in the treatment of

ISR in peripheral arteries.

115.    113. On May 10, 2007, Spectranetics filed its quarterly report with the

SEC on Form 10-Q for the quarter ending March 31, 2007.  The filing was signed by

Defendants Schulte and Childs and reaffirmed the Company's previously announced

financial results.  The Company's revenue was broken down as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Revenue (in thousands):** | | |
| Equipment | $ 1,009 | $ 1,307 |
| Disposables | 13,302 | 9,801 |
| Service | 1,830 | 1,479 |
| Other, net of provision for sales returns | (123) | (74) |
| Subtotal — U.S. Medical | 16,018 | 12,513 |
| Equipment | 54 | 73 |
| Disposables | 1,124 | 867 |
| Service | 162 | 137 |
| Other | 7 | 27 |
| Subtotal — Europe Medical | 1,347 | 1,104 |
| Total revenue | $ 17,365 | $ 13,617 |

116. ~~114.~~ The Company's net income was reported as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Net loss:** | $ (65) | $ (638) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 30,854 | 26,251 |
| Weighted average common shares issued | 155 | 109 |
| Weighted average common shares outstanding — basic | 31,009 | 26,360 |
| Effect of dilution — stock options | - | - |
| Weighted average common shares outstanding — diluted | 31,009 | 26,360 |
| Net loss per share — basic and diluted | $ (0.00) | $ (0.02) |

117. ~~115.~~ Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included

certifications signed by Defendants Schulte and Childs, substantially similar to those

included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any

material misrepresentations.

118. ~~116.~~ These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

119. ~~117.~~ According to CW 1, the Company spent considerable time, effort, and money on the marketing and promotion of its laser and disposables for off-label use.

120. ~~118.~~ The expectation that the Company would successfully market its laser system and medical devices for off-label use was considered in the Company's internal revenue models and projections. The models showed that revenue from the laser and disposables used for ISR in peripheral arteries and thrombus could be "up to $200 million." Scott Schlesinger, the Company's marketing manager, Tatiana Zimmerer, and Steve Okland were involved in the revenue modeling and were told to do this revenue modeling by Schulte.

121. ~~119.~~ This revenue modeling took into account sales for ISR to treat PAD **before** FDA approval was obtained, and even before testing of the safety and efficacy of Spectranetics' disposables and laser was assessed in clinical trials. The revenue source created by marketing and promoting the laser for off-label use was important to the Company for boosting revenue to meet projections and/or to pursue the $200 million goal generated by the revenue modeling performed at Schulte's explicit request.

122.    120. According to CW 1, Dr. Walker, through his relationships, affiliations and ownership in medical centers throughout the country, provided Spectranetics with approximately 50% to 60% of its revenue.  Additionally, the Company recognized revenue from sales resulting from Dr. Walker's training sessions where he trained doctors to use Spectranetics products for off-label uses.  Dr. Walker personally promoted the off-label use of Spectranetics' laser systems to other physicians and health care providers.  CW 1 explained that every month, starting no later than the first quarter of 2007, Spectranetics would sponsor training sessions across the country.  Dr. Walker, his medical associates and colleagues, including several doctors from Alabama and Southwest Arkansas, would each train 15 to 20 doctors a month.  Many of the training sessions occurred at CIS facilities, medical centers where Dr. Walker is the founding member and medical director.  CIS has 10 locations across the southern United States.

123.    121. CW 2 confirmed that CW 2 and many of his or her clients attended Dr. Walker's and his associate Dr. David Allie's Master Summits in New Orleans.  CW 2 advised that many of these meetings were held at a restaurant owned by Dr. Walker's wife.

124.    122. Dr. Walker and his colleagues used the laser in ISR procedures on peripheral arteries on their own patients and taught other doctors how to do this as well.  Spectranetics, in turn, compensated these doctors as "consultants."

125.    123. According to CW 1, Dr. Walker functioned as the mouthpiece for Spectranetics; indeed, according to CW 1, "[i]f you wanted to send a message to the

marketplace, you did it through Dr. Walker."  Essentially, Dr. Walker told the medical

community what Spectranetics wanted them to hear, and he did it through his

relationships with medical centers across the country and with other doctors.

126.  124. CW 1 stated that the Company actively marketed the laser to treat

ISR in peripheral arteries and that it "happened all the time."  At Company meetings,

CEO Schulte would instruct the marketing department how he wanted them to promote

the Company's products for off-label use.

127.  125. CW 1 said that "Emile [Geisenheimer] and Dr. Walker had several

conversations on marketing and testing" of ISR in peripheral arteries and that the Board

was "in on the promotion of off-label usage."  CW 1 said, "All of them knew--Emile,

Fletcher [Vice President of Quality System], Childs, and Ruggio [referring to Dr. Ruggio

on the Board of Directors]."  Indeed, according to CW 1, it was "common knowledge

throughout the Company" that Dr. Walker and other doctors were marketing, promoting

and using the lasers systems and medical devices for off-label use.  It was also

common to hear Geisenheimer, Schulte and Dr. Walker say during Board meetings and

as a message to the Company, generally, that the laser was "the only option" for ISR in

peripheral arteries.

128.  126. CW 1 said that the off-label marketing was so prevalent and

widespread at the Company that there was "no way anyone couldn't have known.  All

you need to do is be around Spectranetics to know" that the Company was promoting

its products for off-label use.

129.    Defendants' decision to market its medical devices for off-label, ISR use in violation of FDA rules and regulations is also cited in the Application for Search Warrant, Ex. G.  The government cited the testimony of its own confidential witnesses who knew about the Company's efforts to market its medical devices to treat ISR.  The government summarized its claim that Defendants knowingly misbranded its medical devices as follows:

> According to CW-1 and documents he/she provided, Spectranetics, through Schulte and other top management officials, has adulterated and misbranded its CLiRpath Turbo laser catheter, TURBO elite Excimer laser catheter and TURBO-Booster guiding catheter for treating infrainguinal ISR without first obtaining approval for such use, ***knowing*** that the SALVAGE trial would not be adequate to support a marketing application and while possessing test results that show that the Spectranetics laser caused potentially grave damage to Nitinol expanding stents.

*See* Application for Search Warrant ¶ 20.  The Application and Search Warrant also provided email evidence showing that Defendants downplayed the known risks attendant with the use of its medical devices during ISR procedures to doctors testing them.  *See* Application for Search Warrant ¶ 21.

130.    The government summarized its claim that Spectranetics promoted its medical devices for off-label use as follows:

> According to CW-1 and the corroborating emails and documents he/she provided, Spectranetics sales staff were directed to promote TurboBooster for the unapproved, "off-label" use for the treatment of ISR.  A common sales methodology at Spectranetics was called "SPIN," an acronym for "Situation, Problem, Implication and Need-Payoff."

*See* Application for Search Warrant ¶ 22.

131.    In one email, Schulte is quoted telling Spectranetics employees that ISR is the Company's "meal ticket."  *See* Application for Search Warrant ¶ 25.  During conversations with the government's confidential witnesses, defendant Schulte brazenly instructed his sales representatives to push ISR, stating "I want the FDA to slap me on the hand if it's the wrong thing to do."  *See* Application for Search Warrant ¶ 29.  The Company's efforts to market its medical devices for non-FDA approved purposes are described in great detail throughout the Application for Search Warrant ¶¶ 28-38.

