IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02048-REB-KLM

(Consolidated with Civil Action No. 08-cv-02055-CMA-CBS, 08-cv-02078-MSK-BNB, 08-cv-02267-MSK-CBS, 08-cv-02420-PAB, 08-cv-02603-MSK-BNB)

In re SPECTRANETICS CORPORATION SECURITIES LITIGATION

---

**DEFENDANTS SUPPLEMENTAL MOTION TO DISMISS DIRECTED AT THE ADDITIONAL ALLEGATIONS INCLUDED IN LEAD PLAINTIFF'S SUPPLEMENTAL CONSOLIDATED CLASS ACTION COMPLAINT[1]**

---

## INTRODUCTION

Plaintiff's Supplemental Consolidated Class Action Complaint ("Supplemental CAC") constitutes an apparent last-ditch effort to attempt to state a claim against Defendants. The supplemental pleading, however, does not save any of Plaintiff's claims against any of the Defendants. As an initial matter, the Supplemental CAC does not improve upon Plaintiff's inadequate effort to allege standing to assert the claims included in the CAC, does not identify any additional statements that Plaintiff alleges are misleading, and does not offer any explanation or motive as to why the defendants would have acquired – and not sold – stock during the class period. Indeed, the supplemental pleading actually further demonstrates why Plaintiff does not have standing to assert its claims and that Plaintiff's theory that Spectranetics was promoting

---

[1] Defendants have read this Court's Practice Standards and certify that they have complied with such standards in this motion. Defendants also met and conferred with Plaintiff's counsel concerning this motion via email on March 6, 2010 to which Plaintiff did not respond. Based on earlier discussions about a briefing schedule concerning Defendants' anticipated motion to dismiss, however, Defendants believe that Plaintiff does not consent to the relief requested and intends to oppose the motion.

the use of its products for off-label uses is completely speculative. As discussed in Defendants' Statement of Supplemental Authority, the Non-Prosecution Agreement between Spectranetics and the FDA does not include any admissions or other statements concerning any alleged off-label promotion of Spectranetics' products and Plaintiff cannot end run that determination by the FDA by bringing this private claim for alleged violation of the securities laws.

Far from saving Plaintiff's claim, Plaintiff's Supplemental CAC is also strange in that it is based on two documents that contradict each other. Specifically, Plaintiff attaches (1) a search warrant application and accompanying affidavit dated September 2, 2008 that served as the start of the FDA's investigation of Spectranetics; and (2) the various agreements between Spectranetics and the federal government from December 29, 2009, including a Non-Prosecution Agreement ("NPA"), a Settlement Agreement, and a Corporate Integrity Agreement ("CIA"), that concluded the investigation. The concluding documents obviously supersede the initiating documents; they reflect the results of the actual investigation conducted by the FDA. Significantly, the concluding documents differ from the search warrant application. Thus, for example, while the application for the search warrant includes certain statements concerning Spectranetics' alleged promotion of its products for use in the treatment of ISR, the NPA does not. Similarly, the application for the search warrant suggests that the FDA would contraindicate Spectranetics' laser for the treatment of ISR while the concluding documents do not express any concern about the safety of the laser for ISR. Indeed,

the FDA has accepted additional information from Spectranetics demonstrating the safety and efficacy of the laser for such treatment.

Setting aside the contradictions between Plaintiff's two new exhibits, Plaintiff's reliance on a search warrant application that was used solely to attempt to establish probable cause for a search does not help state a claim under the Private Securities Litigation Reform Act of 1995. Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007) (Reform Act imposes "higher standard than 'probable cause'" that applies to search warrant). In addition, Plaintiff's reliance on Spectranetics' settlement with the Department of Justice to attempt to establish liability violates the Federal Rules of Evidence. See Fed. R. Evid. 408. Plaintiff also tries to use information in the settlement documents from before the class period to bolster its claims, In re Foxhollow Tech., Inc. Sec. Litig., No. 06-4595, 2008 WL 2220600, at *28 n. 14 (N.D. Cal. May 27, 2008) ("portions of the complaint that relate to pre-class period allegations has no bearing on whether plaintiff has stated a claim"), and the changes in Spectranetics' internal controls included in the CIA constitute supplemental remedial measures.    Moreover, as discussed above and in Defendants' Statement of Supplemental Authority, Spectranetics' resolution with the federal government helps Defendants in any event.

Plaintiff has still failed to state a claim against any of the Defendants and the CAC (and the Supplemental CAC) should be dismissed with prejudice for the reasons explained in this Supplemental Motion to Dismiss and in Defendants' Motion to Dismiss [Docket No. 92], Defendants' Reply in Support of Motion to Dismiss [Docket No. 108], Defendants' Motion to Strike [Docket No. 110], Defendants' Reply in Support of Motion

to Strike [Docket No. 121] and Defendants' Statement of Supplemental Authority [Docket No. 113].

