IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02048-REB-KLM

(Consolidated with Civil Action No. 08-cv-02055-CMA-CBS, 08-cv-02078-MSK-BNB, 08-cv-02267-MSK-CBS, 08-cv-02420-PAB, 08-cv-02603-MSK-BNB)

In re SPECTRANETICS CORPORATION SECURITIES LITIGATION

## LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS

### INTRODUCTION

Lead Plaintiff ("Plaintiffs") respectfully submits this Opposition to Defendants' Supplemental Motion to Dismiss Directed at the Additional Allegations Included in Lead Plaintiff's Supplemental Consolidated Class Action Complaint ("Supplemental Motion"), Dkt. No. 132.[1] On August 4, 2009, Plaintiffs filed Lead Plaintiff's Consolidated Class Action Complaint ("Complaint"). Dkt. No. 75. On February 10, 2010, Plaintiffs filed Lead Plaintiff's Supplemental Consolidated Class Action Complaint ("Supplemental Complaint"),[2] Dkt. No. 125, pursuant to Fed. R. Civ. P. 15(d).[3] The Supplemental Complaint is *not* an amended pleading pursuant to Fed. R. Civ. P. 15(a), as Plaintiffs

---

[1] Defendants informed Plaintiffs of the general basis of the Supplemental Motion. *See* Dkt. No. 132, at 1 n.1. As to each element enumerated in the Supplemental Motion that Defendants contend was not alleged in the Supplemental Complaint, such contention is disputed by Plaintiffs. All docket entry references shall be to *Hancook v. Spectranetics Corp.,* 1:08-cv-02048-REB-KLM. References to the Supplemental Motion will be to "Def. Supp. Br."

[2] All "¶ __" references are to the Supplemental Complaint unless otherwise noted.

[3] "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

have not added any new or additional claims, nor modified any claims in the Complaint. Rather, the Supplemental Complaint updates the Complaint to include events that have transpired *after* the Complaint was filed. Indeed, the basis of Plaintiffs' claim remains identical to that pled in the Complaint. The misleading statements and material omissions are the same as well. The information in the Supplemental Complaint simply provides additional corroborating evidence of the overwhelming evidence of *scienter* already pled in the Complaint. As fully briefed, Plaintiffs' Complaint – and now Supplemental Complaint – is sufficient to survive a motion to dismiss, and Defendants' assertion that the Supplemental Complaint does not address Defendants' arguments raised in their motion to dismiss, Dkt. No. 92, is simply disingenuous.

The Supplemental Complaint alleges material misrepresentations and omissions made by Defendants regarding the off-label marketing of their laser system to treat in-stent restenosis ("ISR"), the illegal importation and testing on humans of the Percutanous Transluminal Angioplasty balloons ("BMT balloons") and the FMD guidewires, failure to report adverse effects of in-house tests to investors and the U.S. Food and Drug Administration ("FDA"), and Spectranetics Corporation's ("Spectranetics" or the "Company") lack of effective controls. These allegations are supported by Scott Schlesinger ("Schlesinger"), a former employee of the Company who brought a whistleblower lawsuit ("Whistleblower Lawsuit"), alleging almost identical claims to those contained in the Supplemental Complaint, against the Company, that was settled on undisclosed terms. The claims are also supported by numerous and reliable confidential witnesses ("CW(s)"). These witnesses include high level

2

employees privy to the illegal conduct perpetrated by the Defendants, interviewed by both Plaintiffs and the Government[4] (as evidenced in the Application and Affidavit for Search Warrant and Seizure ("Search Warrant")).[5] Finally, the claims are supported by **_Defendants' own admissions_** in the various settlement agreements entered into by the Company and the Government.

As set forth in the Supplemental Complaint, in December 2009, Spectranetics entered into a Non-Prosecution Agreement ("NPA"), a Civil Settlement Agreement ("Civil Settlement"), and a Corporate Integrity Agreement ("CIA") with the Department of Justice, U.S. Attorneys' Office, and the U.S. Department of Health and Human Services (collectively, "Agreements").  ¶12.  Pursuant to the terms of the Agreements, the Company agreed to pay $4.9 million in civil damages in addition to $100,000 to avoid criminal prosecution.  ¶222.  The settlement payment constitutes approximately 2.2% of the Company's market capitalization.  *See* Lead Plaintiff's Response to Defendants' Statement of Supplemental Authority In Support of Their Motion to Dismiss ("Pl. Supp. Auth."), Dkt. No. 118, at 4.  Although the Agreements resolved many of the claims against the Company related to Defendants' fraudulent conduct, the Agreements did not

---

[4]  The Government's confidential witnesses will be referred to as "Gov't CW(s)."