132.    127. On July 25, 2007, Spectranetics issued a press release entitled "Spectranetics Reports Second Quarter Revenue of $20.4 Million as Atherectomy Product Sales Increase 43%."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo.  (July 25, 2007)** — Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the three and six months ended June 30, 2007.
>
> Revenue for the second quarter of 2007 reached $20.4 million, up 27% compared with revenue of $16.0 million for the second quarter of 2006.  For the quarter, disposable product revenue rose 35% to $17.4 million, laser revenue declined 23% to $1.1 million, and service and other revenue increased 11% to $1.9 million, all compared with the second quarter of 2006.

133.    128. Schulte was also quoted in the press release discussing the highlights of the quarter:

> I'm proud of this quarter's financial performance, which was driven by atherectomy product sales and supported by gains in our lead removal business.  The growth in revenue by $3 million as compared with the first quarter of 2007 represents the largest sequential revenue increase we have ever achieved.  Our continued strong performance and expanding market share reflect both the advantages of our laser

> technology in treating PAD and the solid execution of our growth strategy. Over the last several quarters we have introduced improvements to our catheter line, upgraded and expanded our sales force, and conducted an industry-leading physician training and education program. This has resulted in an expanded user base and greater utilization of our technology. We now have in place a broad foundation of leading physicians from which to leverage the introduction of the TURBO-Booster(TM) [used to treat ISR in PAD], which received FDA clearance at the end of June. We have initiated a controlled release of TURBO-Booster to specified accounts, which will allow for collection of valuable feedback to help guide our training and marketing programs. Over the next four to five months, we expect to complete the TURBO-Booster launch to our existing 350 atherectomy accounts.

134. 129. These statements were materially false and misleading when made because they failed to disclose that a material portion of the Company's revenue was generated from the illegal sale of medical devices resulting from the promotion and marketing of the Company's medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

135. 130. On June 25, 2007, the Company received approval for use of its new catheter, the "TURBO-Booster"," in the United States. In a conference call with securities analysts on July 25, 2007, Schulte said: "Now that the TURBO-Booster has been cleared by the FDA, we plan on initiating two clinical trials for the treatment of In-Stent Restenosis [for PAD]. We believe that In-Stent Restenosis, or ISR, may represent as much as 25% to 35% of all above the knee procedures, and there is currently no good solution for this lesion subset." Schulte also discussed the ISR studies, PATENT and SALVAGE. While the Company had not yet enrolled patients, Schulte said their progress was "moving along nicely." Also present on the call were Childs and McGuire.

136. 131. These statements were materially false and misleading when made because Defendants failed to disclose that regardless of the Company's efforts to advance clinical trials, the Company had already begun aggressively marketing, promoting and testing its products for use in the treatment of ISR in peripheral arteries, and that such promotion had led to the recognition of revenue from the sale of illegally promoted disposable medical devices.

137. 132. On August 9, 2007, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the quarter ending June 30, 2007.  The filing was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results.  Revenue was broken down as follows:

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| **Revenue (in thousands):** | | |
| Equipment | $    916 | $    1,042 |
| Disposables | 15,625 | 11,865 |
| Service | 1,900 | 1,624 |
| Other, net of provision for sales returns | (170) | (43) |
| Subtotal — U.S. Medical | 18,271 | 14,488 |
| Equipment | 174 | 365 |
| Disposables | 1,731 | 987 |
| Service | 165 | 139 |
| Other | 32 | 18 |
| Subtotal — Europe Medical | 2,102 | 1,509 |
| Total revenue | $  20,373 | $  15,997 |

138. 133. The Company reported net income as follows:

|  | Three Months Ended June 30, | |
|  | 2007 | 2006 |
|---|---|---|
| **Net income (loss)** | $    7,152 | $         308 |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 31,104 | 26,448 |
| Weighted average common shares issued | 36 | 2,023 |
| Weighted average common shares outstanding — basic | 31,140 | 28,471 |
| Effect of dilution — stock options | 2,406 | 2,788 |
| Weighted average common shares outstanding — diluted | 33,546 | 31,259 |
| Net income (loss) per share — basic | $    0.23 | $        0.01 |
| Net income (loss) per share — diluted | $    0.21 | $        0.01 |

139. 134. Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included

certifications, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*,

signed by Defendants Schulte and Childs stating that the Form 10-Q did not include any

material misrepresentations.

140. 135. These statements were materially false and misleading when made

because, as alleged above, the Company failed to disclose that a material portion of the

Company's revenue was generated by the sales of products resulting from the

promotion and marketing of its laser system and medical devices for unapproved uses

and because the Company was promoting its medical devices for ISR in peripheral

arteries.

141. 136. Schulte was quoted in the *Colorado Springs Business Journal* article

by Amy Gillentine, dated October 12, 2007.  In the article, Schulte reiterated that

- 50 -

approval by the FDA for ISR in peripheral arteries could mean up to $200 million for the Company's bottom line.

142. ~~137.~~ Schulte's statement was materially false and misleading when made because the Company had already begun promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries.  In addition, the Company was already recognizing revenue from the sales resulting from the illegal promotion and marketing of its medical devices.

143. ~~138.~~ On October 31, 2007, Spectranetics issued a press release entitled "Spectranetics Reports Third Quarter Revenue of $21.2 Million as Atherectomy Product Sales Increase 42%."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo.  (October 31, 2007)** —
> Spectranetics Corporation (Nasdaq: SPNC) today reported
> financial results for the three and nine months ended
> September 30, 2007.
>
> Revenue for the third quarter of 2007 reached $21.2 million,
> up 31% compared with revenue of $16.2 million for the third
> quarter of 2006.  For the quarter, disposable product
> revenue rose 36% to $17.3 million, laser revenue increased
> 17% to $2.0 million, and service and other revenue
> increased 12% to $2.0 million, all compared with the third
> quarter of 2006.

144. ~~139.~~ Schulte was also quoted in the press release, discussing the PAD market and the Company's progress with its ISR clinical trials:

> Our performance in the third quarter reflects our very strong
> competitive position in the PAD market.  We now offer
> solutions to treat the entire leg, and our laser is the only
> system that can address all three major lesion types -
> calcium, plaque and thrombus, and treat blocked arteries
> throughout the leg which range in diameter from 7
> millimeters down to 1.5 millimeters.  The limited release of

the TURBO-Booster(TM) is right on track with our objectives. We have penetrated approximately half of our 350 atherectomy accounts, and we have received very positive feedback from physicians regarding performance.  With this initial success, we have narrowed our revenue guidance to the top end of the previous range.  **We are also pleased with the progress in our clinical trials for treating in-stent restenosis.**  We enrolled the first patient in the PATENT trial in Germany in late September, and expect the SALVAGE trial to begin later this quarter.  **We believe in-stent restenosis represents a major unmet medical need, affecting 25% to 35% of all above-the-knee procedures.**

(Emphasis added.)

145. ~~140.~~ These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sale of products resulting from the promotion and marketing of medical devices for unapproved use.  In addition, while discussing the Company's progress towards obtaining FDA approval of ISR for PAD, Spectranetics was **already** marketing its products for the treatment of ISR in PAD.

146. ~~141.~~ During a conference call with securities analysts on October 31, 2007, Schulte and Childs reiterated the third quarter financial results reported that day. McGuire was also present on the call.  In addition, Childs stated: "through the third quarter we've held 14 Master Summits and trained just a little over 300 physicians which is right on track with what we anticipated."

147. ~~142.~~ This statement was materially false and misleading when made because Defendants omitted to mention that the training sessions sponsored by the

Company were used to illegally promote the off-label use of Spectranetics' laser system and medical devices.