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff filed its consolidated class action complaint ("CAC") on August 4, 2009. The CAC, like the initial complaints that were filed in September and October 2008, attempted to turn Spectranetics' regulatory issues with the FDA, which began on September 4, 2008 when the FDA executed a search warrant at Spectranetics, into a claim of securities fraud. Defendants filed a motion to dismiss on September 18, 2009 that was fully briefed when Defendants filed their reply on December 18, 2009. After Spectranetics announced a settlement with the federal government that concluded the government's investigation of Spectranetics, both Defendants and Plaintiffs filed statements of supplemental authority. Plaintiff, however, was not satisfied with what it included in its statement of supplemental authority and thus filed a document it labeled a Supplemental Consolidated Class Action Complaint ("Supplemental CAC").

Plaintiff's supplemental pleading does very little, however. It adds a few paragraphs to what Plaintiff had included in the CAC and attaches both the documents reflecting Spectranetics' settlement with the government in December 2009 and the application for the search warrant that the government filed in September 2008. Plaintiff seemingly suggests that these documents improve its claim but they do not. The application for the search warrant has effectively been superseded by the settlement agreements. The search warrant application reflects only the apparent state of the government's knowledge in September 2008 while the settlement agreements were

4

entered into over a year later after the government conducted further investigation.
Moreover, the settlement agreements rebut rather than support Plaintiff's theory of the
case as they do not include any admissions that Spectranetics promoted its products for
the treatment of ISR.

## ARGUMENT

I.   **PLAINTIFF CANNOT RELY UPON AN APPLICATION FOR A SEARCH
     WARRANT OR A SETTLEMENT AGREEMENT WITH THE GOVERNMENT TO
     ATTEMPT TO STATE A CLAIM.**

Plaintiff's effort to add information to the CAC from an application for a search
warrant from September 2008 and Spectranetics' settlement with the government from
December 2009 does not work for at least three reasons.  First, courts have uniformly
held that the Reform Act imposes a "higher" standard to state a claim than is applied to
determine whether there is a "probable cause" to grant an application for a search
warrant.  Higgonbotham v. Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007) (Reform
Act imposes "higher standard than 'probable cause'" that applies to search warrant);
see also The Winer Family Trust v. Queen, 503 F.3d 319, 329 n.3 (3d Cir. 2007). The
application for the search warrant therefore does not help Plaintiff state a claim for
securities fraud.  Moreover, the application adds nothing new to what Plaintiff included
in the original CAC.  Plaintiff had already alleged that the government executed a
search warrant on September 4, 2008 and obviously the execution of a search warrant
was preceded by an application for a search warrant.  Furthermore, as discussed
previously, neither Plaintiff's CAC nor its Supplemental CAC explain how a search

5

warrant or an application for a search warrant concerning purported violations of FDA rules and regulations help establish securities fraud.

Second, Plaintiff violates the Federal Rules of Evidence in attempting to establish liability based on Spectranetics' resolution of its regulatory issues with the federal government. There are numerous reasons why companies settle matters that do not demonstrate any wrongdoing, see Eshelman v. Orthoclear Holdings, Inc., No. C 07-1429, 2009 WL 506864, at *8 (N.D. Cal. Feb. 27, 2009), and courts ordinarily do not allow evidence of settlements (or statements made in settlement discussions) to be used to establish liability, see Fed. R. Evid. 408; United States v. Bailey, 327 F.3d 1131, 1144 (10th Cir. 2003); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893-94 (2d Cir. 1976) (consent judgment with government cannot be used to establish liability); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (striking allegations in complaint based on settlements with government authorities).[2]

Third, Plaintiff alleges that the FDA can still bring claims against Spectranetics despite its settlements with the DOJ, U.S. Attorneys' Office and the U.S. Department of Health and Human Services. Plaintiff does not explain how this assertion somehow bolsters its case, but it constitutes a complete misunderstanding as to the position of the

---

[2]    Courts have also frequently found no liability for securities fraud in other cases where there have been settlements with the government. (See Statement of Supplemental Authority in Support of Defendants' Motion to Dismiss Lead Plaintiff's Consolidated Class Action Complaint at 4-5 (citing Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 825, 829-830 (8th Cir. 2003); Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 941, 943-947 (6th Cir. 2009); Glazer Capital Management, LP v. Magistri, 549 F.3d 736, 740-749 (9th Cir. 2008) [Docket No. 113]).