[5]  Defendants' arguments that Plaintiffs cannot rely on the Gov't CWs and documentary evidence in the Search Warrant, *see* Def. Supp. Br. at 5-6, are baseless.  First, the fact that courts apply a higher standard than "probable cause" in considering securities claims does not mean that the allegations in the Search Warrant cannot be used to support Plaintiffs' claims.  Indeed, the documents and testimony referenced in the Search Warrant are just another piece of the mountain of evidence that Plaintiffs have provided in support of their claims.  Second, the Search Warrant does add something new, as it provides facts, documents, and testimony that corroborate Plaintiffs' allegations.

settle any claims with the Individual Defendants, or other employees of the Company. Additionally, the Agreements did not resolve any claims that may be brought by other state or federal government agencies. *See* ¶¶12, 223. Finally, contrary to Defendants' assertions, the Agreements ***do not*** exonerate Defendants from allegations that the Company engaged in off-label marketing. Nowhere in the Agreements does it state that the Government found Defendants ***innocent*** of these allegations.

Confronted by this additional, irrefutable evidence of their misconduct, Defendants once again attempt to confuse the issues, mischaracterize Plaintiffs' allegations, and belabor the same arguments that Plaintiffs have already adequately addressed on multiple occasions. Contrary to Defendants' contentions, Plaintiffs ***do*** have standing to pursue the claims in this action, *see* Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion to Dismiss ("Pl. MTD Opp."), Dkt. No. 105, at 10-12,[6] and Plaintiffs have already identified the materially false and misleading statements during the Class Period, as detailed below. Plaintiffs' new allegations simply reinforce that the statements were materially false and misleading when made.

Further, Defendants' argument that Plaintiffs "do[ ] not offer any explanation or

---

[6] Defendants are incorrect that the new allegations "further bolsters Defendants' argument that Plaintiff does not have standing to assert its standing . . ." because Defendants' admissions do not include the promotion of off-label uses of their medical devices. *See* Def. Supp. Br. at 8. As explained in detail herein, the Agreements are only with the Company, and the Company's former CEO and possibly other employees remain the subjects of investigations related to these allegations. Further, the Agreements are a "compromise" between the Government and the Company, and such compromises more often than not include provisions whereby a company does not admit to alleged wrongful conduct; and other state and federal agencies may have pending matters against Defendants relating to the matters that are the subject of the Agreements.

motive as to why the defendants would have acquired – and not sold – stock during the class period," Def. Supp. Br. at 1, ignores that a strong inference of *scienter* can be established without stock sales, Pl. MTD Opp. at 39-40, and, indeed, "[c]ourts have found that stock purchases by insiders may even **contribute** towards a finding of *scienter* where the purchases were made out of a desire to cover up defendants' fraud." *See id*. at 40 (citing *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1378-79 (S.D. Fla. 2001)).

Further, although Defendants seem to forget that Plaintiffs are not required to allege motive to plead a strong inference of *scienter*, *Tellabs v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 325 (2007), Plaintiffs have indeed alleged Defendants' personal pecuniary motives, *see* Pl. MTD Opp. at 38 n.51 (discussing lucrative consulting deals and compensation packages) and particularized corporate motives. *See id.* at 38-39. [7]

Therefore, because Plaintiffs have more than adequately met their pleading burden, it is respectfully submitted that Defendants' motions to dismiss the Complaint and Supplemental Complaint should be denied in their entirety.

---

[7] These include that "[t]he expectation that the Company would successfully market its laser system and medical devices for off-label use was considered in the Company's internal revenue models and projections," which showed that revenue could be up to $200 million; that the Company recognized revenue from sales from Dr. Craig M. Walker's ("Dr. Walker") training sessions; and that it was the ultimate goal of the Defendants to sell the Company and that the Individual Defendants (*i.e.*, Guy A. Childs, Emile Geisenheimer ("Geisenheimer"), Jonathan W. McGuire ("McGuire"), Dr. Walker, and John G. Schulte ("Schulte")) were working to make the Company appear more attractive for acquisition.