148. 143. On November 9, 2007, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the quarter ending September 30, 2007.  The filing was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results.  The Company's revenue was broken down as follows:

|  | Three Months Ended September 30, | |
| --- | --- | --- |
|  | 2007 | 2006 |
| **Revenue (in thousands):** | | |
| Equipment | $    1,628 | $    1,393 |
| Disposables | 15,772 | 11,770 |
| Service | 1,870 | 1,628 |
| Other, net of provision for sales returns | (137) | (87) |
| Subtotal — U.S. Medical | 19,133 | 14,704 |
| Equipment | 378 | 319 |
| Disposables | 1,480 | 951 |
| Service | 184 | 142 |
| Other | 51 | 78 |
| Subtotal — Europe Medical | 2,093 | 1,490 |
| Total revenue | $  21,226 | $  16,194 |

149. 144. The Company reported net income as follows:

| | Three Months Ended September 30, | |
| | 2007 | 2006 |
|---|---|---|
| **Net income (loss)** | $    231 | $    (165) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 31,157 | 30,761 |
| Weighted average common shares issued | 179 | 30 |
| Weighted average common shares outstanding — basic | 31,336 | 30,791 |
| Effect of dilution — stock options | 2,613 | — |
| Weighted average common shares outstanding — diluted | 33,949 | 30,791 |
| Net income (loss) per share — basic | $    0.01 | $    (0.01) |
| Net income (loss) per share — diluted | $    0.01 | $    (0.01) |

150. 145. Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed by Defendants Schulte and Childs, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any material misrepresentations.

151. 146. These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

152. 147. On November 28, 2007, Schulte spoke at the Piper Jaffray Healthcare Conference.  At the conference, Schulte stated: "We're doing the work to show that [our laser] doesn't harm self-expanding nitinol stents."   He also stated that

ISR in peripheral arteries "represents an opportunity of almost $200 million for our Company…**In stent restenosis is very key for us** (emphasis added)."

153. ~~148.~~ These statements were materially false and misleading when made because as early as the summer of 2007, the Company had tested the nitinol stent and found that the laser did in fact cause harm to nitinol stents.

154. ~~149.~~ According to Schlesinger, Spectranetics performed testing of its laser to determine whether it could safely be used with procedures involving nitinol stents. The test results, obtained prior to November 28, 2007, revealed that the laser caused significant damage to these stents.

155. ~~150.~~ CW 1 confirmed Schlesinger's allegation, adding that Kelly Elliott, the Company's Vice President for Clinical Affairs had obtained adverse results when she tested the nitinol stent and informed CW 1 of the results. CW 1 also stated that the Company did not report these results to the federal agency, even though it was required by law to inform the FDA of "every possible way the device can harm humans." Ignoring the significant health risks exposed by this testing, Spectranetics continued to actively market its device off-label for use in ISR procedures on peripheral arteries, even going so far as to represent that the device was safe and effective for such procedures, and lauding the fact that the device was "not contra-indicated" for ISR procedures.

156. The statements by Schlessinger and CW 1 are supported by statements made by the government's confidential witnesses in the Application for Search Warrant. Specifically, the government's confidential witness supplied copies of the Company's

tests on Nitinol stents, which showed that the laser caused severe fatigue and "surface melt and splay of material" to Nitinol expanding stents, which, in turn, could create a risk of heart attack, stroke and death.  *See* Application for Search Warrant ¶ 16.  The government also shows how the Company misled the FDA with regard to the testing of the Nintinol stent and how the FDA would likely have contraindicated the Company's lasers for use on ISR had the test results been properly provided.  *See* Application for Search Warrant ¶ 18.

157.  ~~151.~~ Schulte's statements were also materially false and misleading when made because he failed to disclose that the Company had already begun taking advantage of this "opportunity" by illegally promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries.  The Company was already recognizing revenue from the sales resulting from the illegal promotion and marketing of these products.

158.  ~~152.~~ On February 20, 2008, Spectranetics issued a press release entitled "Spectranetics Reports Fourth Quarter Revenue Up 35% to $23.9 Million, Features Strong Lead Management and Atherectomy Product Sales."  The Company, in relevant part, stated:

>    **COLORADO SPRINGS, Colo.  (February 20, 2008)** —
>    Spectranetics Corporation (Nasdaq: SPNC) today reported
>    financial results for the quarter and year ended December
>    31, 2007.
>
>    Revenue for the fourth quarter of 2007 was $23.9 million, up
>    35% compared with revenue of $17.7 million for the fourth
>    quarter of 2006.  Disposable product revenue rose 36% to
>    $19.6 million, laser revenue increased 55% to $2.1 million,

and service and other revenue increased 14% to $2.2 million, all compared with the fourth quarter of 2006.

159. 153. Schulte was also quoted in the press release, and discussed the progression of the ISR trials:

> We will continue to make strategic investments in clinical trial programs such as the PATENT and SALVAGE trials for in-stent restenosis, in addition to product development programs related to our laser system and disposable products. These investments provide us with an opportunity to further penetrate existing markets and to potentially expand the applications and indications for use of our technology. Our outlook for 2008 reflects confidence in our technology and products, our markets and our employees.

160. 154. These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the illegal promotion and marketing of the Company's medical devices for unapproved use. In addition, the Company was already marketing the laser to treat ISR. Unbeknownst to investors, Spectranetics was already taking advantage of "the opportunity to further…expand the applications and indications for use" of the Company's technology.

161. 155. During a conference call with securities analysts on February 20, 2008, Schulte and Childs reiterated the fourth quarter financial results reported that day. McGuire was also present on the call. In addition, Schulte stated: "So, we're focusing a lot of our resources on in-stent restenosis, because we're the only atherectomy technology not contraindicated, we think that's a big opportunity. That's why we're focusing a lot of clinical resources there."

162. 156. Schulte's statements were materially false and misleading when made because he failed to disclose that the Company had already begun taking advantage of this "opportunity" by illegally promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries. The Company was already recognizing revenue from the sales resulting from the illegal promotion and marketing of these products.

163. 157. On March 17, 2008, Spectranetics filed its 2007 Annual Report with the SEC on Form 10-K (the "2007 10-K") for the fourth quarter and full fiscal year of 2007. The 2007 10-K was signed by Defendants Schulte, Childs, Geisenheimer, and Dr. Walker, and reaffirmed the Company's previously announced financial results. The Company's revenues broken down as follows:

**Revenue by Product Line**

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
|  | (in thousands) | | |
| Disposable products | $ 68,634 | $ 50,643 | $ 33,045 |
| Service and other revenue* | 7,949 | 6,971 | 5,472 |
| Laser equipment | 6,291 | 5,876 | 4,695 |
| Total revenue | $ 82,874 | $ 63,490 | $ 43,212 |

164. 158. The Company reported net income as follows:

|  | 2007 | 2006 |
|---|---|---|
|  | (In thousands, except per share amounts) | |
| **Net income (loss)** | $ 7,229 | $ (1,447) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of year | 30,854 | 26,251 |
| Weighted average common shares issued | 371 | 2,879 |
| Weighted average common shares outstanding — basic | 31,225 | 29,130 |
| Effect of dilution from stock options | 2,558 | — |
| Weighted average common shares outstanding — diluted | 33,783 | 29,130 |
| Net income (loss) per share, basic | $ 0.23 | $ (0.05) |
| Net income (loss) per share, diluted | $ 0.21 | $ (0.05) |

165.    159. Under Item 1A of the 2007 10-K, listing "Risk Factors," the report

affirmatively states:

> **We do not promote our products for off-label or otherwise unapproved usage.**

(Emphasis added.)