FDA within the federal government. The FDA does not bring criminal claims; the FDA's criminal claims are brought by the DOJ on behalf of the United States of America; and therefore the NPA with the DOJ is a NPA with the FDA. See 28 U.S.C. § 516 ("the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice"); see also 28 U.S.C. § 519. In addition, the FDA is an agency within the United States Department of Health and Human Services ("HHS") and HHS released its civil claims against Spectranetics as part of the Settlement Agreement. (Supplemental CAC, Ex. A). Thus, the FDA (with Congressionally delegated exclusive jurisdiction over enforcement of the FDCA) has determined an appropriate remedy for Spectranetics' alleged conduct and Plaintiff cannot override or attempt to supplant that decision.[3]

## II.   PLAINTIFF DOES NOT EVEN ATTEMPT TO OVERCOME THE MYRIAD PROBLEMS WITH THE CAC IN THE SUPPLEMENTAL CAC.

Plaintiff seemingly filed the Supplemental CAC because it recognized that the CAC did not state a claim for relief against any of the Defendants. Even if the Court considers the "new" information in the Supplemental CAC, the new pleading does not solve or even attempt to solve many or any of the myriad problems with the CAC pointed out in Defendants' motion to dismiss and reply in support of the motion to dismiss. Among other things:

---

[3]   As discussed in Defendants' Statement of Supplemental Authority, Plaintiff does not get anywhere by suggesting that Spectranetics' agreement to pay $4.9 million to settle the government's charges demonstrates wrongdoing as this settlement pales in comparison to other company's settlements with the FDA. (Statement of Supplemental Authority at 4 [Docket No. 113]).

- The Supplemental CAC actually further bolsters Defendants' argument that Plaintiff does not have standing to assert its claims for securities fraud because it is merely trying to assert a Congressionally-prohibited private claim for violation of the FDCA through the guise of the securities laws. The allegations Plaintiff added to the Supplemental CAC and the documents that Plaintiff has now attached show that the FDA has exercised its authority to investigate whether Spectranetics promoted its devices for off-label uses and has determined that it did not require any admissions concerning off-label promotion in the NPA.   Plaintiff is not permitted to second guess this conclusion by asserting a claim for securities fraud.

- The Supplemental CAC does not identify any additional statements that Plaintiff alleges were false or misleading thereby giving rise to any duty to disclose the conduct that Plaintiff argues Spectranetics had to disclose.

- The Supplemental CAC does not allege or suggest that any of the Defendants sold stock during the class period and does not question that nearly all of the individual defendants actually acquired more stock.

Plaintiff's Supplemental CAC thus does not improve upon the inadequate CAC and should be dismissed.

## III.   PLAINTIFF'S SUPPLEMENTAL CAC DOES NOT OVERCOME THE DEFICIENCIES IN ITS CAC.

To the extent that Plaintiff adds anything in the Supplemental CAC, it offers new allegations in two limited areas based on its misinterpretation of the application for the search warrant and Spectranetics' settlement with the government.   Relying primarily upon the application for the search warrant, it adds a few allegations concerning Spectranetics' purported off-label promotion of its product for ISR.   It also adds some contentions concerning Spectranetics alleged importation of medical devices from FMD and BMT.[4]

---

[4]   Plaintiff also suggests that Spectranetics' Corporate Integrity Agreement ("CIA") with HHS supports its claim, but as discussed in Defendants' Statement of Supplemental Authority, the CIA weakens Plaintiff's case.  It specifically reflects that Spectranetics had internal controls in place even

**A.      Plaintiff's "Additions" Concerning Spectranetics Alleged Off-Label Promotion Depend On Purported Information That Has Long Been Superseded.**

Plaintiff's reliance on the application for the search warrant for additional facts to bolster its claim that Spectranetics knowingly made false or misleading statements about whether it was allegedly promoting its products for use in ISR does not work for at least six reasons.

First, Plaintiff relies almost exclusively for these allegations on the search warrant application from September 2008 and purposely ignores the other documents that it attached to the Supplemental CAC.   These other documents – which reflect Spectranetics' settlement with the FDA from December 2009 – supersede the much earlier application for a search warrant.  Thus, the search warrant application reflected the state of the FDA's knowledge in September 2008 at which time the FDA seemingly had certain concerns about Spectranetics' actions with respect to purported off-label promotion, but by December 2009 after conducting further investigation, the FDA entered into a NPA with Spectranetics that included no admissions concerning any such promotion. (Supplemental CAC, Ex. B).