## ARGUMENT

### I. The New Allegations Fully Support That Defendants' Statements During the Class Period Were False and Misleading

The content of the Agreements and the Search Warrant fully support and substantiate Plaintiffs' allegations that Defendants' statements during the Class Period were false and misleading when made. In the NPA, the Company "*admitted and agreed not to contest* the government's claims" that it failed to comply with the FDA reporting requirements related to several studies that defendants Schulte and McGuire supervised on a daily basis.[8] The Search Warrant also confirms that Defendants failed to report adverse effects of the nitinol stent testing ***during*** the Class Period. Further, in the NPA, the Company admits the very allegations made in the Supplemental Complaint when it affirms that the "Company, through its officers and key employees, illegally imported and tested FMD guidewires and BMT balloons on human subjects" in violation of FDA rules and regulations. *See* ¶¶12, 78, 102, 182. These are judicial admissions that the Defendants cannot contest.

Moreover, the Search Warrant specifically mentions that Dr. Walker performed six evaluations of BMT balloons on human subjects. *See* Search Warrant at ¶58. The emails referenced in the Search Warrant also confirm that defendants McGuire and

---

[8] Therefore, both defendants McGuire and Schulte were "aware of the high mortality rates observed and of the Company's decision not to report those results to the FDA." ¶78. These allegations, although from before the Class Period, should not be disregarded and evidence Defendants' propensity to violate FDA rules and regulations. *See In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Pre-class data is relevant"); *Freedman v. Louisiana-Pac. Corp.*, 922 F. Supp. 377, 396 (D. Or. 1996) ("Plaintiffs are not barred from presenting relevant, admissible evidence from before the three-year period to prove an element").

Schulte were actively involved in illegally importing, marketing, and testing the FMD guidewires.  *See* ¶102.  Further, corroboration of the illegal importation, marketing, and testing of the FMD guidewires is provided by the Gov't CWs who stated that from May 2005 until November 2007, Spectranetics contracted with FMD to manufacture the guidewires, which defendant Schulte provided to physicians with instructions for them to be evaluated on patients, which they did.  *See* ¶102.[9]

Defendants' argument that because the Company never made any statements specifically mentioning FMD guidewires or BMT balloons, the illegal conduct related to the two devices cannot give rise to a claim, *see* Def. Supp. Br. at 13, has no merit. Spectranetics made repeated, specific – and unambiguous – affirmative statements during the Class Period that it did not promote its products for off-label use and that its clinical trials are in compliance with FDA rules.  By not excluding any products from these representations, investors could only conclude that all of the Company's products, including the FMD guidewires and BMT balloons were covered by this public statement, clearly rendering the Company's statements materially false and misleading when

---

[9]  Defendants also attempt to argue that the Search Warrant and the NPA do not corroborate the information provided by the CWs in the Complaint by selectively pointing to only one example regarding FMD guidewires.  *See* Def. Supp. Br. at 14 n.6. What Defendants neglect to mention is that the NPA does not mention any names, but simply states that "Spectranetics, through the actions of officers, managers, agents, and other employees acting on behalf of Spectranetics, caused the FMD guidewires, which lacked FDA approval and clearance . . . to be imported into the United States . . . [and] distributed them . . . to physicians for use in humans." NPA, Ex. B to Dkt. No. 125, at 10.  The Search Warrant also specifically states that Gov't CWs "all independently contend that . . . Spectranetics . . . provided unapproved FMD guidewires to physicians and requested those doctors to evaluate the guidewires in patients," *see* Search Warrant at ¶42, and that they were actually used on patients.  *See id.* at ¶51.

made. Thus, although the conduct related to these devices was in violation of FDA rules and regulations, Defendants' misrepresentations regarding the Company's conduct also violated the federal securities laws.