166.    160. This statement was materially false and misleading when made

because the Company was aggressively marketing and promoting its devices for the

treatment of ISR in peripheral arteries—an off-label use.

167.    161. According to Schlesinger, the Company's top executives clearly knew

that the Company was illegally promoting its medical devices for off-label use.

Schlesinger raised the issue of off-label usage with the Company several times.  On

December 4, 2007, December 14, 2007, January 10, 2008, and February 5, 2008,

Schlesinger met with Defendant McGuire and specifically discussed the inappropriate

pressure on the marketing department Schulte applied in order to aggressively promote

the use of the Company's laser products for ISR in peripheral arteries, thrombus and in combination with lytics – all unapproved uses for the device.  Schlesinger told McGuire that Schlesinger could neither condone nor participate in the unethical and illegal practices occurring within the organization.  After the December 4, 2007 meeting, McGuire sent Schlesinger an e-mail stating "Thanks for the talk tonight.  We'll talk more and things will improve."  In fact, during each of these meetings, McGuire told Schlesinger to give him an opportunity to fix the situation.

168.  162. During a January 7, 2008 planning meeting, Schlesinger told Okland that Schlesinger would not instruct the marketing department to promote the TURBO Booster product for use in the treatment of ISR in peripheral arteries nor train the sales force in such off-label promotion as it would be a violation of FDA regulations.

169.  163. During a March 7, 2008 meeting, Schlesinger detailed his concerns about the Company's practices including the off-label promotion and use of unapproved medical devices with McGuire and Roger Wertheimer, Vice President of Human Resources and General Counsel.  On March 28, 2008, Schlesinger again met with McGuire to discuss these improper and illegal activities.  No effort to investigate this unlawful behavior or put an end to it resulted from this meeting.

170.  164. Instead, during the Class Period, the Company spent considerable resources on the marketing and promotion of its laser and disposables for off-label use to increase revenues and make the Company a more attractive acquisition.  CW 1 said it was the goal of the Individual Defendants to sell the Company and this was discussed

by top management.  During CW 1's tenure, the Company had been approached

several times by other companies seeking to acquire Spectranetics.

171. 165. According to CW 1, when Schulte was giving pitches to companies

seeking to acquire Spectranetics, Schulte "implied to the companies" that the laser

would work for certain off-label uses.  At these meetings to sell the Company, where

Schulte, McGuire, Wertheimer and Childs were all present along with representatives of

the potential acquiring company, Schulte would say "the laser works great on

thrombus," even though it had not been approved for use on thrombus.  Schulte would

tell those in attendance that the laser was "a delight" for dealing with ISR in peripheral

arteries, even though the laser had not been approved for such use.

172. 166. Also under the Risk Factors section of the 2007 10-K, the Company

described how difficult and costly it would be to obtain FDA approval for then off-label

use of its products.  The 2007 10-K states:

> All of our potential products and improvements of our current
> products are subject to extensive regulation and will require
> approval or clearance from the FDA and other regulatory
> agencies prior to commercial sale and distribution.  Pursuant
> to FDA regulations, unless exempt, the FDA permits
> commercial distribution of a new medical device only after
> the device has received 510(k) clearance or is the subject of
> an approved pre-market approval application, or PMA.  The
> FDA will clear marketing of a medical device through the
> 510(k) process if it is demonstrated that the new product is
> substantially equivalent to other 510(k)-cleared products.  In
> some cases, a 510(k) clearance must be supported by
> preclinical and clinical data.  The PMA application process is
> more costly, lengthy and uncertain than the 510(k) process,
> and must be supported by extensive data, including data
> from preclinical studies and human clinical trials.  **Therefore,
> in order to obtain regulatory approvals or clearance, we
> typically must, among other requirements, provide the**

> **FDA and similar foreign regulatory authorities with preclinical and clinical data that demonstrate to the satisfaction of the FDA and such other authorities that our products satisfy the criteria for approval or clearance.  Preclinical testing and clinical trials must comply with the regulations of the FDA and other government authorities in the United States and similar agencies in other countries.**

(Emphasis added.)

173. ~~167.~~   In the section of the 2007 10-K regarding "Overview of Medical Device Regulation," the Company acknowledged that "[o]ur products are medical devices subject to extensive regulation by the FDA under the Federal Food, Drug, and Cosmetic Act, or FDCA."  The Company went on to state:

> **All clinical studies of investigational devices must be conducted in compliance with FDA's requirements.**  If an investigational device could pose a significant risk to patients (as defined in the regulations), the FDA must approve an IDE application prior to initiation of investigational use.

(Emphasis added.)

174. ~~168.~~ These statements were materially false and misleading when made because the Company failed to disclose, in violation of law and in contrast to the Company's description of the law as set forth in the 2007 10-K, that Spectranetics failed to obtain FDA approval to test certain devices imported into the United States, including the FMD guidewires and by this time, a medical balloon manufactured in Germany.

175. ~~169.~~ According to CW 1, the Company began receiving overseas shipments of the BMT balloons as early as summer 2007.  CW 1 confirmed that although the Company had obtained permission to import the balloons into the United

States, the Company did not have FDA permission to test these balloons on humans. In fact, they were specifically labeled **"not for human use"** on the packaging.

176. 170. CW 1 became aware that the Company was illegally testing the BMT balloons on humans on September 2, 2007. On that day, CW 1 came across an e-mail exchange between Trung Pham, a Business Development Manager under CW 1's supervision, and Defendant Schulte discussing Defendant Dr. Walker's use of the BMT balloons on humans. Dr. Walker and his assistant were also on the e-mail exchange. In the e-mail, Pham wrote to Schulte about his appointment to see Dr. Walker in his lab concerning the human tests of BMT. Also, Pham asked whether the evaluation Pham sent Schulte regarding the efficacy of the BMT balloons was "good enough." Schulte's response in the e-mail to Pham's question was "Right on."

177. 171. CW 1 was put on the "tail end" of the e-mail on the "cc" line. CW 1 was shocked that the Company was testing BMT balloons on humans and responded to everyone on the e-mail saying: "This must stop. This product is not approved and not to be used in humans. Please hold up." According to CW 1, no one listened and Dr. Walker continued to test the BMT balloons on humans. In fact, the Company also enlisted the help of Dr. Walker's friend, Dr. Gallino, in the testing of the BMT balloons on humans. According to CW 1, Pham brought the FMD balloons to Drs. Walker and Gallino so they could conduct the illegal testing.

178. 172. Schlesinger's account in the Whistleblower Complaint corroborates CW 1's averments. Schlesinger discovered the illegal BMT testing on humans during a meeting with Company officers in December 2007.

179.   173. Top executives and the Board of Directors were aware of the illegal use of these foreign devices on humans, and illegally kept this information from the FDA.

180.   174. According to the Whistleblower Complaint, on December 4, 2007, December 14, 2007, January 10, 2008, and February 5, 2008, Schlesinger met with Defendant McGuire and raised concerns about the apparent evaluation of the BMT balloons in live patients with the Company's assistance even though the products were not FDA approved.  After the December 4, 2007 meeting, McGuire sent Schlesinger an e-mail saying: "Thanks for the talk tonight.  We'll talk more and things will improve."  In fact, during each of these meetings, McGuire told Schlesinger to give him an opportunity to fix the situation.