before the execution of the search warrant and any changes to the controls constitute inadmissible subsequent remedial measures. (Defendants Statement of Supplemental Authority at 4 n.2 [Docket No. 113]); (Supplemental CAC, Ex. C).  Plaintiff's additional allegations concerning Spectranetics Coral and Coral Reef studies are similarly irrelevant.  The Coral and Coral Reef studies pre-date the class period by over 2 years, see In re Seagate Technology II Sec. Litig., No. 89-2493, 1995 WL 66841, at *4 (N.D. Cal. Feb. 8, 1995); In re Foxhollow Tech., Inc. Sec. Litig., No. 06-4595, 2008 WL 2220600, at *28 n. 14 (N.D. Cal. May 27, 2008) ("portions of the complaint that relate to pre-class period allegations has no bearing on whether plaintiff has stated a claim"); see also Greebel v. FTP Software, Inc., 194 F.3d 182, 202 (1st Cir. 1999), and Spectranetics told its stockholders that it "it appears that we didn't meet our endpoint in [the Coral] study as our complication rates were similar to balloon and stents and higher than distal protection" long before the class period,  see Ex. 41 (excerpts of Spectranetics May 10, 2005 Form 10-Q) at 13-14.

Second, as discussed above and in Statement of Supplemental Authority, the fact that the FDA has acted in an area in which Congress delegated exclusive authority to it – regulation of alleged off-label promotion of drugs and medical devices -- further demonstrates why Plaintiff cannot attempt to enforce the FDCA using the securities laws. Plaintiff's claims are predicated upon and so intertwined with alleged violations of the FDCA that the Court cannot decide these issues in this case without interfering with the FDA's authority. The FDA has determined an appropriate remedy for Spectranetics' alleged conduct and Plaintiff cannot override or attempt to supplant that decision in this lawsuit.

Third, Plaintiff has merely added a host of legal conclusions in the Supplemental CAC. Thus, Plaintiff has alleged in the Supplemental CAC that "Spectranetics . . . has adulterated and misbranded its" devices, (Supplemental CAC ¶129) and that "Spectranetics sales staff were directed to promote the TurboBooster for the unapproved, 'off-label' use" (Supplemental CAC ¶130). Much more is required to state a claim for securities fraud, see 15 U.S.C. 78u-4(b) (Reform Act requires particularity in pleading both falsity and scienter), and such conclusory allegations do not even suffice under Rule 8, Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

Fourth, the "facts" described in the search warrant application do not reflect unlawful off-label promotion. They reflect at most that Spectranetics responded to physician-initiated inquiries concerning using the laser for ISR in the legs, communicated internally concerning using the laser for ISR in the legs, and disclosed information about its clinical trials concerning using the laser to treat ISR in the legs to

10

market analysts. None of these communications constitute off-label promotion. The FDA has acknowledged that companies "may respond to unsolicited requests for information from health care professionals, even if responding to [the] requests requires the companies to provide information regarding off-label uses." (Zelichov Decl., Ex. 30 at 1, 9 [Docket No. 93]). Companies are permitted to discuss off-label uses internally without violating the FDCA. Cf. Coyne Beahm, Inc. v. U.S. FDA, 966 F. Supp. 1374, 1389, 1392 (M.D.N.C. 1997) ("internal manufacturer memoranda" do not establish intended use). And a "company may, and is often required under SEC rules, to discuss off-label uses with investors." Ralph F. Hall & Elizabeth S. Sobotka, "Inconsistent Government Policies: Why FDA Off-Label Regulation Cannot Survive First Amendment Review Under Greater New Orleans," 62 Food & Drug L.J. 1, 30 (2007); see also FDA Letter to Washington Legal Foundation (WLF) (Mar. 19, 2001) (FDA regulations do not bar disclosure of study results about new drugs in press releases or SEC filings), available at http://www.fda.gov/ohrms/dockets/dailys/01/Aug01/081301/m000001.pdf (Exhibit 42).

Fifth, Plaintiff's purported additions to the CAC from the application for search warrant do not address the fact that the FDA's rules are vague not just as to what constitutes off-label promotion but also "when a specific indication for use is reasonably included within a general indication for use of a medical device." (Defendants Motion to Dismiss at 9-12, 41-42 [Docket No. 92]; Defendants Reply in Support of Motion to Dismiss at 2, 4, 20, 20 n.16 [Docket No. 108]). The Supplemental CAC – like the CAC before it -- still ignores these issues entirely thereby establishing that Defendants could

not have acted with knowledge of wrongdoing because the FDA's rules themselves are vague.[5]