Moreover, the Search Warrant includes allegations, supported by emails and the Gov't CWs, that the Company marketed its medical devices for off-label, ISR use, in violation of FDA rules and regulations, while also misrepresenting and omitting to fully disclose the known risks to patients of doctors testing the unapproved devices on humans. ¶129. The Search Warrant specifically states:

> In summary, probable cause exists to believe that Spectranetics and its officers and employees **promoted and sold** its infrainguinal (for use below the groin) laser catheters to physicians throughout the United States for an unapproved or "off-label" use and Spectranetics withheld information from the FDA clearly showing that the unapproved use of the infrainguinal catheters could cause significant harm to patients. In addition, this affidavit establishes probable cause to believe that Spectranetics distributed devices that the FDA had not reviewed in any way to physician consultants so that those physicians could implant them into human subjects, and so as part of the company's contract negotiations to become the domestic distributor for the foreign manufacturers of those devices. Finally, this affidavit establishes probable cause to believe that Spectranetics engaged in a marketing study of an approved cardiac catheter which resulted in a significant rate of serious adverse events which were not reported to the FDA and a summary of the study was not reported to the FDA.

See ¶209 (emphasis added).[10]

---

[10] Defendants incorrectly argue that the Search Warrant and the Agreements contradict each other. See Def. Supp. Br. at 2. The NPA, however, specifically mentions the Search Warrant and states that as a result of the Search Warrant, "Spectranetics revised its FDA compliance procedures, and its internal investigation determined that wrongdoing was limited to a certain number of officers, managers, agents, and other employees." NPA at 11. The Civil Settlement further states that the United States "contends that Spectranetics engaged in the following conduct," which included that Spectranetics promoted its medical devices for unapproved uses, in violation of the FDA
(continued … )

Also, the Gov't CWs stated, with support from email evidence and documents, that Spectranetics' sales staff was "directed" to promote the medical devices for unapproved uses. ¶130. *See also* ¶131 (referencing an email from defendant Schulte telling the Company's employees that ISR was the Company's "meal ticket"; statement by Schulte to sales representative, "I want the FDA to slap me on the hand if it's the wrong thing to do.") (internal quotations omitted).[11]

Defendants' argument that the "search warrant application does not reflect off-label promotion," Def. Supp. Br. at 10-11, also fails. The Search Warrant states, "[a]ccording to CW-1 and documents that she/he provided, Spectranetics, through Schulte and other top management official . . . promoted [the laser] directly to doctors as treatment" for ISR without FDA approval. Search Warrant at ¶20. *See also id.* at ¶21 (quoting emails from Schulte to physicians promoting the laser for ISR; statements by Gov't CW-4 corroborating Gov't CW-1). The Search Warrant further states that

---

*(…continued)*
rules. *See* Civil Settlement, Ex. A to Dkt. No. 125, at 3. Additionally, the Civil Settlement states that it is a "compromise of disputed claims," and that it is not "a concession by the United States that its claims are not well founded." *See id.* at 3. Thus, all of these evidentiary materials are entirely consistent.

[11] Notwithstanding Defendants' arguments to the contrary, Def. Supp. Br. at 2, the fact that the Company did not admit to the off-label promotion has no bearing on the claims, as they are fully supported by the CWs, Schlesinger, the Company's admissions in its answer to the Whistleblower Lawsuit, and the testimony and documents supporting the Search Warrant. Further, it is common for a Company not to make admissions as to all its wrongdoing, as it is a "compromise." Additionally, as mentioned, the Agreements only covered the Company and did not include the Company's officers, directors, employees, or agents who may still be under investigation. Finally, the Agreements did not foreclose other agencies investigating the claims that were the subject of the Agreements, and did not foreclose this class action securities lawsuit.

according to Gov't CW-1 and "the corroborating e-mails and documents he/she provided, Spectranetics['] sales staff were directed to promote [the medical devices] for the unapproved, 'off-label' use for the treatment of ISR." *Id.* at ¶22; *see also id.* at ¶¶23-40. Thus, although doctors are permitted to recommend medical devices for off-label use, it is illegal for a company to promote such use, as Defendants were doing.