181.   175. During a March 7, 2008 meeting, McGuire acknowledged that "the BMT evaluations never should have happened."  Wertheimer was also present at this meeting.  On March 28, 2008, Schlesinger again met with McGuire regarding the illegal evaluations of non-FDA approved products.  Tatiana Zimmerer, Spectranetics' marketing manager, also attended this meeting.  Neither McGuire nor Wertheimer or any other member of the executive team or Board of Directors made any effort to investigate this unlawful behavior or put an end to it.

182.   Defendants **_admitted_** in the Non-Prosecution Agreement that it illegally imported and tested BMT balloons on human subjects, in violation of FDA rules and regulations.  Details regarding the claims raised by Schlessinger and CW 1 regarding the illegal importing and testing of BMT balloons are also found in the Application for

Search Warrant (Ex. G attached hereto), in a section titled "Spectranetics Performs Clinical Trials Using BMT Balloon Catheters Without An Investigational Device Exemption (IDE)."  The government's confidential witnesses testified that negotiations with BMT began in May 2007, that the Company obtained samples of the balloons during the August to September, 2007 time period, and that Spectranetics' personnel provided samples of the balloons to physicians to evaluate their efficacy on patients.  *See* Application for Search Warrant ¶¶ 55-63.  Under the terms of the Non-Prosecution Agreement, the Company conceded that these allegations were true.

183.   ~~176.~~ The representations detailed above and contained in Spectranetics' press releases, SEC filings, conference calls, presentations and news articles during fiscal year 2007 were materially false and misleading when made because Defendants knew or were reckless in not knowing and failed to disclose that: (1) the Company had illegally imported and promoted the FMD guidewires and the BMT balloons and tested these products on humans; (2) the Company had marketed and promoted its lasers and medical devices for unapproved use; (3) a material portion of the Company's revenue was generated by the sales of such products intended for unapproved use; (4) the Company made improper payments to medical professionals including Board member Dr. Walker, who participated in certain clinical studies for the Company; (5) the Company lacked effective regulatory and compliance controls; (6) the Company withheld data from the FDA that indicated that nitinol stents were damaged by use with lasers; (7) the Company lacked adequate internal and financial controls, (8) such questionable behavior would necessarily subject the Company to an extensive

investigation by federal authorities into its business practices; and (9) as a result of the

above, the Company's financial statements were materially false and misleading at all

relevant times.

184. 177. Additionally, pursuant to Sarbanes-Oxley, the 2007 Form 10-K

included certifications signed by Defendants Schulte and Childs, substantially similar to

those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-K did not

include any material misrepresentations.

185. 178. The Sarbanes-Oxley certifications signed by Schulte and Childs for

fiscal year 2007 were materially false and misleading when made because

Spectranetics engaged in questionable and illegal behavior as outlined above and

therefore its financial statements did not fairly present its financial condition and results

of operations.  Specifically, a material portion of the Company's revenue was generated

by the sale of medical devices resulting from the promotion and marketing of those

devices for unapproved use.  Further, the statements were materially false and

misleading when made because the Defendants' undisclosed fraudulent and systemic

flouting of FDA, ICE, SEC, and FINRA rules and regulations, and criminal statutes

exposed the Company to material liabilities and materially impacted the business

prospects of the Company.

**Fiscal Year 2008**

186. 179. On April 23, 2008, Spectranetics issued a press release entitled

"Spectranetics First Quarter Revenue Up 37% to $23.8 Million, Driven By Strong

Vascular Intervention and Lead Management Performance."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo. (April 23, 2008)** — Spectranetics Corporation (Nasdaq: SPNC) today reported financial results for the quarter ended March 31, 2008.
>
> Revenue for the first quarter of 2008 was $23.8 million, up 37% compared with revenue of $17.4 million for the first quarter of 2007.  Disposable product revenue rose 39% to $20.1 million, laser revenue increased 56% to $1.7 million, and service and other revenue increased 11% to $2.1 million, all compared with the first quarter of 2007.

187.  ~~180.~~ Schulte was also quoted in the press release discussing the Company's financial results:

> We achieved significant sales growth both in our vascular intervention and lead management product groups, reflecting the strength of our technology and the continuing opportunities in these markets.  Our financial results to date are on track with our expectations, and we look forward to continued growth and improving profitability.  As such, we are affirming the annual financial guidance we provided in February.

188.  ~~181.~~ These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sale of products resulting from the promotion and marketing of its medical devices for unapproved use.

189.  ~~182.~~ During a conference call with analysts on April 23, 2008, Schulte and Childs reiterated the first quarter financials results reported that day.  McGuire was also present on the call.  Schulte stated: "I think In Stent Restenosis will be growing as a percentage of procedures done in the lower leg so those are important."

190. ~~183.~~ This statement was materially false and misleading when made because Schulte failed to disclose that the Company had already begun promoting, marketing, and testing its products for the treatment of ISR in peripheral arteries.

191. ~~184.~~ On May 12, 2008, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the first quarter ending March 31, 2008, which was signed by Defendants Schulte and Childs.  This report reaffirmed the Company's previously announced financial results.  The revenue was broken down as follows:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| **Revenue:** | | |
| Equipment | $ 1,338 | $ 1,009 |
| Disposables | 18,442 | 13,302 |
| Service | 2,045 | 1,830 |
| Other, net of provision for sales returns | (163) | (123 |
| Subtotal — U.S. Medical | 21,662 | 16,018 |
| Equipment | 321 | 54 |
| Disposables | 1,647 | 1,124 |
| Service | 191 | 162 |
| Other | 10 | 7 |
| Subtotal — Europe Medical | 2,169 | 1,347 |
| Total revenue | $ 23,831 | $ 17,365 |

192. ~~185.~~ The Company reported net income as follows:

| | Three Months Ended March 31, | |
| | 2008 | 2007 |
|---|---|---|
| Net loss | $ (405) | $ (65) |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 31,417 | 30,854 |
| Weighted average common shares issued | 145 | 155 |
| Weighted average common shares outstanding — basic | 31,562 | 31,009 |
| Effect of dilution — stock options | — | — |
| Weighted average common shares outstanding — diluted | 31,562 | 31,009 |
| Net loss per share — basic and diluted | $ (0.01) | $ (0.00) |

193. 186. Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed by Defendants Schulte and Childs, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any material misrepresentations.

194. 187. These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

195. 188. On July 29, 2008, Spectranetics issued a press release entitled "Spectranetics Second Quarter Revenue Up 31% to $26.7 Million, Driven By Solid Performance Across All Business Lines."  The Company, in relevant part, stated:

> **COLORADO SPRINGS, Colo. (July 29, 2008)** —
> Spectranetics Corporation (Nasdaq: SPNC) today reported

financial results for the quarter and six months ended June 30, 2008.

Revenue for the second quarter of 2008 was $26.7 million, up 31% compared with revenue of $20.4 million for the second quarter of 2007.  Disposable product revenue rose 28% to $22.2 million, laser revenue increased 103% to $2.2 million, and service and other revenue increased 19% to $2.3 million, all compared with the second quarter of 2007.

196.  189. Schulte was also quoted in the press release discussing the

Company's strong revenue growth:

Our strong revenue growth in the face of a challenging economic environment reflects the continuing market acceptance of the value of our laser technology, both in vascular intervention and lead management.  This performance demonstrates the effectiveness of our strategy to invest in product development and clinical studies that support our sales efforts.  In addition, with the split of our sales team into separate VI and lead management groups, which we initiated in January, we are now more effectively addressing the growing opportunity in lead management.