Finally, as discussed in Defendants' motion to dismiss (and thus far ignored by Plaintiff), the First Amendment renders the FDA's regulation of "promotional" speech even more uncertain. The Supreme Court in fact has recently reaffirmed that "First Amendment protection extends to corporations" like Spectranetics; that "restrictions distinguishing among different speakers, allowing speech by some but not others" (like the FDA permitting physicians to discuss off-label uses while prohibiting medical device or pharmaceutical manufacturers from doing so) are not permitted; and that a complex regulatory scheme governing speech with the potential threat of criminal liability and heavy costs of defending against any enforcement action (like the FDA's regulation of off-label promotion) constitutes a "prior restraint on speech". Citizens United v. Federal Election Commission, __ S. Ct. __, 2010 WL 183856, at *16, *19, *20 (Jan. 21, 2010). The existence of these issues further demonstrates why Plaintiff cannot allege scienter as the First Amendment further muddies the waters concerning the lack of clear

---

[5]   Plaintiff alleges in the Supplemental CAC that the FDA "would likely have contraindicated the Company's lasers for use on ISR" had Spectranetics disclosed certain preliminary non-statistically significant test results to the FDA. (Supplemental CAC ¶¶ 77, 156). The allegation reflects at most the government's belief at a particular point in time as the FDA has obviously had these test results since at least September 2008, and Plaintiff does not and cannot allege that the FDA has contraindicated Spectranetics' laser for the treatment of peripheral ISR. Indeed, Spectranetics' laser catheters constitute the only atherectomy product not contraindicated for the treatment of ISR and Spectranetics submitted studies to the FDA on September 11, 2008 showing that its products are safe for use in the treatment of ISR and submitted further data, backed by clinical trials, in May 2009 demonstrating the safety and effectiveness of the Company's products for the treatment of ISR. (Zelichov Decl., Ex. 4 at 9; Ex. 17 at 1; Ex. 18 at 1 [Docket No. 93]). Plaintiff still also does not explain how Spectranetics purported failure to disclose certain preliminary test results to the FDA gives rise to a claim for failure to disclose any information to its stockholders. (Defendants' Motion to Dismiss at 25 n.9 [Docket No. 92]; Defendants' Reply in Support of Motion to Dismiss at 12 n.8 [Docket No. 108]).

guidance to companies concerning when actions related to off-label uses of their products constitute allegedly unlawful off-label promotion.

**B.     Plaintiff's "Additions" Concerning Spectranetics' Potential Transactions with FMD and BMT Still Fail To Identify Any Statements Concerning Those Transactions.**

Plaintiff's additional allegations concerning Spectranetics illegal importation of some guidewires from FMD and angioplasty balloons from BMT fail to give rise to any claim for securities fraud. As discussed in Defendants motion to dismiss and reply in support of the motion to dismiss, Spectranetics never made any statements about the potential transactions with FMD or BMT, never mentioned FMD or BMT in press releases or conference calls, and never made any statements about whether it was or was not importing such products from outside the United States. (Defendants Motion to Dismiss at 27-29 [Docket No. 92]; Reply in Support of Motion to Dismiss at 10 n.6 [Docket No. 108]). The facts about these transactions are thus completely irrelevant to any claim of securities fraud, and Plaintiff has not included any additional "alleged" misleading statements in the Supplemental CAC to overcome this failure.

Even if Plaintiff could allege such a statement, the NPA has no bearing on any purported claim for securities fraud because the admissions contained therein address violations of FDA statutes and regulations and not the securities laws. (Supplemental CAC, Ex. B). The NPA also further demonstrates the immateriality of the conduct related to FMD and BMT as no more than 10 FMD wires and 5 BMT balloons were

used, and in any event, Plaintiff does not and cannot allege that Spectranetics received

any payment for this miniscule number of uses. (Supplemental CAC, Ex. B).[6]

### CONCLUSION

For all the foregoing reasons and for the reasons explained in Defendants'

Motion to Dismiss [Docket No. 92], Defendants' Reply in Support of Motion to Dismiss

[Docket No. 108], Defendants' Motion to Strike [Docket No. 110], Defendants' Reply in

Support of Motion to Strike [Docket No. 121] and Defendants' Statement of

Supplemental Authority [Docket No. 113], the Supplemental CAC should be dismissed.


Dated:  March 12, 2010

/s/ Bruce G. Vanyo
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: 310-788-4400
Facsimile:  310-788-4471
Email:  bruce@kattenlaw.com

Counsel for Defendants The
Spectranetics Corporation, Guy A.
Childs, Emile Geisenheimer, Jonathan
W. McGuire, and Craig M. Walker, M.D.

/s/ Stephen C. Schulte
WINSTON AND STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5890
Facsimile:  312-558-5700
Email:  sschulte@winston.com

Counsel for Defendant John G. Schulte

---

[6]    Plaintiff's claim that the search warrant application and NPA corroborate the information it
included from CWs in the CAC (and Supplemental CAC) is false.  Based on information from its purported
CWs, Plaintiff alleged in the CAC (and Supplemental CAC) that Dr. Walker used the FMD guidewires, but
neither the search warrant application nor the NPA even mention Dr. Walker in connection with the
transaction with FMD let alone suggest that he used the FMD guidewires on his patients.