Additionally, Defendants' rehash of their "ignorance of the law" argument based on their contention that the FDA's regulations were somehow too "vague" for them to follow, *see* Def. Supp. Br. at 11, still lacks merit. The Complaint alleges that the rules were clear and that Defendants were fully aware they were violating the unambiguous rules by which they were bound.[12] For example, on July 29, 2008, in a conference call with analysts, defendant Schulte undeniably admitted that the Company was forbidden from promoting its products for the specific off-label use of ISR. ¶198 ("well obviously we can't promote it for [in stent re-stenosis] because we don't have label indication."). His comments and understanding are neither vague nor unclear. Additionally, CWs

---

[12] Any suggestion that the FDA's regulations applicable to Defendants' misconduct were too "vague" to follow is plainly defeated by the regulations themselves. *See* Ex. 3 attached hereto. Defendants also attempt to improperly rely upon an article from the Food and Drug Law Journal and an FDA letter. *See* Def. Supp. Br. at 11. These materials, however, are not authority but rather Defendants' improper attempt to submit untested "expert" opinions to support their motions. The Court cannot consider these sources because Defendants did not seek judicial notice of them and because their attempt to use them to prove the truth of the matters asserted is improper. *See Cont'l Coal, Inc. v. Cunningham*, 511 F. Supp. 2d 1065, 1071 (D. Kan. 2007). Only the facts alleged in the complaint, documents attached as exhibits, and matters about which the Court may take judicial notice can be considered. *See Oxendine v. Kaplan,* 241 F.3d 1272, 1274 (10th Cir. 2001). Therefore, these materials should simply be ignored at this stage of the litigation.

also confirm that Defendants knew that they were violating FDA rules in that they knew they did not have FDA approval for the treatment of ISR in the leg for PAD and that FDCA and FDA regulations clearly "prohibit an applicant from promoting a medical device for off-label uses." ¶¶60, 122-28.[13]

Additionally, the Complaint alleges that the results of the Company's in-house tests to determine if Spectranetics' laser system could be safely used with procedures involving nitinol stents obtained before November 28, 2007 showed that the lasers caused "significant damage." ¶154. The Company was legally required to reveal these findings to the FDA. Not only did Defendants fail to do so, but Defendants ignored the risks to patients evidenced by these tests and continued to market its device for off-label

---

[13] Defendants' desperate argument that under *Citizens United v. FEC*, 130 S. Ct. 876 (2010), "the First Amendment renders the FDA's regulation of 'promotional' speech even more uncertain," Def. Supp. Br. at 12, is unfounded. *Citizens United* has no bearing on Defendants' contention as it deals ***only*** with FEC regulations and is limited to political speech. *See* 130 S. Ct. at 896-99 ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.") (internal quotations and citations omitted). Any contention that the government lacks constitutional authority to regulate speech that affects the health and safety of the public, as do FDA regulations regarding marketing of medical devises, is patently absurd. *See Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 340 (1986) ("the speech may be restricted [ ] if the government's interest in doing so is substantial, the restrictions directly advance the government's asserted interest, and the restrictions are no more extensive than necessary to serve that interest."); *see also Florida Bar v. Went for It*, 515 U.S. 618, 635 (1995) ("The Bar has substantial interest [ ] in protecting injured Floridians from invasive conduct . . . The Bar's proffered study, unrebutted by respondents below, provides evidence indicating that the harms it targets are far from illusory. The palliative devised by the Bar to address these harms is narrow both in scope and in duration. The Constitution, in our view, requires nothing more"). As Justice Holmes wrote, "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52 (1919).

use. ¶155.[14]  These allegations are supported by Schlesinger, CW1, as well as the Gov't CWs, who actually supplied copies of the Company's findings from its in-house tests. ¶156.[15]

Finally, according to the CIA, the Company admitted that it lacked effective regulatory controls in its reporting efforts to the FDA and is required, going forward, to follow a strict compliance program.  See ¶222.[16]  Further, the NPA states that "[a]fter the execution of the Search Warrant, Spectranetics revised its FDA compliance procedures, and its internal investigation determined that wrongdoing was limited to a certain number of officers, managers, agents, and other employees."  NPA at 11.  The NPA also states that Spectranetics has taken certain remedial measures to avoid future

---

[14]  Plaintiffs have previously addressed Defendants' assertion that they did not have a duty to disclose the results of the in-house test (Def. Supp. Br. at 12 n.5).  See Pl. MTD Opp. at 20 n.25 (stating that "Defendants' obligation to reveal the results to the FDA is a separate issue from their duty to having to disclose the results to investors"; Defendants had a duty to disclose the results because "Schulte affirmatively stated that the Company was 'doing work to show the laser does not harm nitinol stents,'" and "because while knowing that tests showed the product was not safe, Spectranetics 'represent[ed] that the device was safe and effective' and 'laud[ed] the fact that the device was 'not contra-indicated' for ISR procedures.'")