197.  190. These statements were materially false and misleading when made

because, as alleged above, the Company failed to disclose that a material portion of the

Company's revenue was generated by the sales of products generated by the

promotion and marketing of its medical devices for unapproved use.

198.  191. During a conference call with securities analysts on July 29, 2008,

Schulte and Childs reiterated the second quarter financial results reported that day.

McGuire was also present on the call.  During the call, Schulte brazenly commented on

off-label promotion and revenue from off-label use of the Company's products:

"Obviously we can't promote it for that because we don't have a label indication.

Physicians obviously could use whatever they want for whatever they want but I would say it's still a relatively small part of our total procedural volume."

199. 192. These statements were materially false and misleading when made because, despite acknowledging that the Company cannot promote its products for ISR in peripheral arteries, Schulte failed to disclose that the Company was already aggressively promoting, marketing and testing its products for use in the treatment of ISR in peripheral arteries. In addition, a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses.

200. 193. On August 11, 2008, Spectranetics filed its quarterly report with the SEC on Form 10-Q for the second quarter ending June 30, 2008, which was signed by Defendants Schulte and Childs and reaffirmed the Company's previously announced financial results. The revenue was broken down as follows:

| | Three Months Ended June 30, | |
| | 2008 | 2007 |
|---|---|---|
| **Revenue (in thousands):** | | |
| Equipment | $ 1,602 | $ 916 |
| Disposables | 19,842 | 15,625 |
| Service | 2,194 | 1,900 |
| Other, net of provision for sales returns | (147) | (170) |
| Subtotal — U.S. Medical | 23,491 | 18,271 |
| Equipment | 606 | 174 |
| Disposables | 2,355 | 1,731 |
| Service | 226 | 165 |
| Other | 20 | 32 |
| Subtotal — Europe Medical | 3,207 | 2,102 |
| Total revenue | $ 26,698 | $ 20,373 |

201. 194. The Company reported net income as follows:

- 71 -

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 2008 | 2007 |
| Net (loss) income | $ (2,640) | $ 7,152 |
| Common shares outstanding: | | |
| Historical common shares outstanding at beginning of period | 31,712 | 31,104 |
| Weighted average common shares issued | 50 | 36 |
| Weighted average common shares outstanding — basic | 31,762 | 31,140 |
| Effect of dilution — stock options | — | 2,406 |
| Weighted average common shares outstanding — diluted | 31,762 | 33,546 |
| Net (loss) income per share — basic | $ (0.08) | $ 0.23 |
| Net (loss) income per share — diluted | $ (0.08) | $ 0.21 |

202. ~~195.~~ Additionally, pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed by Defendants Schulte and Childs, substantially similar to those included in the 2006 10-K, ¶ 102, *supra*, stating that the Form 10-Q did not include any material misrepresentations.

203. ~~196.~~ These statements were materially false and misleading when made because, as alleged above, the Company failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its laser system and medical devices for unapproved uses and because the Company was promoting its medical devices for ISR in peripheral arteries.

204. ~~197.~~ In an article entitled "Healthy Outlook at Laser Company" published in the *Colorado Springs Gazette* on August 29, 2008, *only days before the FDA and ICE raided Spectranetics' headquarters*, Schulte said:

> Our sales have grown at a compound rate of 35 percent a year for the past three years.  Fortune magazine has ranked us as one of the fastest-growing public companies for two consecutive years.  We have built a solid foundation with the investments in research and development, the expanded sales force and our new facility.
>
> Profitability will accelerate once we reach $30 million a quarter in sales, which should happen in the fourth quarter of this year or the first quarter of next year.  For us, revenue growth has been the most important, but profitability will become more important in 2009.  Now our lead-removal business is growing more than 50 percent per quarter and our coronary artery business is growing again after three or four years of shrinking.

205.    198. These statements were materially false and misleading when made because Schulte failed to disclose that a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of its medical devices for unapproved use.

206.    199. The representations detailed above and contained in Spectranetics' press releases, SEC filings, conference calls, presentations and news articles during fiscal year 2008 were materially false and misleading when made because Defendants knew or were reckless in not knowing, and failed to disclose that: (1) the Company had illegally promoted the FMD guidewires and the BMT balloons and tested these products on humans; (2) the Company had marketed and promoted its lasers and medical devices for unapproved use; (3) a material portion of the Company's revenue was generated by the sales of the Company's medical devices intended for unapproved use; (4) the Company had made improper payments to medical professionals including Defendant Dr. Walker, who participated in certain clinical studies for the Company

- 73 -

evaluating medical devices not approved for use in humans by the FDA; (5) the Company lacked effective regulatory and compliance controls; (6) the Company withheld data from the FDA that indicated that nitinol stents were damaged by use with lasers; (7) the Company lacked adequate internal and financial controls, (8) such questionable behavior would necessarily subject the Company to an extensive investigation by federal authorities into its business practices; and (9) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

207.    200. The Sarbanes-Oxley certifications signed by Schulte and Childs during fiscal year 2008 were materially false and misleading when made because Spectranetics engaged in questionable and illegal behavior as outlined above and therefore its financial statements did not fairly present its financial condition and results of operations.  Specifically, a material portion of the Company's revenue was generated by the sales of products resulting from the promotion and marketing of unapproved use. Further, the statements were materially false and misleading when made because Defendants' undisclosed fraudulent and systemic flouting of FDA, ICE, SEC and FINRA, and criminal statutes exposed the Company to material liabilities and materially impacted the business prospects of the Company.

**The Truth Is Disclosed**

208.    201. On September 4, 2008, after the market closed, Spectranetics revealed that FDA and ICE agents executed a search warrant on its headquarters and

plant as part of a federal investigation into its sales and marketing practices.  The

Company's press release, also filed on Form 8-K with the SEC, stated:

> **COLORADO SPRINGS, Colo. (September 4, 2008)** –
> Spectranetics Corporation (Nasdaq: SPNC) was jointly
> served by the Food and Drug Administration (FDA) and U.S.
> Immigration and Customs Enforcement (ICE) this morning
> with a search warrant issued by the United States District
> Court, District of Colorado.
>
> The search warrant requested information and
> correspondence relating to: (i) the promotion, use, testing,
> marketing and sales regarding certain of the company's
> products for the treatment of in-stent restenosis, payments
> made to medical personnel and an identified institution for
> this application, (ii) the promotion, use, testing,
> experimentation, delivery, marketing and sales of catheter
> guidewires and balloon catheters manufactured by certain
> third parties outside of the United States, (iii) two post-
> market studies completed during the period from 2002 to
> 2005 and payments to medical personnel in connection with
> those studies and (iv) compensation packages for certain of
> the company's personnel.
>
> Spectranetics is cooperating fully with the appropriate
> authorities regarding this matter.  Spectranetics currently
> expects that business operations will continue in the ordinary
> course.
>
> The Company confirmed that NASDAQ halted trading of
> Spectranetics Corporation common stock pending this
> announcement.  Trading will resume tomorrow.

209.    The search warrant was issued pursuant to an Application and Affidavit for

Search Warrant and Seizure, submitted in Case Number 08-SW-5232 pending in the

United States District Court for the District of Colorado.  The Application for Search

Warrant (Ex. G attached hereto), executed by Special  Agent Daniel Burke of the U.S.