# EXHIBIT 41

Table of Contents

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED**

**March 31, 2005**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM _____ TO**

Commission file number 0-19711

# The Spectranetics Corporation
(Exact name of Registrant as specified in its charter)

**Delaware**                                      **84-0997049**
(State or other jurisdiction of          (I.R.S. Employer Identification No.)
incorporation or organization)

**96 Talamine Court**
**Colorado Springs, Colorado 80907**
**(719) 633-8333**
(Address of principal executive offices and telephone number)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the Registrant is an accelerated filer. Yes ☑ No ☐

As of May 5, 2005 there were 25,778,542 outstanding shares of Common Stock.

Page 1

Table of Contents

*Item 2. Management's Discussion and Analysis of Results of Operations and Financial Condition (cont'd)*

<u>Corporate Overview</u>

We develop, manufacture, market and distribute single-use medical devices used in minimally invasive surgical procedures within the vascular system in conjunction with our proprietary excimer laser system. Excimer laser technology delivers comparatively cool ultraviolet energy in short, controlled energy pulses to ablate or remove tissue. Our excimer laser system includes the CVX-300® laser unit and various fiber-optic delivery devices, including disposable catheters and sheaths. Our excimer laser system is the only excimer laser system approved in the United States and Europe for use in multiple, minimally invasive cardiovascular applications. Our excimer laser system is used in complex atherectomy procedures to open clogged or obstructed arteries in the coronary and peripheral vascular system. It is also used to remove lead wires from patients with implanted pacemakers or cardioverter defibrillators, which are electronic devices that regulate the heartbeat. Our laser system is typically used adjunctively with balloon catheters and cardiovascular stents. We compete with alternative technologies including mechanical atherectomy and thrombectomy devices. In April 2004, we obtained 510 (k) marketing clearance from the Food and Drug Administration (FDA) for a laser-based treatment of total occlusions (blockages) in the legs not crossable with a guidewire. Some of the patients with total occlusions in the leg suffer from critical limb ischemia (CLI), a debilitating condition that begins with resting leg pain and often leads to tissue loss or amputation as a result of a lack of blood flow to the legs.

Although 88% of our revenue was derived in the United States for the three months ended March 31, 2005, we also have regulatory approval to market our products in two key international markets. In Europe, we have the required approvals to market our products for the same indications that are approved in the United States. We have also received approval to market certain coronary atherectomy products in Japan, and are seeking additional approvals there for our newer coronary, peripheral and lead removal products. In 2003, we appointed a new distributor, DVx Japan, who is assisting us in pursuing reimbursement approval. We currently expect reimbursement approval in 2006, although there are no assurances that reimbursement will be received then, if at all. We do not expect significant revenue increases in Japan until reimbursement is received.

Our strategy is to develop additional applications for our excimer laser system, gather and develop clinical data for publication in peer-reviewed journals, increase utilization of our FDA-approved products, and expand our installed base of laser systems. We plan to remain focused on profitability, however there are no assurances that we will continue to be profitable in the future.

In 1993, the FDA approved for commercialization our CVX-300 laser system and the first generation of our fiber optic coronary atherectomy catheters. Several improvements and additions to our coronary atherectomy product line have been made since 1993 and have been approved for commercialization by the FDA. In 1997, we secured FDA approval to use our excimer laser system for removal of pacemaker and defibrillator leads, and we secured FDA approval in 2001 to market certain products for use in restenosed (clogged) stents (thin steel mesh tubes used to support the walls of coronary arteries) as a pretreatment prior to brachytherapy (radiation therapy).

In April 2004, we received 510(k) marketing clearance from the FDA for our CliR*path* excimer laser catheters which are indicated for use in the endovascular treatment of symptomatic infrainguinal lower extremity vascular disease when total obstructions are not crossable with a guidewire. The data submitted to the FDA showed that the limb salvage rate (no major amputations) among the 47 patients treated was 95% for those patients surviving six months following the procedure. There was no difference in serious adverse events as compared with the entire set of patients treated in the LACI (Laser Angioplasty for Critical Limb Ischemia) trial.