[15]  As previously pointed out in response to the same argument, the safety of the laser is not relevant to Plaintiffs' claims.  That the FDA "accepted additional information from Spectranetics demonstrating the safety and efficacy of the laser for such treatment," Def. Supp. Br. at 3, "only supports Plaintiffs' claims that Defendants knew they did not have FDA approval for the ISR in the leg for PAD, yet still illegally promoted the Company's products for that purpose."  Pl. Supp. Auth. at 3-4; see also Pl. MTD Opp at 36 n.49.

[16]  Defendants are incorrect that their own admissions regarding the material weaknesses in the Company's internal controls cannot be used to support their claims.  "Plaintiff may rely on the defendant's own disclosures . . . to allege that previously-made statements . . . were materially false or misleading." Chalverus v. Pegasys., Inc., 59 F. Supp. 2d 226, 233 (D. Mass. 1999).

wrongdoing. Thus, the CIA and the admissions that the Company lacked adequate internal controls also support Plaintiffs' allegations that the Sarbanes-Oxley ("SOX") certifications filed during the Class Period were false and misleading.

The Company has expressly conceded that it engaged in the misconduct underlying the claims in the Complaint while, at the same time, publicly assuring investors that the Company was in compliance with FDA rules and regulations. Accordingly, the admissions in the Agreements and the allegations in the Search Warrant further validate Plaintiffs' already well pled claims that Defendants' statements during the Class Period were false and misleading when made.

## II. The New Allegations Provide Additional Evidence of *Scienter*

The Agreements[17] and the Search Warrant also bolster the Complaint's previous, almost insurmountable factual evidence of Defendants' *scienter*. Plaintiffs have alleged that all of the Defendants were active and knowing participants in the fraudulent scheme throughout the Class Period based on reliable CWs, the Whistleblower Lawsuit, and Defendants' own admissions in response to the Whistleblower Lawsuit. *See* Pl. MTD Opp. at 30-35. Those *scienter* allegations are further supported by the admissions in the Agreements, the Gov't CWs' statements, emails written by and addressed to

---

[17] Defendants are simply mistaken that Plaintiffs cannot rely on settlements to help establish liability, as several courts have taken settlements into consideration during the *scienter* analysis. *See, e.g., In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1162 (C.D. Cal. 2004). Moreover, the cases cited by Defendants are distinguishable. For example, *United States v. Bailey*, 327 F.3d 1131 (10th Cir. 2003), had nothing to do with any claims relevant to this case, but included an appeal from a conviction following a jury verdict on wire fraud and money laundering. *See id.* at 1135. *See also* Pl. Supp. Auth. at 4-5 n.9 (distinguishing cases cited by Defendants).

Defendants, and documentary evidence supporting the Search Warrant.

Moreover, according to a Form 8-K filed by the Company on March 29, 2010, on March 25, 2010, defendant McGuire resigned his position as Chief Operating Officer. His position was then assumed by defendant Geisenheimer. *See* Ex. 4 attached hereto.[18] This is yet another resignation by a defendant and high level officer of the Company, in addition to the resignation of defendant Schulte who was the "driving force behind the illegal conduct" in the wake of the regulatory investigations of the Company. ¶26. The resignations of these high level officers provide evidence of Defendants' *scienter*. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009) ("At the very least, the timing of Defendants' departures might suggest that the Company believed Defendants had been involved in wrongdoing with respect to corporate finances."); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187-88 (C.D. Cal. 2007) (finding the CFO's resignation "highly suspicious"; this fact leans heavily towards a finding of *scienter*).