Food and Drug Administration is summarized in paragraph 7 as follows:

> In summary, probable cause exists to believe that Spectranetics and its officers and employees promoted and sold its infrainguinal (for use below the groin) laser catheters to physicians throughout the United States for an unapproved or "off-label" use and Spectranetics withheld information from the FDA clearly showing that the unapproved use of the infrainguinal catheters could cause significant harm to patients. In addition, this affidavit establishes probable cause to believe that Spectranetics distributed devices that the FDA had not reviewed in any way to physician consultants so that those physicians could implant them into human subjects, and so as part of the company's contract negotiations to become the domestic distributor for the foreign manufacturers of those devices. Finally, this affidavit establishes probable cause to believe that Spectranetics engaged in a marketing study of an approved cardiac catheter which resulted in a significant rate of serious adverse events which were not reported to the FDA and a summary of the study was not reported to the FDA.

210.    202. CW 3 was a Quality Control Manager at the Company between August 2007 and November 2008 and worked in Spectranetics' headquarters during the Class Period. CW 3 reported to Donald Fletcher, Vice President of Quality System. As Manager of Quality Control, CW 3 was responsible for the production of the lasers and the "end-pieces"."

211.    203. While the Company said that it was served with a search warrant and that the Company was cooperating, CW 3 described the government's efforts quite differently. According to CW 3, the FDA and ICE entered Spectranetics' headquarters and forced all the employees to leave behind their blackberries, computers and documents and "get out of the building"." The employees all convened in the parking lot where they waited for instructions. After some time passed, Schulte told all the employees to go home for the day. After that incident, CW 3 felt that he or she could no

longer work for Spectranetics.  CW 3 did not want to "jeopardize [his or her] integrity

and reputation"."

212. 204. According to analysts at Roth Capital Partners, "Based on the topics

outlined [in the Company's press release], we assume the issue at hand surrounds off-

label usage for ISR (in-stent restenosis) treatment…"  The Roth Capital analysts noted:

> In addition, we understand this to be a "criminal
> investigation" involving FDA's Office of Criminal Investigation
> (OCI), which (using prior cases unrelated to Spectranetics as
> examples) suggests a level of impropriety beyond the typical
> issue of FDA clearances.  For example, if FDA had an issue
> with the approval of a certain marketed product, that case
> would not be handled with an unsuspected raid of a
> company's facility.

213. 205. Canaccord Adams analysts viewed the government raid as

detrimental to the Company's business prospects:

> Spectranetics is facing multiple allegations, including: 1)
> unauthorized marketing of certain products used to treat in-
> stent restenosis (e.g. TurboBooster) along with payments to
> docs at least one hospital; 2) promotion/marketing of
> guidewires and balloon catheters manufactured OUS; 3)
> payment to practitioners involved in two of Spectranetics'
> post-marketing studies; and 4) certain employee
> compensation packages.

> We believe these serious allegations will distract executives,
> the sales force and customers, and thus believe it could
> impact the business both near- and long-term.

214. 206. Jefferies & Co. analysts reported on the material impact on

Spectranetics of the illegal off-label promotion of ISR, providing a quantitative estimate

of the sales Spectranetics would lose if it was forced to end its off-label promotion of its

laser systems and disposable medical devices:

> Our checks suggest that ISR is likely at the center of the agencies' concern. Since SPNC's system is not approved by the FDA for ISR, off-label promotion of the system for ISR is illegal, as is compensating anyone specifically for ISR use. . . . ISR may represent +/- 20% of above-the-knee interventions, or +/- 13% of total procedures. SPNC's vascular sales are +/- 70% of revenue, so annual ISR-related sales could amount to $10MM at a $100-125MM revenue run rate. If we assume all ISR sales disappear - an unwarranted view at this stage - and that SPNC suffers operations disruption and fine, **we still calculate a $60 -75 MM total impact**.

(Emphasis added.)

215. 207. On September 4, 2008, in reaction to this news, Spectranetics stock fell approximately 47 percent on extremely heavy volume, from $9.00 per share to $4.73 per share before trading was halted for the day, wiping out more than $136 million in market capitalization.

**Post-Class Period Events**

216. 208. On September 15, 2008, Spectranetics announced the suspension of its SALVAGE trial. According to the Company: "VIVA has elected to temporarily suspend enrollment in the study after being contacted by the Food and Drug Administration (FDA) about a potential safety concern relating to the laser device. **Spectranetics believes the potential concern relates to laser interaction with nitinol stents."** (Emphasis added).

217. 209. The suspension of the SALVAGE trial based on FDA safety concerns meant that the federal investigation had potentially broader implications for the Company. According to Roth Capital:

> Based on our prior analysis of the federal investigation (commenced earlier this month), we had suspected the primary issue surrounded the off-label promotion of its devices for use in in-stent restenosis (ISR), with no implication of issues with safety/efficacy…
>
> While we believe Spectranetics' laser devices remain as safe and effective as they were viewed prior to the investigation initiated on September 4, the suspension of this study by industry thought leaders (VIVA Physicians) could impact the perception of the company's safety profile in the near-term.  **Although the suspension of a clinical study is a more benign event than a federal investigation, we view the nature of the suspension (safety) as potentially having a more significant impact on its customers' usage patterns.**

(Emphasis added.)

218. 210. On September 19, 2008, Spectranetics disclosed that the Whistleblower Complaint had been filed against the Company.

219. 211. In its Answer to Schlesinger's lawsuit filed the same day as the Company announced the suit, Spectranetics admitted that the **"off-label compliance issues that Mr. Schlesinger raised were already recognized by numerous Spectranetics employees, including Will McGuire, who even at that time had the Company's best experts working to make sure the Company was and is in compliance."**

220. 212. When the news regarding the raid by the FDA and ICE became public, the Company claimed that it had hired a law firm to perform an internal investigation of the alleged wrongdoing.  CW 1 characterized the investigation as a bunch of "Emile's (Geisenheimer) cronies" running the investigation of the Company and that they "did not look deep enough."  He further described the internal investigation

as "myopic."   Notably, CW 1 was on vacation while the investigation was being conducted and was not interviewed by the law firm conducting the investigation.   CW 1 was adamant, though, in stating, "Thank goodness the FDA came in."

221.   213. Not unexpectedly, the announcement of the government investigations into the Company's illegal practices, the termination of the SALVAGE clinical trial, and the filing of the Whistleblower complaint led to a decrease in sales of the Company's medical devices.  Despite double digit increases in VI sales every quarter during the Class Period, the sale of medical devices in the Company's VI product declined 9% in the fourth quarter of 2008 compared to the corresponding quarter of 2007.  A 12% decline in VI sales was reported in the first quarter of 2009 compared to the first quarter of 2008.  Finally, a 13% decline in VI sales was reported for the second quarter of 2009, compared to sales during the second quarter of 2008.

222.   On December 29, 2009, Spectranetics filed a Form 8-K with the SEC.  In the filing, the Company reported that it had reached a resolution of claims brought by the Department of Justice ("DOJ") and the United States Department of Health and Human Services.  Attached to the Form 8-K were three separate agreements, including a Civil Settlement Agreement with the DOJ pursuant to which the Company agreed to pay a fine of $4.9 million.  Also attached to the filing was a Non-Prosecution Agreement, pursuant to which the Company admitted that it engaged in improper conduct when it imported and tested non-FDA approved guidewires and angioplasty balloons and by failing to timely report the adverse results of the Coral and Coral Reef studies to the FDA.  Finally, a third agreement was attached to the Form 8-K, a Corporate Integrity

Agreement entered into with the Office of Inspector General of the Department of Health and Human Services, an agreement which created a strict compliance program for Spectranetics to follow going forward.