We are currently exploring the use of our technology to treat blockages caused by the formation of thrombus (blood clots) and are gathering clinical data for laser-based treatment of saphenous vein grafts (heart bypass grafts that develop blockages) and acute myocardial infarction (AMI, or heart attack). The CORAL trial, which is being conducted in the U.S., is a study of the use of laser atherectomy to treat

Table of Contents

*Item 2. Management's Discussion and Analysis of Results of Operations and Financial Condition (cont'd)*

blockages within saphenous vein grafts. We enrolled almost 100 patients in 18 hospitals, with 2/3 of the patients having lesions where distal protection could not be used due to lesion location or inability to place the filter. The primary endpoint for the CORAL trial is a measurement of the complication rates, known as major adverse cardiac events (MACE). The MACE rates from the CORAL trial will be compared to MACE rates associated with the SAFER trial sponsored by Medtronic, which measured MACE rates using distal protection devices. The goal of this trial is to demonstrate the safety and efficacy of the laser in relation to distal protection devices, which are widely used and were proven to reduce MACE rates in the SAFER clinical trial. We had hoped to match the previously published complication rates of 10% with distal protection versus the complication rates of 17% using balloon and stents alone. Based on our analysis of the data which is not yet complete, it appears that we didn't meet our endpoint in this pilot study as our complication rates were similar to balloon and stents and higher than distal protection. We believe that our patients may have had more difficult lesions, which could influence the final clinical outcomes. We are currently working with the core lab to finalize the statistical analysis and determine our next steps. Our investigators remain convinced that using the laser in the treatment of saphenous vein grafts, either alone when distal protection cannot be deployed or in combination when it can, will reduce complication rates.

The Extended FAMILI trial is a feasibility trial that will benchmark quantitative endpoints common in other AMI trials, such as myocardial blush scores and the reduction in infarct size for the subset of patients. Enrollment in the trial has been slow but is expected to be completed by the end of the second quarter. We expect to have the 30-day follow-up and analysis complete in the third quarter. After completion of the data analysis, a decision will be made whether to pursue a pivotal, randomized trial that, if commenced, may take two to three years to complete.

We are also considering the initiation of additional clinical research during 2005 focused on the treatment of peripheral vascular disease and chronic total occlusions in the coronary vascular system.

Table of Contents

*Item 6. Exhibits*

 *Exhibits.*

    10.36 Consulting Agreement dated February 14, 2005 between the Company and Dr. Craig Walker.

    10.37 Settlement and Amendment to License Agreement executed in February 2005 and effective October 1, 2004 between the Company and SurModics, Inc. (confidential treatment has been requested for portions of this agreement).

    31.1(a) Rule 13(a)-14(a)/15d-14(a) Certification.

    31.1(b) Rule 13(a)-14(a)/15d-14(a) Certification.

    32.1(a) Section 1350 Certification.

    32.1(b) Section 1350 Certification

## SIGNATURES

    Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**The Spectranetics Corporation**
(Registrant)

May 10, 2005                         By: /s/ John G. Schulte
                                     John G. Schulte
                                     President and Chief Executive Officer

May 10, 2005                         By: /s/ Guy A. Childs
                                     Guy A. Childs
                                     Vice President Finance, Chief Financial Officer

# EXHIBIT 42

# MEMORANDUM

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration

Center for Drug Evaluation and Research

**DATE:** JUL 31 2001

**FROM:** Dave Read (HFD-7)

**SUBJECT:** Docket No. 96P-0001/CP1

**TO:** Dockets Management Branch (HFA-305)

In the docket indicated above, please file this memo, as well as the attached letter from Jane Axelrad (HFD-7) dated March 19, 2001, and the attached letter of mine dated Dec. 10, 1997.

By the terms of Ms. Axelrad's letter, if the petitioner (Washington Legal Foundation) wished to keep this petition active, within 30 days the WLF was to submit a written response to the docket; if the WLF submitted no reponse within that time, the petition would be considered to have been voluntarily withdrawn.

No response from the WLF has been received as of the date of this memo.

This docket can be closed -- no further action is needed.  Thanks.

Attachments

96P-0001                                      M1



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

MAR 1 9 2001

Food and Drug Administration
Rockville MD 20857

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Daniel J. Popeo
Paul D. Kamenar
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, D.C. 20036

Re: Docket No. 96P-0001/CP1

Dear Messrs. Popeo and Kamenar:

According to the records of FDA's Dockets Management Branch, the petition referenced above has not been resolved.

As part of the Agency's efforts to reduce the backlog of unresolved citizen petitions, the Center for Drug Evaluation and Research has reviewed the unresolved citizen petitions assigned to it for action. One goal of this review is to identify citizen petitions submitted more than five years ago that, as a result of subsequent events, no longer appear to raise significant and current public health issues. CDER believes that having to respond to these old petitions diminishes the Agency's capacity to address in a timely fashion petitions that raise more significant and current public health issues, as well as its capacity to perform its many other duties. Therefore, these petitions have been given a low priority, and it is unlikely that the Agency will have the resources to respond to them in the foreseeable future.