In addition to the foregoing, Defendants' admissions that they failed to maintain sufficient internal controls to avoid fraud – particularly as here in regard to the Company's critical sensitive relationship with its primary federal regulator – supports a strong inference of *scienter*. *See, e.g., Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (weaknesses in internal controls probative of

---

[18] A court may take judicial notice of public documents which have been filed with the Securities and Exchange Commission. *See Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1266 n.3 (D. Utah 2002).

*scienter*); *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362, 1364 (S.D. Fla. 2005) (lack of internal controls is a "red flag" contributing to *scienter*). The false SOX certifications also provide evidence of *scienter*. *See Middlesex Ret. Sys.*, 527 F. Supp. 2d at 1190 (taking into account SOX certifications in the *scienter* analysis). Finally, the *scienter* allegations are also strengthened by the timing of the disclosures and the fact that the statements concerned the Company's main business and source of revenue. *See* Pl. MTD Opp. at 35-41.

Therefore, when the overwhelming indicia of *scienter* alleged in the Complaint is considered in totality, as it must be, *see Tellabs,* 551 U.S. at 322-23, it is clear that Plaintiffs have adequately pled *scienter* as to all Defendants.

## CONCLUSION

For the foregoing reasons and for the reasons explained in Plaintiffs' Opp. to MTD, Lead Plaintiff's Opposition to Defendants' Motion to Strike the Consolidated Class Action Complaint, Dkt. No. 116, and the Response to Defendants' Statement of Supplemental Authority, all adopted by reference herein, Defendants' motion and Supplemental Motion to dismiss should be denied in their entirety.

Dated: April 12, 2010                                   Respectfully submitted,

| /s/ *Charles J. Piven* | **Labaton Sucharow LLP** | **The Shuman Law Firm** |
|---|---|---|
| Charles J. Piven | David Goldsmith | Kip B. Shuman |
| **Brower Piven** | Mark Goldman | 885 Arapahoe Avenue |
| **A Professional Corporation** | 140 Broadway | Boulder, CO 80302 |
| 1925 Old Valley Road | New York, NY 10005 | Tel: (303) 861-3003 |
| Stevenson, MD 21153 | Tel: (212) 907-0700 | Fax: (303) 484-4886 |
| Tel: 410-332-0030 | Fax: (212) 818-0477 | Kip@Shumanlawfirm.com |
| Fax: 410-685-1300 | dgoldsmith@labaton.com | *Counsel for Lead Plaintiff* |
| piven@browerpiven.com | mgoldman@labaton.com | |
| *Counsel for Lead Plaintiff* | *Counsel for Lead Plaintiff* | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2010, I electronically filed Lead Plaintiff's Opposition to Defendants' Supplemental Motion to Dismiss with Exhibits 3 and 4 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*/s/ Charles J. Piven*
Charles J. Piven

**Mailing Information for a Case 1:08-cv-02048-REB-KLM**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **Robert Bruce Carey**
  rcarey@hbsslaw.com,agostnell@careylaw.com,rob.carey@att.net

- **W. Gordon Dobie**
  wdobie@winston.com,ECF_CH@winston.com

- **Alan I. Ellman**
  aellman@labaton.com,electroniccasefiling@labaton.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Mark S. Goldman**
  mgoldman@labaton.com,mclaughlin@gsk-law.com

- **David J. Goldsmith**
  dgoldsmith@labaton.com,ElectronicCaseFiling@labaton.com

- **John F. Head**
  jfhead@headlawyers.com

- **Reed R. Kathrein**
  reed@hbsslaw.com,sf_filings@hbsslaw.com

- **Charles J. Piven**
  piven@browerpiven.com

- **Stephen C. Schulte**
  sschulte@winston.com,psenica@winston.com,mdaun@winston.com,
  ECF_CH@winston.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

- **Trig Randall Smith**
  trigs@csgrr.com,stremblay@csgrr.com,e_file_sd@csgrr.com

- **Bruce G. Vanyo**
  bruce@kattenlaw.com,sandy.broff@kattenlaw.com

- **Carol C. Villegas**
  cvillegas@labaton.com,ElectronicCaseFiling@labaton.com

- **Marisa Gayle Westervelt**
  marisa.westervelt@kattenlaw.com,paula.phillips@kattenlaw.com

- **Richard H. Zelichov**
  richard.zelichov@kattenlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

(No manual recipients)