223.    Significantly, while these agreements provided that the Company would not be criminally prosecuted for its admitted wrongdoing, they do not protect the Individual Defendants or any officers or directors of Spectranetics from criminal prosecution, and as explained in paragraph 14 of the Non-Prosecution Agreement (Ex. B attached hereto), the FDA and other administrative agencies retain their claims, causes of action, and rights to continue pursuing their claims against the Company.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET DOCTRINE**

224.    ~~214.~~ At all relevant times, the market for Spectranetics' common stock was an efficient market for the following reasons, among others:

(a)    Spectranetics' stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Spectranetics filed periodic public reports with the SEC and the NASDAQ;

(c)    Spectranetics regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Spectranetics was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

225.  215. As a result of the foregoing, the market for Spectranetics' common stock promptly digested current information regarding Spectranetics from all publicly available sources and reflected such information in Spectranetics' stock price.  Under these circumstances, all purchasers of Spectranetics' common stock during the Class Period suffered similar injury through their purchase of Spectranetics' common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

226.  216. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was

authorized and/or approved by an executive officer of Spectranetics who knew that those statements were false when made.

**LOSS CAUSATION/ECONOMIC LOSS**

227. 217. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

228. 218. Because of the misrepresentations, omissions and fraudulent scheme perpetrated during the Class Period and the material information that was finally revealed on September 4, 2008, the Company's shares fell $4.27 per share, or 47 percent, from $9.00 per share to $4.73 per share before trading was halted for the day, on unusually heavy trading volume. As the chart below demonstrates, Class members suffered economic losses from the curative disclosure made by Defendants on September 4, 2008.



229. 219. Since September 4, 2008, Spectranetics stock has not traded above the prices at which Class members purchased the stock during the Class Period. As a result, members of the Class who purchased Spectranetics securities during the Class Period and continue to hold those securities have sustained economic injury resulting from the decline(s) in the value of Spectranetics securities resulting from the revelations of Defendants' misstatements and/or omissions during the Class Period.

230. 220. Members of the Class who purchased Spectranetics securities during the Class Period, and sold those securities after the end of the Class Period, have suffered economic injury caused by Defendants' fraudulent scheme and misrepresentations and/or omissions during the Class Period that were not fully revealed until September 4, 2008.

231. 221. Thus, the damage suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' misrepresentations, omissions and fraudulent scheme to artificially inflate the price of Spectranetics securities and the subsequent significant decline in the value of Spectranetics stock when Defendants' prior misrepresentations and omissions during the Class Period were revealed.

232. 222. The foregoing allegations describe Lead Plaintiff's general theory of damages, demonstrate that Lead Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Lead Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to Defendants' omissions alleged herein.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and SEC Rule 10b-5(b)
Promulgated Thereunder, Asserted Against All Defendants**

233. 223. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

234. 224. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Spectranetics' business, operations, management and the value of Spectranetics securities; and (ii) cause Lead Plaintiff and other members of the Class to purchase Spectranetics securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

235. 225. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Spectranetics securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated by the SEC.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

236. 226. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and operations of Spectranetics as specified herein.

237. 227. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spectranetics' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Spectranetics and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Spectranetics securities during the Class Period.

238. 228. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other

Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading when made.

239. 229. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spectranetics' operating condition from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misstatements of the Company's business, operations and revenue throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

240. 230. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Spectranetics stock were artificially inflated during the Class Period. In ignorance of the fact that market prices of Spectranetics' publicly traded securities were artificially

inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Spectranetics securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements.

241. 231. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Spectranetics' marketing practices and their effect on the Company's financial results, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Spectranetics securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

242. 232. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5(b) promulgated thereunder.

243. 233. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT II**

**Violation of Section 10(b) of
the Exchange Act and SEC Rule 10b-5(a) and (c)
Promulgated Thereunder, Asserted Against All Defendants**

244. 234. Lead Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs of this Complaint as if fully set forth herein. This claim is asserted against all of the Defendants.

245. 235. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiff need not allege in this Count nor prove for this Count that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) or any other provisions of law.

246. 236. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff; (ii) artificially inflate the market price of Spectranetics' common stock; and (iii) cause Lead Plaintiff to purchase Spectranetics' common stock at artificially inflated prices.

247. 237. In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the Class in connection with their purchases of Spectranetics' common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

248. 238. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing or reckless suppression and concealment of information regarding Spectranetics' (1) illegal importation and testing of medical devices from Japan and Germany, (2) promotion and marketing of off-label use for its laser to treat ISR in peripheral arteries, (3) illegal payments made to members of its Board of Directors, and (4) lack of effective regulatory and financial controls during the Class Period. Defendants knowingly suppressed and concealed such information to distort the balance of facts available to Spectranetics' investors that would be included in the Company's financial statements disseminated to investors during the Class Period.

249. 239. Lead Plaintiff and the Class reasonably relied upon Spectranetics, a medical device company, to comply with FDA procedures and regulations in conducting its business, reasonably relied upon the integrity of the financial statements to contain accurate reporting on legally made sales, reasonably relied on the belief that Company officials would not engage in illegal conduct, putting the Company at risk of being the subject of multiple federal investigations, and reasonably relied upon the integrity of the market in which Spectranetics' securities traded.

250. 240. During the Class Period, Lead Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Lead Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Spectranetics' securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

251. 241. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Spectranetics' common stock during the Class Period.

252. 242. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiff and the Class for damages suffered in connection with their purchases of Spectranetics' securities during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act,
### Against the Individual Defendants

253. 243. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

254. 244. The Individual Defendants acted as controlling persons of Spectranetics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's

reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

255. 245. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

256. 246. As set forth above, Spectranetics and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)     Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

(b)     Awarding compensatory damages against all Defendants, jointly and severally, in favor of Lead Plaintiff and the Class, for all losses and damages suffered

as a result of Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

(c)       Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Lead Plaintiff' attorneys and experts; and

(d)       Awarding Lead Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: ~~August 4, 2009~~  January 21, 2010


**/s/ Kip B. Shuman**
**THE SHUMAN LAW FIRM**
Kip B. Shuman
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, CO 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
Kip@Shumanlawfirm.com
Rusty@Shumanlawfirm.com

**Lead Plaintiff's Liaison Counsel**

**LABATON SUCHAROW LLP**
David J. Goldsmith
Mark S. Goldman
Carol C. Villegas
140 Broadway
New York, NY 10005
Telephone: (212) 907-0877
Facsimile: (212) 818-0477
dgoldsmith@labaton.com
mgoldman@labaton.com
cvillegas@labaton.com

**BROWER PIVEN**, A Professional Corporation
Charles J. Piven
Yelena Trepetin
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone:  410-332-0030
piven@browerpiven.com
trepetin@browerpiven.com

**Co- Lead Counsel for Lead Plaintiff and the Class**

**CHIMICLES & TIKELLIS LLP**
Steven A. Schwartz (Pa. I.D. No. 50579)
Denise Davis Schwartzman (Pa. I.D. No. 40659)
Kimberly A. Sanders (Pa. I.D. No. 206431)
One Haverford Centre
361 W. Lancaster Ave.
Haverford, PA 19041
Telephone: (610) 642-8500~~Fascimile~~
Facsimile: (610) 649-3633
Steveschwartz@chimicles.com
DeniseSchwartzman@chimicles.com
KAS@chimicles.com

**THE MILLER LAW FIRM , PC**
E. Powell Miller
David H. Fink
Darryl Bressack
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 84102200
Facsimile: (248) 652-2852
epm@millerlawpc.com
dhf@millerlawpc.com
dgb@millerlawpc.com

**Additional Lead Plaintiff's Counsel**