Your petition was submitted more than five years ago, and a review of the docket indicates that it has been inactive for many years. CDER believes that this petition does not raise a significant and current public health issue that merits a formal agency response. In a December 10, 1997, letter to Ryan McInstry of the Washington Legal Foundation (on which Mr. Kamenar was copied), Dave Read of my staff explained that FDA's regulations at 21 CFR 312.7(a) do not, as the petition asserts, operate as a bar to disclosure of study results relating to investigational new drugs in reports with the SEC and in press releases, and public companies make such disclosures on a routine basis.

Accordingly, we have enclosed a copy of the petition and would appreciate it if you would review it and respond to the docket number listed above if you wish to keep this petition active. If we do not receive a written response from you within 30 days, a copy of this letter will be filed in Docket No. 96P-0001/CP1 with instructions that the petition be considered to have been voluntarily withdrawn without prejudice to resubmission.

Docket No. 96P-0001/CP1

If you have any questions, please contact Dave Read at 301-594-2041. Thank you for your attention to this matter.

Sincerely,

Jane A. Axelrad
Associate Director for Policy
Center for Drug Evaluation and Research

Enclosures

2

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 12th day of March, 2010, I electronically filed the foregoing:

**DEFENDANTS SUPPLEMENTAL MOTION TO DISMISS DIRECTED AT THE ADDITIONAL ALLEGATIONS INCLUDED IN LEAD PLAINTIFF'S SUPPLEMENTAL CONSOLIDATED CLASS ACTION COMPLAINT**

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses, and I hereby certify that I have caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated without e-mail addresses on the list below.

/s/ Richard H. Zelichov

31512268

Jeffrey A. Berens
Dyer & Berens LLP
682 Grant Street
Denver, CO  80203-3507
Telephone:  (303) 861-1764
Fax: (303) 395-0393
Email: jeff@dyerberens.com
Email: jeffreyberens@comcast.net
Atty for: Ted Karkus (interested party)

David A.P. Brower
Jessica Sleater
Brower Piven,
  A Professional Corporation
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 501-9000
Fax: (212) 501-0300

Reed R. Kathrein
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue
Berkeley, CA  94710
Telephone:  (510) 725-3000
Fax: (510) 725-3001
Email: reed@hbsslaw.com
Atty for: Robert Dickson (interested party)

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: 206-623-7292
Fax: 206-623-0594
Email: berman@hbsslaw.com
Atty for: Robert Dickson (interested party)

Robert B. Carey
The Carey Law Firm
2301 East Pikes Peak
Colorado Springs, CO  80909
Telephone:  (719) 635-0377
Fax:  (719) 635-2920
Email: rcarey@careylaw.com
Email: rcarey@hbsslaw.com
Atty for: Robert Dickson (interested party)

John F. Head
Head & Associates, P.C.
1860 Blake Street #300
Denver , CO 80202
Telephone: 303-623-6000
Fax: 303-623-4211
Email: jfhead@headlawyers.com
Atty for: Louis Lee Posner (interested party)

Christopher J. Keller
David J. Goldsmith
Alan I. Ellman
Stefanie J. Sundel
Labaton Sucharow LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
Email:  aellman@labaton.com
Email:  dgoldsmith@labaton.com

Atty for:  Genesee Cty. Employees Retirement
System (consol plaintiff)

Sean Handler
Schiffrin Barroway Topaz & Kessler LLP
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Fax:  (610) 667-7056

Charles J. Piven
Yelena Trepetin
Brower Piven,
 A Professional Corporation
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: (410) 332-0030
Fax: (410) 685-1300
Email: Piven@browerpiven.com
Atty for: Peter Tortora (interested party)

Kip Brian Shuman
Rusty Evan Glenn
The Shuman Law Firm
885 Arapahoe Avenue
Boulder, CO  80302
Telephone: (303) 861-3003
Fax: (303) 484-4886
Email: kip@shumanlawfirm.com
Email: rusty@shumanlawfirm.com
Atty for: Max Hancook, plaintiff; Genesee Cty.
Employees Retirement System, consol plaintiff,
interested party; Peter Tortora, interested party; Wayne
Cty Employees' Retirement System, interested party

David J. Goldsmith
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:    (212) 818-0477
Email:  dgoldsmith@labaton.com
Atty for: Genesee Cty Employees Retirement
System  (consol plaintiff)

Darren J. Robbins
Matthew P. Montgomery
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Fax:  (619) 231-7423
Atty for: Ted Karkus (interested party)

Stephen C. Schulte
W. Gordon Dobie
WINSTON & STRAWN LLP
35 West Wacker Drive

Chicago, IL 60601-9703
Telephone: 312-558-5600
Facsimile:   312-558-5700
Email: sschulte@winston.com
Email: wdobie@winston.com
Atty for: John G. Schulte (defendant)